1   THEODORE J. BOUTROUS JR., SBN 132099
       tboutrous@gibsondunn.com
2   THEANE EVANGELIS, SBN 243570
       tevangelis@gibsondunn.com
3   DHANANJAY S. MANTHRIPRAGADA, SBN 254433
       dmanthripragada@gibsondunn.com
4   GIBSON, DUNN & CRUTCHER LLP
    333 South Grand Avenue
5   Los Angeles, CA  90071-3197
    Telephone: 213.229.7000
6   Facsimile:  213.229.7520

7   MICHELE L. MARYOTT, SBN 191993
       mmaryott@gibsondunn.com
8   KEVIN RING-DOWELL, SBN 278289
       kringdowell@gibsondunn.com
9   GIBSON, DUNN & CRUTCHER LLP
    3161 Michelson Drive
10  Irvine, CA  92612-4412
    Telephone: 949.451.3800
11  Facsimile:  949.451.4220

12  Attorneys for Defendants GRUBHUB HOLDINGS INC.
    and GRUBHUB INC.

13                  UNITED STATES DISTRICT COURT

14                NORTHERN DISTRICT OF CALIFORNIA

15                    SAN FRANCISCO DIVISION

16

17  ANDREW TAN and RAEF LAWSON in their          CASE NO. 3:15-cv-05128-JSC
    capacities as Private Attorney General
    Representatives, and RAEF LAWSON,           **DEFENDANTS' SEPARATE DISPUTED**
18  individually and on behalf of all other similarly   **PROPOSED FINDINGS OF FACT AND**
    situated individuals,                        **CONCLUSIONS OF LAW**
19
                        Plaintiffs,              **Phase One Trial:**
20                                               Date:      September 5, 2017
                v.                               Time:      11:00 a.m.
21                                               Place:     Courtroom F – 15th Floor
    GRUBHUB HOLDINGS INC. and                    Judge:     Hon. Jacqueline Scott Corley
22  GRUBHUB INC.,

23                      Defendants.

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

DEFS' DISPUTED FINDINGS OF FACT & CONCLUSIONS OF LAW – CASE NO. 3:15-CV-05128-JSC

Pursuant to this Court's Case Management and Pretrial Order (Non-Jury) No. 2, *see* Dkt. 145, Defendants GrubHub Holdings Inc. and GrubHub Inc. (together, "Grubhub") hereby submit their separate disputed proposed findings of fact and conclusions of law.

## I. DEFENDANTS' SEPARATE DISPUTED PROPOSED FINDINGS OF FACT

**A.    Grubhub Business Model And Business Operations**

1.      Grubhub is an online and mobile food ordering company that connects diners with local and delivery restaurants through its website and associated mobile application (the "Grubhub App").

2.      Grubhub was founded in Chicago, Illinois in 2004.

3.      Grubhub was founded to help diners order food without having to collect paper menus or call a noisy restaurant and risk a wrong order, while also allowing diners to pay in advance.  In addition, Grubhub helps restaurants avoid having to invest in their own takeout and delivery marketing materials.

4.      In October 2007, Grubhub expanded its business operations into its second market, San Francisco, California.

5.      At that time, Grubhub processed food orders only for restaurants that employed or contracted with their own in-house delivery persons, who performed 100% of the deliveries for orders that Grubhub processed.

6.      In June 2014—a full ten years after Grubhub's founding and seven years after Grubhub began its business operations in California—Grubhub first began contracting with independent contractors (called "Delivery Service Providers," or "DSPs") to perform deliveries in those circumstances where restaurants on the Grubhub platform were unable or unwilling to perform deliveries using their own in-house delivery persons.

7.      At all times relevant to this litigation (i.e., between August 28, 2015 and February 15, 2016), only a very small amount of delivery orders placed on the Grubhub website and Grubhub App—a percentage in the low single digits—were delivered by DSPs who contracted with Grubhub; in all other circumstances, restaurants with their own delivery persons delivered the food orders that diners placed on the Grubhub App.

**B.      Plaintiff and Plaintiff's August 2015 DSP Agreement**

    **1.      Plaintiff Raef Lawson And The August 2015 DSP Agreement**

    8.      On August 28, 2015, Plaintiff Raef Lawson ("Plaintiff") accepted the then-operative version of Grubhub's DSP Agreement (the "August 2015 DSP Agreement").

    9.      Pursuant to the August 2015 DSP Agreement, Plaintiff had a contractual right to decide how often to make himself available to receive delivery offers through the Grubhub App.  In other words, Grubhub had no right to require Plaintiff to make himself available to receive delivery offers. Plaintiff alone chose whether and when to "toggle on" to accept deliveries or to sign himself up for delivery blocks .

    10.      Pursuant to the August 2015 DSP Agreement, Plaintiff had a contractual right to select the specific dates and times during which to make himself available to receive incoming delivery offers.

    11.      Pursuant to the August 2015 DSP Agreement, Plaintiff had a contractual right to determine the geographic area within which to make himself available to receive incoming delivery offers, whether in the "South Bay" or "Los Angeles Metro ('Westside-Downtown')" zone in Los Angeles.  In other words, Grubhub had no right to "assign" Plaintiff to a particular geographic region.

    12.      Pursuant to the August 2015 DSP Agreement, Plaintiff had a contractual right to use employees, contractors, subcontractors, agents or representatives to perform deliveries for delivery offers that he received through the Grubhub App.

    13.      The August 2015 DSP Agreement did not require Plaintiff to follow any particular driving routes when performing deliveries.  Rather, Plaintiff could choose his routes when performing deliveries, irrespective of whether Plaintiff's chosen routes were the fastest or the most efficient routes.

    14.      The August 2015 DSP Agreement did not require Plaintiff to follow any scripted or prompted dialogue when communicating with diners or restaurant employees, managers, and contractors.

    15.      The August 2015 DSP Agreement did not restrict, constrain, prohibit, or discourage Plaintiff from soliciting or accepting gratuities from diners for completed deliveries.

    16.      The August 2015 DSP Agreement did not require Plaintiff to follow any requirements pertaining to his personal appearance while performing deliveries, such as wearing a uniform or

satisfying similar requirements relating to Plaintiff's attire, personal grooming habits, or piercings or tattoos.

17.     Upon accepting the August 2015 DSP Agreement, Plaintiff informed Grubhub of whether Plaintiff intended to use a vehicle or bicycle while performing deliveries, and what type of vehicle or bicycle Plaintiff intended to use.  However, the August 2015 DSP Agreement did not require that Plaintiff's chosen bicycle or vehicle satisfy any specific age, capacity, or size requirements.

18.     Pursuant to the August 2015 Agreement, Plaintiff could:  (1) lease delivery bags for free from Grubhub, in exchange for his commitment to wear a Grubhub branded t-shirt and hat; (2) buy a delivery bag kit from Grubhub for $25.00, without making any commitment to wear a Grubhub branded t-shirt and hat; or (3) buy or obtain delivery bags on his own, without making any commitment to wear a Grubhub branded t-shirt and hat.  Thus, Plaintiff had a contractual right to decide for himself whether to buy or receive delivery bags from Grubhub or, alternatively, to use his own delivery bags.

19.     Pursuant to the August 2015 DSP Agreement, Plaintiff had a contractual right to perform deliveries for or through companies other than Grubhub, even Grubhub's direct competitors, including concurrently or simultaneously with his use of the Grubhub App.

20.     The August 2015 DSP Agreement contained a one-page Service Level Agreement, which stated that Plaintiff should "[s]ign up for weekly delivery blocks either through the GrubHub driver app or another means," and "[s]hould not reject incoming orders or be otherwise unavailable to receive incoming orders during any scheduled delivery block."

21.     However, the Service Level Agreement also stated that "[e]xceptions [could] be made for extenuating circumstances if [Plaintiff] timely communicate[d] such circumstances to [Plaintiff's] dispatcher."

22.     Furthermore, the August 2015 DSP Agreement did not require Plaintiff to complete deliveries in any particular manner *after* he had accepted any given delivery offer.  On the contrary, the August 2015 DSP Agreement stated that Plaintiff, not Grubhub, was "solely responsible for determining how to perform the Delivery Services," and that Grubhub had "no right to . . . control or prescribe the manner, method or means [Plaintiff] use[d] to complete" deliveries.

23.     The August 2015 DSP Agreement expressly defined the parties' relationship as an independent contractor relationship, not an employment relationship.

24.     Plaintiff e-signed his initials multiple times immediately next to several contractual provisions in the August 2015 DSP Agreement that expressly defined the parties' relationship as an independent contractor relationship.

25.     The August 2015 DSP Agreement required Grubhub to report all compensation that it paid to Plaintiff on an IRS Form 1099.

26.     The August 2015 DSP Agreement remained in effect for a period of 60 days and continued to automatically renew at the expiration of each 60-day period.

27.     However, "[e]ach day for which DSP agrees to make itself available for service [was] treated as a separate contractual engagement ('Engagement')."

28.     Both Grubhub and Plaintiff had a mutual contractual right to terminate the August 2015 DSP Agreement, either: (1) if the other party or Plaintiff's employees, contractors, subcontractors, agents or representatives materially breached the August 2015 DSP Agreement; or (2) without cause, upon 14 days' prior written notice to the other party.

29.     The August 2015 DSP Agreement did not restrict, constrain, prohibit, or discourage Plaintiff from accepting another DSP Agreement or otherwise re-establishing an independent contractor relationship with Grubhub at a later date, even if one or both parties terminated the August 2015 DSP Agreement.

**2.      Compensation Pursuant To The August 2015 DSP Agreement**

30.     Pursuant to the August 2015 DSP Agreement, Grubhub paid Plaintiff the following Service Fees:  (1) $4.25 per fulfilled delivery; (2) 100% of any gratuities left by diners; and (3) $0.50 per straight-line mile between the restaurant and the diner.

31.     Pursuant to the August 2015 DSP Agreement, Plaintiff had a contractual right to receive an additional incentive-based payment ***separate from and in addition to*** the Service Fees (referred to herein as the "True-Up Payment"), if Plaintiff chose to:  (1) sign up for one or more delivery blocks on any given day; (2) accept and fulfill 75% of the orders that Plaintiff received during the day in question; and (3) make himself available to receive incoming orders for the entirety of each delivery block during

the applicable week (Monday–Sunday); and if (4) the sum of the Service Fees was less than the compensation that Plaintiff would receive if he were compensated at $15.00 per hour.

32.     Pursuant to the August 2015 DSP Agreement, the incentive-based True-Up Payment was equal to the difference between the total amount of the Service Fees and the amount that Plaintiff would receive if he were paid $15.00 per hour.[1]

33.     Pursuant to the August 2015 DSP Agreement, Plaintiff had a contractual right to negotiate with Grubhub for compensation that differed from the default Service Fees and/or True-Up Payment.  In other words, Grubhub did not set Plaintiff's compensation amount and communicate it to Plaintiff on a "take-it-or-leave-it" basis.

**C.     The December 2015 Amendment To The August 2015 DSP Agreement**

**1.     Amendments Unrelated to Compensation**

34.     On December 2, 2015, Grubhub issued an amendment to the August 2015 DSP Agreement, called "Amendment No. 1 To Delivery Service Provider Agreement" (referred to herein as "Amendment No. 1").

35.     On December 5, 2015, Plaintiff accepted Amendment No. 1.

36.     In relevant part, Amendment No. 1 deleted and replaced the Service Level Agreement that previously applied to the August 2015 DSP Agreement.

37.     Specifically, Amendment No. 1 deleted the Service Level Agreement provision stating that Plaintiff should "[s]ign up for weekly delivery blocks either through the GrubHub driver app or another means," and "should not reject incoming orders or be otherwise unavailable to receive incoming orders during any scheduled delivery block," and added the following provision in its place: "Unless otherwise expressly agreed in writing between the Parties, there shall be no specific minimum time period for which [DSP] must make itself available.  [DSP] shall have complete discretion to accept Fee Offers and form Engagements . . . and is under no obligation to make itself (including its personal)

---

[1]     For example, if Plaintiff signed up for a four-hour delivery block and the Service Fees totaled only $25.00, the True-Up Payment for that delivery block would be $35.00 (i.e., $15.00 per hour multiplied by four hours = $60.00, minus $25.00 in Service Fees = $35.00).

and its equipment available other than for the duration of an Engagement, once accepted in accordance with the terms hereof."

### 2.      Amendments Related To Compensation

38.      In addition to the amendments just discussed, Amendment No. 1 deleted and replaced the provisions in the August 2015 DSP Agreement pertaining to Plaintiff's compensation formula.

39.      Specifically, Amendment No. 1 stated that Grubhub would "offer [Plaintiff] a Service Fee or Service Fee schedule ('Fee Offer') for a proposed engagement," and Plaintiff would "have the opportunity to accept or reject the Fee Offer."

40.      Pursuant to this contractual provision, Grubhub communicated a Fee Offer to Plaintiff via email on December 2, 2015 and Plaintiff accepted that Fee Offer on December 5, 2015.

41.      Pursuant to the Fee Offer that Plaintiff accepted on December 5, 2015, Grubhub would—by default—pay Plaintiff the following Service Fees:  (1) $4.00 per fulfilled delivery (rather than the $4.25 per fulfilled delivery that previously applied under the August 2015 DSP Agreement); (2) 100% of any gratuities left by diners; and (3) $0.50 per straight-line mile between the restaurant and the diner.

42.      Pursuant to the Fee Offer that Lawson accepted on December 5, 2015, Plaintiff still had a contractual right to receive an incentive-based True-Up Payment *separate from and in addition to* the Service Fees, if:  (1) Plaintiff chose to sign up for one or more delivery blocks on the day in question; (2) Plaintiff chose to accept 75% of the orders that Plaintiff received during the day in question; and (3) the sum of the Service Fees was less than the compensation amount that Plaintiff would receive if he were to make $11.00 per hour.

43.      The True-Up Payment was equal to the difference between the sum of the Service Fees and the amount that Plaintiff would be entitled to if he were compensated at $11.00 per hour (rather than $15.00 per hour, which applied under the August 2015 DSP Agreement).

44.      The compensation provisions set forth in the Offer went into effect on December 21, 2015.

**D.      Grubhub's Delivery Block And "Off Block" System**

45.      Plaintiff could make himself available to receive delivery offers through the Grubhub App in one of two ways:  (1) first, Plaintiff could sign up for delivery blocks (i.e., blocks of varying lengths of time); or (2) Plaintiff could "toggle on" to the Grubhub App and receive delivery offers at any time, irrespective of whether Plaintiff signed up for a delivery block.

46.      For the duration of Plaintiff's contractual relationship with Grubhub, and until approximately April 2017, Grubhub used a scheduling software program called "When I Work" to schedule DSPs' delivery blocks.

47.      While logged onto "When I Work," Plaintiff could sign up for as many, or as few, delivery blocks as he desired, which were made available to Plaintiff on a weekly basis on a "first-come, first-serve" basis.

48.      Grubhub made delivery blocks available on "When I Work" to DSPs who had a track record of consistently making themselves available to fulfill food orders before opening up those delivery blocks to other DSPs who had not established such a track record.

49.      After signing up for a delivery block on "When I Work," Plaintiff could later log onto "When I Work" and "drop" that delivery block, thereby making that delivery block available to another DSP who might want to sign up for the delivery block.

50.      Alternatively, after signing up for a delivery block on "When I Work," Plaintiff could later "swap" that delivery block (i.e., trade delivery blocks) with another DSP on the "When I Work" software.

**E.      Plaintiff's Actual Use Of The Grubhub App And Other Apps**

51.      After he first accepted the August 2015 DSP Agreement, Plaintiff chose not to sign up for a Grubhub delivery block for several months.

52.      The first delivery block for which Plaintiff signed up was on October 25, 2015, approximately two months after Plaintiff accepted the August 2015 DSP Agreement.

53.      After Plaintiff first signed up for delivery blocks in late October 2015, Plaintiff chose to sign up for delivery blocks in the evening because Plaintiff stated that he experienced less traffic and, according to Plaintiff, he received a higher quantity of orders during those delivery blocks.

54.     During the entirety of the parties' contractual relationship, Grubhub never required Plaintiff to sign up for a delivery block, "assigned" Plaintiff a delivery block, or reprimanded or punished Plaintiff when he chose not to sign up for a delivery block.

55.     On most occasions, Plaintiff chose to sign up for delivery blocks before logging on to receive delivery offers through the Grubhub App.

56.     However, on at least one occasion (October 31, 2015), Plaintiff chose to "toggle on" to the Grubhub App and made himself available to receive delivery offers *without* signing up for a delivery block, i.e., while driving "off block."

57.     Plaintiff chose to receive delivery offers in a geographic zone called "Los Angeles."

58.     Plaintiff chose to perform deliveries in "Los Angeles" because he was familiar with the area and it was near his residence in Westchester.

59.     On January 26, 2016, Grubhub advised Plaintiff that it intended to split the "Los Angeles" zone into two geographic zones.  Before doing so, Grubhub emailed Plaintiff asking whether Plaintiff would like to receive delivery offers in the new "South Bay" zone following the geographic split or remain in the "Los Angeles Metro ('Westside-Downtown')" zone.

60.     That same day, on January 26, 2016, Plaintiff advised Grubhub that he was not willing to receive delivery offers in the "South Bay," but would instead prefer to receive delivery offers in "Los Angeles," i.e., in "Los Angeles Metro ('Westside-Downtown')."  Grubhub honored Plaintiff's choice to continue receiving delivery offers in the "Los Angeles Metro ('Westside-Downtown')" zone.

61.     While performing deliveries for food offers received through the Grubhub App, Plaintiff used several strategies to maximize his income, including accepting the minimum number of delivery offers needed to qualify for incentive-based True-Up Payments.  Plaintiff also exercised his right to receive and accept delivery orders through companies other than Grubhub, including Grubhub's direct competitors, either concurrently or simultaneously with his use of the Grubhub App.

62.     On multiple occasions, Plaintiff chose to accept incoming delivery offers at the end of his delivery blocks, continued driving after his delivery blocks ended, and negotiated with Grubhub for larger True-Up Payments for that additional time.

63.     Plaintiff, not Grubhub, paid for and provided the vehicle (a 2009 Honda Accord) that Plaintiff used to perform deliveries for offers that he received through the Grubhub App.

64.     Plaintiff, not Grubhub, paid for and provided the vehicle insurance (Progressive Insurance) that Plaintiff used while performing deliveries for offers that he received through the Grubhub App.

65.     Plaintiff, not Grubhub, paid for and provided the smartphone (a Motorola Moto smartphone) and the wireless carrier service (Republic Wireless) that Plaintiff used while performing deliveries for offers that he received through the Grubhub App.

66.     In tax year 2015, Grubhub issued Lawson a Form 1099, rather than a W-2 Form.

67.     In tax year 2015, Plaintiff identified as self-employed while filing his personal income taxes.

68.     Plaintiff believes that he worked as an independent contractor for a living during tax year 2015.

69.     In tax year 2016, Grubhub issued Lawson a Form 1099, rather than a W-2 Form.

70.     In tax year 2016, Plaintiff identified as self-employed while filing his personal income taxes.

71.     Plaintiff believes that he worked as a member of the "gig economy" for a living during tax year 2016.

72.     Plaintiff cannot recall what attire he wore on any given day while performing deliveries through the Grubhub App and has no way of remembering what attire he wore while performing deliveries through the Grubhub App.

73.     For virtually every delivery block for which he signed up, Plaintiff has no recollection of where he was during his delivery block and/or while he performed deliveries.

74.     Pursuant to Plaintiff's contractual right to perform driving or delivery services for other companies, Plaintiff regularly accepted and completed deliveries for other companies while he was partnered with Grubhub.

75.     Specifically, Plaintiff accepted more than 40 delivery requests from other companies, such as Postmates and Caviar, during his Grubhub delivery blocks.

Gibson, Dunn &
Crutcher LLP

76.     On multiple occasions (e.g., October 31, 2015, January 1, 2016, January 8, 2016, January 18, 2016, and January 30, 2016), Plaintiff accepted delivery requests from other companies during his Grubhub delivery blocks, and did not fulfill a single delivery for offers received through the Grubhub App.

77.     On multiple occasions (e.g., December 12, 2015, December 16, 2015, January 10, 2016, and January 11, 2016), Plaintiff accepted a delivery request from another company *after* he had accepted—but before he had completed—a delivery offer through the Grubhub App.  In other words, Plaintiff routinely accepted a delivery request for another company while he was in the middle of performing a delivery for a restaurant on the Grubhub platform.

78.     During the entirety of the parties' contractual relationship, Grubhub never imposed an on-site living requirement on Plaintiff.

79.     During the entirety of the parties' contractual relationship, Grubhub never imposed a time limit within which Plaintiff had to complete a given delivery.

80.     During the entirety of the parties' contractual relationship, Grubhub never prohibited Plaintiff from leaving the geographic zone that he selected for himself.

**F.     Mileage Reimbursement**

81.     As discussed above, *see supra* Parts I.B.2 and I.C.2, one of the Service Fees that Grubhub paid to Plaintiff consisted of, *inter alia*, a mileage reimbursement amount equal to $0.50 per straight-line mile between the restaurant and the diner.

82.     Grubhub communicated its mileage reimbursement policy to Plaintiff in the Services Fees and Equipment Appendix on several occasions, including in the August 2015 DSP Agreement, in an email communicating the Fee Offer to Plaintiff, and in Plaintiff's weekly pay statements.

83.     Grubhub paid Plaintiff this mileage reimbursement amount, irrespective of whether Plaintiff qualified for incentive-based True-Up Payments.

84.     Indeed, Grubhub made incentive-based True-Up Payments to Plaintiff (when he chose to take advantage of them) ***on top of*** the Service Fees, including the mileage reimbursement Service Fee.

DEFS' DISPUTED FINDINGS OF FACT & CONCLUSIONS OF LAW – CASE NO. 3:15-CV-05128-JSC

Gibson, Dunn & Crutcher LLP

85.     The weekly pay statements that Grubhub sent to Plaintiff make this clear.  Specifically, Plaintiff's weekly pay statements state that Grubhub always paid Plaintiff the three Service Fees (labeled on Plaintiff's pay statements as "Delivery Fees," "Tips," and "Mileage Fees").  Then, if Plaintiff qualified for an incentive-based True-Up Payment, Grubhub paid Plaintiff a separate True-Up Payment (labeled on Plaintiff's pay statements as "GH Contribution") ***on top of*** the Service Fees.

86.     Plaintiff personally was aware of Grubhub's mileage reimbursement policy and that Grubhub communicated that mileage reimbursement policy to Plaintiff in his weekly pay statements.

87.     Plaintiff did not record his mileage during his Grubhub delivery blocks or while otherwise "toggled on" in the Grubhub App.  As a result, Plaintiff does not know and has no means by which to determine whether Plaintiff's mileage reimbursement payments exceeded Plaintiff's actual mileage-related expenses.

88.     Because Plaintiff performed driving and delivery services for other companies during his Grubhub delivery blocks or while otherwise "toggled on" in the Grubhub App, Plaintiff does not know and has no means by which to determine which mileage expenses are attributable to time spent performing deliveries for orders received through the Grubhub App, and which expenses are attributable to time spent performing deliveries for other companies.

89.     Because Plaintiff made personal errands during his Grubhub delivery blocks or while otherwise "toggled on" in the Grubhub App, Plaintiff does not know and has no means of knowing how much mileage he actually accrued while performing deliveries for restaurants on the Grubhub platform.

90.     Plaintiff never informed Grubhub that he believed he was incurring expenses over and above the 50 cents per mile that Grubhub compensated Plaintiff; accordingly, Grubhub did not know and had no reason to know whether Plaintiff believed that he was incurring expenses over and above 50 cents per mile.

## G.     Termination Of The Parties' Contractual Relationship And Subsequent Events

91.     During January and February 2016, Plaintiff routinely signed up for Grubhub delivery blocks and did not make himself available to perform deliveries during those delivery blocks or "drop" or "swap" delivery blocks with other DSPs.

92.    On February 15, 2016, Grubhub emailed Plaintiff a notice of intent to terminate the parties' contractual relationship.

93.    After Grubhub sent Plaintiff its notice of intent to terminate the parties' contractual relationship on February 15, 2016, Plaintiff chose to enter into a new DSP Agreement with Grubhub. Approximately one month later, on March 11, 2016, Plaintiff accepted a new DSP Agreement (the "March 2016 DSP Agreement").

94.    When Plaintiff accepted the March 2016 DSP Agreement, Plaintiff used a different email address than the one he had previously used when contracting with and receiving delivery offers from Grubhub.

95.    While Plaintiff was attempting to re-contract with Grubhub to re-establish an independent contractor relationship, Plaintiff completed a survey that Grubhub sent to him.  That survey asked whether Plaintiff had ever partnered with Grubhub in the past.  In response to that question, Plaintiff falsely informed Grubhub that he had *not* partnered with Grubhub in the past.

96.    On April 7, 2017, Plaintiff accepted another DSP Agreement (the "April 2017 DSP Agreement").

97.    When Plaintiff accepted the April 2017 DSP Agreement, Plaintiff used yet another email address that was different than the email addresses he had previously used when contracting with and receiving delivery offers from Grubhub.

98.    Even though Plaintiff's DSP Agreements (including the August 2015 DSP Agreement) did not restrict, constrain, prohibit, or discourage Plaintiff from re-establishing an independent contractor relationship with Grubhub, and even though Plaintiff previously signed his name as "Raef Lawson" on his August 2015 DSP Agreement and his March 2016 DSP Agreement, Plaintiff signed his name as "Ray Lawson" on the April 2017 DSP Agreement in an apparent effort to disguise his true identity from Grubhub.

## II. DEFENDANTS' PROPOSED CONCLUSIONS OF LAW

**A.    Plaintiff Did Not Carry His Burden Of Proving That He Was An Employee Of Grubhub (Claims I–V)**

1.      To prevail on any of his claims, Plaintiff bore the burden to prove that he was Grubhub's employee.  *See* Cal. Evid. Code § 500 ("Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting."); *see also Gardner v. Baby Trend*, 2012 WL 130724, at *16–17 (Cal. Ct. App. Jan. 13, 2012) (unpublished) (finding that the trial court committed reversible error when it "impos[ed] the burden on defendant to *disprove* plaintiff's employee status, in a civil case where plaintiff's cause of action [was] dependent upon that status"); *Brown v. Mission Filmworks, LLC*, 2012 WL 6055939, at *6 (Cal. Ct.. App. Dec. 6, 2012) (unpublished) (affirming trial court order that placed the burden on plaintiff to prove employment status).

2.      "Because the California Labor Code does not expressly define 'employee,' the common law test for employment applies."  *Hennighan v. Insphere Ins. Sols., Inc*., 38 F. Supp. 3d 1083, 1097 (N.D. Cal. 2014), *aff'd*, 650 F. App'x 500 (9th Cir. 2016); *see also Johnson v. Serenity Transp., Inc*., 141 F. Supp. 3d 974, 995 (N.D. Cal. 2015) (Corley, M.J.) (finding that the common law test applies when "the Court must decide "whether a single entity ha[s] accurately classified workers as employees versus independent contractors, rather than whether secondary entities were joint employers").

3.      As the California Supreme Court explained in *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, the common law employment classification test requires a court to consider the putative employer's "right to control work details," as well as several "'secondary' indicia."  48 Cal. 3d 341, 350–51, 355 (1989).

4.      For the reasons stated below, and based on the evidence adduced at trial, all of the factors in the common law employment classification test point in the same direction (or are neutral)— Plaintiff failed to carry his burden of proving that he was Grubhub's employee.

5.      Even if this Court were to place the burden of proof on *Grubhub* and hold that *Grubhub* bore the burden of proving that Plaintiff was an independent contractor, this Court would hold that Grubhub amply satisfied that burden of proof.

6.     In short, Grubhub correctly classified Plaintiff as an independent contractor; therefore, Plaintiff was not Grubhub's employee.

**1.     Grubhub Did Not Control The Manner And Means Of Plaintiff's Performance.**

7.     "Under the common law, the principal test of an employment relationship is whether [Grubhub] [had] the right to control the manner and means of accomplishing the result desired." *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 531 (2014) (citations omitted).

8.     For an individual to be an employee, "the right to exercise complete or authoritative control must be shown, rather than mere suggestion as to detail." *Ali v. U.S.A. Cab Ltd.*, 176 Cal. App. 4th 1333, 1347 (2009).  Thus, a "worker is an independent contractor when he or she follows the employer's desires only in the result of the work, and not the means by which it is achieved." *Id.*

9.     For several reasons, Grubhub did not control "the manner and means of accomplishing the result desired." *Ayala*, 59 Cal. 4th at 531.

10.     First, Plaintiff at all times maintained a substantial contractual right of control over his schedule while performing deliveries through the Grubhub App.  Most notably, Plaintiff could make himself available to receive orders by toggling on in the Grubhub App at any time, even if he did not sign up for a delivery block; indeed, Plaintiff did exactly that on at least one occasion.  Subject to delivery block availability, Plaintiff also had a contractual right to select delivery blocks on whichever days and at whichever times he preferred, and he was not required to make himself available for a minimum or maximum number of delivery blocks.  Although the Service Level Agreement appended to Plaintiff's August 2015 DSP Agreement stated that Plaintiff should "[s]ign up for weekly delivery blocks either through the GrubHub App or another means," Plaintiff's August 2015 DSP Agreement elsewhere stated that there was "no specific minimum time period for which [Plaintiff] must make [himself] available."  Additionally, Amendment No. 1—which Plaintiff accepted on December 5, 2015—deleted and replaced this provision of the Service Level Agreement.  Thus, notwithstanding the Service Level Agreement, Plaintiff maintained substantial authority to determine how many and which delivery blocks to sign up for—if any.  The right of control that Plaintiff maintained over his schedule suggests an employment relationship.  *See Jones v. Royal Admin. Servs., Inc.*, __ F.3d __, 2017 WL 3401317 (9th Cir. 2017) (affirming summary judgment order finding that workers were independent

contractors, where defendant "did not have the right to control the hours the [workers] worked nor did it set quotas for the number of [jobs] the [workers] had to [complete]); *Hennighan*, 38 F. Supp. 3d at 1100 (agent was independent contractor because he "establish[ed] his own schedule"); *Taylor v. Waddell & Reed, Inc*., 2012 WL 3584942, at *5 (S.D. Cal. Aug. 20, 2012) (defendant was not employer because it "did not set financial advisor schedules"); *Rabanal v. Rideshare Port Mgmt., LLC*, 2013 WL 6020340, at *7 (Cal. Ct. App. Nov. 14, 2013) (unpublished) (van drivers were independent contractors because they "decided when they wanted to work").

11.     Second, Plaintiff at all times maintained the right to control where he would perform deliveries.  In practice, Plaintiff selected the geographic zone(s) within which to perform deliveries and, when Grubhub later altered the boundaries of those geographic zones, Grubhub honored Plaintiff's choice to stay in the "Los Angeles Metro" zone.  Plaintiff's substantial control over where he performed deliveries suggests an independent contractor relationship.  *See Arnold v. Mutual of Omaha Ins. Co*., 202 Cal. App. 4th 580, 589 (2011) (affirming summary judgment order finding agent to be independent contractor because she "used her own judgment in determining . . . [the]  place . . . in which she would solicit"); *Fireman's Fund Ins. Co. v. Davis*, 37 Cal. App. 4th 1432, 1442–43 (1995) (sales manager was independent contractor because "place of work . . . [was] left to the discretion of [plaintiff]").

12.     Third, Grubhub had no contractual right to prevent or restrict Plaintiff from working or performing driving or delivery services for other companies, including Grubhub's direct competitors. On the contrary, Plaintiff's August 2015 DSP Agreement expressly authorized Plaintiff to do so. Furthermore, Plaintiff did, in practice, perform driving and delivery services for other companies on more than 40 occasions during his Grubhub delivery blocks (or while "toggled on" to the Grubhub App), and often while he was performing deliveries that he had accepted through the Grubhub App. Plaintiff's freedom to perform services for other companies suggests an independent contractor relationship.  *See Jones*, 2017 WL 3401317, at *5 (telemarketers were independent contractors as a matter of law where they could, and did, have "many different clients and offered [the same] services to others during the same period"); *Arnold*, 202 Cal. App. 4th at 589 (affirming summary judgment order finding agent to be independent contractor because her "appointment with [defendant] was nonexclusive"); *Robinson v. City of San Bernardino Police Dep't*, 992 F. Supp. 1198, 1207 (C.D. Cal.

1998) (finding that phlebotomist was independent contractor because she "practice[d] her profession for others when not working for defendant"); *Rabanal*, 2013 WL 6020340, at *7 (van drivers were independent contractors because they "decided . . . whether . . . [to] solicit fares from other transportation networks").

13.     Fourth, Grubhub had no contractual right to control (and did not, in practice, control) Plaintiff's personal appearance through requirements relating to attire, piercings or tattoos, or personal grooming habits.  Indeed, at all times, Plaintiff had complete discretion to wear whatever attire and to perform deliveries with whatever delivery bags he desired; indeed, Plaintiff could use bags supplied by Grubhub's *competitors*.  Grubhub's lack of control over Plaintiff's appearance while Plaintiff performed deliveries and the lack of any contractual requirement mandating that Plaintiff perform deliveries using Grubhub branded delivery bags—or *any* Grubhub branded requirement for that matter—suggests an independent contractor relationship.  *See Desimone v. Allstate Ins. Co.*, 2000 WL 1811385, at *12 (N.D. Cal. Nov. 7, 2000) (plaintiff was independent contractor where defendant "place[d] little constraint on Plaintiffs' or their employees' manner of dress"); *cf. Alexander v. Fedex Ground Package Sys.*, 765 F.3d 981, 989 (9th Cir. 2014) (finding that delivery drivers were employees because, *inter alia*, defendant "control[led] its drivers' clothing from their hats down to their shoes and socks.")

14.     Fifth, Grubhub had no contractual right to control (and did not, in practice, control), the appearance, age, capacity, or size of Plaintiff's vehicle, or whether Plaintiff used a vehicle at all.  Grubhub's lack of control over the vehicle that Plaintiff used to complete deliveries suggests an independent contractor relationship.  *Cf. Alexander*, 765 F.3d at 989–90  (finding that drivers were employees because, *inter alia*, "FedEx require[d] drivers to paint their vehicles a specific shade of white, mark them with the distinctive FedEx logo, and to keep their vehicles 'clean and presentable [and] free of body damage and extraneous markings.'")

15.     Sixth, Plaintiff possessed a contractual right to negotiate his compensation amount with Grubhub.  In fact, Plaintiff negotiated the amount of his compensation with Grubhub on several occasions; frequently, Plaintiff chose to accept incoming delivery offers at the end of his delivery blocks, continued driving after his delivery blocks ended, and then negotiated with Grubhub for larger

True-Up Payments for that additional time.  Plaintiff's right to negotiate the amount of his compensation suggests an independent contractor relationship.  *See Ali*, 176 Cal. App. 4th at 1349 (denying class certification in a misclassification case because some drivers "set their own rates, such as flat rates per trip or rates below the standard metered rate," whereas other drivers did not); *cf. Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1101 (9th Cir. 2014) (reversing summary judgment order in favor of defendant, in part, because defendant "controlled the drivers' rates.").

16.     Seventh, Plaintiff had a contractual right to use employees, contractors, subcontractors, agents, or representatives to perform deliveries for any offers that he received through the Grubhub App.  In other words, Grubhub had no right to require (and, in practice, did not require) Plaintiff to personally perform deliveries for offers he received through the Grubhub App.  Plaintiff's right to use employees, contractors, subcontractors, agents, or representatives to perform deliveries suggests an independent contractor relationship.  *See Desimone*, 2000 WL 1811385, at *11 (finding insufficient evidence of control to establish an employment relationship because "Plaintiffs [could] hire employees to perform their duties"); *Mission Ins. Co. v. Workers' Comp. Appeals Bd.*, 123 Cal. App. 3d 211, 223 (1981) (finding that defendant in worker's compensation action lacked control because "the contract did not even require that the services be performed by applicant personally."); *Rabanal*, 2013 WL 6020340, at *7 (van drivers were independent contractors, in part, because drivers "were entitled to hire employees to assist them"); *see also Merchants Home Delivery Serv., Inc. v. N.L.R.B.*, 580 F.2d 966, 974–75 (9th Cir. 1978) (owner-operators were independent contractors under federal law because they "ha[d] the right to employ their own helpers to assist them in making deliveries").

17.     Eighth, Grubhub did not monitor the manner and means of Plaintiff's performance.  Grubhub did not, for instance, have Grubhub managers or supervisors accompany Plaintiff while performing deliveries.  Although Grubhub did have the ability to check the status of a given delivery offer (which occurred only rarely when Grubhub received a specific complaint from a restaurant or diner), that ability merely enabled Grubhub to monitor the *results* of the parties' contractual engagement—which is consistent with an independent contractor relationship.  Grubhub's inability to monitor and control the *manner and means* of Plaintiff's performance suggests an independent contractor relationship.  *See Hennighan*, 38 F. Supp. 3d at 1101 ("Even if [defendant] monitored sales

Gibson, Dunn & Crutcher LLP

agents' productivity and set goals for them, that only relates to the results [defendant] expected, not the manner by which agents had to achieved those goals—the key distinction for showing control."); *Desimone*, 2000 WL 1811385, at *13 ("The annual evaluations of agency results, like the reporting requirements, do not reflect an attempt by Defendant to exercise control over how Plaintiffs sell insurance to their customers on a daily basis, but rather are a means by which each agency's results are monitored."); *Mission Ins. Co.*, 123 Cal. App. 3d at 223 (reversing finding that applicant was an employee because applicant's "work was not inspected except where a customer made a specific complaint").

18.      Ninth, Grubhub had no contractual right to dictate (and, in practice, did not dictate) the route that Plaintiff used when completing deliveries.  On a related note, when Plaintiff performed deliveries for other companies during his Grubhub delivery blocks, Grubhub had no contractual right to control (and, in practice, did not control) the order in which Plaintiff completed his deliveries. Grubhub's lack of control over Plaintiff's delivery routes and the order in which Plaintiff completed his deliveries, whether for a restaurant on the Grubhub platform or for competitor companies, suggests an independent contractor relationship.  *See Rabanal*, 2013 WL 6020340, at *7 (affirming finding that van drivers were independent contractors because the drivers "could determine the order of, and the routes for, pickup and drop-off"); *cf. Ruiz*, 754 F.3d at 1101 (reversing summary judgment order for defendant, in part, because defendant "determined [plaintiffs' driving] routes").

19.      Tenth, Grubhub had no contractual right to regulate (and, in practice, did not regulate), the content of Plaintiff's communications with restaurants and diners, through scripted or guided dialogue.  This fact suggests an independent contractor relationship.  *See Comparetto v. Allstate Insurance Co.*, 2014 WL 11514474, at *9 (C.D. Cal. July 24, 2014) (denying defendant's motion for summary judgment, in part, because plaintiffs testified that defendant required plaintiffs to use "call scripts" when interacting with customers); *cf. Jones*, 2017 WL 3401317, at *4–5 (finding that defendant "had only limited control" over putative employee-telemarketers, even though the telemarketers were "only permitted to use the 'scripts and materials' [defendant] approved and had to comply with the 'guidelines and procedures' [defendant] provided when selling [defendant's] products."); *Hennighan*, 38 F. Supp. 3d at 1102 ("[T]he fact that [defendant] might require a script or preapproved materials to

be used in sales of its products does not in itself show an undue amount of control sufficient to tip the scale in favor of finding an employment relationship.").

20.     Eleventh, Plaintiff and Grubhub possessed a mutual right to terminate the DSP Agreement, either (1) immediately, upon a material breach; or (2) with 30 days' notice to the other party, without cause.  As the Ninth Circuit has held in its most recent published cases analyzing independent contractor classification, a mutual at-will termination provision is *not* inconsistent with an independent contractor relationship.  *See Jones*, 2017 WL 3401317, at *5 (affirming summary judgment order finding that workers were independent contractors, where "each party retain[ed] the ability to cancel the contract at any time," and noting that "[t]he designated impermanency of the relationship support[ed] a finding of independent contractor status"); *Ruiz*, 754 F.3d at 1096–97, 1105 (holding that a mutual termination provision was "consistent with either an employer-employee or independent contractor relationship.").  In fact, the Ninth Circuit recently endorsed the rationale of a summary judgment order that this Court (Judge Orrick presiding) entered in favor of a defendant in a misclassification action, in which this Court held that a mutual termination clause is not merely a neutral factor; rather, it "is evidence of an *independent-contractor* relationship."  *Hennighan*, 38 F. Supp. 3d at 1105, *aff'd* 650 F. App'x 500 (emphasis added); *see also Beaumont-Jacques v. Farmers Grp., Inc*., 217 Cal. App. 4th 1138, 1147 (2013) (provision allowing for termination "without cause by either [party] on 30 days' written notice" created a "mutual" right to terminate, and supported independent contractor status); *Arnold*, 202 Cal. App. 4th at 584, 589 (holding that a provision that allowed either party to "terminate the contract with or without cause through written notice," "may properly be included in an independent contractor agreement, and is not by itself a basis for changing that relationship to one of an employee").  Alternatively, even if this Court were not to follow these authorities, this Court still would conclude that the *particular* mutual termination provision at issue in this case suggests an independent contractor relationship, given that the August 2015 DSP Agreement did not restrict, constrain, prohibit, or discourage Plaintiff from re-establishing an independent contractor relationship with Grubhub at a later date (and, in practice, that is exactly what Plaintiff did).

21.     For the reasons set forth above, the Court concludes that Grubhub had no substantial or meaningful right to control the manner and means of Plaintiff's performance.  This strongly suggests

an independent contractor relationship. *See Hennighan*, 38 F. Supp. 3d at 1100 (finding that insurance agent was independent contractor because insurance agent "was responsible for the means by which he performed his work and [] [defendant] did not meaningfully 'control' him"); *Desimone*, 2000 WL 1811385, at *14 (finding that plaintiffs were independent contractors where "defendant [did] exercise some control over [p]laintiffs' business activities, [but] it [was] not so extensive as to mandate a finding that [p]laintiffs [were] employees."); *Arnold*, 202 Cal. App. 4th at 589 (affirming finding that plaintiff was independent contractor where, "under common law principles, [defendant] had no significant right to control the manner and means by which [plaintiff] accomplished the results of the services she performed as one of [defendant's] soliciting agents.").

## 2. The Secondary *Borello* Factors Support Independent Contractor Status

22. In addition to the right to control, courts tasked with determining a putative employee's proper employment classification must consider several "additional factors." *Borello*, 48 Cal. 3d at 350. These "additional factors" include:

> [1] whether the one performing services is engaged in a distinct occupation or business; [2] the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; [3] the skill required in the particular occupation; [4] whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; [5] the length of time for which the services are to be performed; [6] the method of payment, whether by the time or by the job; [7] whether or not the work is a part of the regular business of the principal; and [8] whether or not the parties believe they are creating the relationship of employer-employee.

*Id.* at 350–51. In addition, the California Supreme Court has cited approvingly to several other factors, many of which overlap with the factors enumerated above. *Id.* at 354–55. These include:

> [1] the alleged employee's opportunity for profit or loss depending on his managerial skill; [2] the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; [3] whether the service rendered requires a special skill; [4] the degree of permanence of the working relationship; and [5] whether the service rendered is an integral part of the alleged employer's business.

*Id.* at 355.

23. Here, all, or virtually all, of these secondary factors suggest an independent contractor relationship.

24. First, Plaintiff engaged in a distinct occupation or business during his contractual relationship with Grubhub. Specifically, Plaintiff accepted more than 40 delivery requests from other

companies during his Grubhub delivery blocks.  On multiple occasions (e.g., December 12, 2015, December 16, 2015, January 10, 2016, and January 11, 2016), Plaintiff even accepted delivery requests for other companies *after* he had accepted—but before he had completed—a delivery offer through the Grubhub App.  This fact suggests an independent contractor relationship.  *See Jones*, 2017 WL 3401317, at *5 (where workers "'had many different clients and offered [the same] services to others during the same period,'" those facts that "strongly suggest[ed] [they] were independent contractors rather than employees.") (citation omitted); *Hennighan*, 38 F. Supp. 3d at 1102 ("The fact that [plaintiff] sold insurance on behalf of other companies supports his classification as an independent contractor."); *Rabanal*, 2013 WL 6020340, at *7 (van drivers were independent contractors, in part, because "Plaintiffs' working relationship with RPM was decidedly not exclusive"); *see also Soares v. Flowers Foods, Inc.*, 2017 WL 2793807, at *14–15 (N.D. Cal. June 28, 2017) ("[D]etermining whether the individual performing services [was] engaged in a distinct occupation or business from the alleged employer [is] riddled with individualized inquiries," including "whether [plaintiffs] contracted with other companies").  Furthermore, Plaintiff filed his income taxes as a self-employed individual during 2015 and 2016 (the years in question).  This fact further supports this Court's finding that Plaintiff was engaged in a distinct occupation or business, and this Court's ultimate finding that Plaintiff was an independent contractor.  *See Hennighan*, 38 F. Supp. 3d at 1102 (plaintiff engaged in a distinct business because plaintiff "identified himself as self-employed in his tax returns").

25.    Second, the kind of occupation in which Plaintiff was engaged (with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision) "is largely duplicative of the control factor."  *Hennighan*, 38 F. Supp. 3d at 1103.  For the reasons discussed above, Grubhub did not have a substantial or meaningful right to control Plaintiff.  Therefore, this factor suggests an independent contractor relationship.

26.    Third, Plaintiff exercised skill while using the Grubhub App.  Although driving and delivery are not traditionally thought of as highly skilled activities, *see Narayan v. EGL, Inc.*, 616 F.3d 895, 902 (9th Cir. 2010), the skills necessary to use the Grubhub App exceed those that are typically required to perform deliveries.  For instance, Plaintiff used strategies to maximize his profitability, including by signing up for delivery blocks that Plaintiff believed would be most profitable; trying to

qualify for True-Up Payments; and accepting delivery orders through companies other than Grubhub, including Grubhub's competitors, simultaneously with his use of the Grubhub App.   These facts suggest an independent contractor relationship.   *See State Comp. Ins. Fund v. Brown*, 32 Cal. App. 4th 188, 202 (1995) (affirming order finding that truck drivers were independent contractors because "truck driving—while perhaps not a skilled craft—requires abilities beyond those possessed by a general laborer"); *Sahinovic v. Consolidated Delivery & Logistics, Inc.*, 2004 WL 5833528, at *7 (N.D. Cal. Sept. 13, 2004) ("[T]he primary skills involve driving and delivery.  Professional drivers in general 'could be either employees or independent contractors.' . . . . [T]his factor is neutral or slightly favors a finding that Plaintiffs are ICs.").

27.     Fourth, Plaintiff supplied the instrumentalities and tools of his work.  Specifically, Plaintiff paid for and provided the vehicle (a 2009 Honda Accord), smartphone (a Motorola Moto), wireless carrier service (Republic Wireless), and insurance (Progressive) that Plaintiff used while performing deliveries through the Grubhub App.  Plaintiff's substantial investment in his vehicle, smartphone, wireless carrier service, and insurance suggest an independent contractor relationship. *Jones*, 2017 WL 3401317, at *5 (workers were independent contractors where workers "supplied [] the 'tools and instrumentalities,' further supporting a finding of independent contractor status."); *Hennighan*, 38 F. Supp. 3d at 1088 ("Where a plaintiff 'used his own car, purchas[ed] its gas . . . and liability insurance,' and 'received no standard employee benefits,' he is likely an independent contractor."); *Sahinovic*, 2004 WL 5833528, at *8 ("Plaintiffs, not [Defendant] supplied the equipment used, e.g., the vehicles . . . Generally, under such circumstances, plaintiffs are found to be ICs."); *see also Saleem v. Corp Transp. Grp., Ltd.*, 854 F.3d 131, 144-45 (2d Cir. 2017) (affirming order finding black car drivers to be independent contractors because they provided the "essential facets of [their] business operations: vehicle acquisition, fuel, repair, and maintenance, license, registration, and insurance fees, and tolls, parking, and tickets.").

28.     Fifth, Plaintiff contracted with Grubhub to perform delivery services for a short length of time.  Each day for which Plaintiff made himself available to receive delivery offers was treated as a separate engagement, such that each day was, in essence, a new contractual arrangement between the parties.  Furthermore, Plaintiff performed deliveries for less than four months, from October 25, 2015

Gibson, Dunn & Crutcher LLP

to February 15, 2016.  These facts suggest an independent contractor relationship.  *See Jones*, 2017 WL 3401317, at *5 (noting that the parties had a mutual right to terminate the contract and, as a result, the "designated impermanency of the relationship support[ed] a finding of independent contractor status"); *Millsap v. Fed. Express Corp.*, 227 Cal. App. 3d 425, 431–32 (1991) ("[I]t appears that, although Pence had an ongoing relationship with NCE, each time he picked up packages for delivery operated, in essence, as a new contract.  At any time NCE could choose not to continue its relationship with Pence, but that choice would be more of a determination not to hire than a determination to fire."); *cf. Hennighan*, 38 F. Supp. 3d at 1104 ("The relationship between Insphere and Hennighan lasted only two years. Their contract was terminable at will by either side. This factor is neutral.").

29.     Sixth, Grubhub paid Plaintiff based on, *inter alia*, the number of jobs that he completed.  Indeed, on multiple occasions (e.g., January 22, 2016 and February 14, 2016), Plaintiff did not qualify for the True-Up Payments and received only the Service Fees, including the Service Fee based entirely on the number of delivery orders that Plaintiff fulfilled.  Furthermore, while Plaintiff often satisfied the criteria necessary to obtain True-Up Payments, those True-Up Payments were made ***on top of*** the Service Fees (one of which, as just discussed, was calculated based on the number of completed deliveries).  These facts suggest an independent contractor relationship.  *See Johnson*, 2017 WL 1365112, at *21 (granting summary judgment for defendant because, *inter alia*, plaintiffs "were paid per job"); *Robinson*, 992 F. Supp. at 1207 (holding that phlebotomist was independent contractor because, *inter alia*, she was "paid on a 'job' basis and did not receive a salary from defendant").

30.     Seventh, the delivery services that Plaintiff performed were not a part of the regular business of Grubhub.  Grubhub is a food ordering company, not a food delivery company, as evidenced by the fact that Grubhub transmits most of the delivery orders that it receives directly to restaurants that employ or contract with their in-house delivery persons.  Stated differently, Grubhub effectively operates as a broker between diners and restaurants.  This fact suggests an independent contractor relationship.  *See Rabanal*, 2013 WL 6020340, at *7 ("In sum, [defendant] acted as a broker by providing a service to its customers and its control was limited to the results of plaintiffs' work, namely picking up and dropping off passengers, not how those results were achieved.").

31.     Eighth, both Grubhub and Plaintiff believed they were entering into an independent contractor relationship when they executed the August 2015 DSP Agreement.  The August 2015 DSP Agreement expressly defines the parties' relationship as an independent contractor relationship.  This fact suggests an independent contractor relationship.  *See State Comp. Ins. Fund*, 32 Cal. App. 4th at 203 ("[T]he parties expressly and voluntarily agreed to independent contractor status."); *Robinson*, 992 F. Supp. at 1206 ("[W]here the parties enter into a written agreement which sets forth the details of their relationship and which expressly states the legal nature of the relationship they intend to create, the agreement is a significant factor to consider.").  Furthermore, Grubhub issued Plaintiff a Form 1099 during tax years 2015 and 2016, Plaintiff filed his personal income taxes as a self-employed individual in tax years 2015 and 2016, and Plaintiff believes that he worked as an "independent contractor" and a member of the "gig economy" in tax years 2015 and 2016, respectively.  These facts also suggest an independent contractor relationship.  *See Desimone*, 2000 WL 1811385, at *16 ("Defendant characterizes [Plaintiffs] as independent contractors for tax purposes, and [Plaintiffs] file their taxes as 'self-employed' individuals . . . . Plaintiffs' tax treatment weigh[s] in favor of treating Plaintiffs as independent contractors."); *Hennighan*, 38 F. Supp. 3d at 1098 ("An individual who . . . identifies himself as self-employed on personal tax returns weighs in favor of finding an independent contractor relationship.").  Additionally, independent contractor relationships are common in the "on demand economy."  This fact also suggests an independent contractor relationship.  *See State Comp. Ins. Fund*, 32 Cal. App. 4th at 202 (affirming order finding that truck drivers were independent contractors because "[i]t [was] customary for brokers to hire independents rather than have driver employees."); *Ayala*, 59 Cal. 4th at 538–39 ("[C]ommunity custom in thinking that a kind of service . . . is rendered by servants, is of importance.").

32.     Finally, Plaintiff had an opportunity for profit (or loss), depending on his managerial skill.  First, Plaintiff had an opportunity for profit (or loss) by selecting the most profitable delivery blocks or times, choosing to take part in bonuses or promotions (such as theTrue-Up), and deciding which offers to accept—such as those with larger tips, shorter or longer driving distances, or closer proximity to home.  *See Hennighan*, 38 F. Supp. 3d at 1092 ("Because Hennighan was free to establish his own schedule and determine the amount of investment, time, and otherwise that he wished to make

in selling [defendant's] products, Hennighan bore the risk of profit or loss"). Second, Plaintiff had an opportunity for profit (or loss) because Plaintiff had a contractual right to hire or sub-contract with other individuals to perform deliveries on his behalf. *See Cross v. Roadway Express, Inc*., 2009 WL 1202889, at *6 (C.D. Cal. Apr. 30, 2009) ("Plaintiff had the opportunity to profit" because he was able to pay sub-contractors less than the amount he received from his putative employer); *Saleem*, 854 F.3d at 143 (finding that black car drivers had entrepreneurial opportunities because their contracts "permitted other individuals to drive for them."). Third, Plaintiff had an opportunity for profit (or loss) by managing his own expenses, including by using a bicycle if he so desired. *See Desimone*, 2000 WL 1811385, at *14 ("[E]xpenses are controlled by Plaintiffs, a factor that weighs strongly in favor of Plaintiffs' independent contractor status."); *Saleem*, 854 F.3d at 144 n. 29 ("Economic investment, by definition, creates the opportunity for loss, but investors take such a risk with an eye to profit."). Fourth, Plaintiff had the opportunity to profit by performing driving or delivery services for other companies (even while using the Grubhub App). *See Saleem*, 854 F.3d at 144 ("By toggling back and forth between different car companies . . . drivers' profits increased' through the[ir] initiative, judgment[,] or foresight—all attributes of the typical independent contractor.") (citation and internal quotation marks omitted). Finally, Plaintiff carried his own insurance, which is reflective of the fact that Plaintiff could incur real losses. *Desimone*, 2000 WL 1811385, at *14 ("The requirement that Plaintiffs obtain certain insurance policies and name Defendant as an additional insured reflects the reality, that Plaintiffs are responsible for their profits and losses, by protecting Defendant in the event Plaintiffs incur substantial losses.").

33. All remaining secondary factors relevant to Plaintiff's proper classification, *see Borello*, 48 Cal. 3d at 355, are duplicative of the common law factors previously analyzed. Specifically, Plaintiff's investment in equipment or materials required for his task is largely duplicative of whether Plaintiff supplied the instrumentalities and tools of his work. Whether Plaintiff's service required a special skill is largely duplicative of whether Plaintiff exercised skill while performing deliveries. The degree of permanence of the working relationship is largely duplicative of the length of time for which the services were to be performed. Finally, whether the service provided is an integral part of Grubhub's business is largely duplicative of whether the delivery services that Plaintiff performed were

a part of the regular business of Grubhub.  For the reasons discussed above, all of these factors suggest an independent contractor relationship.

### 3. Conclusion

34.     As the evidence adduced at trial made clear, Grubhub did not maintain a substantial or meaningful right to control the manner and means of Plaintiff's performance, which strongly suggests an independent contractor relationship.  Furthermore, all or virtually all of the secondary factors relevant to the putative employment analysis suggest an independent contractor relationship.  On these facts, this Court holds that Plaintiff was an independent contractor, not Grubhub's employee.

35.     Because Plaintiff was an independent contractor and not Grubhub's employee, this Court grants judgment in favor of Grubhub on all counts and dismisses all of Plaintiff's claims (Claims I–V) with prejudice.

### B.     Plaintiff Did Not Carry His Burden Of Proving An Expense Reimbursement Violation (Claim I)

36.     Separate and apart from the issue of employment classification, Plaintiff also bore the burden of proof regarding the remainder of his expense reimbursement claim.  *See Lindell v. Synthes USA*, 155 F. Supp. 3d 1068, 1077 (E.D. Cal. 2016) (finding that it is plaintiff's burden to prove that "(a) Defendants had a policy of not reimbursing class members for expenses, *or* (b) that Defendants did reimburse employees, but not in a manner that communicated to employees how expenses were apportioned in paychecks *or* (c) that Defendants reimbursed employees *but* did not fully reimburse them for their expenses."); *see also Mireles v. Paragon Sys., Inc.*, 2014 WL 4385453 (S.D. Cal. Sept. 4, 2014) (finding that plaintiff bore the burden of proof for section 2802 claims).

37.     Although this Court concludes that Plaintiff was not Grubhub's employee and, on that basis alone, dismisses Plaintiff's minimum wage claim, *see supra* Part II.A, the Court also concludes that Plaintiff failed to carry his burden of proving that Plaintiff incurred reimbursable mileage-related expenses for which Grubhub failed to compensate Plaintiff.[2]

---

[2]  Plaintiff's expense reimbursement claim was predicated on "reimbursement only for mileage." *See* Dkt. 88 at 3; *id.* at 5 ("Plaintiff is content to seek expenses solely based on his mileage").

Gibson, Dunn & Crutcher LLP

1      **1.      Grubhub Reimbursed Plaintiff For His Mileage At A Rate Of 50 Cents Per Mile**

2          38.      In *Gattuso v. Harte-Hanks Shoppers, Inc.*, the California Supreme Court found that

3   Labor Code section 2802 does not "restrict[] the methods that an employer may use to calculate

4   reimbursement" for employees' vehicle-related expenses.  42 Cal. 4th 554, 570 (2007).

5          39.      Accordingly, an employer may satisfy its obligations under section 2802 in one of three

6   ways—(1) by reimbursing an employee her actual expenses, a "burdensome" method that requires the

7   employee to "keep detailed and accurate records of amounts spent," (2) by adopting a "mileage

8   reimbursement method" by which the employee "need only keep a record of the number of miles

9   driven" and the employer then "multiplies the work-required miles driven by a predetermined amount

10  that approximates the per-mile cost of owning and operating an automobile," or (3) by providing the

11  employee a "lump-sum payment," by which an "employer merely pays a fixed amount for automobile

12  expense reimbursement." *Gattuso*, 42 Cal. 4th at 567–71.

13         40.      However, "[i]f the employee can show that the reimbursement amount that the employer

14  has paid is less than the actual expenses that the employee has necessarily incurred for work-required

15  automobile use (as calculated using the actual expense method), the employer must make up the

16  difference." *Gattuso*, 42 Cal. 4th at 569.

17         41.      In other words, "any challenge to Defendant['s] [] reimbursement method would require

18  Plaintiff[] to show that the mileage reimbursement was less than [his] actual expenses . . . ." *Ortiz v.*

19  *CVS Caremark Corp.*, 2014 WL 1117614, at *4–5 (N.D. Cal. Mar. 19, 2014).

20         42.      Throughout this litigation, and at trial, the parties agreed that one of the Service Fees

21  that Plaintiff received was a payment for mileage and that this payment policy was communicated to

22  DSPs, such as Plaintiff, in the August 2015 DSP Agreement and in weekly pay statements.  However,

23  the parties disputed whether this mileage payment constituted reimbursement for mileage, on the one

24  hand, or compensation for "labor performed."

25         43.      The burden of proving the *non-existence* of a mileage reimbursement policy rested on

26  Plaintiff.  *See Lindell*, 155 F. Supp. 3d at 1077.  Plaintiff failed to meet this burden.

27         44.      Before and during trial, Plaintiff argued that Grubhub's mileage payments did not, in

28  fact, constitute a reimbursement policy because, according to Plaintiff, he did not receive mileage

payments when he qualified for True-Up Payments.  However, as discussed above, Grubhub paid Plaintiff his True-Up Payments *on top of* Plaintiff's Service Fees (not *in lieu of* his Service Fees).  That fact is evidenced by, *inter alia*, Plaintiff's own pay statements, which state that Plaintiff received his Service Fees, including mileage, even when he qualified for True-Up Payments.

45.     Before and during trial, Plaintiff also argued that Grubhub's mileage payments do not, in fact, represent a reimbursement policy because, according to Plaintiff, Grubhub labeled its mileage payments as a "Service Fee," as opposed to a "reimbursement."  However, in *Gattuso*, 42 Cal. 4th at 575–76, the California Supreme Court expressly held that an expense reimbursement policy can properly be incorporated into an elevated compensation payment, just as Grubhub has done here.  As *Gattuso* explained, an employer may satisfy section 2802 "by paying employees enhanced compensation in the form of *increases in base salary* or in *commission rates*, or both, provided there is a means or method to apportion the enhanced compensation" and the employer "communicate[s] to its employees the method" or apportionment used.  *Id.* at 558 (emphasis added); *see also id.* at 575–76.  Here, Grubhub did just that—it paid Plaintiff an elevated compensation (i.e., elevated Service Fees).  Moreover, there is a clear "method to apportion the enhanced compensation," given that Grubhub expressly labeled  the "enhanced compensation" as "mileage." *Id.* at 558.

46.     Finally, Plaintiff argued that Grubhub's mileage payments do not, in fact, represent a reimbursement policy because, according to Plaintiff, the reimbursement method that Grubhub uses is not correlated to the precise number of miles that Plaintiff drove (i.e., it is not tied to the miles that Plaintiff spent traveling from his location to each restaurant).  However, the type of second-guessing of Grubhub's reimbursement method that Plaintiff proposes is exactly what *Gattuso* condemns.  In fact, *Gattuso* held that an employer may satisfy section 2802 by paying its employees a *lump sum payment*— something far less correlated to putative employees' actual expenses than Grubhub's policy was—so long as that lump-sum amount exceeds the employee's actual expenses.  Thus, *Gattuso* rejected Plaintiff's argument that "section 2802 requires that an employer must correlate the employee's reimbursement to the incurred expenses . . . .'"  *Gattuso*, 42 Cal. 4th at 570; *id.* at 570–71 ("Nothing . . . restricts the methods that an employer may use to calculate reimbursement"); *see also Christensen v. CVS Pharm., Inc.*, 2017 WL 118030, at *5 (Cal. Ct. App. Jan. 12, 2017) (unpublished) ("[L]iability

under section 2802 turns on whether the employer's reimbursement rate is 'sufficient to fully reimburse the employees for all expenses actually and necessarily incurred,' not on the methodology employed in setting the rate or the employer's view of what categories of costs the rate does or does not reimburse.").

47.     For these reasons, Plaintiff failed to carry his burden of proving that the 50-cent per mile that Grubhub paid Plaintiff was *not* a reimbursement for Plaintiff's mileage-related expenses.

**2.     Plaintiff Did Not Carry His Burden Of Proving That Grubhub Knew Or Had Reason To Know That Plaintiff Incurred Actual Expenses That Were Not Fully Compensated**

48.     Even if this Court were to conclude that Plaintiff was Grubhub's employee (he is not, *see supra* Part II.A), Plaintiff also bore the burden of proving that Grubhub knew or had reason to know that its mileage payments to Plaintiff were insufficient to compensate Plaintiff for his actual expenses. *See Hammitt v. Lumber Liquidators, Inc.*, 19 F. Supp. 3d 989, 1001 (S.D. Cal. 2014) ("Absent evidence Defendant knew or had reason to know that Plaintiff had incurred business-related expenses" that were not being reimbursed, "Defendant is not liable for failure to reimburse Plaintiff for those expenses as a matter of law.") (citation omitted).  Plaintiff failed to satisfy this burden of proof.

49.     First, Grubhub reasonably and in good faith believed that it had classified Plaintiff as an independent contractor.  Thus, if this Court were to find that Plaintiff was Grubhub's employee (which it does not), the Court would still hold that Grubhub did not know and had no reason to know that it was employing an employee (Plaintiff) who was incurring unreimbursed mileage-related expenses.

50.     Second, Plaintiff did not inform Grubhub that he believed Grubhub's mileage reimbursement policy was insufficient to cover his actual expenses.  *See Chavez v. Lumber Liquidators, Inc.*, 2012 WL 1004850, at *10 (N.D. Cal. Mar. 26, 2012) ("[W]hether the employee actually sought reimbursement from [Defendant] for the expense[s] . . . appears to be critical.").

51.     Plaintiff presented no other basis for this Court to conclude that Grubhub knew or should have known that its mileage reimbursement policy was insufficient to cover Plaintiff's actual expenses.

52.     Under these circumstances, Plaintiff failed to carry his burden of proof.  Plaintiff's failure to carry his burden of proof on this point constitutes an independent justification for this Court's order granting judgment in Grubhub's favor on Plaintiff's expense reimbursement claim.

### 3.     Plaintiff Did Not Carry His Burden Of Proving That His Actual Mileage Expenses Exceeded The Mileage That Grubhub Paid Him

53.     Because Plaintiff failed to prove the *non-existence* of a reimbursement policy, Plaintiff's expense reimbursement claim was, in effect, a claim predicated on the allegation that Grubhub *under*-reimbursed Plaintiff for his mileage-related expenses.  Accordingly, Plaintiff bore the burden to prove "that the mileage reimbursement [that Grubhub paid him] was less than [his] actual expenses."  *Ortiz*, 2014 WL 1117614, at *5; *see also Gattuso*, 42 Cal. 4th at 569 (holding that "the *employee* [must] show that the reimbursement amount that the employer has paid is less than the actual expenses that the employee has necessarily incurred for work-required automobile use (as calculated using the actual expense method)" in order to prevail on a claim under section 2802) (emphasis added).  Plaintiff failed to satisfy this burden of proof.

54.     Most notably, Plaintiff has never quantified the amount of expenses he claimed to have incurred in connection with the work he performed while using the Grubhub App.

55.     Moreover, because Plaintiff did not track his mileage expenses during the period of time in which he performed deliveries through the Grubhub App, Plaintiff had no means by which to reconstruct those actual expenses, after the fact.

56.     Under these circumstances, Plaintiff failed to carry his burden of proof.  Plaintiff's failure to carry his burden of proof on this point constitutes an independent justification for this Court's order granting judgment in Grubhub's favor on Plaintiff's expense reimbursement claim.

### 4.     Plaintiff Did Not Carry His Burden Of Proving That His Actual Mileage Expenses Were Attributable To Plaintiff's Alleged Work While Using the Grubhub App

57.     Even if this Court were to conclude that Plaintiff was Grubhub's employee (he is not, *see supra* Part II.A), that Grubhub knew or had reason to know that Grubhub was employing an individual (Plaintiff) who was incurring unreimbursed expenses (it did not, *supra* Part II.B.2), and Plaintiff's actual expenses exceeded the mileage amount that Grubhub paid him (Plaintiff has not

proven this fact, *see supra* Part II.B.3), Plaintiff also bore the burden of proving that his actual expenses were incurred "in direct consequence of the discharge of his . . . duties" to *Grubhub*.  Cal. Lab. Code § 2802(a); *see also Cassady v. Morgan, Lewis, & Bockius LLP*, 145 Cal. App. 4th 220, 235, 237 (2006) ("No public policy would be served by requiring employers to indemnify for expenses attributable to an employee's conduct while working for a different employer.").  Plaintiff failed to satisfy this burden of proof.

58.     Indeed, the evidence adduced at trial proved that Plaintiff performed driving and delivery services for other companies on more than 40 occasions during his Grubhub delivery blocks (or while "toggled on" in the Grubhub App), and often while he was performing deliveries that he had accepted through the Grubhub App.

59.     On multiple occasions (e.g., December 12, 2015, December 16, 2015, January 10, 2016, and January 11, 2016), Plaintiff accepted a delivery request from another company *after* he had accepted—but before he had completed—a delivery offer through the Grubhub application.  In other words, Plaintiff routinely accepted a delivery request for another company while he was in the middle of performing a delivery for a restaurant on the Grubhub platform.

60.     However, Plaintiff did not know and was unable to produce any records demonstrating which of his actual expenses were attributable to delivery offers received through the Grubhub App, which expenses were incurred while performing driving and delivery services for other companies, and which expenses were attributable to Plaintiff's own personal pursuits.

61.     Accordingly, Plaintiff failed to prove that Grubhub's reimbursement payments were insufficient to compensate Plaintiff for actual expenses that he allegedly incurred "in direct consequence of the discharge of his . . . duties" to Grubhub.  Cal. Lab. Code § 2802(a).

62.     Under these circumstances, Plaintiff failed to carry his burden of proof.  Plaintiff's failure to carry his burden of proof on this point constitutes an independent justification for this Court's order granting judgment in Grubhub's favor on Plaintiff's expense reimbursement claim.

**C.     Plaintiff Did Not Carry His Burden Of Proving A Minimum Wage Violation (Claim II)**

63.     Separate and apart from the issue of employment classification, Plaintiff also bore the burden of proof regarding the remainder of his minimum wage claim, i.e., of proving that Plaintiff

performed uncompensated or undercompensated work. *See Sanchez v. Martinez*, 2016 WL 128797, at *3 (Cal. Ct. App. Jan. 12, 2016) (unpublished) (affirming judgment in favor of defendant on minimum wage claim under Labor Code 1194 because "plaintiffs never carried their initial burden of *proving* that they performed uncompensated work . . . [and] were not paid at least the minimum wage for all the hours they worked."); *A-Ju Tours, Inc. v. Ok Song Chang*, 2013 WL 4562308, at *6 (Cal. Ct. App. Aug. 28, 2013) (unpublished) ("[T]he employee therefore has the burden of proving that the compensation received, including any commission income, was less than the minimum wage due.").

64.     Plaintiff's theory of liability for his minimum wage claim necessarily depended on Plaintiff proving that the entirety of his Grubhub delivery blocks constituted compensable on-call time.

65.     Although this Court concludes that Plaintiff was not Grubhub's employee and, on that basis alone, grants judgment in Grubhub's favor on Plaintiff's minimum wage claim, *see supra* Part II.A, the Court also concludes that Plaintiff failed to carry his burden of proving that Plaintiff performed uncompensated or undercompensated work for purposes of his minimum wage claim.

66.     As the California Supreme Court held in *Mendiola v. CPS Security Solutions, Inc*., not all "on-call time constitutes hours worked," and courts must instead weigh a host of factors to determine whether on-call time is compensable in a given case.  60 Cal. 4th 833, 840–41 (2015).  Specifically, "courts considering whether on-call time constitutes hours worked have primarily focused on the extent of the employer's control," and that fact-intensive inquiry turns on "various factors":  (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on the employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.  *Id.* at 840–41.  In addition, courts consider whether the "[o]n-call waiting time . . . is spent primarily for the benefit of the employer and its business."  *Gomez v. Lincare, Inc.*, 173 Cal. App. 4th 508, 523–24 (2009).

67.     In weighing these factors, the Court is particularly cognizant of the fact that "[i]n the vast majority of reported cases dealing with on-call time, the hours were held *noncompensable* under

the FLSA." *Henry v. Med-Staff, Inc.*, 2007 WL 1998653, at *6 (C.D. Cal. July 5, 2007) (citation omitted) (emphasis added).[3]

68.     For the following reasons, Plaintiff failed to prove that Plaintiff's Grubhub delivery blocks (or the time that Plaintiff spent "toggled on" in the Grubhub App) fit within the small minority of cases in which on-call time has been found to be compensable.

69.     First, it is undisputed that Grubhub did not impose an on-premises living requirement on Plaintiff during his Grubhub delivery blocks.  This factor suggests that Plaintiffs' delivery blocks were non-compensable.  *See Owens v. Local No. 169*, 971 F.2d 347, 356–57 (9th Cir. 1992) (holding that waiting time was not compensable where "Plaintiffs were not subject to an on-premises living requirement").

70.     Second, Grubhub did not place excessive geographical restrictions on Plaintiff's movements.  Most notably, Plaintiff could select the geographical zone in which he wanted to receive delivery offers.  Plaintiff, for instance, chose to receive delivery offers within the "Los Angeles" zone.  Furthermore, the geographical zones from which Plaintiff could choose (including the actual geographic zone that Plaintiffs chose), were often quite large—and included his home and university—and Plaintiff could travel anywhere within those zones and still receive food delivery offers.  These facts suggest that Plaintiff's delivery blocks were non-compensable.  *See Henry*, 2007 WL 1998653, at *8 (granting summary judgment for defendant where on-call employees were "free[] . . . to go where they wish"); *Minnard v. Rotech Healthcare, Inc.*, 2008 WL 2169716, at *14 (E.D. Cal. May 22, 2008) (granting defendant's motion for summary judgment and finding on-call time was not compensable, in case where plaintiff "was not able to travel out of the Sacramento area").

71.     Third, Plaintiff failed to prove that the frequency of calls was unduly restrictive.  In fact, the evidence adduced at trial demonstrated that Plaintiff experienced significant periods of downtime while using the Grubhub App.  Most notably, Plaintiff experienced sufficient downtime to make himself available to perform driving and delivery services for companies other than Grubhub on more than 40 occasions during his Grubhub delivery blocks.  These facts suggest that Plaintiff's delivery

---

[3]  Notably, "[t]he standard for determining whether on-call time is subject to hourly compensation is largely the same under [the FLSA] and California law." *Henry*, 2007 WL 1998653, at *6.

blocks were non-compensable.  *See Cornish v. Odyssey HealthCare, Inc.,* 2009 WL 10671024, at *6 (C.D. Cal. Sept. 22, 2009) (finding that "the frequency of calls was not unduly restrictive" where "on average Plaintiff received 5–6 calls per weeknight [15-hour] on-call shift").

72.    Fourth, Plaintiff failed to prove that there was an unduly restrictive fixed time limit for response.  In fact, at no point during the parties' contractual relationship has Grubhub ever imposed a fixed time limit for response.  Moreover, the nature of the services that Plaintiff performed (food delivery) does not necessarily impose a "fixed time limit for response [that] was unduly restrictive . . . ."  *Mendiola*, 60 Cal. 4th at 840–41.  These facts suggest that Plaintiff's delivery blocks were non-compensable.  *See Berry*, 30 F.3d at 1184 ("[T]he required response by telephone or two-way radio within fifteen minutes is not a factor prohibiting the coroner's personal pursuits."); *Owens*, 971 F.2d at 349 (on-call time was not compensable, where "a mechanic with a pager was expected to reply within ten minutes of receiving a call."); *Henry*, 2007 WL 1998653, at *10–11 ("[G]iven that MedStaff has no fixed time limit for responses . . . this factor weighs in favor of finding on-call time non-compensable."); *Cornish*, 2009 WL 10671024, at *6 ("[T]he fifteen-minute response time did not unduly limit Plaintiff's ability to engage in personal activities, leave the home, or eat a meal.")

73.    Fifth, Plaintiff failed to prove that he was unable to easily trade on-call responsibilities with other DSPs.  Grubhub had no policy against "trading" delivery blocks.  On the contrary, Plaintiff could "drop" or "swap" a delivery block with a click of the button, while logged onto the When I Work program.  Furthermore, in briefing submitted with the Court, Plaintiff argued that "[t]he number of blocks that the drivers signed up for were limited," which suggests to this Court that there was a sufficient *demand* amongst DSPs to pick up any delivery blocks that Plaintiff might have wished to "drop" or "swap" through the When I Work program.  Dkt. 110 at 13; *see also id.* at 22 n.31 (arguing that delivery blocks were "limited in availability").  These facts suggest that Plaintiff's delivery blocks were non-compensable.  *See Berry*, 30 F.3d 1184–85 ("Because there is no policy against trading shifts and no evidence to support a conclusion that trading shifts is difficult, we conclude the coroners can easily trade shifts."); *Gomez*, 173 Cal. App. 4th at 524 (finding the on-call time was not compensable because, *inter alia*, "[o]n-call employees were permitted to trade on-call responsibilities").

74.     Sixth, whether Plaintiff could ease restrictions through the use of a pager is not relevant to the overall analysis of the compensability of Plaintiff's delivery blocks because Plaintiff already received delivery offers from Grubhub through his cell phone, the modern day equivalent of a pager.

75.     Seventh, and significantly, Plaintiff actually engaged in personal activities during call-in time.  As just discussed, Plaintiff engaged in driving and delivery services for companies other than Grubhub on more than 40 occasions during his Grubhub delivery blocks.  Often, Plaintiff accepted and performed driving and delivery services for other companies *after* he had accepted—but before he had completed—deliveries through the Grubhub App.  On several occasions, Plaintiff performed driving and delivery services for other companies and performed *zero* deliveries through the Grubhub App. These facts strongly suggest that Plaintiff's delivery blocks were non-compensable.  *See Berry*, 30 F.3d at 1185 ("As the district court noted, the ability of coroners to maintain secondary employment while on-call undermines the coroners' position that they are unable to actually pursue personal activities."); *Vandiver v. State*, 2010 WL 4681252, at *6–7 (Cal. Ct. App. Nov. 19, 2010) (unpublished) ("Although the issue in this case arose in the context of a demurrer . . . we can determine as a matter of law that the allegations of the complaint do not support relief—an employee who is allowed to accept outside paid employment cannot establish that the restrictions on his activities entitled him to compensation from another employer during the same time."); *Gomez*, 173 Cal. App. 4th at 524 (on-call time was not compensable where plaintiffs "confirmed they had engaged in some personal activities while on call").

76.     Eighth, Plaintiff failed to prove that he spent his delivery blocks primarily for the benefit of Grubhub.  As discussed elsewhere in this order, Plaintiff regularly performed driving and delivery services for companies other than Grubhub during his Grubhub delivery blocks.  These facts suggest that Plaintiff's delivery blocks were non-compensable.  *See Henry*, 2007 WL 1998653, at *7 ("[O]n-call time is not compensable on an hourly basis [where] employees were able to use on-call time primarily for personal pursuits.").

77.     For all these reasons, Plaintiff failed to prove that his delivery blocks constitute entirely compensable on-call time.

78.     Plaintiff failed to prove a minimum wage violation based on any other cognizable theory of liability.

79.    This Court grants judgment in favor of Grubhub on Claim II.

**D.    Plaintiff Did Not Carry His Burden Of Proving An Overtime Violation (Claim III)**

80.    Separate and apart from the issue of employment classification, Plaintiff also bore the burden of proof regarding the remainder of his overtime claim.  *See Santos v. TWC Admin. LLC*, 2014 WL 12558274, at *7 (C.D. Cal. Nov. 3, 2014) ("Damages are an essential element of [plaintiff's] overtime claim under Labor Code §§ 204, 515, and 1194; she, therefore, has the ultimate burden of persuasion on this issue at trial.").

81.    Plaintiff's theory of liability for his overtime claim necessarily depended on Plaintiff proving that the entirety of his Grubhub delivery blocks constituted compensable on-call time.  The sole week for which Plaintiff alleged an overtime violation was the week of November 30, 2015.

82.    Although this Court concludes that Plaintiff was not Grubhub's employee and, on that basis alone, grants judgment in Grubhub's favor on Plaintiff's overtime claim, *see supra* Part II.A, the Court also concludes that Plaintiff failed to carry his burden of proving that Plaintiff performed uncompensated or undercompensated work for purposes of his overtime claim.

83.    The Court reaches this conclusion based on the same reasons discussed above regarding Plaintiff's minimum wage claim; namely, Plaintiff failed to prove that his delivery blocks constituted entirely compensable on-call time.

84.    Plaintiff has not proven an overtime violation based on any other cognizable theory of liability.

85.    This Court grants judgment in favor of Grubhub on Claim III.

**E.    Plaintiff Did Not Carry His Burden Of Proving His Unfair Competition Law Claim (Claim IV)**

86.    Plaintiff asserted a derivative Unfair Competition Law ("UCL") claim predicated on Grubhub's alleged violations of California's minimum wage, overtime, and expense reimbursement statutes.

87.    Because Plaintiff bore the burden of proof for the specific Labor Code claims that underpinned his UCL claim, Plaintiff likewise bore the burden of proof as to each of the elements of his UCL claim.  *See Garcia v. Bana*, 2013 WL 621793, at *10 (N.D. Cal. Feb. 19, 2013) (finding that

1    plaintiff was not entitled to restitution under the UCL because he "did not meet his burden to prove

2    that he is owed overtime").

3    88.    Furthermore, because Plaintiff's UCL claim "require[d] a violation" of the

4    "borrow[ed]" predicate statutes, Grubhub's "defense to the underlying offense [was] a defense under

5    the [UCL]." *Irwin v. Mascott*, 94 F. Supp. 2d 1052, 1057 (N.D. Cal. 2000); *see also Alonzo v. Maximus,*

6    *Inc.*, 832 F. Supp. 2d 1122, 1137 (C.D. Cal. 2011) ("Plaintiffs' UCL claim 'stand[s] or fall[s] depending

7    on the fate of the antecedent substantive causes of action.'") (citation omitted, brackets in original).

8    89.    For the reasons set forth above, *see* Parts II.A–II.D, Plaintiff failed to carry his burden

9    of proof with respect to each of the following issues—(1) Plaintiff's putative employment

10   classification; (2) Grubhub's alleged expense reimbursement violations; and (3) Grubhub's alleged

11   minimum wage violations; and (4) Grubhub's alleged overtime violations.

12   90.    Accordingly, this Court grants judgment in favor of Grubhub on Claim IV.

13   **F.    Plaintiff Did Not Carry His Burden Of Proving His Status As An Aggrieved Employee Under PAGA (Claim V)**

14

15   91.    In addition to Plaintiff's individual claims, this bifurcated trial also resolved the issue

     whether Plaintiff was an "aggrieved employee" pursuant to California's Private Attorneys' General

16   Act ("PAGA").

17   92.    California's PAGA statute permits only an "aggrieved employee" to assert a PAGA

18   claim and recover civil penalties on behalf of the State of California. *See* Cal. Labor Code § 2699(a);

19   *see also Iskanian v. CLS Trans. Los Angeles, LLC*, 59 Cal. 4th 348, 387 (2014).

20

21   93.    Because Plaintiff failed to carry his burden of proof that he was an "employee" of

22   Grubhub or that he personally experienced a Labor Code violation, this Court grants judgment in favor

23   of Grubhub on Plaintiff's PAGA claim (Count V).   *See Holak v. K Mart Corp.*, 2015 WL 2384895, at

24   *6 (E.D. Cal. May 19, 2015) (granting summary judgment in favor of defendant on PAGA claim

25   "[b]ecause Plaintiff [was] not aggrieved by any of the specific Labor Code violations alleged in her

26   PAGA claim").

27

28

1

### III.  CONCLUSION

2    Grubhub intends to submit evidence substantiating each of the above-referenced proposed

3 disputed factual findings and conclusions of law at trial.

4

5 Dated: August 18, 2017

6                                              THEODORE J. BOUTROUS JR.
                                               GIBSON, DUNN & CRUTCHER LLP
7

8

9                                              By:   /s/ *Theodore J. Boutrous, Jr.*
                                                          Theodore J. Boutrous, Jr.
10
                                               Attorneys for Defendants GRUBHUB HOLDINGS
11                                             INC. and GRUBHUB INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **ECF ATTESTATION**

2

I, Dhananjay S. Manthripragada, hereby attest that concurrence in the filing of this document

3

has been obtained from Theodore J. Boutrous, Jr.

4

Dated: August 18, 2017

5

By:   */s/ Dhananjay S. Manthripragada*

6

Dhananjay S. Manthripragada

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28