THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
DHANANJAY S. MANTHRIPRAGADA, SBN 254433
  dmanthripragada@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
Facsimile:  213.229.7520

MICHELE L. MARYOTT, SBN 191993
  mmaryott@gibsondunn.com
KEVIN RING-DOWELL, SBN 278289
  kringdowell@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA  92612-4412
Telephone: 949.451.3800
Facsimile:  949.451.4220

Attorneys for Defendants GRUBHUB HOLDINGS INC.
and GRUBHUB INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ANDREW TAN and RAEF LAWSON in their capacities as Private Attorney General Representatives, and RAEF LAWSON, individually and on behalf of all other similarly situated individuals,<br><br>    Plaintiffs,<br><br>  v.<br><br>GRUBHUB HOLDINGS INC. and GRUBHUB INC.,<br><br>    Defendants. | CASE NO. 3:15-cv-05128-JSC<br><br>**DEFENDANTS' PRETRIAL BRIEF**<br><br><u>**Trial (Phase One):**</u><br>Date:  September 5, 2017<br>Time:  11:00 a.m.<br>Place:  Courtroom F—15th Floor<br>Judge:  Hon. Jacqueline Scott Corley |

Gibson, Dunn &
Crutcher LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ..................................................................................................... 1

II.   FACTS THAT ARE UNDISPUTED OR WILL BE PROVED AT TRIAL........................... 2

    A.    Grubhub Is A Food Ordering Company .......................................................... 2

    B.    Grubhub Did Not Have A Right To Control The Manner And Means By
        Which Plaintiff Performed His Deliveries ....................................................... 3

    C.    Grubhub Paid Plaintiff Like He Was An Independent Contractor ................... 6

    D.    Grubhub Did Not Control The Manner And Means By Which Plaintiff
        Performed Deliveries ....................................................................................... 7

III.  LEGAL STANDARDS APPLICABLE TO PLAINTIFF'S CLAIMS ................................... 9

    A.    Law Applicable To Plaintiff's Allegations Of Employment Misclassification
        (All Claims)...................................................................................................... 9

        1.    Legal Standards Applicable To The Right to Control .................................. 11

        2.    Secondary Indicia......................................................................................... 14

    B.    Legal Standards Applicable To Plaintiff's Expense Reimbursement Claim
        (Claim I)......................................................................................................... 17

    C.    Legal Standards Applicable To Plaintiff's Minimum Wage Claim (Claim II)........... 19

    D.    Legal Standards Applicable To Plaintiff's Overtime Claim (Claim III)..................... 20

    E.    Legal Standards Applicable To Plaintiff's UCL Claim (Claim IV) .......................... 20

    F.    Legal Standards Applicable To Plaintiff's Allegations Of "Aggrieved
        Employee" Status Under PAGA (Claim V)................................................... 20

IV.   GRUBHUB'S ANTICIPATED EVIDENTIARY ISSUES.................................................... 21

    A.    Plaintiff's Evidence Will Not Support Plaintiff's Arguments ..................................... 22

    B.    Plaintiff's Evidence Will Not Be Relevant To The Extent It Merely
        Demonstrates Control Over The *Results* Of Plaintiff's Work ................................... 23

V.    CONCLUSION....................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Fedex Ground Package Sys.*,
   765 F.3d 981 (9th Cir. 2014) ..................................................................................13, 24

*Ali v. USA Cab Ltd.*,
   176 Cal. App. 4th 1333 (2009) ..............................................................................11, 14

*Alonzo v. Maximus, Inc.*,
   832 F. Supp. 2d 1122 (C.D. Cal. 2011) ........................................................................20

*Amey v. Cinemark USA Inc.*,
   2015 WL 2251504 (N.D. Cal. May 13, 2015) ...............................................................21

*Arnold v. Mutual of Omaha Ins. Co.*,
   202 Cal. App. 4th 580 (2011) ........................................................................11, 12, 16

*Ayala v. Antelope Valley Newspapers, Inc.*,
   59 Cal. 4th 522 (2014) ....................................................................................................22

*Beaumont-Jacques v. Farmers Grp., Inc.*,
   217 Cal. App. 4th 1138 (2013) ..............................................................................11, 16

*Bowerman v. Field Asset Servs., Inc.*,
   2013 WL 6057043 (N.D. Cal. Nov. 14, 2013) ..............................................................15

*Brisbane Lodging, L.P. v. Webcor Builders, Inc.*,
   216 Cal. App. 4th 1249 (2013) ......................................................................................10

*Cassady v. Morgan, Lewis & Bockius LLP*,
   145 Cal. App. 4th 220 (2006) ........................................................................................18

*Christensen v. CVS Pharm., Inc.*,
   2017 WL 118030 (Cal. Ct. App. Jan. 12, 2017) ..........................................................18

*Comparetto v. Allstate Insurance Co.*,
   2014 WL 11514474 (C.D. Cal. July 24, 2014) ............................................................14

*Cotter v. Lyft, Inc.*,
   60 F. Supp. 3d 1067 (N.D. Cal. 2015) ..........................................................................11

*Desimone v. Allstate Ins. Co.*,
   2000 WL 1811385 (N.D. Cal. Nov. 7, 2000) .............................................13, 14, 15, 24

*Fireman's Fund Ins. Co. v. Davis*,
   37 Cal. App. 4th 1432 (1995) ................................................................................12, 23

Gibson, Dunn &
Crutcher LLP

ii

*Gattuso v. Harte-Hanks Shoppers, Inc.*,
 42 Cal. 4th 554 (2007) .................................................................................................17, 18

*Gomez v. Lincare, Inc.*,
 173 Cal. App. 4th 508 (2009) ...............................................................................................19

*Hammitt v. Lumber Liquidators, Inc.*,
 19 F. Supp. 3d 989 (S.D. Cal. 2014).....................................................................................18

*Happy Nails & Spa of Fashion Valley, L.P. v. Su*,
 159 Cal. Rptr. 3d 503 (Cal. Ct. App. July 19, 2013) ..............................................................9

*Hennighan v. Insphere Ins. Sols., Inc.*,
 38 F. Supp. 3d 1083 (N.D. Cal. 2014), *aff'd*, 650 F. App'x 500 (9th Cir. 2016) ..10, 12, 13, 14, 15,
 16, 23

*Henry v. Med-Staff, Inc.*,
 2007 WL 1998653 (C.D. Cal. July 5, 2007) ........................................................................19

*Holak v. K Mart Corp.*,
 2015 WL 2384895 (E.D. Cal. May 19, 2015)........................................................................20

*Irwin v. Mascott*,
 94 F. Supp. 2d 1052 (N.D. Cal. 2000) ..................................................................................20

*Iskanian v. CLS Trans. Los Angeles, LLC*,
 59 Cal. 4th 348 (2014) ..........................................................................................................20

*Johnson v. Serenity Transp., Inc.*,
 141 F. Supp. 3d 974 (N.D. Cal. 2015) ..................................................................................10

*Jones v. Royal Admin. Servs., Inc.*,
 __ F.3d __, 2017 WL 3401317 (9th Cir. 2017) ....................................................1, 2, 5, 12, 14, 15

*Lindell v. Synthes USA*,
 155 F. Supp. 3d 1068 (E.D. Cal. 2016)..................................................................................18

*McDonald v. Shell Oil Co.*,
 44 Cal. 2d 785 (1955) ............................................................................................................24

*McMahan v. Heat 'N' Soul Tax Servs. of Vallejo, Inc.*,
 2008 WL 4292732 (Cal. Ct. App. Sept. 22, 2008).................................................................17

*Mendiola v. CPS Security Solutions, Inc.*,
 60 Cal. 4th 833 (2015) ..........................................................................................................19

*Merchants Home Delivery Serv., Inc. v. N.L.R.B.*,
 580 F.2d 966 (9th Cir. 1978)..................................................................................................14

*Mission Ins. Co. v. Workers' Comp. Appeals Bd.*,
   123 Cal. App. 3d 211 (1981)............................................................11, 13, 14, 24

*Narayan v. EGL, Inc.*,
   285 F.R.D. 473 (N.D. Cal. 2012) ...............................................................15

*Narayan v. EGL, Inc.*,
   616 F.3d 895 (9th Cir. 2010)................................................................11, 22

*Olmstead v. Home Depot U.S.A., Inc.*,
   2015 WL 1791440 (Cal. Ct. App. Apr. 17, 2015) ......................................23

*Ortiz v. CVS Caremark Corp.*,
   2014 WL 1117614 (N.D. Cal. Mar. 19, 2014) ...........................................21

*Rabanal v. Rideshare Port Mgmt., LLC*,
   2013 WL 6020340 (Cal. Ct. App. Nov. 14, 2013).......................12, 13, 14, 15

*Raphael v. Tesoro Refining & Mkg. Co. LLC*,
   2015 WL 5680310 (C.D. Cal. Sep. 25, 2015) ...........................................21

*Robinson v. City of San Bernardino Police Dep't*,
   992 F. Supp. 1198 (C.D. Cal. 1998).....................................................12, 23

*Ruiz v. Affinity Logistics Corp.*,
   754 F.3d 1093 (9th Cir. 2014)............................................................14, 16

*S.G. Borello & Sons, Inc. v. Department of Industrial Relations*,
   48 Cal. 3d 341 (1989) ...............................................................10, 11, 14

*Salazar v. McDonald's Corp.*,
   2017 WL 88999 (N.D. Cal. Jan. 5, 2017) ..................................................21

*Sistare-Meyer v. Young Men's Christian Ass'n*,
   58 Cal. App. 4th 10 (1997) .......................................................................9

*Soares v. Flowers Foods, Inc.*,
   __ F.R.D. __, 2017 WL 2793807 (N.D. Cal. June 28, 2017) .........10, 14, 15, 22

*Stuart v. RadioShack Corp.*,
   641 F. Supp. 2d 901 (N.D. Cal. 2009) ......................................................18

*Taylor v. Waddell & Reed, Inc.*,
   2012 WL 3584942 (S.D. Cal. Aug. 20, 2012) ...........................................12

*Tieberg v. Unemployment Ins. App. Bd.*,
   2 Cal. 3d 943 (1970) ..............................................................................12

*Vandiver v. State*,
   2010 WL 4681252 (Cal. Ct. App. Nov. 19, 2010).....................................13

Gibson, Dunn &
Crutcher LLP

*W. Indemnity Co. v. Pillsbury,*
    172 Cal. 807 (1916) ................................................................................................11

**Statutes**

Cal. Lab. Code § 510(a) ................................................................................................20

Cal. Lab. Code § 1194(a) ..........................................................................................19, 20

Cal. Lab. Code § 2699(a) ..............................................................................................20

Cal. Lab. Code § 2802 ..............................................................................................17, 18

Cal. Lab. Code § 2802(a) ......................................................................................16, 17, 18

**Rules**

Fed. R. Evid. 403 ......................................................................................................21

1    Pursuant to this Court's Case Management and Pretrial Order (Non-Jury) No. 2, *see* Dkt. 145,

2    Defendants Grubhub Holdings Inc. and Grubhub Inc. (together "Grubhub") hereby submit their pretrial

3    brief in anticipation of Phase One of the bifurcated trial in the above-referenced action.

4                                   **I.  INTRODUCTION**

5    Plaintiff Raef Lawson's claims for minimum wage, overtime pay, and expense reimbursements,

6    and the derivative claims arising from those claims, all fail for the same reason:  Plaintiff was an

7    independent contractor, not Grubhub's employee.   The evidence at trial will prove that Plaintiff

8    received significant benefits from his independent contractor status that would not have been available

9    to him had he been an employee.  Plaintiff, a part-time actor (and in his own words, a member of the

10   "the gig economy"), chose when and how long to work, and whether to work at all—a privilege that

11   would be unthinkable in a true employment relationship.  Plaintiff chose to keep several competitor

12   smartphone applications running at the same time while performing deliveries through Grubhub, and

13   bounced back and forth from one application to the next to maximize his profitability—a classic

14   attribute of an independent contractor in today's digital era.  The evidence will further prove that

15   Plaintiff chose where to work, what vehicle to drive, what to wear while performing deliveries, what

16   food delivery bags to use, what to say to restaurant workers and diners, and what delivery routes to

17   take, among dozens of other decisions that rested with Plaintiff and Plaintiff alone.  Plaintiff even

18   initialed express representations in his contract, before and after he filed this lawsuit, acknowledging

19   his independent contractor relationship with Grubhub, filed an IRS Form 1099 for the compensation

20   he received from Grubhub and, when listing his work experience on his professional resume, chose not

21   to list Grubhub as an employer—clear and unambiguous concessions that Plaintiff himself did not

22   believe that Grubhub was his employer.  And the evidence will prove that Grubhub never once used

23   (and could not use) the parties' mutual contract termination right to control Plaintiff in any way.

24   These facts lead to one and only one possible conclusion—Plaintiff was an independent

25   contractor.  In fact, little more than a week ago, the Ninth Circuit—applying the Restatement (Second)

26   of Agency, which is "nearly identical" to California's independent contractor test—issued a

27   unanimous, published decision, *Jones v. Royal Admin. Servs., Inc.*, __ F.3d __, 2017 WL 3401317 (9th

28   Cir. 2017), clarifying that, under facts such as these, an employment relationship does not exist.  *Id.* at

*5.  In *Jones*, like this case, the defendant "did not have the right to control the hours the [workers] worked nor did it set quotas for the number of [jobs] the [workers] had to [complete] . . . ."  *Id.* at *4. In *Jones*, as here, the workers "'had many different clients and offered [the same] services to others during the same period,'" facts that "strongly suggest[ed] [they] were independent contractors rather than employees."  *Id.* at *5 (citation omitted).  In *Jones*, like this case, "each party retain[ed] the ability to cancel the contract at any time" with advance notice; i.e., they had a mutual termination right.  *Id.* And in *Jones*, the workers "supplied [] the 'tools and instrumentalities,' further supporting a finding of independent contractor status."  *Id.* (citation omitted).  "Taking these factors into account, it [was] clear" to the Ninth Circuit that the workers were not employees, and instead "were independent contractors" as a matter of law.  *Id.* at *6.  These facts, *all* of which are present here, mandate the same outcome in this case.

Under *Jones*, other governing Ninth Circuit and California law, and the facts that will be proved at trial, this Court should find that Plaintiff was an independent contractor.  In occasionally using the Grubhub application to perform deliveries, Plaintiff had a degree of unfettered freedom and flexibility that provided significant benefits to him and that has never been associated with "employment" in American law or society.  Accordingly, the Court should find in Grubhub's favor on all of Plaintiff's claims and grant judgment for Grubhub.

## II.  FACTS THAT ARE UNDISPUTED OR WILL BE PROVED AT TRIAL

### A.   Grubhub Is A Food Ordering Company

Founded in 2004, Grubhub is a food ordering company that connects diners with local takeout and delivery restaurants.  As Grubhub's Chief Operating Officer (Stan Chia) and others will testify, Grubhub was founded to help diners order food without having to collect paper menus or call a noisy restaurant and risk a wrong order, while also allowing diners to pay in advance.  In addition, Grubhub helps restaurants avoid having to invest in their own takeout and delivery marketing materials.

Grubhub expanded from its founding city of Chicago into its second market, San Francisco, in October 2007.  As Mr. Chia and others will testify, it was not until June 2014—a full ten years after Grubhub's founding and seven years after Grubhub began operations in California—that Grubhub first began contracting with independent contractors ("Delivery Service Providers," or "DSPs") to perform

deliveries in those circumstances when restaurants on the Grubhub platform were unable or unwilling to perform deliveries using their own in-house delivery persons.  At all relevant times during Plaintiff's relationship with Grubhub, only a very small percentage of delivery orders placed on the Grubhub website and associated mobile applications—*a percentage in the low single digits*—were delivered by DSPs who contracted with Grubhub; in all other circumstances, restaurants with their own delivery persons delivered the food orders themselves.

**B.    Grubhub Did Not Have A Right To Control The Manner And Means By Which Plaintiff Performed His Deliveries**

To access Grubhub's application and become eligible to receive food orders, Plaintiff was required to sign a Delivery Service Provider Agreement ("DSP Agreement"), a contract that has changed over time in material ways.  On August 28, 2015, Plaintiff accepted one such DSP Agreement.

As the evidence at trial will demonstrate, the DSP Agreement granted Plaintiff substantial and meaningful control over the manner by which he performed deliveries.  To take just a few examples, Plaintiff's DSP Agreement granted Plaintiff the following contractual rights:

| Plaintiff's Rights | DSP Agreement |
|---|---|
| Plaintiff had a ***right to decide how many hours to make himself available*** to perform deliveries. | "Unless otherwise expressly agreed in writing between the Parties, there shall be no specific minimum time period for which [DSP] must make itself available."  GH000307 ¶ 3.1. |
| Plaintiff had a ***right to decide which days and times to make himself available*** to perform deliveries. | "[DSP] shall have complete discretion to designate the dates it will make itself (including its personnel) and its equipment available to perform Engagements, and shall have no obligation to make itself (including its personnel) or its equipment on any particular date."  GH000307 ¶ 3.1. |
| Plaintiff had a ***right to decide the geographic region*** in which he performed deliveries. | "On a regular basis, [DSP] shall notify GrubHub . . . of the dates and/or periods and general geographic location(s) that [DSP] will be available to perform Delivery Services."  GH000307 ¶ 3.1. |
| Plaintiff had a ***right to perform deliveries for other companies***, even while performing deliveries he received through Grubhub. | "GrubHub does not have the right to restrict [DSP] from being concurrently or subsequently engaged to perform delivery services for other entities and customers, even should such business directly compete with GrubHub. Unless prohibited by law, nothing in this Agreement shall prohibit [DSP] from carrying and/or delivering orders for GrubHub (and its affiliates) and another entity at the same time, provided doing so does not interfere with the completion of the Delivery Services as required by this Agreement. Indeed, GrubHub understands that [DSP] may increase its profitability and/or |

Gibson, Dunn & Crutcher LLP

| | reduce its risk of loss by performing such concurrent services." GH000306 ¶ 2.4. |
|---|---|
| Plaintiff had the **right to hire or contract with other persons** to perform the deliveries that he accepted through Grubhub. | "[DSP] shall be solely responsible for determining how to perform the Delivery Services, including but not limited to whether to utilize employees, contractors, subcontractors, agents or representatives to perform all or some of the Delivery Services . . . ." GH000306 ¶ 2.2. |
| Plaintiff had a **right to negotiate his compensation**. | "Nothing will prevent [DSP] or GrubHub from negotiating a different Service Fee than that set forth in this Agreement for any given Engagement." GH000310 ¶ 8.1. |
| Plaintiff had a **right to choose the delivery bags he used** while performing deliveries. | "[Y]ou may either (select one):  1. Lease delivery bags from GrubHub in exchange for your marketing of GrubHub while performing delivery Services by wearing GrubHub-branded t-shirts and hats . . . 2. Lease delivery bags from Grubhub for $5/month . . . 3. Purchase . . . delivery bags" GH000323. |
| Plaintiff had a **mutual right to terminate the contract without cause**, on 14-days' notice. | "This Agreement shall remain in effect for 60 days, after which it will continue to automatically renew for additional 60 day periods, unless and until terminated as follows . . . By either Party or DSP without cause upon fourteen (14) days' prior written notice . . . ." GH000315 ¶ 13.1.2. |
| Plaintiff had a general **right to perform deliveries as he saw fit**. | "[DSP] shall be solely responsible for determining how to perform the Delivery Services . . . . GrubHub shall have no right to, and shall not, control or prescribe the manner, method or means [DSP] uses to complete the Delivery Services." GH000306 ¶ 2.2. |

In addition, Plaintiff's DSP Agreement was silent regarding many other factors affecting the manner and means of his performance.  For example, Plaintiff's DSP Agreement did ***not*** require Plaintiff to:  (1) wear a uniform or satisfy any requirements pertaining to his appearance while performing deliveries; (2) use a bicycle or vehicle that complied with any specific appearance, age, capacity, or size requirements; (3) follow any particular delivery routes when completing deliveries; (4) follow a scripted or prompted dialogue when communicating with restaurants or diners; (5) prohibit Plaintiff from soliciting and accepting cash gratuities from diners; (6) prohibit Plaintiff from advertising his driving and/or delivery services to diners, restaurants, or other companies; or (7) refrain from contracting with Grubhub again, in the event that one or both parties terminated the contract.

To be sure, Plaintiff's original DSP Agreement contained an appendix (the "Service Level Agreement" or "SLA") stating that Plaintiff should "[s]ign up for weekly delivery blocks either through the GrubHub driver app or another means" and "[s]hould not reject incoming orders or be otherwise

unavailable to receive incoming orders during any scheduled delivery block."  GH000319.  However, notwithstanding this language, the SLA also stated that "[e]xceptions [could] be made for extenuating circumstances if [Plaintiff] timely communicate[d] such circumstances to [Plaintiff's] dispatcher."  *Id.*  Furthermore, the DSP Agreement elsewhere clarified that "there [was] no specific minimum time period for which [DSP] must make itself available."  GH000307 ¶ 3.1.  And, importantly, Plaintiff accepted an amendment to his DSP Agreement on December 5, 2015 (called "Amendment No. 1"), which *deleted* the foregoing provisions from the Service Level Agreement and added the following provision in its place:  "Unless otherwise expressly agreed in writing between the Parties, there shall be no specific minimum time period for which [DSP] must make itself available.  [DSP] shall have complete discretion to accept Fee Offers and form Engagements . . . and is under no obligation to make itself (including its personal) and its equipment available other than for the duration of an Engagement, once accepted in accordance with the terms hereof."  GH000349.

In addition to the above contractual provisions, all of which relate to whether Grubhub or Plaintiff had a right to control the manner and means of Plaintiff's performance (among other relevant factors), Plaintiff's DSP Agreement contained a number of other contractual provisions proving that Plaintiff was an independent contractor engaged by Grubhub, *not* Grubhub's employee.  Those provisions include the following:

| Factors Showing Independent Contractor Status | DSP Agreement |
|---|---|
| The DSP Agreement stated that Grubhub is a *food ordering company*, not a food delivery company. | "GrubHub is an online and mobile food ordering company that connects diners with local takeout and delivery restaurants through its website (the 'Service')."  GH000305, Recital (a). |
| The DSP Agreement *defined the parties' relationship as an independent contractor relationship*. | "This Agreement is made between coequal, independent business enterprises that are separately owned and operated. The Parties intend this Agreement to create the relationship of principal and independent contractor between GrubHub and [DSP], and not that of employer and employee. The Parties are not employees, agents, joint venturers or partners of each other for any purpose."  GH000309 ¶ 7.1. |
| The DSP Agreement *required Plaintiff to electronically initial provisions stating that he was an independent contractor*. | "By initialing to the right, [DSP] represents and acknowledges the following:  (1) [DSP] understands that this Agreement creates the relationship of principal-independent contractor, not employer-employee; (2) [DSP] specifically desires and intends to operate as an independent delivery service provider; and |

Gibson, Dunn &
Crutcher LLP

|  | (3) If at any time [DSP] believes that its relationship with GrubHub is something other than an independent contractor relationship, [DSP] agrees to immediately notify GrubHub of this view." GH000310. |
| --- | --- |
| The DSP Agreement *required Grubhub to provide Plaintiff a Form 1099*, not a Form W2. | "GrubHub shall report all Service Fees remitted to [DSP] on a calendar year basis using an IRS Form 1099." GH000311 ¶ 8.4. |
| The DSP Agreement *stated that Plaintiff would provide his own equipment* (e.g., vehicle, smartphone). | "[DSP] is responsible for all costs and expenses arising from [DSP]'s performance of the Delivery Services, including, but not limited to, costs related to [DSP]'s personnel and equipment." GH000308 ¶ 5.4. |

## C.     Grubhub Paid Plaintiff Like He Was An Independent Contractor

Pursuant to Plaintiff's DSP Agreement, Grubhub—by default—paid Plaintiff the following Service Fees:  (1) $4.25 per fulfilled delivery; (2) 100% of any gratuities left by diners; and (3) $0.50 per straight-line mile between the restaurant and the diner.  Plaintiff could also receive an additional incentive payment *on top of* the Service Fees (the "True-Up Payment") if Plaintiff chose to:  (1) sign up for one or more delivery blocks on any given day; (2) accept and fulfill 75% of the orders that Plaintiff received during the day in question; and (3) make himself available to receive incoming orders for the entirety of each delivery block during the applicable week (Monday–Sunday); and if (4) the sum of the Service Fees was less than the compensation that Plaintiff would receive if he were compensated at $15.00 per hour.  The incentive True-Up Payment was equal to the difference between the total amount of the Service Fees that Plaintiff earned and the amount that Plaintiff would receive if he were paid $15.00 per hour.  As the evidence will show, Grubhub used this system to incentivize Plaintiff and other DSPs to make themselves available to receive delivery offers because, in contrast to a true employment relationship, Grubhub had no contractual authority to *instruct* Plaintiff or other DSPs to make themselves available to receive delivery offers.[1]

In past briefing filed with this Court, Plaintiff has argued that, in those instances in which he choose to pursue and earn incentive True-Up Payments, Plaintiff did not actually receive Service Fees

---

[1]  On December 5, 2015, Plaintiff accepted a Fee Offer, which largely retained this compensation structure, except that it (1) changed the per-delivery Service Fee from $4.25 per fulfilled delivery to $4.00 per fulfilled delivery; and (2) changed the amount of the incentive True-Up Payment to the difference between the total of the Service Fees and the amount Plaintiff would be entitled to if he were compensated at $11.00 per hour (rather than $15.00 per hour).

from Grubhub (neither the fixed per-delivery fee nor the mileage-based payments).  Rather, Plaintiff has alleged that whenever he earned an incentive True-Up Payment, Grubhub paid him a ***flat hourly wage*** based solely on the number of hours he worked.  As the evidence will prove at trial, however, Plaintiff is wrong.  Indeed, Plaintiff's pay statements, which Grubhub intends to submit into evidence, indisputably prove that Grubhub ***always*** paid Service Fees to Plaintiff when he performed deliveries (labeled on Plaintiff's pay statements as "Delivery Fees," "Tips," and "Mileage Fees").  If Plaintiff chose to pursue and actually earned the incentive-based True-Up Payments, Grubhub then paid Plaintiff a separate and additional True-Up Payment (labeled on Plaintiff's pay statements as "GH Contribution") ***on top of*** those Service Fees.  But that does not alter the fact that Grubhub paid Plaintiff Service Fees (including the fixed per-delivery amount and the mileage-based payment), every time Grubhub paid Plaintiff.

## D. Grubhub Did Not Control The Manner And Means By Which Plaintiff Performed Deliveries

The evidence will prove that throughout his relationship with Grubhub, Plaintiff took ample advantage of the freedom and flexibility he enjoyed as an independent contractor.  Indeed, Plaintiff chose to perform deliveries whenever and in whatever manner he saw fit.  As Grubhub's business records will demonstrate, after Plaintiff accepted his DSP Agreement on August 28, 2015, Plaintiff waited nearly *two months* to sign up for his first delivery block, which took place on October 25, 2015.  After Plaintiff began signing up for delivery blocks, he typically, but not always, chose to sign up for delivery blocks near the end of the day, when traffic was lighter and, in Plaintiff's view, demand was higher.  Frequently, Plaintiff chose to accept incoming delivery offers at the end of his delivery blocks, continued driving after his delivery blocks ended, and negotiated with Grubhub for larger True-Up Payments for that additional time.  And, although Plaintiff usually chose to sign up for delivery blocks, he was not required to do so, and he "toggled on" to receive delivery offers *without* signing up for delivery blocks on at least one occasion (on October 31, 2015).

In addition to deciding *when* to perform deliveries, Plaintiff also chose *where* to perform them.  Grubhub's business records will show that when Plaintiff accepted his DSP Agreement on August 28, 2015, Plaintiff—entirely of his own volition—chose to receive delivery offers in Grubhub's "Los

Angeles" zone.  And as the evidence will show, Grubhub later split the "Los Angeles" zone into smaller regions and offered Plaintiff the opportunity to switch zones to the "South Bay" zone, if he desired. Plaintiff ultimately declined Grubhub's offer to switch delivery zones and, as such, Grubhub continued sending delivery offers to Plaintiff in the "Los Angeles" zone.

Even after Plaintiff chose when and where to receive incoming delivery offers, Plaintiff decided for himself exactly *how* to perform deliveries.  For example, Plaintiff chose which delivery routes to follow when traveling to restaurants and delivering food to drivers; Grubhub did not provide, and Plaintiff did not follow, any mandatory driving or delivery routes.  Plaintiff also choose the attire that he wore while performing deliveries.  He decided which delivery bags to use while performing deliveries, too.  Finally, Plaintiff chose what to say to restaurant workers and diners; Grubhub never once provided Plaintiff scripts or prompts to follow when performing deliveries.

Based on Grubhub's business records and business records that Grubhub has subpoenaed from two of its competitors, Caviar and Postmates, the evidence will also prove that Plaintiff frequently chose to perform driving and delivery services through companies *other* than Grubhub—a hallmark characteristic of an independent contractor.  Indeed, of the 59 days that Plaintiff signed up for delivery blocks or "toggled on" to receive delivery offers from Grubhub, Plaintiff also made himself available to receive incoming delivery offers from Caviar or Postmates, or both, ***41 times***.  As these records will show, Plaintiff chose to accept delivery requests from other companies after he had accepted—but before he had completed—deliveries for offers that he had accepted through Grubhub.  In other words, Plaintiff routinely accepted a delivery request for other companies while he was in the middle of performing a delivery through Grubhub.  Thus, far from devoting his time and energies solely to Grubhub, Plaintiff acted as the classic independent contractor, contracting with and performing services for many different (and competing) companies for his own benefit—all at the same time.

Finally, the evidence will prove that Plaintiff chose to re-contract with Grubhub multiple times. On March 11, 2016, less than one month after Grubhub terminated the parties' contract, Plaintiff chose to enter into a second DSP Agreement.  *See* GH000111–24.  Plaintiff completed a survey at that time, using a different email address than the one he had previously used with Grubhub, in which he was asked why he was interested in being a delivery partner with Grubhub.  In response, Plaintiff stated,

1   "Grubhub is the busiest and most efficient delivery service in my area, not to mention the most

2   rewarding."  GH001815.  On April 7, 2017 (after filing this lawsuit), Plaintiff entered into yet another

3   DSP Agreement with Grubhub.  LAWSON001508–21.  At that time, Plaintiff again electronically

4   initialed next to a series of representations stating that he understood that the DSP Agreement created

5   a principal-independent contractor relationship.  LAWSON001513.

6   ### III.  LEGAL STANDARDS APPLICABLE TO PLAINTIFF'S CLAIMS

7   As this Court explained during the parties' July 31, 2017 telephonic hearing, the Court is

8   familiar with the issues that govern in cases involving allegations of employment misclassification,

9   both as a result of the summary judgment briefing in this action and because the Court is overseeing

10   multiple other actions involving similar claims.  For that reason, Grubhub does not intend to provide

11   the Court with a full-fledged application of the facts at issue in this case to the law governing alleged

12   employment misclassification, overtime and minimum wage claims, and expense reimbursement

13   claims.  Nevertheless, solely for the Court's convenience, Grubhub provides a brief overview of the

14   legal standards applicable to Plaintiff's claims, for reference during and after trial.  Additionally,

15   Grubhub has submitted separate memoranda of law regarding:  (1) the burdens of proof with respect to

16   each of the issues presented below; and (2) the legal effect of a mutual at-will termination provision.

17   **A.**      **Law Applicable To Plaintiff's Allegations Of Employment Misclassification (All Claims)**

18   "[C]ommon and statutory law distinguishes contractors from employees, and their statuses,

19   though both rooted in contract are significantly different."  *Sistare-Meyer v. Young Men's Christian*

20   *Ass'n*, 58 Cal. App. 4th 10, 16 (1997).  Because "[i]ndependent contractors typically have greater

21   control over the way in which they carry out their work than employees, and businesses assume fewer

22   duties with respect to independent contractors than employees . . . the independent contractor status

23   provides the hiring party and the worker with an alternative relationship that gives each more freedom

24   and flexibility than the employer-employee relationship."  *Id.* at 16–17; *see also Happy Nails & Spa of*

25   *Fashion Valley, L.P. v. Su*, 159 Cal. Rptr. 3d 503, 520 n.6 (Cal. Ct. App. July 19, 2013) (unpublished)

26   ("[P]rivate parties are free to change the nature of their business relationship" from employment

27   relationships to independent contractor relationships "in accordance with the 'long-standing

28   established public policy in California which respects and promotes the freedom of private parties to

Gibson, Dunn &
Crutcher LLP

contract'") (citing *Brisbane Lodging, L.P. v. Webcor Builders, Inc.*, 216 Cal. App. 4th 1249, 1262 (2013)).

When determining whether a given contractual relationship is an employment relationship or an independent contractor relationship, California courts apply the multi-factored, common law test set forth in *S.G. Borello & Sons, Inc. v. Department of Industrial Relations,* 48 Cal. 3d 341, 350 (1989). *See Hennighan v. Insphere Ins. Sols., Inc.*, 38 F. Supp. 3d 1083, 1097 (N.D. Cal. 2014), *aff'd*, 650 F. App'x 500 (9th Cir. 2016) ("Because the California Labor Code does not expressly define 'employee,' the common law test for employment applies."); *see also Johnson v. Serenity Transp., Inc.*, 141 F. Supp. 3d 974, 995 (N.D. Cal. 2015) (Corley, M.J.) (finding that the common law test applies when the Court must decide "whether a single entity ha[s] accurately classified workers as employees versus independent contractors, rather than whether secondary entities were joint employers").

"Under this approach, '[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired.'" *Soares v. Flowers Foods, Inc.*, __ F.R.D. __, 2017 WL 2793807, at *11 (N.D. Cal. June 28, 2017) (Corley, M.J.) (citing *Borello*, 48 Cal. 3d at 350). In addition, "California courts also consider 'several "secondary" indicia' of the nature of a service relationship for the purposes of a common law employment relationship." *Id.* These factors include:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Borello*, 48 Cal. 3d at 351. The factors "'cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.'" *Id.* (citation omitted). "'[I]t is the rare case where . . . [all] factors will point with unanimity in one direction or the other.'" *Hennighan*, 38 F. Supp. 3d at 1099. Thus, even if several factors weigh in favor of employment, the Court can and should find that the Plaintiff is an independent contractor if the factors, when weighed together, support that conclusion. *See Arnold v. Mutual of Omaha Ins. Co.*, 202 Cal. App. 4th 580, 590

1   (2011) ("Even if one or two of the individual factors might suggest an employment relationship,

2   summary judgment is nevertheless proper when, as here, all the factors weighed and considered as a

3   whole established that [the plaintiff] was an independent contractor").

4        When applying this test to the facts of this case, however, the Court should remain mindful that

5   "[t]he test the California courts have developed over the 20th Century for classifying workers"

6   —i.e., the *Borello* test—is "outmoded," "isn't very helpful in addressing [] 21st Century problems[,]"

7   and, if applied literally, could effectively require a fact finder to take "a square peg and . . . choose

8   between two round holes." *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1081–82 (N.D. Cal. 2015).

9   Therefore, it is particularly important for the Court to "assess and weigh *all* of the incidents of the

10  relationship with the understanding that no one factor is decisive . . . ." *Narayan v. EGL, Inc.*, 616 F.3d

11  895, 901 (9th Cir. 2010) (citation omitted) (emphasis added).  Furthermore, as the California

12  Supreme Court has held, "a worker's express or implied agreement" to form an "an independent contractor

13  [relationship] is 'significant.'"  *Borello*, 48 Cal. 3d at 358 (citation omitted).  Thus, the "agreement

14  between the parties expressly stating that the relationship created is that of independent contractor

15  should not be lightly disregarded." *Mission Ins. Co. v. Workers' Comp. Appeals Bd.*, 123 Cal. App. 3d

16  211, 226 (1981).

17       **1.    Legal Standards Applicable To The Right to Control**

18       "'[T]he test of "control" . . . means "*complete* control."'"  *Mission Ins. Co.*, 123 Cal. App. 3d

19  at 221 (emphasis in original) (citing *W. Indemnity Co. v. Pillsbury*, 172 Cal. 807, 811 (1916)).  "'For

20  example, the citizen who hires a taxicab to take him to a certain place exercises that amount of control

21  over the driver, but he does not thereby become the man's employer.'"  *Id.*; *see also Ali v. USA Cab

22  Ltd.*, 176 Cal. App. 4th 1333, 1347 (2009) ("[T]he right to exercise complete or authoritative control

23  must be shown, rather than a mere suggestion as to detail.").  Importantly, and as discussed below, *see

24  infra* Part IV.B, a principal in an independent contractor relationship "'may retain a broad general

25  power of . . . control as to the results of the work so as to insure satisfactory performance of the

26  independent contract . . . .'"  *Beaumont-Jacques v. Farmers Grp., Inc.*, 217 Cal. App. 4th 1138, 1143

27  (2013) (citation omitted); *see also Tieberg v. Unemployment Ins. App. Bd.*, 2 Cal. 3d 943, 946–47

28

(1970) ("If control may be exercised only as to the *result* of the work and not the *means* by which it is accomplished, an independent contractor relationship is established.") (emphasis added).

Although the existence or non-existence of a right to control depends on the particular circumstances of the case, a number of trends have emerged in the case law.  Specifically, courts routinely hold that workers are independent contractors when some, or perhaps even one, of the following factual circumstances exists.  Here, ***all*** of these factual circumstances are satisfied:

- Independent Contractors Often Control When They Work.  *See Jones*, 2017 WL 3401317, at *6 (affirming summary judgment order finding that telemarketers were independent contractors as a matter of law, in part, because they "set [their] own hours"); *Hennighan*, 38 F. Supp. 3d at 1100 (finding that agent was independent contractor because he "establish[ed] his own schedule"); *Taylor v. Waddell & Reed, Inc.*, 2012 WL 3584942, at *5 (S.D. Cal. Aug. 20, 2012) (finding no control where defendant "did not set financial advisor schedules"); *Rabanal v. Rideshare Port Mgmt., LLC*, 2013 WL 6020340, at *7 (Cal. Ct. App. Nov. 14, 2013) (unpublished) (van drivers were independent contractors because they "decided when they wanted to work").

- Independent Contractors Often Control Where They Work:  *See Arnold*, 202 Cal. App. 4th at 589 (affirming summary judgment order finding that agent who "used her own judgment in determining . . . [the]  place . . . in which she would solicit" was independent contractor); *Fireman's Fund Ins. Co. v. Davis*, 37 Cal. App. 4th 1432, 1442–43 (1995) (manager was independent contractor because "place of work . . . [was] left to [her] discretion").

- Independent Contractors Often Decide Whether To Provide Services To Other Companies:  *See Jones*, 2017 WL 3401317, at *5 (the fact that workers "'ha[ve] many different clients and offer[] [the same] services to others during the same period' . . . strongly suggests [that the workers are] independent contractors rather than employees.") (citation omitted); *Robinson v. City of San Bernardino Police Dep't*, 992 F. Supp. 1198, 1207 (C.D. Cal. 1998) (finding that phlebotomist was independent contractor because she "practice[d] her profession for others when not working for defendant"); *Arnold*, 202 Cal. App. 4th at 589 (affirming summary judgment order finding agent to be independent contractor because her "appointment with [defendant] was nonexclusive"); *Rabanal*, 2013 WL 6020340, at *7 (van drivers were independent contractors because they "decided . . . whether . . .

[to] solicit fares from other transportation networks"); *Vandiver v. State*, 2010 WL 4681252, at *6–7 (Cal. Ct. App. Nov. 19, 2010) (unpublished) ("Although the issue in this case arose in the context of a demurrer . . . we can determine as a matter of law that the allegations of the complaint do not support relief—an employee who is allowed to accept outside paid employment cannot establish that the restrictions on his activities entitled him to compensation from another employer during the same time.").

- Independent Contractors Often Do Not Have A Uniform:  *See Desimone v. Allstate Ins. Co.*, 2000 WL 1811385, at *12 (N.D. Cal. Nov. 7, 2000) (plaintiff was independent contractor where defendant "place[d] little constraint on Plaintiffs' or their employees' manner of dress"); *cf. Alexander v. Fedex Ground Package Sys.*, 765 F.3d 981, 989 (9th Cir. 2014) (drivers were employees because, *inter alia*, defendant "control[led] its drivers' clothing from their hats down to their shoes and socks.").

- Independent Contractors Can Often Use The Tools And Instrumentalities They Want:  *See Alexander*, 765 F.3d at 989–90 (finding that drivers were employees because "FedEx require[d] drivers to paint their vehicles a specific shade of white, mark them with the distinctive FedEx logo, and to keep their vehicles 'clean and presentable [and] free of body damage and extraneous markings.'").

- Independent Contractors Can Be Monitored If Needed To Ensure They Are Completing Their Work:  *See Hennighan*, 38 F. Supp. 3d at 1101 ("Even if [defendant] monitored sales agents' productivity and set goals for them, that only relates to the results [defendant] expected, not the manner by which agents had to achieved those goals—the key distinction for showing control."); *Desimone*, 2000 WL 1811385, at *13 ("The annual evaluations of agency results, like the reporting requirements, do not reflect an attempt by Defendant to exercise control over how Plaintiffs sell insurance to their customers on a daily basis, but rather are a means by which each agency's results are monitored."); *Mission Ins. Co.*, 123 Cal. App. 3d at 223 (reversing finding that applicant was an employee because applicant's "work was not inspected except where a customer made a specific complaint").

- Independent Contractors Who Drive As Part Of Their Work Can Often Choose Their Routes:  *See Rabanal*, 2013 WL 6020340, at *7 (affirming finding that van drivers were independent contractors because the drivers "could determine the order of, and the routes for, pickup and drop-off");

1   *cf. Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1101 (9th Cir. 2014) (reversing summary judgment

2   order for defendant, in part, because defendant "determined [plaintiffs' driving] routes").

3   • <u>Independent Contractors Typically Do Not Need To Follow Scripts</u>:  *See Hennighan*,

4   38 F. Supp. 3d at 1100 (granting summary judgment for defendant, in part, because defendant "did not

5   control the means by which [plaintiff] interacted with clients"); *cf. Jones*, 2017 WL 3401317, at *5

6   (affirming summary judgment order finding that telemarketers were independent contractors as a

7   matter of law, even though defendant "controlled the 'scripts and materials' the telemarketer was

8   permitted to use in the sale."); *Comparetto v. Allstate Insurance Co.*, 2014 WL 11514474, at *9 (C.D.

9   Cal. July 24, 2014) (denying defendant's motion for summary judgment, in part, because plaintiffs

10  testified that defendant required plaintiffs to use "call scripts" when interacting with customers).

11  • <u>Independent Contractors Can Often Negotiate Their Pay</u>:  *See Ali*, 176 Cal. App. 4th at

12  1349 (denying class certification in a misclassification case because some drivers "set their own rates,

13  such as flat rates per trip or rates below the standard metered rate," whereas other drivers did not).

14  • <u>Independent Contractors Can Often Hire Their Own Employees Or Sub-Contractors</u>:

15  *See Desimone*, 2000 WL 1811385, at *11 (insufficient evidence of control to establish an employment

16  relationship where "Plaintiffs [could] hire employees to perform their duties"); *Mission Ins.*, 123 Cal.

17  App. 3d at 223 (finding that defendant in worker's compensation action lacked control because "the

18  contract did not even require that the services be performed by applicant personally."); *Rabanal*, 2013

19  WL 6020340, at *7 (van drivers were independent contractors, in part, because they "were entitled to

20  hire employees to assist them"); *see also Merchants Home Delivery Serv., Inc. v. N.L.R.B.*, 580 F.2d

21  966, 974–75 (9th Cir. 1978) (owner-operators were independent contractors under federal law because

22  they "ha[d] the right to employ their own helpers to assist them in making deliveries").

23  **2.  Secondary Indicia**

24      As discussed above, "California courts also consider 'several "secondary" indicia' of the nature

25  of a service relationship for the purposes of a common law employment relationship."  *Soares*, 2017

26  WL 2793807, at *11 (citing *Borello*, 48 Cal. 3d at 350); *see also Borello*, 48 Cal. 3d at 351 ("[T]he

27  individual factors cannot be applied mechanically . . . they are intertwined and their weight depends

28  often on particular combinations.").  Like the right to control analysis, the application of these factors

often depends on the context-dependent circumstances of the particular case, but several guiding principles have emerged from the case law regarding these secondary factors.  Specifically, courts are more likely to find an independent contractor relationship in the following circumstances:

- Independent Contractors Often Perform Services For Other Companies:  *See Jones*, 2017 WL 3401317, at *5 (affirming summary judgment order finding that telemarketers were independent contractors as a matter of law because they "'had many different clients and offered [the same] services to others during the same period.'") (citation omitted); *Hennighan*, 38 F. Supp. 3d at 1102 (finding that plaintiff engaged in a distinct business because "Hennighan was affiliated with and sold insurance for other companies, including a separate insurance agency, First Authority Insurance"); *Rabanal*, 2013 WL 6020340, at *7 (van drivers were independent contractors, in part, because their "relationship with [defendant] was decidedly not exclusive"); *see also Soares*, 2017 WL 2793807, at *15 (denying class certification because, *inter alia*, "some [putative class members] provided delivery services to other companies" and "other [putative class members] drove exclusively for [defendant]"); *Narayan v. EGL, Inc*., 285 F.R.D. 473, 478 (N.D. Cal. 2012) (denying class certification because "some putative class members provided pick-up and delivery services to other companies concurrently with performing services for [defendant]," and "other class members did not").

- Independent Contractors Often File Their Income Taxes As Self-Employed Individuals: *Hennighan*, 38 F. Supp. 3d at 1102 (finding that plaintiff engaged in a distinct business because plaintiff "identified himself as self-employed in his tax returns"); *Bowerman v. Field Asset Servs., Inc*., 2013 WL 6057043, at *2 (N.D. Cal. Nov. 14, 2013) ("[T]he fact that the Bowermans paid self-employment taxes and filed Schedule Cs is relevant to [the misclassification] determination . . . ."); *Desimone*, 2000 WL 1811385, at *16 (N.D. Cal. Nov. 7, 2000) ("Plaintiffs acknowledge that Defendant characterizes them as independent contractors for tax purposes, and that they file their taxes as 'self-employed' individuals . . . . [T]he fact that Plaintiffs have filed their taxes and established their own retirement plans as independent contractors since becoming EAs is evidence that Plaintiffs do not view their relationship with Defendant as that of an employee.").

- Principals And Independent Contractors Can Have A Mutual Right To Terminate The Contractual Relationship: *See Jones*, 2017 WL 3401317, at *5 (affirming summary judgment order

1   finding that telemarketers were independent contractors as a matter of law, where "each party retain[ed]

2   the ability to cancel the contract at any time on 30 days notice"); *Hennighan*, 38 F. Supp. 3d at 1105

3   ("A mutual termination clause is evidence of an independent-contractor relationship"); *Beaumont-*

4   *Jacques*, 217 Cal. App. 4th at 1147 (clause allowing for termination "without cause by either [party]

5   on 30 days' written notice" created a "mutual" right to terminate, and supported independent contractor

6   status); *Arnold*, 202 Cal. App. 4th at 584, 589 (provision that allowed either party to "terminate the

7   contract with or without cause through written notice," "may properly be included in an independent

8   contractor agreement, and is not by itself a basis for changing that relationship to one of an employee");

9   *cf. Ruiz*, 754 F.3d at 1105 ("[T]he parties' mutual termination provision is consistent with either an

10   employer-employee or independent contractor relationship.'").

11                                      *       *       *

12          Under these legal standards, the evidence at trial will make abundantly clear that the

13   relationship between Grubhub and Plaintiff was the definitive example of an independent contractor

14   relationship.  Plaintiff enjoyed vast freedom and flexibility over when, where, how, and for whom, he

15   worked.  He decided what days and which hours, if any, to work.  He chose where to work and which

16   delivery routes to follow.  More often than not, he chose to make himself available to perform deliveries

17   for other companies while he performed deliveries through Grubhub.  He decided what to wear while

18   completing his deliveries, what delivery bags to use, what to say to customers and diners, and what

19   vehicle to use when completing deliveries (or to refrain from using a vehicle, and to instead use a

20   bicycle).  He negotiated for more money when he believed appropriate.  He chose whether (or not) to

21   hire subcontractors and employees of his own to perform deliveries.  And, of course, Plaintiff chose to

22   sign an agreement expressly characterizing his relationship with Grubhub as an independent contractor

23   relationship, filed his taxes accordingly (and profited financially as a result), and did not list Grubhub

24   as his employer on his professional resume.  Under these facts, the only possible conclusion is that

25   Plaintiff was an independent contractor.

26

27

28

Gibson, Dunn &
Crutcher LLP

DEFENDANTS' PRETRIAL BRIEF – CASE NO. 3:15-CV-05128-JSC

**B.      Legal Standards Applicable To Plaintiff's Expense Reimbursement Claim (Claim I)**

California Labor Code section 2802(a) states as follows:

> An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful.

Cal. Lab. Code § 2802(a).

As the California Supreme Court has explained, an employee may satisfy its obligations under section 2802 "by paying employees increased enhanced compensation in the form of increases in base salary or increases in commission rates, or both, provided there is a means or method to apportion the enhanced compensation to determine what amount is being paid for labor performed and what amount is reimbursement for business expenses." *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 559 (2007).   Indeed, although there is an "important distinction between wages (as payment for labor performed) and business expense reimbursement[,]" that "does not mean . . . that an employer is prohibited from combining wages and business expense reimbursements in a single enhanced employee compensation payment or from discharging its section 2802 business expense reimbursement obligation through an increase in base salary or in commission rates (or an increase in both salary and commission rates)." *Id.* at 572–73.

In the specific context of automobile-related expenses, the California Supreme Court has further held that an employer may calculate the amount of the reimbursement in any one of three ways—(1) by reimbursing an employee her actual automobile-related expenses, a "burdensome" method that requires the employee to "keep detailed and accurate records of amounts spent," (2) by adopting a "mileage reimbursement method" by which the employee "need only keep a record of the number of miles driven" and the employer then "multiplies the work-required miles driven by a predetermined amount that approximates the per-mile cost of owning and operating an automobile," or (3) by providing the employee a "lump-sum payment," by which an "employer merely pays a fixed amount for automobile expense reimbursement." *Gattuso*, 42 Cal. 4th at 567–71.   If the employer uses either the mileage reimbursement or the lump-sum payment methods, and "[i]f the employee can show that the reimbursement amount that the employer has paid is less than the actual expenses that the employee

has necessarily incurred for work-required automobile use (as calculated using the actual expense method), the employer must make up the difference." *Id.* at 569; *see also McMahan v. Heat 'N' Soul Tax Servs. of Vallejo, Inc.*, 2008 WL 4292732, at *2 n.1 (Cal. Ct. App. Sept. 22, 2008) (unpublished) ("[T]he mileage reimbursement method seems to function much like a presumption, establishing the reimbursement amount unless a different amount (higher or lower) is established by the evidence.").[2]

Notably, under section 2802, an employee is entitled to reimbursement only for reasonable expenses incurred "in direct consequence of the discharge of his or her duties" to the employer. Cal. Lab. Code § 2802(a). Therefore, if an employee incurred expenses in furtherance of her personal pursuits, or in the discharge of his or her duties to *another* company or individual, an employer need not reimburse the employee for those expenses. *See Cassady v. Morgan, Lewis & Bockius LLP*, 145 Cal. App. 4th 220, 235 (2006) ("No public policy would be served by requiring employers to indemnify for expenses attributable to an employee's conduct while working for a different employer.").

Finally, "before an employer's duty to reimburse is triggered, it must either know or have reason to know that the employee has incurred an expense." *Stuart v. RadioShack Corp.*, 641 F. Supp. 2d 901, 904 (N.D. Cal. 2009). Therefore, an employee must submit "evidence [showing that the employer] knew or had reason to know that [the employee] had incurred business-related expenses" that the employer was not fully reimbursing. *Hammitt v. Lumber Liquidators, Inc.*, 19 F. Supp. 3d 989, 1001 (S.D. Cal. 2014). Courts determine whether the employer knew or had reason to know that the employee was incurring business-related expenses by examining whether the employee submitted a reimbursement request to the employer. *Id.* at 1000–01 (granting employer's motion for summary

---

[2] Because the mileage reimbursement and lump sum payment methods are "merely an approximation of actual expenses" and therefore are "inherently less accurate than the actual expense method," those methods do not need to—and in fact, are designed to avoid the need to—correspond perfectly with the actual expense amounts that employees have incurred. *Gattuso*, 42 Cal. 4th at 569. "Thus, liability under section 2802 depends not on how an employer established its mileage reimbursement rate, but on whether the reimbursement provided is 'sufficient to fully reimburse the employees for all expenses actually and necessarily incurred.'" *Christensen v. CVS Pharm., Inc.*, 2017 WL 118030, at *5 (Cal. Ct. App. Jan. 12, 2017) (unpublished). As discussed above, it is the plaintiff-employee's duty to make this showing. *See Gattuso*, 42 Cal. 4th at 569; *see also Lindell v. Synthes USA*, 155 F. Supp. 3d 1068, 1077 (E.D. Cal. 2016) (holding that it is plaintiff's burden to prove that "(a) Defendants had a policy of not reimbursing class members for expenses, *or* (b) that Defendants did reimburse employees, but not in a manner that communicated to employees how expenses were apportioned in paychecks *or* (c) that Defendants reimbursed employees *but* did not fully reimburse them for their expenses.").

judgment on expense reimbursement claim because "Plaintiff did not submit reimbursement requests" and, as a result, there was no evidence that employer "knew or had reason to know that Plaintiff had incurred business-related expenses").

## C.     Legal Standards Applicable To Plaintiff's Minimum Wage Claim (Claim II)

California Labor Code section 1194(a) states as follows:

> Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit.

Cal. Lab. Code § 1194(a).

Plaintiff's claim for minimum wage (Claim II) is predicated on the theory that the entirety of his Grubhub delivery blocks (or the time spent "toggled on" in the Grubhub App) constitutes compensable on-call time for purposes of California's minimum wage laws.  As the California Supreme Court made clear in *Mendiola v. CPS Security Solutions, Inc.*, not all "on-call time constitutes hours worked," and courts must instead weigh a host of factors to determine whether on-call time is compensable in a given case.  60 Cal. 4th 833, 840–41 (2015).  Specifically, "courts considering whether on-call time constitutes hours worked have primarily focused on the extent of the employer's control," and that fact-intensive inquiry turns on "various factors":  "(1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on the employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time."  *Id.* at 840–41.  In addition, courts consider whether the "[o]n-call waiting time . . . is spent primarily for the benefit of the employer and its business."  *Gomez v. Lincare, Inc.*, 173 Cal. App. 4th 508, 523–24 (2009) (on-call time was not compensable where plaintiffs "confirmed they had engaged in some personal activities while on call").  Notably, "[i]n the vast majority of reported cases dealing with on-call time, the hours were held noncompensable . . . ."  *Henry v. Med-Staff, Inc.*, 2007 WL 1998653, at *6 (C.D. Cal. July 5, 2007).

Gibson, Dunn & Crutcher LLP

19

**D.  Legal Standards Applicable To Plaintiff's Overtime Claim (Claim III)**

California Labor Code section 1194(a) states as follows:

> Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit.

Cal. Lab. Code § 1194(a).  California Labor Code section 510(a), in turn, states as follows:

> Eight hours of labor constitutes a day's work.  Any work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek and the first eight hours worked on the seventh day of work in any one workweek shall be compensated at a rate of no less than one and one-half times the regular rate of pay for an employee.

Cal. Lab. Code § 510(a).

Plaintiff's claim for overtime (Claim III) is predicated on the theory that the entirety of his Grubhub delivery blocks (or the time spent "toggled on" in the Grubhub App) constitutes compensable on-call time for purposes of California's overtime laws.  Accordingly, the factors discussed above with respect to the compensability of on-call time for purposes of California's minimum wage claims, *see supra* Part III.C, apply with equal measure to Plaintiff's overtime claims.

**E.  Legal Standards Applicable To Plaintiff's UCL Claim (Claim IV)**

Plaintiff asserts a UCL claim predicated on alleged violations of the Labor Code provisions discussed above.  *See* Parts III.B–D.  Therefore, "Plaintiffs' UCL claim 'stand[s] or fall[s] depending on the fate of the antecedent substantive causes of action.'"  *Alonzo v. Maximus, Inc.*, 832 F. Supp. 2d 1122, 1137 (C.D. Cal. 2011) (citation omitted, brackets in original); *Irwin v. Mascott*, 94 F. Supp. 2d 1052, 1057 (N.D. Cal. 2000) ("A defense to the underlying offense is a defense under the Act.").

**F.  Legal Standards Applicable To Plaintiff's Allegations Of "Aggrieved Employee" Status Under PAGA (Claim V)**

California's PAGA statute permits an "aggrieved employee" to assert a PAGA claim for civil penalties on behalf of the State of California for an employer's alleged violations of the California Labor Code.  *See* Cal. Labor Code § 2699(a); *see also Iskanian v. CLS Trans. Los Angeles, LLC*, 59 Cal. 4th 348, 387 (2014).  Phase One of this bifurcated trial focuses solely on the issue of whether Plaintiff is an "aggrieved employee" under PAGA, i.e., whether Plaintiff personally experienced a

Labor Code violation.  *See* Dkt. 122 at 2 ("Trial shall be conducted in phases, with the first phase of trial . . . to be limited to Plaintiff's individual claims and the issue of whether Plaintiff Lawson is an 'aggrieved employee' under PAGA").  If this threshold showing is not made, PAGA liability cannot arise.  *See Holak v. K Mart Corp.*, 2015 WL 2384895, at *6 (E.D. Cal. May 19, 2015) (granting summary judgment in favor of defendant on PAGA claim "[b]ecause Plaintiff [was] not aggrieved by any of the specific Labor Code violations alleged in her PAGA claim").

Although all other matters pertaining to PAGA liability in this action are reserved for Phase Two of this bifurcated trial, Grubhub notes that if Phase Two becomes necessary, Grubhub intends to file a motion to dismiss Plaintiff's representative PAGA claim as unmanageable.  *See Salazar v. McDonald's Corp.*, 2017 WL 88999, at *7–9 (N.D. Cal. Jan. 5, 2017) ("Numerous federal courts in California have struck representative PAGA claims on manageability grounds."); *see also, e.g., Raphael v. Tesoro Refining & Mkg. Co. LLC*, 2015 WL 5680310, at *3 (C.D. Cal. Sep. 25, 2015) (dismissing PAGA claim where a "multitude of individualized inquires [made] the PAGA action unmanageable"); *Amey v. Cinemark USA Inc.*, 2015 WL 2251504, at *16–17 (N.D. Cal. May 13, 2015) (dismissing PAGA claim that required "numerous individualized determinations"); *Ortiz v. CVS Caremark Corp.*, 2014 WL 1117614, at *4–5 (N.D. Cal. Mar. 19, 2014) (striking PAGA claim because "highly individualized questions" pertaining to each "aggrieved employee[]" were necessary).  Indeed, as discussed below and more fully in prior briefing, Plaintiff's PAGA claims are unmanageable due to the proliferation of individualized issues that would be required in order to assess the classification of every DSP in California, the number of DSPs who allegedly experienced Labor Code violations in California, and the pay periods in which those individuals allegedly experienced those violations.  *See infra* Part IV.A; *see also* Dkt. 152 at 2–4 (discussing at length the individualized inquiries that would be necessary to adjudicate Plaintiff's representative PAGA claim).

## IV.  GRUBHUB'S ANTICIPATED EVIDENTIARY ISSUES

Based on the depositions that Grubhub conducted of Plaintiff's witnesses, the pre-trial briefing that Plaintiff has submitted, and numerous meet and confers with Plaintiff's counsel, it appears that Plaintiff is preparing to submit a great deal of evidence that is irrelevant to Plaintiff's claims.  The Court has discretion to exclude such irrelevant evidence, the probative value of which is "substantially

1   outweighed by a danger . . . [of]  confusing the issues, . . . undue delay, [or] wasting time."  Fed. R.

2   Evid. 403  Grubhub wishes to alert the Court to these issues in advance of any evidentiary objections

3   that Grubhub might make on relevance grounds during trial.

4   **A.    Plaintiff's Evidence Will Not Support Plaintiff's Arguments**

5           Grubhub anticipates that Plaintiff will attempt to introduce evidence pertaining to DSPs other

6   than Plaintiff himself, even though the parties expressly stipulated that Phase One of the bifurcated trial

7   will be "limited to Plaintiff's individual claims and the issue of whether Plaintiff Lawson is an

8   'aggrieved employee' under PAGA."  Dkt. 122 at 2.  Indeed, Plaintiff has attempted to *obtain* discovery

9   related to Grubhub's relationships with other DSPs who will not serve as witnesses during the Phrase

10  One trial.   Furthermore, despite this Court's ruling that each side may present the testimony of a

11  maximum of two DSPs other than Plaintiff during Phase One, Plaintiff has continued to *produce*

12  documentary evidence pertaining to DSPs who will not testify at the Phase One trial.

13          As explained more fully in Grubhub's Motion for Limine No. 1, *see* Dkt. 161, Plaintiff's

14  misguided efforts to obtain and introduce evidence pertaining to other DSPs is irrelevant under Federal

15  Rule of Evidence ("FRE") 401 and any probative value of the evidence is substantially outweighed by

16  dangers of confusing the issues, undue delay, and wasting time.   Most notably, the classification

17  analysis for each DSP is inherently "fact-bound," *Narayan*, 616 F.3d at 901, and the putative

18  employer's right to control can vary "vis-à-vis *each* putative [employee]."  *Ayala v. Antelope Valley*

19  *Newspapers, Inc.*, 59 Cal. 4th 522, 528 (2014) (emphasis added).  That is particularly true where, as

20  here, Grubhub has issued different contracts in different geographic regions and at different times, and

21  where some DSPs perform deliveries for other companies, whereas other DSPs perform deliveries

22  exclusively  through  the  Grubhub  application.   *See Soares*,  2017  WL  2793807,  at  *14–15

23  ("[D]etermining whether the individual performing services [was] engaged in a distinct occupation or

24  business from the alleged employer [is] riddled with individualized inquiries," including "whether they

25  contracted with other companies").  Grubhub respectfully refers this Court to Motion In Limine No. 1,

26  *see* Dkt. 161, in which Grubhub discusses this matter in further detail.

27          On a related note, Grubhub expects that Plaintiff will attempt to submit into evidence certain

28  documentary evidence that is not, in fact, reflective of Grubhub's practices or contracts.  For instance,

Plaintiff appears intent on introducing so-called "training" materials that were working drafts that a group of individuals at the company created, but that were never implemented or shared outside of this group or amongst Grubhub's management, in practice. *See* Dkt. 133 at 10 (clarifying that the alleged "training" documents Plaintiff requested in discovery were "never 'used for training operations specialists'"). For obvious reasons, inchoate documents that were never used and do not reflect Grubhub's *actual* policies are irrelevant to Plaintiff's claims.

**B.    Plaintiff's Evidence Will Not Be Relevant To The Extent It Merely Demonstrates Control Over The *Results* Of Plaintiff's Work**

Grubhub further anticipates that, in an attempt to show that Grubhub had a right to control Plaintiff, Plaintiff will submit evidence at trial allegedly suggesting that, once Plaintiff chose to sign up for a Grubhub delivery block, Grubhub had a right to require Plaintiff to actually "toggle on" to the Grubhub application and make himself available to receive delivery offers during that block. *See* Dkt. 110 at 13 (arguing that "during [the] blocks, GrubHub expects [DSPs] to have their app toggled to indicate that they are available to accept orders at all times"). Similarly, Grubhub expects that Plaintiff will proclaim that once Plaintiff signed up for a Grubhub delivery block, Grubhub required Plaintiff to actually accept incoming delivery offers, rather than decline them. *Id.* at 7 (arguing that "drivers need to try to accept nearly every order that is offered to them."). Grubhub strongly disputes Plaintiff's assertions and intends to submit evidence disproving these assertions. But, irrespective of whether Plaintiff's allegations are true, they are legally irrelevant.

Indeed, as this Court has held (in an order that the Ninth Circuit recently affirmed), "where an employer is more concerned with the quality of the ***result*** rather than the ***manner*** in which the work is done, that is evidence of an independent-contractor relationship." *Hennighan*, 38 F. Supp. 3d at 1098, (emphasis added); *see also Robinson*, 992 F. Supp. at 1206 (finding that an independent contractor relations exists where defendant controls the result of the work, rather than the means by which the work is accomplished); *Fireman's Fund*, 37 Cal. App. 4th at 1442 ("An independent contractor is one who renders service in the course of an independent employment or occupation, following his employer's desires only as to the results of the work, and not as to the means whereby it is to be accomplished."); *Olmstead v. Home Depot U.S.A., Inc.*, 2015 WL 1791440, at *6–7 (Cal. Ct. App. Apr.

17, 2015) (unpublished) ("We conclude that the power of a business owner to supervise and control the work results in furtherance of its entitlement to quality assurance does not transform . . . [a worker] into an employee"). Similarly, where a supposed indicia of control is, in fact, "required by the nature of the business," that requirement is "all but irrelevant to the right to control the means by which the result . . . [is] to be achieved . . . ." *Mission Insurance Co.*, 123 Cal. App. 3d at 221.

Here, the **result** for which the parties contracted, properly understood, is the delivery of high-quality, warm food to diners who placed delivery orders through the Grubhub website and associated mobile applications. *See* GH000305 ("[DSP] is interested in entering into this Agreement with GrubHub for the opportunity to perform delivery of orders placed through the Service . . . ."); *cf. Alexander*, 765 F.3d at 990 ("'[R]esult,' reasonably understood, refers in this context to timely and professional delivery of packages."). Thus, any supposed requirement that Plaintiff *actually* make himself available to perform deliveries or accept delivery offers during his delivery blocks (which were not required, and which he voluntarily signed up for in the first place) would have no bearing on whether Grubhub "controlled *the manner in which the desired result was to be achieved*." *Mission Ins. Co.*, 123 Cal. App. 3d at 221.

On a related note, Grubhub expects that Plaintiff will suggest that Grubhub "monitored" whether Plaintiff completed his deliveries. *See* Dkt. 110 at 15 ("GrubHub drivers including Plaintiff did have dispatchers . . . monitoring their deliveries[]"). The evidence will demonstrate that Grubhub indisputably did *not* monitor whether Plaintiff was completing deliveries. But once again, even if Plaintiff's assertion were correct, it too would be irrelevant. As the California Supreme Court has explained, "[t]he general supervisory right to control the work so as to [e]nsure its satisfactory completion in accordance with the terms of the contract does not make the hirer of the independent contractor" an employer. *McDonald v. Shell Oil Co.*, 44 Cal. 2d 785, 788 (1955); *see also Desimone*, 2000 WL 1811385, at *13 ("The annual evaluations of agency results . . . do not reflect an attempt by Defendant to exercise control over how Plaintiffs sell insurance to their customers on a daily basis, but rather are a means by which each agency's results are monitored."). Therefore, it is irrelevant whether Grubhub has a "general supervisory right . . . to [e]nsure [the] satisfactory completion" of the results

DEFENDANTS' PRETRIAL BRIEF – CASE NO. 3:15-CV-05128-JSC

Gibson, Dunn &
Crutcher LLP

for which the parties contracted, *McDonald*, 44 Cal. 2d at 788—i.e., to ensure that Plaintiff delivered high-quality, warm food to diners.

## V.  CONCLUSION

Grubhub respectfully submits that the evidence adduced at trial will prove that Plaintiff was an independent contractor, not an employee, and that each of Plaintiff's substantive claims fails for reasons unique to those claims.  At all times, Plaintiff maintained complete freedom to perform deliveries in the manner and means he desired.  He chose when to work, where to work, how long to work, what to wear while working, what vehicle to use while working, what delivery bags to use while working, what delivery routes to take, what to say to restaurants and diners, whether to negotiate his pay, whether to hire employees or subcontractors to perform work on his behalf, whether to file his taxes as a self-employed taxpayer (and to profit financially, as a result), and—perhaps most important under the facts of this case—whether to work for other companies, including Grubhub's direct competitors.  There can be no question about what the facts of this case will prove:  Plaintiff was an independent contractor, not Grubhub's employee.  This Court should grant judgment in Grubhub's favor on all counts.

Dated: August 18, 2017

> THEODORE J. BOUTROUS JR.
> GIBSON, DUNN & CRUTCHER LLP
>
>
> By:  /s/ *Theodore J. Boutrous, Jr.*
> Theodore J. Boutrous, Jr.
>
> Attorneys for Defendants GRUBHUB HOLDINGS INC. and GRUBHUB INC.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ECF ATTESTATION**

I, Dhananjay S. Manthripragada, hereby attest that concurrence in the filing of this document has been obtained from Theodore J. Boutrous, Jr.

Dated: August 18, 2017

By:   */s/ Dhananjay S. Manthripragada*
Dhananjay S. Manthripragada