1   SHANNON LISS-RIORDAN (State Bar No. 310719)
    (sliss@llrlaw.com)
2   THOMAS FOWLER, *pro hac vice*
    (tfowler@llrlaw.com)
3   LICHTEN & LISS-RIORDAN, P.C.
    729 Boylston Street, Suite 2000
4   Boston, MA 02116
    Telephone:    (617) 994-5800
5   Facsimile:     (617) 994-5801
6
7   Matthew D. Carlson (State Bar No. 273242)
    mcarlson@llrlaw.com
8   LICHTEN & LISS-RIORDAN, P.C.
    466 Geary St., Suite 201
9   San Francisco, California 94102
    Telephone: (415) 630-2651
10  Facsimile:  (617) 994-5801

11              **UNITED STATES DISTRICT COURT**
12          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

13

14  RAEF LAWSON, individually and in his        Case No. 15-cv-05128 JSC
    capacity as Private Attorney General
15  Representative
                                                **PLAINTIFF'S PROPOSED FINDINGS OF**
16                      Plaintiff,              **FACT AND CONCLUSIONS OF LAW**
    v.
17
    GRUBHUB HOLDINGS INC. and                   BEFORE THE HON. JACQUELINE SCOTT
18  GRUBHUB INC.,                               CORLEY
19
                        Defendants
20

21

22

23

24

25

26

27

28
    ─────────────────────────────────────────────────────
         PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
                      CASE NO. 3:15-cv-05128

# TABLE OF CONTENTS

I.   **INTRODUCTION** .................................................................................. 1

II.  **PROPOSED FINDINGS OF FACT** .................................................. 5

    A.   **GRUBHUB IS A FOOD DELIVERY BUSINESS** ................. 5

    B.   **PLAINTIFF'S WORK FOR GRUBHUB** ............................... 7

    C.   **GRUBHUB'S DRIVER AGREEMENT** ................................. 8

    D.   **GRUBHUB'S CONTROL OVER PLAINTIFF'S WORK** ............... 11

        i.    **Training** ............................................................... 11

        ii.   **Branding and Uniforms** ...................................... 11

        iii.  **Scheduling** ........................................................... 12

        iv.   **Pay** ....................................................................... 17

            a.   Hourly Rate ............................................. 17

            b.   Expenses ................................................. 21

        v.    **Performance of Deliveries** .................................. 22

            a.   Zones ....................................................... 22

            b.   Delivery Assignments ............................ 23

            c.   GrubHub's Dispatchers and Driver Care
                Specialists had the Power to Reassign Deliveries ................ 24

            d.   GrubHub Closely Monitored its Drivers During
                Their Shifts ............................................. 26

                1.   Drivers Were Required to Provide
                    GrubHub with Regular Updates
                    throughout their Deliveries ...................... 26

                2.   GrubHub Tracked the Drivers' Progress
                    During Each Delivery .............................. 27

        vi.   **GrubHub Handled Issues with Restaurants and
            Customers, Rather Than the Drivers** .................. 29

        vii.  **GrubHub Maintained Files on its Drivers** .......... 30

        viii. **GrubHub Routinely Terminated Drivers** ............ 31

        ix.   **Plaintiff's Termination** ...................................... 33

i

E.   **PLAINTIFF DID NOT OPERATE HIS OWN BUSINESS** .............................. 35

F.   **PLAINTIFF BELIEVED THAT HE WAS GRUBHUB'S EMPLOYEE** ........................................................................ 37

G.   **DAMAGES** ......................................................................................... 38

    i.   **Expense Reimbursement** ........................................... 38

    ii.   **Overtime** .......................................................................... 39

    iii.   **Minimum Wage** ............................................................ 39

III.   **PROPOSED CONCLUSIONS OF LAW** ....................................... 41

A.   **GRUBHUB HAS NOT MET ITS BURDEN OF PROVING THAT PLAINTIFF WAS AN INDEPENDENT CONTRACTOR** .......................... 41

    i.   **GrubHub Bears the Burden of Proving That Plaintiff Was an Independent Contractor** ...................................... 41

    ii.   **GrubHub Had the Right to Control Plaintiff's Work and Extensively Exercised That Control** ......................... 43

        a.   GrubHub Retained All Necessary Control Over Plaintiff's Work .................................................. 44

        b.   GrubHub Retained the Right to Terminate Plaintiff At Will .................................................... 44

        c.   GrubHub Controlled Plaintiff in Myriad Other Ways .................................................................... 48

            1.   GrubHub Terminated Drivers in Its Discretion, Including Plaintiff ...................... 48

            2.   GrubHub Closely Monitored Its Drivers' Work ..................................................................... 49

            3.   Drivers Were Expected to Accept Every Order Possible and Faced Negative Consequences if They Did Not ...................... 52

            4.   Drivers Had Limited Ability to Pick Their Schedule ................................................... 53

            5.   GrubHub Set the Rate of Drivers' Pay ................ 55

            6.   Drivers Were Expected to Remain in Their Designated Geographical Zones While on Shift ........................................................ 56

ii

7.   GrubHub Required Drivers to Pass a Background Check ................................ 57

8.   GrubHub Encouraged Drivers to Use and Wear Its Branding and Hold Themselves Out as Being GrubHub's Representative ............... 58

9.   Drivers Were Not Free to Operate Their Own Business While Working for GrubHub .................................................. 59

iii.   Analysis of the Secondary Borello Factors Also Demonstrates That Plaintiff Was GrubHub's Employee ............... 62

a.   Plaintiff Was Not Engaged in a Distinct Occupation or Business ............................ 62

b.   Plaintiff Performed Work Under GrubHub's Direction ........................................ 64

c.   Plaintiff's Position as a Delivery Driver Did Not Require a High Degree of Skill ........................ 65

d.   GrubHub's Investment in its Delivery Business Significantly Outweighed Plaintiff's Investment ............... 65

e.   The Relationship Between Plaintiff and GrubHub Was Indefinite in Duration ........................ 67

f.   GrubHub Paid Plaintiff Weekly, Generally on an Hourly Basis .................................. 68

g.   Plaintiff's Work Performing Deliveries for GrubHub was a Part of GrubHub's Core Business as a Food Delivery Service ........................ 69

h.   Plaintiff Believed that He was an Employee ........................ 72

B.   PLAINTIFF SUFFERED WAGE VIOLATIONS ........................ 73

i.   Expense Reimbursement ........................ 73

ii.   Overtime ........................ 75

iii.   Minimum Wage ........................ 76

iv.   The Time Plaintiff Spent on Shift Was Compensable Time ........................ 78

IV.   CONCLUSION ........................ 82

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

# <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Air Couriers Int'l v. Emp't Dev. Dep't</u>,
   150 Cal. App. 4th 923 (2007)............................................................. passim

<u>Alexander v. FedEx Ground Package System, Inc.</u>,
   765 F.3d 981 (9th Cir. 2014)............................................................ passim

<u>Angelotti v. Walt Disney Co.</u>,
   192 Cal. App. 4th 1394 (2011)................................................................ 72

<u>Antelope Valley Press v. Poizner</u>,
   162 Cal. App. 4th 839 (2008)........................................................... 45, 67

<u>Armenta v. Osmose, Inc.</u>,
   135 Cal. App. 4th 314 (Cal. App. Dec. 29, 2005).................................. 76

<u>Armour & Co. v. Wantock</u>,
   323 U.S. 126 (1944)................................................................................ 79

<u>Arnold v. Mutual of Omaha Ins. Co.</u>,
   202 Cal. App. 4th 580 (2011)................................................................ 61

<u>Arriaga v. Florida Pacific Farms, L.L.C.</u>,
   305 F.3d 1228 (11th Cir. 2002).............................................................. 77

<u>Arzate v. Bridge Terminal Transp., Inc.</u>,
   192 Cal. App. 4th 419 (2011)........................................................... 46, 73

<u>Ayala v. Antelope Valley Newspapers, Inc.</u>,
   59 Cal. 4th 522 (2014).......................................................... 45, 46, 47

<u>Beliz v. W.H. McLeod & Sons Packing Co.</u>,
   765 F.2d 1317 (5th Cir. 1985)............................................................... 61

<u>Bemis v. People</u>,
   109 Cal. App. 2d 253 (Cal. Dist. Ct. App. 1952).................................. 42

<u>Bowerman v. Field Asset Services, Inc.</u>,
   2013 WL 6057043 (N.D. Cal. Nov. 14, 2013)....................................... 63

<u>Bowerman v. Field Asset Servs., Inc.</u>,
   242 F. Supp. 3d 910 (N.D. Cal. 2017) ............................... 44, 46, 52, 53

<u>Brown v. Abercrombie & Fitch Co.</u>,
   2015 WL 9690357 (C.D. Cal. July 16, 2015) ....................................... 77

<u>Cleveland v. Groceryworks.com, LLC</u>,
   200 F. Supp. 3d 924 (N.D. Cal. 2016) .................................................. 82

<u>Clincy v. Galardi S. Enterprises, Inc.</u>,
   808 F. Supp. 2d 1326 (N.D. Ga. 2011) ................................................ 66

Collinge v. IntelliQuick Delivery, Inc.,
    2015 WL 1299369 (D. Ariz. Mar. 23, 2015) .......................... 51, 66

Comparetto v. Allstate Insurance Co.,
    2014 WL 11514474 (C.D. Cal. July 24, 2014) .......................... 51

Cotter v. Lyft, Inc.,
    60 F. Supp. 3d 1067 (N.D. Cal. 2015) .......................... passim

Coverall North America, Inc. v. Division of Unemployment Assistance,
    447 Mass. 852 (2006).......................... 59

Dalton v. Lee Publ'ns, Inc.,
    270 F.R.D. 555 (S.D. Cal.2010).......................... 75

Desimone v. Allstate Ins. Co.,
    2000 WL 1811385 (N.D. Cal. Nov. 7, 2000).......................... 51, 63

Espejo v. Copley Press, Inc.,
    13 Cal. App. 5th 329 (Ct. App. 2017) .......................... 46, 55

Estrada v. FedEx Ground Package Sys., Inc.,
    154 Cal. App. 4th 1 (2007).......................... passim

Faigin v. Signature Grp. Holdings, Inc.,
    211 Cal. App. 4th 726 (Cal. App. Ct. 2012) .......................... 42

Fisher v. San Pedro Peninsula Hosp.,
    214 Cal. App. 3d 590 (Ct. App. 1989) .......................... 42

Flores v. Velocity Express, LLC,
    250 F. Supp. 3d 468 (N.D. Cal. 2017) .......................... 51, 57, 66, 68

Garcia v. Seacon Logix, Inc.,
    238 Cal. App. 4th 1476  (Cal. Ct. App. 2015) .......................... 51

Gattuso v. Harte-Hanks Shoppers, Inc.,
    42 Cal. 4th 554 (2007) .......................... 73, 75

Grant v. Woods,
    71 Cal. App. 3d 647 (Cal. Ct. App. 1977) .......................... 72

Hennig v. Indus. Welfare Comm.,
    46 Cal. 3d 1262 (1988) .......................... 77

Hennighan v. Insphere Ins. Sols., Inc.,
    38 F. Supp. 3d 1083 (N.D. Cal. 2014) .......................... 46, 51, 63

Herman v. Express Sixty-Minutes Delivery Serv., Inc.,
    161 F.3d 299 (5th Cir. 1998).......................... 66

Hurtado v. Raly Dev., Inc.,
    2012 WL 3687488 (S.D. Fla. Aug. 27, 2012).......................... 61

JKH Enterprises, Inc. v. Dep. of Indus. Relations,
    142 Cal. App. 4th 1046 (Cal. Ct. App. 2006) .......................... passim

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

<u>Jones v. Royal Admin. Servs., Inc.,</u>
    866 F.3d 1100 (9th Cir. 2017)................................................................. 46, 51, 61

<u>Keller v. Miri Microsystems LLC,</u>
    781 F.3d 799 (6th Cir. 2015)............................................................................. 66

<u>Knecht v. City of Redwood City,</u>
    683 F. Supp. 1307 (N.D. Cal. 1987) ................................................................. 52

<u>Lawson v. Grubhub, Inc.,</u>
    2017 WL 2951608 (N.D. Cal. July 10, 2017) ............................................ passim

<u>Linton v. Desoto Cab Company, Inc.,</u>
    --- Cal. Rptr. 3d --- , 2017 WL 4416856 (Cal. App. Ct. Oct. 5, 2017) ........... passim

<u>Lujan v. Minagar,</u>
    124 Cal. App. 4th 1040 (2004)......................................................................... 42

<u>Lusardi Constr. Co. v. Aubry,</u>
    1 Cal. 4th 976 (1992) ........................................................................................ 1

<u>Martin v. Tango's Restaurant, Inc.,</u>
    969 F.2d 1319 (1st Cir. 1992) ............................................................................ 1

<u>Martinez v. Combs,</u>
    49 Cal. 4th 35 (2010) .................................................................................... 3, 43

<u>Martins v. 3PD, Inc.,</u>
    2013 WL 1320454 (D. Mass. Mar. 28, 2013) .............................................. 41, 71

<u>Mendiola v. CPS Sec. Sols., Inc.,</u>
    60 Cal. 4th 833 (2015) ................................................................................ 79, 80

<u>Mission Ins. Co. v. Workers' Comp. Appeals Bd.,</u>
    123 Cal. App. 3d 211 (1981)............................................................................ 52

<u>Morillion v. Royal Packing Co.,</u>
    22 Cal. 4th 575 (2000) .................................................................................... 78

<u>Narayan v. EGL, Inc.,</u>
    616 F.3d 895 (9th Cir. 2010)..................................................................... passim

<u>O'Connor v. Uber Technologies, Inc.,</u>
    2013 2L 6354534 (N.D. Cal. Dec. 5, 2013) ..................................................... 82

<u>O'Connor v. Uber Technologies, Inc.,</u>
    2015 WL 5138097 (N.D. Cal. Sept. 1, 2015) .............................................. 47, 59

<u>O'Connor v. Uber Technologies, Inc.,</u>
    82 F. Supp. 3d 1133 (N.D. Cal. 2015) ......................................................... passim

<u>O'Connor v. Uber Technologies, Inc.,</u>
    311 F.R.D. 547 (N.D. Cal. 2015) ..................................................................... 75

<u>Rabanal v. Rideshare Port Mgmt., LLC,</u>
    2013 WL 6020340 (Cal. Ct. App. Nov. 14, 2013)........................................ 57, 62

vi

Razak v. Uber Technologies, Inc.,
  2017 WL 4052417 (E.D. Pa. Sept. 13, 2017) ............................................................ 78, 80, 81

Robinson v. City of San Bernardino Police Dept.,
  992 F. Supp. 1198 (C.D. Cal. 1998) ............................................................................ 61

Robinson v. George,
  16 Cal. 2d 238 (1940) ................................................................................................. 42

Ruiz v. Affinity Logistics Corp.,
  754 F.3d 1093 (9th Cir. 2014)................................................................................ passim

S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations,
  48 Cal. 3d 341 (1989) ............................................................................................. passim

Sahinovic v. Consol. Delivery & Logistics, Inc.,
  2004 WL 5833528 (N.D. Cal. Sept. 14, 2004) ........................................................... 42

Sakacsi v. Quicksilver Delivery System, Inc.,
  2007 WL 4218984 (M.D. Fla. Nov. 28, 2007) ........................................................... 66

Sales v. Bailey,
  2014 WL 3897726 (N.D. Miss. Aug. 8, 2014) ........................................................... 68

Santa Cruz Transp., Inc. v. Unemployment Ins. Appeals Bd.,
  235 Cal. App. 3d 1363 (Cal. Ct. App. 1991) .......................................................... 41, 71

See's Candy Shops, Inc. v. Superior Court,
  210 Cal. App. 4th 889 (2012)..................................................................................... 78

Skidmore v. Swift & Co.,
  323 U.S. 134 (1944)................................................................................................... 79

State Comp. Ins. Fund v. Brown,
  32 Cal. App. 4th 188 (1995)........................................................................................ 53

Stuart v. RadioShack Corp.,
  2009 WL 281941 (N.D. Cal. Feb. 5, 2009)................................................................ 75

Stuart v. RadioShack Corp.,
  641 F. Supp. 2d 901 (N.D. Cal. 2009) ....................................................................... 75

Stubbs v. Covenant Sec. Servs., Ltd.,
  2015 WL 5521984 (N.D. Cal. Sept. 16, 2015) .......................................................... 72

Tan v. GrubHub, Inc.,
  171 F. Supp. 3d 998 (N.D. Cal. 2016) ....................................................................... 75

Toyota Motor Sales U.S.A., v. Sup. Ct.,
  269 Cal. Rptr. 647 (Cal. App. Ct. 1990) .................................................................... 66

Truesdale v. Workers' Comp. Appeals Bd.,
  190 Cal. App. 3d 608 (1987)........................................................................................ 56

USS-POSCO Indus. v. Case,
  244 Cal. App. 4th 197 (2016)................................................................................. 73, 74

<u>Vandiver v. State,</u>
  2010 WL 4681252 (Cal. Ct. App. Nov. 19, 2010)...................................................... 62

<u>Varisco v. Gateway Sci. & Eng'g, Inc.,</u>
  166 Cal. App. 4th 1099 (Cal. App. Ct. 2008) ......................................................... 69

<u>Villalpando v. Exel Direct Inc.,</u>
  2015 WL 5179486 (N.D. Cal. Sept. 3, 2015) .......................................................... 51

<u>W.B. Worthen Co. v. Kavanaugh,</u>
  295 U.S. 56, 55 S. Ct. 555, 79 L. Ed. 1298 (1935) ................................................... 2

<u>Yellow Cab Coop., Inc. v. Workers' Comp. Appeals Bd.,</u>
  226 Cal. App. 3d 1288 (Cal. Ct. App. 1991) .................................................... 41, 49

<u>Zellagui v. MCD Pizza, Inc.,</u>
  59 F. Supp. 3d 712 (E.D. Pa. 2014) ........................................................................ 79

**Statutes**

Cal. Lab. Code § 1194 ...................................................................................... 73, 76

Cal. Lab. Code § 1197 ...................................................................................... 73, 76

Cal. Lab. Code § 1198 ............................................................................................ 73

Cal. Lab. Code § 2802 ...................................................................................... 73, 75

Cal. Lab. Code § 3353 ............................................................................................ 42

Cal. Lab. Code § 3357 ............................................................................................ 42

Cal. Lab. Code § 510 ........................................................................................ 73, 76

Cal. Lab. Code § 554 .............................................................................................. 73

Private Attorneys General Act ("PAGA"),
  Cal. Lab. Code § 2698 *et seq* .......................................................................... 1, 82

Unfair Competition Law,
  Cal. Business and Professions Code Sections 17200 *et seq*................................... 82

**Rules**

29 CFR 553.221 ..................................................................................................... 78

Cal. Code Regs. tit. 8 § 11090, § 3 ........................................................................ 76

Cal. Code Regs. tit. 8, § 11090, § 4 ....................................................................... 76

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

# I.   __INTRODUCTION__

At the Phase I trial in this case, Plaintiff Raef Lawson demonstrated that he was misclassified as an independent contractor by Defendants GrubHub Holdings Inc. and GrubHub Inc. (collectively referred to as "GrubHub"). Plaintiff also demonstrated that he suffered the several wage violations he has claimed (failure to reimburse business expenses, overtime, and minimum wage violations).  He is thus an aggrieved employee under the Private Attorneys General Act ("PAGA"), Cal. Lab. Code § 2698 *et seq.*

As this Court heard at trial, GrubHub is a food delivery service that employs many thousands of delivery drivers around the country, including in California, while purporting to classify them as independent contractors. By misclassifying its drivers as independent contractors, GrubHub has been able to reap substantial savings by avoiding such basic costs as ensuring drivers receive minimum wage and overtime and shifting to its workers the cost of using and maintaining vehicles for its delivery service.  Through this misclassification, it also competes unfairly with law-abiding companies that classify their delivery drivers as employees. Indeed, with more and more companies attempting to avoid the employee label, in the fiercely competitive food delivery arena in particular, a company like GrubHub is effectively fueling a race to the bottom, making it nearly impossible for a law-abiding company to compete.  The purpose of the wage laws is not only to protect workers, but also complying competitors, and ensuring that a worker such as Plaintiff is properly classified is essential to ensuring an even playing field and basic labor protections set forth by the legislature.  See Lusardi Constr. Co. v. Aubry, 1 Cal. 4th 976, 985 (1992) ("vigorously enforce[ing]" wage laws not only protects employees but also "protect[s] employers who comply with the law from those who attempt to gain competitive advantage at the expense of their workers by failing to comply with minimum labor standards.'"); Martin v. Tango's Restaurant, Inc., 969 F.2d 1319, 1324 (1st Cir. 1992) (wage laws are "intended to protect complying competitors of the defendants, in addition to making the employee whole.").

Here, in order to attempt to avoid the legal responsibilities and costs placed on it by the employment relationship, GrubHub has attempted to obfuscate its true relationship with Plaintiff (like its drivers generally) by adopting an entire vocabulary of phrases and titles to try to differentiate its system from traditional employment and make it sound like its drivers are not what they obviously are: employees.  To give just a few examples, rather than sign up for "shifts," GrubHub drivers sign up for "blocks." Rather than "punch in" for their shifts, the drivers "toggle available" in the app.  Rather than working under "supervisors" or even "dispatchers", GrubHub shifted to using the titles of "operations specialists" and "driver care specialists."  GrubHub does not even use the term "drivers", but instead refers to them as "delivery service partners".  And rather than referring to the drivers' pay as an "hourly wage," GrubHub describes its pay system as "truing up" to a guaranteed rate, provided that the driver performs the work assigned to him as expected (and if he does not, then the driver's pay is, in old-fashioned parlance, "docked").

Despite GrubHub's creative labeling for age-old employment concepts, the Court should not be misled by the company's labels.  The Court must instead focus on the actual relationship between Plaintiff and GrubHub, which in most respects (other than for the use of 21st Century technology) is little different from traditional employment relationships.  As the Ninth Circuit counseled in <u>Alexander v. FedEx Ground Package System, Inc.</u>, 765 F.3d 981, 998 (9th Cir. 2014):

> Abraham Lincoln reportedly asked, "If you call dog's tail a leg, how many legs does a dog have?" His answer was, "Four. Calling a dog's tail a leg does not make it a leg." Justice Cardozo made the same point in <u>W.B. Worthen Co. v. Kavanaugh</u>, 295 U.S. 56, 62, 55 S. Ct. 555, 79 L. Ed. 1298 (1935), counseling us, when called upon to characterize a written enactment, to look to the "underlying reality rather than the form or label."

Plaintiff, who worked as a GrubHub delivery driver for a brief period, from October 2015 to February 2016, when GrubHub abruptly terminated him (with no warning and little explanation), brought this case to challenge GrubHub's misclassification scheme.  Mr. Lawson has shown that he (like other GrubHub delivery drivers) is just the type of worker that the

California Labor Code is intended to protect.

Importantly, due to their remedial nature, the statutory provisions of the California Labor Code that protect workers' rights to overtime, minimum wage, and expense reimbursement "are to be liberally construed with an eye to promoting such protection." Martinez v. Combs, 49 Cal. 4th 35, 69 (2010) (internal citations omitted). As such, under California law, GrubHub's self-serving labels are "not dispositive, and subterfuges are not countenanced." S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations, 48 Cal. 3d 341, 349 (1989).

As explained below, the evidence presented at trial overwhelmingly supports the conclusion that Plaintiff was an employee under the test set forth in Borello.  GrubHub bears the burden of proving that Plaintiff was not an employee, but GrubHub simply failed to meet its burden.

With respect to Borello's principal factor – GrubHub's right to control – the evidence at trial showed that GrubHub's right to control was not only set forth in its contract, but as a practical matter, was exercised in nearly every facet of Plaintiff's work.  As this Court noted at summary judgment, GrubHub's contract gave it the power to terminate Plaintiff at will, which is "[p]erhaps the strongest evidence of the right to control." Lawson v. Grubhub, Inc., 2017 WL 2951608, *4 (N.D. Cal. July 10, 2017) (internal quotation omitted).  Beyond that, GrubHub expected its drivers to be available to accept deliveries during shifts they are signed up for, to accept a certain percentage of delivery assignments, and to remain in their designated geographical areas.  GrubHub employs a team of dispatchers and driver care specialists who monitor the progress of deliveries (watching them from their computer screens in Chicago), assign or reassign deliveries to drivers based on their discretion (including their assessment of which drivers will best be able to perform them), and keep in touch closely with the drivers during their shifts regarding their deliveries.  If a driver fails to perform or fulfill GrubHub's requirements to the company's satisfaction, or engages in behavior that GrubHub decides is not appropriate or acceptable, GrubHub may unilaterally, in its discretion, terminate the driver.

The evidence showed that <u>Borello</u>'s secondary factors also support Plaintiff's contention that he was GrubHub's employee. 48 Cal. 3d at 350-51. The job of a GrubHub delivery driver is a low-skilled job, and no prior experience or education is required, other than having a driver's license and passing a background check.  The drivers are not contracted to perform a single, or limited, amount of work; instead, their contracts are ongoing unless they quit or GrubHub terminates them.  GrubHub unilaterally determines the amount the drivers are paid, which is generally on an hourly basis.  GrubHub drivers have no way to distinguish themselves to customers so as to build their own customer base or run their own business; the work they perform is for GrubHub's customers, not their own customers.  And the work that the drivers perform is at the very core of a growing and very important portion of GrubHub's business: food delivery.

Tellingly, GrubHub did not focus its efforts on rebutting these facts at trial.  Instead, the focus of its defense was to attempt to paint Plaintiff as a bad actor, in order to distract the Court from the real issues at hand.  GrubHub spent much time emphasizing that Plaintiff performed (increasing amounts of) work for Postmates and Caviar while on shift for GrubHub, and that toward the end of his tenure at GrubHub, he began arriving later and later for his shifts (which can be explained by his disillusionment with GrubHub after it lowered his pay).  However, GrubHub did what any employer might do when it believed that its employee was breaking company rules – it terminated Plaintiff.  When it did so, it did not provide Plaintiff with advance warning, much explanation, or even an opportunity to explain himself.  GrubHub's termination of Plaintiff was perhaps the greatest evidence of the control it held and exercised over him.

Thus, as set forth extensively below, Plaintiff was an employee of GrubHub and is entitled to recover his car expenses he incurred delivering food orders for GrubHub, as well as unpaid overtime and minimum wage.  He is also an "aggrieved employee" under PAGA and therefore able to represent the State of California and other drivers in seeking penalties for GrubHub's violation of the wage laws.

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

## II.      PROPOSED FINDINGS OF FACT

### A.      GRUBHUB IS A FOOD DELIVERY BUSINESS

1.      GrubHub is a Chicago-based food ordering and delivery service that dispatches delivery drivers and bike couriers in California and throughout the country via an on demand dispatch system. (Jeff Smith at 27-29; TJ O'Shae at 460; Raef Lawson at 121.)[1]

2.      GrubHub is one of the largest food delivery companies in the country, currently operating in approximately 1,200 markets with many thousands of drivers across the country. (Stanley Chia at 606; O'Shae at 461.)[2]

3.      GrubHub began in 2004 as a company that provided online marketing and ordering capabilities for restaurants, but beginning in 2014, it began providing delivery service, using its own delivery drivers. (Chia at 599.)  As of June 2016, there were 4,000 GrubHub delivery drivers in California alone. (Chia at 675.)

4.      GrubHub has aggressively grown the food delivery component of its business since 2014 by adding thousands of delivery drivers and acquiring a number of food delivery companies, including:

    a.      DiningIn in 2015 ($80 million acquisition)

    b.      Delivered Dish in December 2015

    c.      LA Bites in May 2016 ($65 million acquisition)

---

[1]      Record references indicate the witness whose testimony is referenced with page numbers from the trial transcript.  For Jeff Smith, whose deposition testimony was entered into evidence, the page numbers refer to his deposition testimony.  Exhibits admitted at trial are referred to as "Ex. __".

[2]      Each year, GrubHub makes massive investments in its delivery business. For example, GrubHub's annual SEC reports reveal that GrubHub's Operation and Support expenses jumped from $107,424,000 in 2015 to $171,756,000 in 2016. (Ex. 164 at GH001898; Ex. 165 LAWSON001925.) GrubHub states that "this increase was primarily attributable to expenses related to restaurant delivery services." (Ex. 165 at LAWSON001927.) Moreover, GrubHub states that "Delivery expenses increased during the year ended December 31, 2015 compared to nominal related expenses in the prior year due to our investment in capacity for the delivery network . . . ." (Ex. 165 at LAWSON001927.)

    d.  Foodler in 2017

    e.  Eat 24 (upcoming).

(Chia at 658-59.)

   5.  GrubHub has an extensive infrastructure to carry out its food delivery service. At its headquarters in Chicago, it has several teams of employees whose job it is to oversee delivery service. For example, GrubHub has a team of driver care specialists whose job it is to take calls from GrubHub drivers around the country and relay communications to the drivers, including in Los Angeles. GrubHub also has a team of dispatchers who are responsible for monitoring the drivers' work and job assignments. (O'Shae at 479-82, 544-45.)[3] GrubHub also has a customer care team that troubleshoots issues that customers may have with their delivery orders.  (O'Shae at 462-63.)  At any given time, GrubHub had hundreds of delivery drivers actively performing deliveries in markets across the country, including in Los Angeles, California. (O'Shae at 461.)

   6.  GrubHub advertises to restaurants that using GrubHub's delivery service will allow the restaurant to focus on making great food without having to worry about the logistics of the delivery service, since GrubHub will handle that. (Chia at 602.)

   7.  Moreover, GrubHub's delivery service is integral to its subsistence and continued expansion. GrubHub Chief Operating Officer Stanley Chia emphasized that, in order to remain viable in GrubHub's biggest urban markets, such as Los Angeles, San Francisco, New York City, and Boston, GrubHub has had to offer its delivery service. (Chia at 662-63.) As Mr. Chia acknowledged, GrubHub's delivery service "has a national scale that allows us to do things in a way that other subscale companies aren't able to do." (Chia at 667.)

---

[3]  Sometime in late 2015, the "dispatcher" role was shifted to what GrubHub called "operation specialist", but their duties were similar. (Mendoza at 991-1002; Hanson at 1045-46; Smith at 43-46 (explaining that, when he was working at GrubHub, there were not "dispatchers", but instead "operations specialists" who "monitor[] the dispatch screen" … "make sure we're quoting to the customers the right times… [and then] checking up on drivers to see if everything is okay with their orders".); O'Shae at 479 (while she worked in the driver care department in early 2016, explaining the role of employees she referred to as "dispatchers").)

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

8.      Further, Mr. Chia stated in an interview with Cranes that "Grubhub was aggressively growing its delivery business in 2015. At the beginning of the year it had a minuscule delivery volume, but by the end of the year it had an annual run rate of about $200 million." (Chia at 668-69.) Mr. Chia said in an interview with Entrepreneur Magazine that "Being able to provide a technology solution, as well as the operational component of actually delivering food for a restaurant is very powerful." (Chia at 669.)[4]

## B.   PLAINTIFF'S WORK FOR GRUBHUB

9.      Plaintiff Raef Lawson, an aspiring actor and writer, worked for a number of "gig economy" companies, including GrubHub, over an approximately two year period, from January 2015 to February 2017.  (Lawson at 120, 248.)

10.     Prior to working for these companies, Mr. Lawson never previously worked as a driver or in delivery service. (Lawson at 125.)

11.     After graduating from college in 2003, Mr. Lawson held such jobs as parking lot attendant at Home Depot, assistant manager for Taco Bell, and security guard for a park service for a number of years. (Lawson at 117-18.)

12.     In approximately August 2012, Mr. Lawson moved to Los Angeles for a graduate program in writing. (Lawson at 118-19; Ex. 1245.)  He later left the program to pursue acting. (Lawson at 119.)

13.     When he began to run low on savings, he began to drive for Uber and Lyft in January 2015 to make ends meet while continuing to pursue acting. (Lawson at 120.)

14.     After driving for these months for Uber and Lyft, Mr. Lawson applied to work as

---

[4]      GrubHub's SEC annual reports for both 2015 and 2016 state: "By providing the delivery services, the company is able to significantly broaden the number of restaurants it can offer to diners while enhancing the transparency, consistency, and reliability of the diner experience. Delivery services benefit the restaurants by allowing them to focus on making great food while GrubHub handles the complexity of operating the delivery networks." (Chia at 671-72; Ex. 164 at GH001869; Ex. 165 at LAWSON001875.)

a delivery driver for GrubHub in August 2015. (Lawson at 128.)

15.     He decided to work for GrubHub because he needed money to cover his living expenses while he continued to pursue acting, and he had heard from another driver that GrubHub had somewhat flexible scheduling. (Lawson at 121-22.)

16.     In order to apply to work for GrubHub, Mr. Lawson had to fill out an application online and submit a copy of his driver's license, vehicle registration, and vehicle insurance. (Lawson at 122.)

17.     He also had to undergo a background check, performed by a third party. (Lawson at 126.)

18.     GrubHub reviewed the results of applicants' background checks in order to decide whether to allow the driver to begin working for GrubHub. (Grebner at 1122-23; O'Shae at 744.)[5]

### C.     GRUBHUB'S DRIVER AGREEMENT

19.     In order to work as a driver for GrubHub, Mr. Lawson was required to sign an online contract (Ex. 1; Lawson at 123) and agree to updates when the company updated its contract.  (Ex. 2; Lawson at 256.)

20.     The contract permits GrubHub to terminate drivers at will. It provides that GrubHub could terminate the driver, "without cause upon fourteen (14) days' prior written notice. . . ." (Ex. 1 at GH000315, ¶¶ 13.1, 13.1.1, 13.1.2.)

21.     The contract also allows drivers like Mr. Lawson to terminate their relationship with GrubHub at will. (Ex. 1 at GH000315, ¶¶ 13.1, 13.1.1, 13.1.2.)

22.     The contract requires the drivers to "fully perform the Delivery Services in a timely, efficient, and safe manner and in accordance with all user instructions." (Ex. 1 at

---

[5]     After he had begun working for GrubHub, Mr. Lawson was later required to undergo a second background check. (Lawson at 126; Ex. 70.)

GH000306, ¶ 2.3)

23.     The contract requires drivers to "display a placard or other means of identifying [the delivery driver] as providing a service in connection with an order placed through GrubHub." (Ex. 1 at GH000306, ¶ 2.3.)

24.     Although the contract purports to allow the drivers to have others perform deliveries, it requires that any individuals whom a driver might hire to sign Appendix C of the contract, which subjects the individual to the obligations of the contract (Ex. 1 at GH000321), and it requires the individual to undergo background checks (performed by GrubHub at its request) (Ex. 1 at GH000309, ¶ 6.2.)

25.     The contract requires drivers to "maintain a professional appearance consistent with industry standards while performing Delivery Services." (Ex. 1 at GH000309, ¶ 6.4.)

26.     The contract requires drivers "on a regular basis" to "notify GrubHub in writing or via electronic means . . . of the dates and/or periods and general geographic location(s) that [driver] will be available to perform Delivery Services . . . ." (Ex. 1 at GH000307, ¶ 3.1.)

27.     The contract requires the delivery driver to "faithfully and diligently devote best efforts, skills and abilities to the performance of each Engagement in a professional manner and at least consistent with industry standards," which GrubHub lays out as Appendix A. (Ex. 1 at GH000308, ¶ 3.3.)

28.     Appendix A of the contract requires the driver to have done the following:

- Has downloaded the necessary driver tools to fulfill GrubHub delivery orders.

- Sign up for weekly delivery blocks either through the GrubHub driver app or another means.

- When delivery block starts, provide status update to dispatcher that you are "on call" via GrubHub driver tools.

- Should not reject incoming orders or be otherwise unavailable to receive incoming orders during any scheduled delivery block. Exceptions may be made

for extenuating circumstances if you timely communicate such circumstances to the dispatcher.

- Provide status update via driver app when you have arrived at the restaurant, have received the food and are leaving the restaurant for delivery.

- Communicate with GrubHub's Care Team and/or dispatcher to notify them of potential diner issues.

- While this Agreement is in effect, you must have no more than one moving violation in 24 months and may not be involved in any at fault accidents.

(Ex. 1, at GH000319.) GrubHub "reserves the right to modify the provisions of this [Appendix A], in its sole discretion, upon prior notice" to the driver.  Id.

29.     If the driver does not comply with these instructions on a given delivery, the contract states that the driver "shall forfeit all or part of the agreed upon Service Fee for that job . . . ," but that "GrubHub may waive the forfeiture set forth herein in its discretion." (Ex. 1, at GH000308, ¶ 1.)

30.     The contract requires the driver to provide to GrubHub "a description of the vehicle(s) (including bicycle(s) if applicable) [the delivery driver] shall use to perform the Delivery Services." (Ex. 1, at GH000308, ¶ 5.1.)

31.     The contract requires drivers to "utilize and maintain (i) a smartphone (at their own expense) in order to access technology used by GrubHub, and (ii) equipment sufficient to adequately insulate food orders during delivery . . . ." (Ex. 1, at GH000308, ¶ 5.1.)

32.     The contract requires the driver to maintain the equipment "in good working condition and properly licensed and registered to lawfully perform the Delivery services." (Ex. 1, at GH000308, ¶ 5.3.) GrubHub reserves the right to "verify compliance with all federal, state, and local laws . . . ." (Ex. 1 at GH000308, ¶ 5.3.)

33.     The driver is required to maintain several types of insurance and provide proof of insurance to GrubHub prior to beginning work for GrubHub. (Ex. 1 at GH000311, ¶¶ 10.1,

10.1.1.)

34.     The contract provides that it remains "in effect for 60 days, after which it will continue to automatically renew for additional 60 day periods" unless it is terminated. (Ex. 1 at GH000315, ¶ 13.1.)

### D.     GRUBHUB'S CONTROL OVER PLAINTIFF'S WORK

#### i.     Training

35.     Before beginning to work for GrubHub, Mr. Lawson was given training videos to watch, which instructed him how to use the GrubHub app and how to interact with restaurants and customers; he was instructed to be polite and respectful to restaurants and customers. (Lawson at 125-26; O'Shae at 557-58.)

36.     The videos encouraged him to wear a GrubHub shirt and hat while performing deliveries and instructed him on GrubHub's dress code, which required close-toed shoes. (Lawson at 125-26.)

37.     The videos also instructed him to be prompt with orders, making sure that they were delivered fast enough for the food to still be hot when it reached the customer. (Lawson at 126.)

#### ii.     Branding and Uniforms

38.     GrubHub encouraged drivers to use its logos. (Lawson at 127-28; Smith at 152; Ex. 1 at GH000333.)[6]

39.     While working for GrubHub, Mr. Lawson typically wore a hat and t-shirt with GrubHub's logo, and he used an insulated food bag with GrubHub's logo on it. (Lawson at 127-28, 152.)

---

[6]     Ms. O'Shae testified that GrubHub wanted the drivers to wear uniforms because it would make it easy for restaurants to identify them. (O'Shae at 557.)  Mr. Smith testified that he wanted drivers to wear the shirts and hats, as did the restaurants and customers.  (Smith at 152.)  Mr. Grebner testified that he believed the GrubHub insulation bags were required.  (Grebner at 1119.)

40.     In order to work for GrubHub, drivers were required to use insulated food delivery bags. (Lawson at 127-28.)  While drivers could lease these bags from GrubHub (with GrubHub's logo) for a monthly $5 fee, GrubHub waived this fee if the driver agreed to wear the branded hat and t-shirt while working. (Ex. 1 at GH000333; Lawson at 127-28.)  This was a way to encourage drivers to wear the shirt and hat.  (Smith at 153.)

### iii.     Scheduling

41.     GrubHub's contract informs drivers that, in order to work, they should sign up for shifts, which GrubHub calls "blocks." (Ex. 1 at GH000332.)

42.     Mr. Lawson understood from GrubHub that he was expected to sign up for blocks of time in order to work. (Lawson at 128-29.) The blocks were typically slated for two or three hours; drivers would have to take the entire block and could not change the length of the available blocks. (Lawson at 129-30; O'Shae at 509; Mendoza at 977-78; Smith at 66.)

43.     Every week, blocks of time were made available online for drivers to sign up to work for the coming week. (Lawson at 128; O'Shae at 499; Smith at 63; Ex. 43.)

44.     GrubHub used a program called "WhenIWork" for drivers to sign up for their shifts. (Lawson at 128-29; O'Shae at 499; Chia at 694; Mendoza at 981; Grebner at 1139-40; Smith at 102.)[7]

45.     GrubHub's managers made the blocks of time available each week for drivers to sign up for, based upon their estimates and predictions of what demand there would be at different times. (Chia at 695; Mendoza at 1003; Smith at 72-75; O'Shae at 499-500; Ex. 84.)

46.     Drivers were only able to sign up for blocks that were available.  (Smith at 67; Lawson at 129.)

47.     It was difficult for Mr. Lawson to sign up for blocks that he wanted to work

---

[7]     This program is designed for employers to schedule their employees for work. For example, WhenIWork allows drivers to sign up for "open shifts" and refers to workers as "employees." (Exs. 85, 1016.)

because they were taken up very quickly by other drivers.  In Los Angeles, GrubHub had many drivers competing for blocks of time. (Lawson at 128; O'Shae at 498.)[8]

48.     Mr. Lawson typically signed up to work about 20 hours per week, though he would have preferred to work 40 or more hours per week, including busier shifts; however, these hours were generally not available. (Lawson at 425-26.)

49.     Mr. Lawson was able to get more hours than usual during the one week when he received "priority scheduling"; that week (November 30 to December 6, 2015), he worked 44.75 hours. (Lawson at 222, 279-80; Exs. 9, 61.)

50.     GrubHub chose "preferred" drivers it decided were high-performing to get "priority scheduling." (Ex. 61; Smith at 67; Lawson at 131; O'Shae at 499, 501, 510.)  The factors that were used to determine which drivers got priority scheduling included things like how many orders the driver performed, how many orders were rejected or not accepted, how long the driver typically took to perform deliveries, and whether a driver received good feedback from restaurants and customers. (Ex. 61; Smith at 67-70; Lawson at 131; O'Shae at 509).[9]

51.     Drivers who had "priority scheduling" were permitted to sign up for their blocks

---

[8]     Ms. O'Shae testified that, when shifts were released, there was a "mad scramble" to get shifts, and drivers were frequently complaining that they were not able to get shifts. (O'Shae at 498, 500, 503.)  She explained that it was discussed during her training that it was hard for drivers to get shifts. (O'Shae at 501).

Although Mr. Lawson applied to work for GrubHub in August 2015 and signed the contract in September, he did not begin working until October because he had difficulty figuring out how to use GrubHub's scheduling app; once he figured out how to use it, he found it difficult to get shifts. (Lawson at 128, 392; Exs. 1, 12.)  In response to his concerns about signing up to get shifts during this period (Lawson at 393-95; Ex. 43 at GH000265), GrubHub acknowledged that it was difficult for drivers to get shifts during this time and explained that "We are in the midst of growing pains within the Los Angeles market…."  (Ex. 43 at GH000264.)

[9]     GrubHub sent Mr. Lawson an email explaining that he had been chosen for priority scheduling that week, which stated: "Because of your hard work, positive attitude, and timely service, you get priority scheduling this week. Sign up anytime you want from 11:00 am to 11:00 pm for any day of the week, and we'll make sure you are scheduled during those times." (Ex. 61.)

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

of time before other drivers, and there was no limit to the number of blocks they could sign up for. (Lawson at 131; O'Shae at 502-03; Smith at 67-68.)[10]

52.    GrubHub's Los Angeles general manager, Jeff Smith,[11] explained that he decided, in his own discretion, which drivers got priority scheduling. (Smith at 67-70.)  In addition to looking at the drivers' statistics, "[i]f an op specialist said a driver went above and beyond and did something for them we'd maybe add them" to priority scheduling. (Smith at 69.)

53.    Drivers were expected to work during their scheduled shifts.  (Lawson at 208-09, 227, 242; O'Shae at 528-29; Smith 73-75; Mendoza at 1004, 1020-21.)

54.    Drivers were not supposed to work when they were not scheduled for a shift. (Lawson at 133; O'Shae at 491-95, 757.)

55.    Mr. Lawson understood this rule, and he never worked when he was not signed up for a shift. (Lawson at 133.)

56.    GrubHub monitored whether drivers were working during the shifts they signed up for. (Lawson at 192-93; O'Shae at 495-97; Ex. 63; Ex. 64.)

---

[10]    If a driver wanted to change a block that he had signed up for under priority scheduling, the driver could only swap the block with another driver who had priority scheduling. (Lawson at 131-32; O'Shae at 753.)

[11]    Jeff Smith was the General Manager in Los Angeles beginning November 2015 and continuing until after Mr. Lawson's termination in February 2016. (Ex. 173 (GrubHub's Interrogatory Responses); Mendoza at 982-83 (testifying in deposition that he managed Los Angeles before Mr. Smith, which was until mid to late 2015).)  More than a year later, after Mr. Smith's deposition and just before trial (August 31, 2017), GrubHub attempted to change its interrogatory response to state that Mr. Smith did not become the Los Angeles General Manager until just before Mr. Lawson was terminated (in February 2016) (Ex. 1492).  However, GrubHub provided no documents to substantiate this change in testimony, and the evidence showed that Mr. Smith started as General Manager in November 2015:
First, Mr. Smith testified that just before working for GrubHub, he worked for Restaurants on the Run, which was acquired by GrubHub in 2015.  (Smith at 7-8.)
Second, Mr. Mendoza testified that while he managed Los Angeles, he was unaware of the priority scheduling system (Mendoza at 1009-10).  However, Mr. Smith testified about using the priority scheduling system (Smith at 67-68), and Mr. Lawson received priority scheduling one week in November - December 2015.  (Lawson at 222, 279-80; Exs. 9, 61.)

57.     Dispatchers at GrubHub were responsible for making sure drivers were where they needed to be, that they were logged on when they were supposed to be, and that they stayed logged on for their entire shift.  (O'Shae at 479, 481, 765.)

58.     At the beginning of each block, dispatchers or driver care specialists would check to see that drivers were "toggled available." (O'Shae at 495-96.) [12]

59.     Further, drivers were expected to begin their shifts promptly.  If the driver was not toggled available within 10 minutes of the start of their shift, dispatchers would generally contact them to find out why and instruct them to toggle available and move to their zones. (O'Shae at 496-97.)  If the driver did not respond to two texts or emails, the driver would be removed from the shift. (O'Shae at 496-97; Smith at 110; Ex. 101.)

60.     For example, once after beginning a shift, Mr. Lawson received an email from GrubHub during his shift stating, "Please toggle available for your scheduled blocks or we must remove them due to non-compliance."  (Ex. 64.)[13]

61.     GrubHub also closely monitored drivers' availability to perform deliveries during the duration of a shift. (Lawson at 192-93.)

62.     For example, Mr. Lawson once toggled his app to unavailable in order to take a ten minute restroom break.  GrubHub immediately contacted him to inform him that if he did not toggle back to available, his shift would be removed (meaning he would not be paid for that time). (Lawson at 192-93.)

---

[12]     Mr. Lawson received emails from GrubHub telling him to toggle on at the start of his shifts (Lawson at 134.): "Please toggle available for your scheduled blocks or we must remove them due to non-compliance." (Ex. 64); "Are you working your scheduled GrubHub block today? Toggle the app to Available in the next 5 minutes or your blocks will be dropped." (Ex. 67); "Are you working your scheduled GrubHub block today? Toggle the app to Available in the next 10 minutes or your blocks will be cancelled." (Ex. 65.)

[13]     The GrubHub app sometimes had technical glitches, so drivers might not be registering as having logged in, even when they thought they had.  (Ex. 64; Lawson at 384-86; O'Shae at 520-21.)

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

63.     Also, if a driver did not accept orders, the driver may get toggled unavailable, which could lead to the shift getting cancelled, because it appeared to GrubHub dispatchers that the driver was not working. (O'Shae at 529-30.)

64.     Drivers were also warned not to leave their shift early.  For example, GrubHub sent the drivers an email stating: "please be aware that toggling yourself as 'unavailable' before the end of your block can affect your performance and your hourly rate. Especially when it's happening 10 or 15 minutes before the end of the block. We depend on our drivers, on you!, to keep the market running smoothly." (Exs. 63, 101; Lawson at 193-94.)

65.     If a driver needed to leave a shift early, such as because of a childcare issue or the driver was not feeling well, the driver was required to call in and inform GrubHub.  (O'Shae at 468).

66.     GrubHub would also monitor whether drivers were trying to work even when they were not signed up for a block to work. (O'Shae at 491-92.)  Driver care specialists would text drivers who were toggled available without being signed up and instruct them to toggle off. (O'Shae at 491-92.)[14]

67.     GrubHub required drivers to sign up for blocks so that GrubHub could make sure

---

[14]     Due to a quirk in GrubHub's system, drivers could physically toggle themselves available to accept deliveries even when they were not signed up for a shift.  However, these drivers would be evident to GrubHub (they showed up with a gray tag on the monitors in Chicago). (O'Shae at 494.) GrubHub considered drivers who tried to perform deliveries when they were not signed up for a shift to be "gaming the system" (O'Shae at 494, 755-59, 761.)  As a GrubHub training document stated, drivers "CANNOT work without a block." (Ex. 101 at GH001554.)

When drivers did try to work when they were not scheduled, GrubHub sent warning messages to drivers telling them that they should not try to toggle on if they were not signed up for a shift. (O'Shae at 492-95, 757; Exs. 104, 105, 131.)  Driver care specialists would also toggle drivers off who were not signed up for a shift and warn them about this conduct, and if the driver toggled available again, the driver care specialists would bring it to the attention of GrubHub's dispatchers, who would call the drivers about it; it may also be noted in their file. (O'Shae at 494-95, 756-57.)

GrubHub driver coordinator manager Jared Grebner testified that he was not aware of drivers working without being signed up for a shift. (Grebner at 1161.)

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

it had the number of drivers it needed to meet the demand that GrubHub had forecasted for a given market at a given time. (Chia at 626.)  If other drivers who were not scheduled took deliveries during a shift, that would interfere with that calculation.  It would also mean that drivers who were signed up for a shift might not get orders, and GrubHub might then be paying more drivers than it needed.  As Ms. O'Shae testified, "It was no different than me showing up to my job on my day off and expecting to get paid." (O'Shae at 759; Exs. 104, 105, 131.)

68.    If a driver had signed up for a shift but then could not or did not want to work, the driver needed to contact GrubHub to drop the shift or swap it with another driver. (Lawson at 130; O'Shae at 752-53.)

69.    If the driver gave enough advance notice, the driver could drop a shift by releasing it on WhenIWork, but if there was not enough advance notice, the driver was supposed to call GrubHub to let the company know he could not work the shift.  (O'Shae at 752-53.)

### iv.    Pay

#### a.    Hourly Rate

70.    While working as a GrubHub driver, Mr. Lawson was generally paid by the hour. (Exs. 4-13.)

71.    When he first began working for GrubHub, his hourly rate was $15.  On December 20, 2015, the rate was lowered to $11 an hour. (Lawson at 144; Ex. 1 at GH000332; Ex. 11.)

72.    Mr. Lawson received these hourly rates every day that he worked for GrubHub except for 7 days.[15]  On 5 of those days (October 31, November 13, November 20, November 25, and December 6), he was paid California's minimum wage of $9 per hour. (Lawson at 200-02; Exs. 4, 6, 7, 8, 9).  On one day only, he made more than GrubHub's minimum rate.[16]  On one

---

[15]    However, these rates included tips he received from customers. (Ex. 1 at GH000332; Exs. 4-11.)

[16]    On January 21, 2016, Mr. Lawson made $5.83 more in total than he would have received

day, he was paid less than California minimum wage.[17]

73.     Although as a practical matter, drivers were generally paid on an hourly basis, GrubHub explained its pay system as being based on a formula[18] that would be "trued up" to the minimum hourly guarantee, provided that the driver met GrubHub's minimum delivery acceptance rate. (Lawson at 196-98; O'Shae at 746-47; Smith at 174; Ex. 1 at GH000332.)

74.     The minimum acceptance rate was 75% when Mr. Lawson started with GrubHub, but Jeff Smith increased it to 85% while Mr. Lawson was working for the company. (Ex. 1 at GH000312, ¶¶ 10.1.2, 10.1.3; Lawson at 196, 198; Smith at 175-76.)

75.     GrubHub used this minimum acceptance rate in order for drivers to receive the minimum guarantee as a way to encourage them to accept deliveries that are sent to them while they were on shift. (Smith at 176.) Indeed, drivers were very concerned about keeping up their acceptance rate so as to receive the minimum hourly rate. (O'Shae at 531-32.)

76.     Mr. Lawson attempted to accept every delivery possible so that he could receive the minimum hourly rate. (Lawson at 146, 212, 391-92.)[19]

---

from the $11 per hour minimum rate. (Ex. 11; Lawson at 204-05.) Indeed, it was uncommon for drivers to ever make more than the guaranteed minimum hourly pay rate. (O'Shae at 750.)

[17]     On February 13, 2016, Mr. Lawson was paid $17.72 for a shift of 7 hours, for an hourly rate of $2.53. (Ex. 11; Lawson at 206-07.)

[18]     The formula was based on per-delivery payment ($4.25 per delivery in Los Angeles while Mr. Lawson worked for GrubHub), plus tips, plus 50 cents per mile. (Lawson at 198; Ex. 1 at GH000322.) The miles counted in this calculation included only "as the crow flies" straight-line miles from each restaurant to each customer, not the actual miles driven by the driver, and not the miles driven to get to the restaurant to pick up the delivery. (Ex. 1 at GH000322; Lawson at 215.)

[19]     Even though the minimum acceptance rate was below 100%, as a practical matter, Mr. Lawson believed he needed to accept every order possible because there were times he simply would not be able to accept an order or he would not see an order come through on his phone; he was concerned those occasions would bring him below the minimum acceptance rate unless he accepted every order possible. (Lawson at 209-21, 391-92.)
       One reason a driver might not see an order come through on his phone was that he might be in an area with poor cell service reception. (Lawson at 210; O'Shae at 516-17.) Mr. Lawson

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

77.     GrubHub managers wanted and expected drivers to accept every delivery that was sent to them while they were on shift. (Smith at 73-75; Mendoza at 1004, 1020-21; O'Shae at 528.)

78.     Indeed, GrubHub scheduled the number of drivers who would work each shift based upon the expectation that they would accept all, or most, of the deliveries sent to them. (Smith 73-75; Mendoza at 1004, 1020-21.)

79.     Another reason that Mr. Lawson tried to accept every order that was sent to him is because if drivers did not accept orders, their app would be toggled to unavailable, which would put them at risk of having their entire shift cancelled by one of GrubHub's dispatchers or driver care specialists (which would cause them not to receive the hourly rate for that shift). (Lawson at 145, 209; O'Shae at 512, 528-30.)

80.     GrubHub dispatchers also told Mr. Lawson that if he was not accepting orders while on a block, it would look like he was not working. (Lawson at 209.)

81.     Mr. Lawson also understood that if his acceptance rate was too low, he could be terminated. (Lawson at 209.)

82.     Indeed, GrubHub terminated drivers who maintained an acceptance rate that it considered too low. (Lawson at 145; O'Shae at 532; Exs. 33, 34, 39-41.)[20]  Mr. Smith testified that there was no particular guideline as to what percentage acceptance rate was low enough for a driver to be considered for termination; it was just something he decided in his discretion. (Smith at 89.)

also believed he might have received so-called "ghost orders", which is what drivers called orders that they had not seen on their phones (which may or may not have been due to poor phone reception).  (Lawson at 209-12, 391-92.) Ms. O'Shae testified that drivers complained often about "ghost orders."  (O'Shae at 515, 517.)

[20]     Mr. Lawson feared that he would be terminated if he did not keep his acceptance rate high, because he had been told by GrubHub that there were already too many drivers in Los Angeles, and therefore he felt expendable. (Lawson at 148-50.)

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

83.     Mr. Lawson also tried to accept every order he could because he wanted to receive GrubHub's weekly bonus. (Lawson at 148.)  The bonus was for an additional $2.50 per hour (up to $100 per week) for drivers who had an acceptance rate in the top 15th percentile that week. (Ex. 1 at GH000332; Lawson at 144.)[21]

84.     Drivers could not negotiate their rate of pay – either with GrubHub or customers. (Lawson at 232-33.)  GrubHub set the drivers' pay in its discretion. (Smith at 172.)[22]

85.     Drivers were paid weekly by direct deposit into their bank account. (Lawson at 196; Exs. 4-10.) The direct deposits were made each Thursday for work performed the previous week. (Exs. 4-10.)

86.     GrubHub usually sent drivers a statement when they were paid, showing how their pay was calculated for the week.  (Exs. 4-10.)[23]

87.     If a driver thought their pay had been calculated incorrectly, the driver could contact GrubHub and ask for a pay adjustment. (O'Shae at 468, 543, 748; Lawson at 218; Ex. 42.)[24]

---

[21]     In order to be in the top 15th percentile and receive the bonus, a driver realistically had to accept 100% of the orders sent to him. (Lawson at 207-08.)

[22]     Mr. Chia could only recall a couple of instances in one city where GrubHub had agreed to pay some drivers a higher payment to work in inclement weather. (Chia at 688-89.)  Mr. Smith had never heard of a driver negotiating the rate of pay. (Smith at 165.)

[23]     Mr. Lawson received statements when he was paid, beginning when he started with GrubHub in October 2015. (Lawson at 199.)  However, he stopped receiving statements in December 2015. (Lawson at 199, 202-03; Exs. 4-11.) Although he inquired about why he was no longer receiving statements, he did not receive any further statements after that date. (Lawson at 202-03.)

[24]     If, for example, an order caused Mr. Lawson to continue working past the end of his shift, he had to fill out an online form in order to get paid for the additional time; however, the online form often did not work, and so he would email GrubHub requesting an adjustment. (Lawson at 218; Ex. 42.)  GrubHub kept track of Mr. Lawson's pay adjustment requests in his file.  (Exs. 42, 80.)

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

88.     It was in GrubHub's discretion whether to adjust the pay when a driver pointed out that an error had been made. (Lawson at 418-19.)[25]   Pay adjustment requests were handled by GrubHub's driver specialists. (Lawson at 218; O'Shae at 551-52.)[26]

### b.     Expenses

89.     GrubHub does not reimburse drivers for the expenses they incur performing deliveries. This is made clear by the contract, which states that the delivery driver is responsible for "all costs and expenses arising from PDSP's performance of the Delivery Services, including but not limited to, costs related to PDSP's personnel and equipment." (Ex. 1, at GH000308, ¶5.4.)

90.     Further, GrubHub's managers testified that GrubHub does not reimburse for expenses.  (Chia at 691; Smith at 169.)

91.     No one at GrubHub ever informed Mr. Lawson that the mileage component of GrubHub's pay formula was reimbursement for expenses[27], and he never understood it to be. (Lawson at 213-14; Ex. 1 at GH000322.)[28]

---

[25]     Driver care specialists looked at the requests for pay adjustment closely. For example, on January 21, 2015, a driver care specialist declined Mr. Lawson's request to pay him to the end of an hour and instead only paid him to seven minutes before the end of the hour. (Ex. 42.)

[26]     The driver care specialists were trained on how GrubHub driver pay worked and had discretion to adjust a driver's pay up to $100 without consulting higher management; beyond that amount, further managerial approval was necessary. (O'Shae at 751-52.)

[27]     As Mr. Chia testified, the purpose of the mileage component was to encourage drivers not to reject orders that were far away, not to reimburse expenses. (Chia at 622-23, 625.)

[28]     Furthermore, the 50 cents per straight-line mile that was a part of GrubHub's pay formula did not cover all of the miles that the driver actually drove. (Ex.1, at GH000322; Lawson at 214-15.)  GrubHub calculated the miles "as the crow flies," meaning in a straight line from the restaurant to the customer, rather than the miles of the route that the driver actually drove. (Ex.1, at GH000322; Lawson at 215.)  These miles also did not include the miles the driver had to drive to pick up the order from the restaurant. (Ex.1, at GH000322; Lawson at 215.)  Also, when a driver picked up multiple orders from a restaurant, these miles did not include the distance between each customer, but instead the distance from the restaurant to each customer, meaning that if the customers were located in different directions from the restaurant, the miles would not

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

92.     GrubHub also included the 50 cents per mile component in the pay formula for its bicycle couriers, even though they do not have automobile expenses. (Chia at 625.)

### v.     Performance of Deliveries

#### a.     Zones

93.     GrubHub delivery drivers are all assigned geographical "zones" in which they would perform deliveries. (Lawson at 136; Ex. 71; O'Shae at 484; Mendoza at 977; Grebner at 1111.)

94.     Although the drivers could inform GrubHub of their preferences for a zone, GrubHub made the decision of what zone a driver would be assigned to.  (Lawson at 136-38; O'Shae at 484.)[29]

95.     If a driver wanted to change their zone, they would have to put in a request, and GrubHub would let them know if they could change their zone.  (O'Shae at 485.)

96.     Drivers were expected to be in their zone at the start of their shift and stay in their zone during the duration of their shift. (Lawson at 138, 141, 154-55; O'Shae at 492, 543-44; Mendoza 1022-25; Ex. 101 at GH001553.)[30]

97.     Dispatchers would monitor if the drivers stayed in their zones during their shift and would contact them if they went out of their zone.  (O'Shae at 766-67.)

---

account for the distance the driver would drive from one customer to the next.  (Lawson at 215.)

[29]     GrubHub decided zone assignments based on how many drivers were currently assigned to a given zone; if there were already too many drivers already in a zone, the driver may not get their zone preference. (O'Shae at 484.)

[30]     GrubHub warned its drivers about staying in their zones: "Our delivery areas in When I Work aren't arbitrary. If you've scheduled yourself in a delivery area, we need you to be there." (Ex. 141 at LAWSON000261; Lawson at 157); "So, if you're signed up for each of these zones, this is where we expect you to be." (Ex. 142.)

          If drivers were not in their zones during their shift, GrubHub may send them an email saying "We see you're not in your current zone.  Please move to your zone and be ready to take an order."  (O'Shae at 492.)

98.     When a shift began, Mr. Lawson drove to his assigned zone.  (Lawson at 133.)
Then he would toggle his status on the GrubHub app to available. (Lawson at 134.)

99.     If a driver did not toggle on as available when their shift began, GrubHub would
contact them and tell them that they had to get to their zone and log on or GrubHub would
remove the shift. (Lawson at 155-56; Grebner at 1162; Ex. 138; O'Shae at 497.)

100.    If a driver left his zone without GrubHub's permission during his shift, the driver
could be contacted and threatened that their shift may be cancelled.  (Lawson at 155-56; O'Shae
at 543-44; Ex. 138.)[31]

101.    GrubHub considered it "fraudulent activity" when drivers left their zones. (Chia at
640-41.)  GrubHub driver care specialists were at times instructed to send texts to drivers telling
them to return to the correct zones. (O'Shae at 492.)

102.    Although drivers were expected to remain in their zone, they could be sent out of
their zone by GrubHub to perform a delivery (even as far as 20 miles out of their zone). (Lawson
at 183-84; O'Shae at 494, 543-44).

103.    Mr. Lawson often did not want to do the deliveries that were far outside of his
zone, but he felt he had to do them anyway. (Lawson at 184; Ex. 62.)

104.    After an out-of-zone delivery, drivers were expected to return to their zone, unless
they were sent another order out of their zone. (Lawson at 185; O'Shae at 493, 544.)

**b.     Delivery Assignments**

105.    While on shift, drivers would receive delivery orders through the GrubHub app on
their phones.  When GrubHub sent an order, the app would make a cowbell sound and a
notification would pop up on the app. (Lawson at 142; O'Shae at 511-12.)

106.    The notification stated the name of the restaurant but did not provide additional

---

[31]     For example, during one shift, GrubHub sent Mr. Lawson an email from GrubHub with a
heading "You're Outside Our Delivery Area," which stated "Hi Raef … Hey! Please move
closer or we will be removing your blocks." (Ex. 138; Lawson at 155-56.)

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

information regarding the order. (Lawson at 142, 400-01; O'Shae at 512-13, 524.)[32]

107.    If the driver did not press the "accept" button on the app within 10 to 20 seconds of an order coming in, the order notification would disappear. (Lawson at 142; O'Shae at 511-12.)[33]

108.    If a driver did not press the "accept" button to accept orders, the app may automatically toggle the driver unavailable. (O'Shae at 511-12.)[34]

### c.    GrubHub's Dispatchers and Driver Care Specialists had the Power to Reassign Deliveries

109.    GrubHub's delivery orders were at first assigned manually to drivers by dispatchers; there were no written guidelines for how the dispatchers would decide which driver would get which order.  (Mendoza at 997-99).

110.    In 2015, GrubHub began phasing in an algorithm to assign orders. (Mendoza at 999; Chia at 685.)

111.    Even after GrubHub began using an algorithm to assign orders, dispatchers and driver care specialists were able to override the algorithm and reassign the orders manually.[35] They could override the algorithm based on their own discretion.  There were no specific guidelines setting forth when they should override the algorithm. (O'Shae at 506, 508; Mendoza

---

[32]    The notification did not state the size of the order, what the cost of the order was, or the amount of tip the customer left for the order. (Lawson at 142-43; O'Shae at 524.)

[33]    Mr. Lawson and Ms. O'Shae do not remember the app having a "reject" button at the time Mr. Lawson worked for GrubHub. (Lawson at 143, 397-98; O'Shae at 512.) Instead, the order would simply disappear if the drivers did not press "accept" within the allotted amount of time and would count as a rejected order. (Lawson at 143.)

[34]    The drivers were expected to accept the order within this 10-20 second window, even if they were driving. (O'Shae at 513.)

[35]    After an order was assigned to one driver, a dispatcher could take it away and assign it to another driver.  (O'Shae at 481.)

at 1001-02; Smith at 58.)[36]

112.    Drivers would at times call in to GrubHub and request to have an order reassigned. (O'Shae at 506, 538; Chia at 685; Lawson at 146-47; Exs. 42, 62.)

113.    For example, Mr. Lawson would sometimes request a reassignment where he thought an order was too far away from his location or if the order was going to take him past the end of his shift. (Lawson at 146-47, 183-84; Ex. 62.)

114.    Also, when he received more orders than he thought he could deliver on time, he would call GrubHub and ask whether an order should instead be reassigned or if he should do them all, even if they were going to be late.  (Lawson at 186.)  It would then be for GrubHub to decide whether to reassign the delivery or instruct him to go ahead and do it.  (O'Shae at 536.)

115.    GrubHub's driver care specialists decided whether or not to grant requests for reassignments, based on their own discretion. (O'Shae at 538-39, 547-48, 768.)

116.    Also, if they did decide to reassign an order, the driver care specialists would use their discretion in deciding which driver to reassign the order to.  In making these decisions, driver care specialists may take into account their beliefs about the drivers' ability. (Smith at 144-45.)[37]

117.    The driver care specialists developed relationships with drivers; they would get to know some of them who called in a lot.  (O'Shae at 486.)

118.    With some of them, they had pleasant interactions, and others were more challenging.  (O'Shae at 486-87.)  They had their favorite drivers.  (O'Shae at 487.)

119.    Sometimes GrubHub granted Mr. Lawson's requests for reassignments, and at

---

[36]    Mr. Smith testified that GrubHub employees sometimes reassigned orders because "sometimes they think they're smarter than the algorithm." (Smith at 143.)

[37]    Mr. Smith testified that: "after time the op specialists do see and start to know the drivers and know the ability of some of these drivers . . . they have their go-tos and they'll send them a couple orders here and there, yes." (Smith at 144.)

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

other times he was told that he had to complete the orders. (Lawson at 145, 420.)[38]

120.     Initially when Mr. Lawson began working for GrubHub, order reassignments were not counted against drivers' acceptance rate, but later GrubHub began counting reassignments against the drivers' acceptance rate and made this clear to the drivers. (Lawson at 146; O'Shae at 539.)

121.     Mr. Lawson understood GrubHub's driver care specialists and dispatchers to be his supervisors. (Lawson at 398-99.)  Ms. O'Shae also considered GrubHub's dispatchers to have supervisory authority over the drivers. (O'Shae at 809-10.)[39]

### d.     GrubHub Closely Monitored its Drivers During Their Shifts

122.     GrubHub's dispatchers and driver care specialists monitored the drivers' work closely while they were on shift.  Training documents that Jeff Smith helped create explain that dispatchers should "[m]onitor orders in real time," "monitor attendance in real time", and "contact drivers".  (Ex. 102.)

### 1.     Drivers Were Required to Provide GrubHub with Regular Updates throughout their Deliveries

123.     Once a driver accepted an order, the next step in the process was for him to drive to the restaurant as quickly as possible to pick up the order. (Lawson at 151.)

---

[38]     For example, on December 5, 2015, GrubHub sent Mr. Lawson an order that was far away from his location near the end of his shift, and he called in and asked for it to be reassigned. (Lawson at 146-47; Ex. 62.) Then, even though it was reassigned, the order was sent back to him. (Lawson at 147; Ex. 62.)  Mr. Lawson was upset about this, so he sent an email to GrubHub to complain about the dispatcher's conduct in sending him back the order. (Lawson at 146-48; Ex. 62.) GrubHub responded by explaining that because Mr. Lawson was "the only driver scheduled to be in South Bay, we had no choice but to offer the order back" to him.  (Ex. 62.) Although Mr. Lawson did not want to complete the order, he did it anyway because he wanted to keep his acceptance rating high to ensure that he would receive the guaranteed minimum hourly rate, and if possible the weekly bonus, and because he did not want to be terminated. (Lawson at 148.)

[39]     She particularly believed that their ability to decide whether or not reassignments would count against their acceptance rates gave them a high degree of power over the drivers. (O'Shae at 542, 779.)

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

124.    The GrubHub app had a button that opened up Google Maps that drivers could use to get to the restaurant.  (O'Shae at 524.)  Mr. Lawson generally used this navigation tool to get to the restaurant. (Lawson at 151.)

125.    Once the driver arrived at the restaurant, he was required to press a button on the app to indicate to GrubHub that he had arrived. (Lawson at 151, 191.)

126.    The driver would then identify himself to the restaurant as a GrubHub driver. (Lawson at 152.)[40]

127.    After receiving the food from the restaurant, the driver would then press a button in the app to indicate to GrubHub that he had picked up the order. (Lawson at 152, 191.)

128.    Drivers were expected to review the order on the app and look through the order provided by the restaurant to make sure that they had the correct items to deliver to the customer. (O'Shae at 558-59.)[41]

129.    After picking up the order from the restaurant, the driver would deliver the order to the customer's location as fast as possible, ring the doorbell or knock, and hand the food to the customer. (Lawson at 152.)

130.    Once the order had been delivered, the driver would press a button on the GrubHub app to indicate to GrubHub that the order had been delivered. (Lawson at 153, 191.)

**2.    GrubHub Tracked the Drivers' Progress During Each Delivery**

131.    GrubHub tracked the driver's location during each order. (Lawson at 152-53.)

---

[40]    GrubHub liked drivers wearing the GrubHub shirt and hat because the restaurant could then quickly identify them.  (O'Shae at 557; Smith at 152.) Mr. Lawson explained that when he arrived at a restaurant, the restaurant staff would usually know what order he was there to pick up because he was wearing the GrubHub uniform. (Lawson at 152.)

[41]    Ms. O'Shae testified that she often wrote up in drivers' files that items were missing from their orders and that they were supposed to inventory the items before leaving the restaurant. (O'Shae at 559-60.)

132.    From their office in Chicago, GrubHub dispatchers had screens on which they could see a map (for each market) showing the physical locations of all the drivers working at the time. (O'Shae at 482; Hanson at 1046-47; Smith at 47.)

133.    The dispatchers could click on an individual driver on the map and see the orders the drivers had been assigned and the drivers' destinations. (O'Shae at 482.)[42]

134.    GrubHub dispatchers and driver care specialists could also see on their screens when drivers went out of their zones. (O'Shae at 766; Smith at 122-23.) When drivers went out of their zones, GrubHub dispatchers would contact the drivers to find out why. (O'Shae at 766-67; Smith at 122-23.)

135.    GrubHub dispatchers and driver care specialists closely monitored the timeliness of orders using Google Maps, as well as the order lookup tool in the GrubHub software (which would tell them the status of the order, i.e., if it was picked up, waiting to be picked up, or out for delivery). (O'Shae at 525-26, 771; Hanson at 1046.)

136.    GrubHub wanted drivers to deliver orders quickly to customers.  When customers placed orders, they were given an estimated time of delivery.  If an order was late, GrubHub would offer the customer a credit toward their next order.  (O'Shae at 774-75.)

137.    If an order were taking a long time, a GrubHub dispatcher (operations specialist) could manually reassign the order to another driver.  (Smith at 58.)[43]

138.    If a customer asked when an order would arrive, a customer care employee would contact a driver care specialist, who would look at their monitor to see where the driver was and

---

[42]    Mr. Lawson was aware that GrubHub tracked his location, because sometimes if he had inadvertently neglected to mark an order delivered in the app (or if there was some other reason it had not been marked as delivered, such as if there was a glitch in the app that prevented him from reporting it, or if he did not have cell reception), someone from GrubHub would call him and ask what happened. (Lawson at 153.)  Ms. O'Shae explained that driver care specialists would reach out to drivers who had not marked their orders as "delivered." (O'Shae at 526-27.)

[43]    There is no particular amount of time in which that is supposed to be done, but it would be in the dispatcher's (operation specialist's) discretion.  (Smith at 58.)

estimate how long it might take for the order to arrive.  If it appeared that the order would be late, the driver care specialist may suggest that the customer care employee offer the customer something free or a credit on their next order as an apology.  (O'Shae at 525-26)

139.    GrubHub's software assigned color coding to the screen used to track drivers and orders.  Orders that were ten or fifteen minutes late would be marked as yellow.  Orders that were more than twenty minutes late would be marked as red. (O'Shae at 526.)

140.    Drivers were expected to call GrubHub if they anticipated being late on a delivery. (O'Shae at 535-36.)

141.    Dispatchers, and sometimes driver care specialists, would contact drivers if they were taking a long time to complete an order or if it looked like they were going the wrong way. (O'Shae at 521-22, 775-76; Smith at 47-48.)

142.    GrubHub managers regularly analyzed aggregated data to ensure that the drivers were performing deliveries as GrubHub wanted them to be performed. (Chia at 698-701.)

### vi.    GrubHub Handled Issues with Restaurants and Customers, Rather Than the Drivers

143.    GrubHub handled communications with the restaurants and customers, rather than the drivers. (Lawson at 186-87, 189; O'Shae at 534-35.) [44]

144.    For example, if a driver arrived at a restaurant and the order was not yet ready, the driver was not supposed to complain to the restaurant about the delay. (Lawson at 187; O'Shae at 535.) Instead, the driver supposed required to call in to GrubHub to report the delay and get instructions on what to do. (Lawson at 187; O'Shae at 535; Smith at 161-62.)[45] The driver was not supposed to contact the customer directly about a delayed order. (Lawson at 186.)

---

[44]    During her training, Ms. O'Shae said she was explicitly instructed not to inform customers that the drivers were independent contractors, just that they represented GrubHub. (O'Shae at 776-77.)

[45]    Mr. Lawson knew that complaining to the restaurant directly could hurt his rating from the restaurant.  (Lawson at 187-88; Ex. 19.)

145.    Drivers were also not permitted to remedy customer issues, such as when the wrong items were delivered.  The driver was not supposed to go back to the restaurant to pick up missing items for the customer. (Lawson at 189-90; O'Shae at 536-37.)

146.    If a customer was upset that the wrong items had been delivered, the driver was supposed to tell the customer to call Customer Care at GrubHub. (Lawson at 189; O'Shae at 536.)[46]

147.    If a customer had a complaint about a driver, the customer would contact GrubHub, rather than take it up with the driver directly. (Lawson at 190-91; O'Shae at 537.)

148.    Likewise, restaurants would inform GrubHub if they were unhappy with a driver. (O'Shae at 533-34). GrubHub allowed the restaurants to rate the drivers.  GrubHub informed the drivers that restaurant ratings were a factor in whether they would be eligible for priority scheduling. (Lawson at 188.)

149.    Driver care specialists were responsible for communicating restaurant or customer complaints to drivers. (Ex. 80.)

### vii.    GrubHub Maintained Files on its Drivers

150.    GrubHub maintained electronic files on its drivers, referred to as Salesforce accounts.  Driver care specialists had access to these files. (O'Shae at 466.)

151.    These files included information on the driver's hiring, their contract, past contacts GrubHub had with the driver, any customer or restaurant complaints about the driver, and any other relevant information from the Driver Care department's phone calls with the driver. (O'Shae at 466.)

152.    The driver's Salesforce file would automatically come up on the driver care

---

[46]    Drivers could not issue refunds or credits to unhappy customers.  Indeed, GrubHub once chastised Mr. Lawson for even suggesting that GrubHub might issue a refund if the customer called Customer Care. (Lawson at 189-90.)  Mr. Lawson was told to never tell a customer about any kind of refund or what GrubHub's response might be to a complaint. (Lawson at 190:9-13.)

specialists' screens when drivers called in to GrubHub, so the driver care specialist could see the driver's history. (O'Shae at 467.)

153.    If a driver made mistakes, such as delivering the wrong order to a customer, that mistake would be noted in the driver's file. (O'Shae at 538.)

154.    The drivers' files may be consulted when GrubHub was deciding whether to terminate a driver. (O'Shae at 738-39.)

### viii.    GrubHub Routinely Terminated Drivers

155.    Not only does GrubHub's contract permit it to terminate drivers at will, GrubHub has in fact routinely terminated drivers for conduct that, in its discretion, it does not find acceptable.  (Exs. 31-41.)[47]

156.    For example, GrubHub has terminated drivers for not being available to perform deliveries during the delivery blocks they had signed up for (Exs. 31-33, 38, 41), declining too many orders sent to them during their delivery blocks (Exs. 34, 39), maintaining too low an order acceptance rate over time (Exs. 39, 41), failing to complete deliveries of orders they had accepted (Ex. 33), marking deliveries as complete when the deliveries were not actually made (Exs. 35, 40), traveling too far away from restaurants in their market during their delivery blocks (Ex. 34, 37, 38), reaching out to customers after customers had cancelled an order (Ex. 35), and taking too long to complete deliveries. (Exs. 36, 41)

157.    At the time Mr. Lawson worked for GrubHub, the company had too many drivers in Los Angeles and was eager to weed out drivers. (O'Shae at 498.)  In fact GrubHub's driver care specialists were repeatedly told during their training that "we need less drivers, not more" in Los Angeles. (O'Shae at 498, 746.)

158.    In determining whether to terminate drivers, GrubHub would look at factors such

---

[47]    Mr. Smith agreed that "[i]f a driver is not performing the services the way GrubHub wants them to be performed, . . . GrubHub [can] terminate the services of a driver."  (Smith at 82.)

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

as drivers' delivery times, acceptance rates, and how many orders they had taken. (Smith at 88; O'Shae at 734-35, 737.)[48]

159.    GrubHub would also terminate drivers if it believed, in its discretion, that they had engaged in inappropriate behavior with customers or restaurants, stolen food, or were committing fraud against the company.  (Chia at 646-47.)[49]

160.    GrubHub would terminate drivers based on complaints without even necessarily asking for the driver's side of the story. (Smith at 6-9.)

161.    GrubHub kept track of customer complaints about drivers, which were noted in the drivers' Salesforce files. (O'Shae at 465, 538.)  These files would be consulted when GrubHub was deciding whether to terminate a driver.  (O'Shae at 738-39.)

162.    Customer Care employees would advise Driver Care employees about customer complaints about drivers.  (O'Shae at 464.)

163.    Driver care employees would also receive complaints about drivers from restaurants.  Depending on the severity of the complaint, the driver care employees would inform GrubHub's operations specialists.  (O'Shae at 465.)  The operations specialists would then in consultation with higher GrubHub management make the decision whether to terminate a driver. (O'Shae at 465, 472.)

164.    GrubHub also used "driver issue forms" when complaints were received about drivers.  (O'Shae at 466.)  "Issue forms" were also used for various performance issues.  (Ex. 99.)

165.    If a driver ever tried to reapply for GrubHub after being terminated, it was in

---

[48]    In deciding whether to renew a driver's contract, GrubHub may also look at the driver's file.  (O'Shae at 739-40.)

[49]    Ms. O'Shae described an instance in which a driver was terminated after a restaurant made a complaint about him.  She notified an operation specialist who told her, "Yeah, we know him to be a problem."  (O'Shae at 470.)

GrubHub's discretion whether to reinstate the driver and allow him to work for GrubHub again. (Smith at 190-92; O'Shae at 741.)[50]

### ix.     Plaintiff's Termination

166.     GrubHub terminated Mr. Lawson on February 15, 2016 (Lawson at 244-45, Ex. 75.)

167.     GrubHub did not give Mr. Lawson a clear explanation for why he had been terminated.  He was simply sent an email that said: "We noticed that you have not been available to receive orders and have not performed delivery services during a high proportion of the delivery blocks that you have signed up for." (Ex. 75; Lawson at 244-45.)

168.     It is not clear why exactly Mr. Lawson was terminated.  It may have been because GrubHub realized he was working for other delivery companies while he was on shift for GrubHub, or it may have been because he was not showing up to be available for his shifts that he signed up for.

169.     While he worked for GrubHub, Mr. Lawson also worked for two other food delivery companies, Caviar and Postmates. (Lawson at 226, 230.)

170.     GrubHub preferred that drivers not work for other companies while they were on shift for GrubHub; it wanted drivers to be focused on delivering for GrubHub.  (Smith at 126-32.)[51]

171.     Drivers typically did not inform GrubHub that they were driving for other

---

[50]     Mr. Smith testified that he at times gave drivers a second chance after they had been terminated, but that after a point, he decided not to give drivers second chances any more. (Smith at 190-91.)  He explained: "In my earlier days I would give people a chance, now I don't … I've learned from mistakes because they usually make another mistake." (Smith at 191.) Ms. O'Shae testified that when drivers who had been terminated reached out to her about whether they could be rehired, she was supposed to refer the question to management for consideration, who would either tell her how to respond or instruct an operations specialist to respond. (O'Shae at 741-42.)

[51]     Mr. Smith resisted this answer but did respond that he did care "if a driver is driving for other companies at the same that they're on a block of time with GrubHub." (Smith at 126.)

companies.  (O'Shae at 762.)  When GrubHub realized that a driver was driving for another company, it may be noted in their file.  (O'Shae at 763.)

172.     Indeed, Mr. Lawson did not tell GrubHub that he was also working for Postmates and Caviar while he was working for GrubHub; he understood that GrubHub expected him to be available throughout his shift to accept all orders and believed that GrubHub would not like him performing deliveries for other companies while on shift. (Lawson at 242.) As Mr. Lawson put it, he thought it "would be risky to accept the orders from other companies." (Lawson at 239.)[52]  It was clear that Mr. Lawson was nervous about admitting to GrubHub that he had been delivering for multiple companies while working for GrubHub, even after he was terminated and even at his deposition.  (Lawson at 240-41.)

173.     From late October 2015, when he first started working for GrubHub, until late December 2015, Mr. Lawson was consistently available to accept orders during his shifts and indeed regularly did accept orders, almost always obtaining a high acceptance rate. (Plaintiff's Deliveries on His GrubHub Shifts Chart (attached here as Exhibit A)[53]; Exs. 4-12, 1020.)

174.     While he later performed some delivery work for Postmates and Caviar while he was on shift for GrubHub, he did not do this often in 2015. Indeed, prior to December 20, 2015, Mr. Lawson performed only a total of four deliveries for Postmates and no deliveries for Caviar while on shift for GrubHub. (Exs. 12, 161, 1455, 1458.)[54]

175.     However, after December 20, 2015, Mr. Lawson became disillusioned with GrubHub when the hourly rate was lowered from $15 to $11.  After that point, he began doing more deliveries for Postmates, and began doing deliveries for Caviar, while on shift for GrubHub.

---

[52]     Mr. Smith acknowledged that operation specialists complained about drivers driving for other apps so that they are not taking orders directly to GrubHub customers.  (Smith at 141.)

[53]     This demonstrative was presented at trial. (Transcript at 954.)

[54]     On those four occasions, he performed a Postmates delivery near the end or at the very beginning of his GrubHub shift. (Exs. 12, 161, 1455, 1458.)

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

As a result, there were periods of time that he was on shift for GrubHub but unavailable to take orders. (Lawson at 241-42; Ex. 161.)

176.    Thus, it may well have been that GrubHub terminated him in mid-February because he was performing deliveries for other companies while on shift for GrubHub.

177.    Also, as Mr. Grebner explained, the company monitored its drivers to ensure that they were available to perform deliveries when they were signed up for shifts.  The evidence showed that, after December 20, 2015, Mr. Lawson progressively was showing up for his shifts later and later. (Ex. 17; Plaintiff's Deliveries on His GrubHub Shifts Chart (Exhibit A).)

178.    Mr. Lawson was ultimately terminated on February 15, 2016, without warning and without any explanation other than the email GrubHub sent him, and without being asked for or given an opportunity to explain himself. (Lawson at 244-45; Ex. 75.)

179.    After his termination, Mr. Lawson twice tried to apply to work again for GrubHub because he needed the money.  However, he was never permitted to work for GrubHub again. (Lawson at 245-46, 382-83.)

### E.    PLAINTIFF DID NOT OPERATE HIS OWN BUSINESS

180.    While working for GrubHub, Mr. Lawson was not operating his own business. (Lawson at 246-47.)

181.    Mr. Lawson never considered himself to be working for himself while he was a GrubHub delivery driver.  As he explained, he had to deliver GrubHub's orders to GrubHub's customers, GrubHub set all the prices, and he was following GrubHub's rules regarding the deliveries. (Lawson at 246.)

182.    When Mr. Lawson delivered food for GrubHub, he delivered to GrubHub's customers, not his own customers. (Lawson at 231.)

183.    Mr. Lawson did not have any way of obtaining his own customers for food delivery. (Lawson at 231-32.)

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

184.    He did not have business cards. (Lawson at 232.)[55]

185.    Customers were not able to request him to come back to deliver for them again, even if they were very happy with his service. (Lawson 232.)

186.    He could not decide what services to offer to the customers.  He was required simply to follow GrubHub's rules and deliver the orders that GrubHub sent to him. (Lawson at 246.)

187.    Mr. Lawson never hired anyone to help him deliver his GrubHub orders.[56]  Indeed, he never understood that to be a possibility and never even heard of any other driver doing that. (Lawson at 246.)[57]

188.    While he was working for GrubHub, Mr. Lawson also performed some delivery work for other delivery companies, Postmates and Caviar. (Lawson at 230.) Before and after working for GrubHub, Mr. Lawson also worked for a number of other "gig economy" companies over a two-year period in order to support himself while he pursued acting. (Lawson 120-22, 248.)

189.    However, Mr. Lawson has never had his own delivery customers. (Lawson at

---

[55]    Mr. Smith testified that he had never heard of a driver who had worn any kind of branded material advertising their own company.  (Smith at 154.)

[56]    As Mr. Lawson barely made minimum wage working for GrubHub (and at times made less than minimum wage), it was not realistic for him to hire anyone to help him perform deliveries. (Lawson at 247.)

[57]    GrubHub managers agreed that they had never heard of a driver hiring others to perform their deliveries.  (Chia at 676-67; Smith at 155.)  GrubHub's system is not designed to allow drivers to hire other drivers, as the orders came to the drivers' phone, and they could not redirect them to anyone else's phone. (Lawson at 247.)
        GrubHub Director of Network Operations William Francione testified that he was aware of drivers using helpers (after Mr. Lawson stopped working for GrubHub – and while this lawsuit was pending).  (Francione at 1195-97.)  Mr. Grebner testified that he was only aware of one driver – in Cincinnati – subcontracting, and special arrangements had to be made to allow this to happen. (Grebner at 1112.)

231.) When he worked for GrubHub, he delivered to GrubHub's customers; when he worked for Postmates, he delivered to Postmates' customers; and when he worked for Caviar, he delivered to Caviar's customers. (Lawson at 231.)

190.   Furthermore, Mr. Lawson had no way of contacting customers and asking them from what restaurants they wanted him to pick up deliveries, or using which service (i.e. GrubHub, Postmates, or Caviar). (Lawson at 232.)

191.   In addition to his delivery work, Mr. Lawson pursued a career in acting and writing.  This was not a business, as he simply auditioned for and took short-term parts that he was offered, and he did not earn income from his writing.  (Lawson at 233-34.)[58]

## F.   PLAINTIFF BELIEVED THAT HE WAS GRUBHUB'S EMPLOYEE

192.   Although, in order to work for GrubHub, he was required to sign a contract that stated that he was an independent contractor, Mr. Lawson came to believe that he was an employee.  (Lawson at 249.)

193.   During the last few years, Mr. Lawson would describe his occupation as an actor. (Lawson at 247.)  But in order to support himself, while maintaining a somewhat flexible schedule, he worked for a number of so-called "gig economy" companies. (Lawson at 248.) Because those companies referred to their workers as independent contractors, when describing what he did for work, he sometimes referred to himself as working as an independent contractor. (Lawson at 248.)

194.   Mr. Lawson did not, however, think his classification as an independent contractor was correct, and in fact he filed misclassification claims against some of these companies. (Lawson at 249.)

---

[58]    Even if his acting and writing were considered a business, it was certainly not a delivery business.

### G.     DAMAGES

#### i.     Expense Reimbursement

195.    In order to work as a delivery driver for GrubHub, Mr. Lawson had to pay for his car, as well as expenses to fuel and maintain his car. (Lawson at 214.)

196.    Mr. Lawson did not keep records of the expenses he incurred using his car working for GrubHub. (Lawson at 214.)[59]

197.    GrubHub's records show 252.27 miles that Mr. Lawson drove while performing deliveries.  (Exs. 11, 175.)

198.    However, GrubHub only tracked straight-line miles "as the crow flies." (Ex. 1 at GH000322; Lawson at 215; Smith at 166.)  GrubHub also only tracked distance from the restaurant to the customer, not distance driven by the driver to pick up the order from the restaurant.  (Ex. 1 at GH000322; Lawson at 215; Smith at 166.)

199.    Mr. Lawson estimates that the actual miles he drove were at least twice as much as the miles that GrubHub has in its records, when considering both the actual distance driven (as opposed the straight-line miles) and the distance driven to the restaurants to pick up delivery orders.  (Lawson at 215.)

200.    Indeed, a comparison of the straight-line miles that GrubHub tracked to the shortest actual driving route, as calculated with Google Maps, shows that the minimum actual miles he could have driven are approximately 50% more than the straight-line miles. (Ex. 175; Lopez at 833-38.)

201.    Thus, conservatively estimating that the miles he drove performing deliveries for GrubHub were twice as much as the miles GrubHub has recorded in its records would mean that he drove 504.54 miles delivering food for GrubHub. (Exs. 11, 159, 174, 175.)

---

[59]    After he stopped working for GrubHub, Mr. Lawson did begin tracking his mileage working for other companies, as well as his gas payments. (Lawson at 214; Ex. 1491.) However, he only recorded five entries for gas payments he made while still working for GrubHub. (Ex. 1491.)

202.   Using the IRS mileage reimbursement rates in effect at the time ($0.575 for 2015 and $0.54 for 2016), the car expenses Mr. Lawson incurred driving these miles for GrubHub comes to $286.10. (Ex. 159.)

### ii.   Overtime

203.   During the week of November 30, 2015, Mr. Lawson worked 44.75 hours for GrubHub. (Ex. 9; Lawson at 219-23.)

204.   Mr. Lawson's regular rate for that week was $11.30 per hour. (Ex. 9; Lawson at 223.)

205.   Thus, his unpaid overtime for that week amounts to $26.84 (4.75 hours of work beyond 40 hours times half his regular rate for that week, $5.65). (Ex. 9; Lawson at 223; Overtime Demonstrative, attached here as Exhibit B (presented at trial, Transcript at 220-23).)

206.   During the 44.75 hours that Mr. Lawson was working that week, he performed 27 deliveries.  (Lawson at 427-28; Ex. 11 at GH001096.)  He did not perform any deliveries for Postmates or Caviar that week. (Lawson at 428; Ex. 161.)  Between deliveries, he waited for his next order in a parking lot in a plaza and stayed near his car so he could be ready to respond to a delivery when it came in.  (Lawson at 429.)

207.   Indeed, between deliveries, drivers were expected to be in their vehicle ready and available for the next order.  (O'Shae at 544.)

### iii.   Minimum Wage

208.   On a number of days that he worked for GrubHub, Mr. Lawson did not receive the California minimum wage. (Ex. 159.)

209.   Specifically, he did not receive minimum wage on the following dates: November 12, 2015; November 13, 2015; November 18, 2015; November 20, 2015; November 25, 2015; November 29, 2015; December 6, 2015; December 8, 2015; December 19, 2015; December 25, 2015; December 31, 2015; January 7, 2016; January 9, 2016; January 10, 2016; January 11, 2016; January 13, 2016; January 14, 2016; January 17, 2016; January 21, 2016; January 29,

2016; February 2, 2016; February 4, 2016; February 5, 2016; February 6, 2016; and February 13, 2016. (Ex. 11; Ex. 13; Ex. 159.) [60]

210.    These dates were identified by calculating the effective hourly rate Plaintiff received for each day that he worked for GrubHub. (Ex. 159.)

211.    The effective hourly rate is the amount that GrubHub paid Plaintiff each day, minus any tips that Plaintiff received that day and the amount of mileage reimbursement Plaintiff was owed (see *supra* Sec. II.G.i), divided by the number of hours that Plaintiff worked that day. (Exs. 159, 11; Shuford at 872-76.)

212.    Then, Plaintiff's effective hourly rate for each day was compared to the California minimum wage ($9 per hour in 2015 and $10 per hour in 2016). (Shuford at 876.) If the effective hourly rate was less than the California minimum wage, there was a minimum wage violation. (Ex. 159.)

213.    In order to calculate the damages for the days in which there was a minimum wage violation, the difference between the effective hourly rate and the California minimum wage was multiplied by the number of hours that he worked that day. (Shuford at 877-80; Exs. 11, 13, 159.)

214.    Using this method of calculating minimum wage damages, the cumulative amount of unpaid minimum wage for those days is $273.62. (Ex. 159.)[61]

215.    In addition, Mr. Lawson received a weekly bonus of $2.50 per hour for the weeks

---

[60]    During GrubHub's opening, its counsel suggested that Mr. Lawson's shifts could not be considered fully compensable, in part because Mr. Lawson filmed a comedy sketch during the period of time that he worked for GrubHub. However, he did not work for GrubHub on the day that he filmed the comedy sketch. (Lawson at 234.)  Mr. Lawson's tweets regarding this sketch were not published while he was on a GrubHub shift. (Lawson at 234-38; Ex. 12; Ex. 1466 at GH002296-97.)

[61]    Using this same methodology for calculating minimum wage damages on a weekly basis, Mr. Lawson's minimum wage damages would be $211.31.  (Ex. 160; Shuford at 881-83.)

of November 9, 2015; November 16, 2015; and December 14, 2015. (Exs. 6, 7, 13.) When Mr. Lawson received a weekly bonus, that pay was listed in GrubHub's records as earnings for just a specific day. (Ex. 13.)  But if the amount of those bonuses were spread out hourly over those weeks, the calculation performed above would be reduced to $247.38. (Ex. 177; Shuford at 938-41.)

216.    Also, if the time Mr. Lawson worked during the days showing minimum wage violations were reduced by the amount of time he spent performing deliveries for Postmates or Caviar, the calculations performed above would be reduced to $187.57.  (Ex. 176; Shuford at 940-41.)[62]

## III.  PROPOSED CONCLUSIONS OF LAW

### A.  GRUBHUB HAS NOT MET ITS BURDEN OF PROVING THAT PLAINTIFF WAS AN INDEPENDENT CONTRACTOR

#### i.  GrubHub Bears the Burden of Proving That Plaintiff Was an Independent Contractor

As the Court recognized in its Order denying summary judgment, because there is no dispute that Plaintiff performed services for GrubHub,[63] GrubHub bears the burden of proving

---

[62]    This calculation takes into account "spreading the bonus" across all hours of the weeks in which he earned a bonus, as described in ¶ 215.  (Shuford at 934.)

[63]    Nor could GrubHub reasonably dispute it, given that GrubHub's drivers are essential to its delivery business. See O'Connor v. Uber Technologies, Inc., 82 F. Supp. 3d 1133, 1141-45 (N.D. Cal. 2015) (rejecting argument that Uber was merely an intermediary between customers and drivers); see also Estrada v. FedEx Ground Package Sys., Inc., 154 Cal. App. 4th 1, 9 (2007) (noting that "[i]n practice [] the work performed by the drivers is wholly integrated into FedEx's operation"); Yellow Cab Coop., Inc. v. Workers' Comp. Appeals Bd., 226 Cal. App. 3d 1288, 1294 (Cal. Ct. App. 1991) ("[t]he drivers, as active instruments of that enterprise, provide an indispensable 'service' to Yellow . . ."); Santa Cruz Transp., Inc. v. Unemployment Ins. Appeals Bd., 235 Cal. App. 3d 1363, 1376 (Cal. Ct. App. 1991) ("the work performed by the [drivers] in this case is part of the regular business of [Defendant]" and "[t]he modern tendency is to find employment when the work being done is an integral part of the regular business of the employer . . . ."); Martins v. 3PD, Inc., 2013 WL 1320454, *14 (D. Mass. Mar. 28, 2013) (Defendant "is clearly a delivery company, hiring Plaintiffs for a vital and necessary aspect of its business . . .").

that Plaintiff was an independent contractor. Lawson v. GrubHub, Inc., 2017 WL 2951608, *3

("As it is undisputed that Plaintiff provided delivery services to Grubhub, the burden is on

Grubhub to prove Plaintiff was an independent contractor.") (citing Narayan v. EGL, Inc., 616

F.3d 895, 900 (9th Cir. 2010) ("Once the employee establishes a prima facie case, the burden

shifts to the employer, which may prove, if it can, that the presumed employee was an

independent contractor.")); see also Linton v. Desoto Cab Company, Inc., --- Cal. Rptr. 3d --- ,

2017 WL 4416856, *8 (Cal. App. Ct. Oct. 5, 2017) ("It is established that '[o]ne seeking to avoid

liability has the burden of proving that persons whose services he has retained are independent

contractor rather than employees.") (internal citation omitted); O'Connor, 82 F. Supp. 3d at 1143

("Although the Court's conclusion based on the record facts likely stand on logic and common

sense alone, the case law makes abundantly clear that the drivers are Uber's presumptive

employees.").[64]

---

[64]    GrubHub argued in a pretrial submission (Dkt. 176), that it is *Plaintiff's* burden to prove
that he was an employee. Essentially, GrubHub argues that the presumption in favor of employee
status is limited to the workers' compensation context. *See* Cal. Lab. Code §§ 3357, 3353.
However, this argument was made and rejected in Alexander, where FedEx argued that
"statutory presumption of employee status that does not apply" in the wage and hour context. See
Alexander, 765 F.3d at 992. The Ninth Circuit found that "California courts have recognized that
the burden of proof is on the party attacking the employment relationship [] in a range of cases
outside of the workers' compensation context." Id. at 992 (internal citations and quotations
omitted) (citing Bemis v. People, 109 Cal. App. 2d 253 (Cal. Dist. Ct. App. 1952); Robinson v.
George, 16 Cal. 2d 238 (1940); Faigin v. Signature Grp. Holdings, Inc., 211 Cal. App. 4th 726,
737 n. 4 (Cal. App. Ct. 2012); Lujan v. Minagar, 124 Cal. App. 4th 1040 (2004))**;** see also
Desoto Cab Co., 2017 WL 4416856, *7-8. Moreover, the presumption is consistent with
established California law stating that independent contractor status is an *affirmative defense*
with a burden of proof that must be met by the *defendant*. See Fisher v. San Pedro Peninsula
Hosp., 214 Cal. App. 3d 590, 608 (Ct. App. 1989) ("Whether [plaintiff] is an independent
contractor is an affirmative defense which must be asserted and proved by [defendant] at the
time of trial."); Sahinovic v. Consol. Delivery & Logistics, Inc., 2004 WL 5833528, *3 (N.D.
Cal. Sept. 14, 2004) ("Whether a plaintiff is an independent contractor is an affirmative defense
which must be asserted and proved by the party invoking it."). Indeed, GrubHub pled
"Independent Contractor Status" as its thirty-first affirmative defense in its answer to Plaintiff's
operative complaint. (Dkt. 66 at ¶ 31).

---

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

### ii.    GrubHub Had the Right to Control Plaintiff's Work and Extensively Exercised That Control

California employers are required to comply with the requirements of California wage and hour law, including both the California Labor Code and relevant Wage Orders set forth by the Industrial Welfare Commission ("IWC"). In order to determine employment status, California courts have focused on the multi-factor test set out in Borello, 48 Cal. 3d at 350-51. See Lawson, 2017 WL 2951608, *3.[65] Under Borello, the "'most significant consideration' is the putative employer's 'right to control work details.'" Borello, 48 Cal. 3d at 350). In addition to the right of control, the Borello test also considers "a number of 'secondary' indicia," including:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, which reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principle; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

Borello, 48 Cal. 3d at 350. These secondary indicia "cannot be applied mechanically as separate tests; they are intertwined and their weight depends on particular combinations." Id. at 351. No one Borello factor "is dispositive when analyzing employee/independent contractor status." O'Connor, 82 F. Supp. 3d at 1140.

---

[65]      In Martinez v. Combs, 49 Cal. 4th at 69, the California Supreme Court exhaustively reviewed how the term "employ" had been defined by the Industrial Welfare Commission (IWC) and concluded that the common law definition set forth in Borello, 48 Cal. 3d at 350, is one of "three alternative definitions" of employment. These three alternative tests include "(a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." Id. Thus, Martinez clarifies that Borello is but one way to assess an alleged employment relationship in California. Nonetheless, as courts in California, including this Court, have primarily focused on Borello in analyzing employment status, Plaintiff will focus on this test. See Lawson, 2017 WL 2951608, *3-6.

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:15-cv-05128

1

2

### a.   GrubHub Retained All Necessary Control Over Plaintiff's Work

In considering whether a worker is an employee, the employer's "right of control need not extend to every possible detail of the work; rather, the relevant question is whether the employer retains 'all necessary control' over the worker's performance." Lawson, 2017 WL 2951608, *3 (quoting Borello, 48 Cal. 3d at 350); see also Desoto Cab Co., 2017 WL 4416856, *8 (noting "[t]hat a degree of freedom is permitted to a worker, or is inherent in the nature of the work involved, does not automatically lead to the conclusion that a worker is an independent contractor" and "[t]he right of control need not extend to all details of the work. It is true plaintiff could do much on his own, including deciding which passengers to pick up and how much actual work time he engaged in during his shifts. However, that is not the end of the discussion.") (citing Air Couriers Int'l v. Emp't Dev. Dep't, 150 Cal. App. 4th 923, 934 (2007) (explaining that "the fact that a certain amount of freedom is allowed or is inherent in the nature of the work involved" does not preclude a finding of employment status).

As shown at the trial, given the simple nature of the job of a food delivery driver, GrubHub retained all *necessary* control over Plaintiff's work so as to support a finding of an employment relationship. See Bowerman v. Field Asset Servs., Inc., 242 F. Supp. 3d 910, 941 (N.D. Cal. 2017) (finding workers who performed preservation, maintenance, and repair services – more complex work than simply making deliveries – to be employees as a matter of law because "the straightforward nature of the work severely limits the space between dictating 'results' and controlling the manner and means of the work."). Chief among these controls was GrubHub's right to terminate its drivers at will.

### b.   GrubHub Retained the Right to Terminate Plaintiff At Will

This Court has previously found that GrubHub's contractual right to terminate its drivers at will is "an indicator of at-will employment status." Lawson, 2017 WL 2951608, *4. Indeed, the right of the hirer to terminate a worker at will is not just indicative of an employment relationship – it is the "strongest evidence" of it.  Ayala v. Antelope Valley Newspapers, Inc., 59

44

Cal. 4th 522, 532 (2014) ("the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because the power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities."); <u>Alexander</u>, 765 F.3d at 988 ("The right to terminate at will, without cause, is strong evidence in support of an employment relationship."). Indeed, the California Court of Appeal in recently described the right to terminate at will as the "ultimate control." <u>Desoto Cab Company</u>, 2017 WL 4416856, *9.

Factually, nothing has changed on this point since the summary judgment stage of this case, and the trial merely confirmed this evidence.  Plaintiff's contract with GrubHub clearly provides that GrubHub may terminate the agreement "immediately upon written notice to the breaching Party . . . , with such notice specifying the breached [sic] relied upon," or "without cause upon fourteen (14) days' prior written notice . . . ." (Facts at ¶ 20.)  Accordingly, this right to terminate at will remains the "strongest evidence" that Plaintiff was misclassified as an independent contractor.

GrubHub has argued that, because the termination provision in its contract is a "mutual" termination provision, it weighs in favor of independent contractor status. (Dkt. 177.) This argument is incorrect for several reasons. First, the Court's prior determination that the termination provision supports a finding of employment status comports with Ninth Circuit and California precedent as discussed in <u>Narayan</u>, 616 F.3d at 902-03 ("the contracts signed by the plaintiff Drivers contained automatic renewal clauses and could be terminated by either party upon thirty-days notice or upon breach of the agreement. Such an agreement is a substantial indicator of an at-will employment relationship.") (citing <u>Estrada</u>, 154 Cal. App. 4th at 6 (contract with automatic renewal and mutual termination provisions supported trial court conclusion that drivers were employees), and also citing <u>Antelope Valley Press v. Poizner</u>, 162 Cal. App. 4th 839, 846 (2008) (contract with mutual 30-day notice termination provision

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

supported finding that newspaper deliverers were employees)).[66]  In addition, this conclusion is supported by numerous post-Narayan district court and California appellate court misclassification decisions. See Desoto Cab Co., 2017 WL 4416856, *9; Espejo v. Copley Press, Inc., 13 Cal. App. 5th 329, 346 (Ct. App. 2017) (affirming trial court ruling that newspaper carriers were employees where contract was terminable on 30 days' notice, "indicating the contract was terminable at will."); Arzate v. Bridge Terminal Transp., Inc., 192 Cal. App. 4th 419, 423 (2011) (reversing trial court finding that drivers were independent contractors where contracts "were for a term of 30 days, with automatic renewal after 30 days unless cancelled by either party on one day's written notice"); Bowerman, 242 F. Supp. 3d at 929 (in misclassification case where parties had "a mutual right to terminate the agreement," granting summary judgment to plaintiffs on the misclassification issue and noting that "[t]he right to terminate at will, without cause, provides 'strong evidence' of a right to control and an employment relationship"); Cotter v. Lyft, Inc., 60 F. Supp. 3d 1067, 1079 (N.D. Cal. 2015) (in misclassification case where contract had mutual termination provision, denying summary judgment for Lyft and noting that Lyft's "a hirer's ability to discharge a worker without cause is '[p]erhaps the strongest evidence of the right to control.'"); O'Connor v. Uber Technologies, Inc.,

---

[66]     GrubHub incorrectly argues that Narayan is no longer good law in the Ninth Circuit on this point, citing a trio of cases: Ruiz v. Affinity Logistics Corp., 754 F.3d 1093 (9th Cir. 2014), Hennighan v. Insphere Ins. Sols., Inc., 38 F. Supp. 3d 1083 (N.D. Cal. 2014), aff'd, 650 F. App'x 500 (9th Cir. 2016), and Jones v. Royal Admin. Servs., Inc., 866 F.3d 1100 (9th Cir. 2017). However, Ruiz pre-dated Ayala, in which the California Supreme Court unambiguously emphasized the significance of the right to terminate at will, notwithstanding the mutuality of a termination provision. In Hennighan, while the Ninth Circuit did affirm the district court's order granting summary judgment to the defendant on the misclassification issue, it did so without any discussion of the district court's analysis of the termination provision. And Jones is not helpful to GrubHub because in that case the court simply commented on the existence of a mutual termination provision – it did not ascribe in any particular weight to it one way or another. Rather, the court's focus was on a "contemplated end to the . . . relationship," which it found supported a finding of independent contractor status. Id. at 1107. Here, GrubHub's contracts automatically renew, and there was no such contractually contemplated end to Plaintiff's relationship with GrubHub. (Facts at ¶ 34.)

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

2015 WL 5138097, *35 (N.D. Cal. Sept. 1, 2015).[67]

Second, GrubHub's argument that the termination provision is not a "'true' termination provision because a [driver] could decide to sign up again even after being terminated" (Dkt. 177 at 5) has no merit. While GrubHub might, in practice – and at its discretion – permit drivers to sign up to work for GrubHub again after being terminated, it is also true that GrubHub retains the *right* to terminate drivers and keep them terminated, and what matters under California law is GrubHub's *right* to terminate at will.  Indeed, the evidence at trial showed that GrubHub retained and exercised discretion in deciding whether to allow drivers to come back to work after they had been terminated.  GrubHub's Los Angeles General Manager Jeff Smith testified that he decided in his discretion whether he would let terminated drivers come back to work again at GrubHub if they reapply.[68]  He testified that although he used to give drivers a second chance, he

---

[67]      GrubHub's counsel have made this argument before – to Judge Chen in the O'Connor litigation – where it was rejected. O'Connor, 2015 WL 5138097, *35 ("Uber argues that contracts which provide a mutual right to terminate at will are 'evidence of an independent-contractor' relationship and thus are somehow distinguishable from contracts that only provide the employer with a right to terminate at will, which contracts would indicate an employment arrangement. Uber is incorrect. The driver's right to terminate at will is indicative of employee status. The California Supreme Court in Ayala recognized that a bona fide independent contractor cannot terminate the agreement at will—if he was truly a contractor he would have to finish out his contract or pay damages to Uber for early termination…There is no contractual provision restricting a driver's right to quit or imposing any penalty therefor. Uber has presented no evidence that it has ever sought contract damages from a driver who stopped driving for Uber, or that it has even contemplated doing so.") (internal citation omitted). As Judge Chen pointed out – and as was made even more explicit in Ayala, "[a]n employee may quit, but an independent contractor is legally obligated to complete his contract." Ayala, 59 Cal. 4th at 531, n.2. Here, as in O'Connor, there is no contractual provision restricting a driver's right to quit or imposing any penalty for doing so. There is no evidence that GrubHub has ever sought contract damages from a driver who stopped working for GrubHub, or any indication that it has even contemplated doing so. In other words, no matter how it is viewed, the mutual termination provision vests GrubHub with the right to terminate at will – the "strongest evidence of the right to control." Ayala, 59 Cal. 4th at 532.

[68]      Although the parties dispute when Mr. Smith began working as the Los Angeles General Manager, there is no disagreement that he was General Manager when Plaintiff was terminated. (Facts at ¶ 52 n.11.)

---

47

stopped doing that, believing that if they made mistakes before, they would do it again. (Facts at ¶ 165 n.50.) Also, Plaintiff was not able to start working for GrubHub again after he was terminated, despite applying twice to do so. (Facts at ¶ 179.)[69] There is simply no question that GrubHub's termination provision gives it the right to terminate at will, and it clearly also had and exercised the right not to allow drivers to come back to work after they were terminated. GrubHub's attempt to distinguish this case from the long line of cases holding that misclassification did or could occur, where the contract contains a mutual at-will termination provision, must be rejected.

### c.      GrubHub Controlled Plaintiff in Myriad Other Ways

Not only did GrubHub's contract give it the right to terminate its drivers at will, the evidence at trial showed that it also exercised control over its drivers' work (including Plaintiff) in many ways.

### 1.      GrubHub Terminated Drivers in Its Discretion, Including Plaintiff

First, the evidence at trial showed that GrubHub exercised its right to terminate drivers at will. (Facts at ¶¶ 155-60.) GrubHub termination emails showed that drivers were terminated for such reasons as being unavailable to perform deliveries during their shifts, turning down too many orders, leaving their zones during shifts, communicating directly with customers, and others. (Facts at ¶ 156.)[70]

Indeed, GrubHub terminated Plaintiff. (Facts at ¶ 167.) When it terminated him, it gave

---

[69]      Ms. O'Shae testified that when drivers who had been terminated contacted asking to be rehired, she had to refer the question to a GrubHub manager, who would decide whether to reinstate the driver. (Facts at ¶ 65 n.50.)

[70]      GrubHub's driver care specialists were told that GrubHub needed "less drivers, not more" in Los Angeles, and therefore GrubHub was eager to weed out drivers. (Facts at ¶ 158.) In order to determine whether to terminate drivers, GrubHub's managers such as Jeff Smith or Jared Grebner would look at factors such as drivers' delivery times, acceptance, rates, and how many orders they had taken. (Facts at ¶¶ 155 n.47, 158.)

only a vague explanation, so that it is still not clear what exactly the reason was for his termination. (Facts at ¶ 167.)[71] He was not given any advanced warning or a chance to explain his conduct. (Facts at ¶ 178.)  See Desoto Cab Co., 2017 WL 4416856, * 9 ("Plaintiff was terminated based on an allegation that, it appears, was never fully investigated. Nor was he allowed to contest the allegations against him before he was terminated. This factor alone presents strong evidence of an employment relationship . . .") (citing Yellow Cab, 226 Cal. App. 3d at 1298) (additional citations omitted).[72]

## 2.     GrubHub Closely Monitored Its Drivers' Work

The evidence also showed that GrubHub closely monitors its drivers' work. From their computer monitors in Chicago, GrubHub's dispatchers and driver care specialists could see where each driver was physically located at any moment during their shift. (Facts at ¶¶ 132-34.) They monitored whether and when drivers logged on at the beginning of their shift (and contacted them if they did not log on within 10 minutes of the start of their shift). (Facts at ¶¶ 58-60.)  They monitored whether drivers arrived at their zone when their shift started and stayed in their zone throughout their shift (unless they were sent out of the zone to perform a delivery, after which they were expected to return to their zone) – and contacted them to return to their zone if they strayed out of it. (Facts at ¶¶ 97-102.)  They monitored whether drivers left their

---

[71]     Interestingly, GrubHub produced no evidence from the time of Plaintiff's termination explaining the reason for his termination, or justifying it, other than the one vague email that was sent to him informing him of the termination.  There were no internal emails discussing any investigation or conclusions that were reached, explaining what GrubHub had concluded he had done to breach his contract.  The evidence put on at trial regarding Plaintiff's alleged misconduct was an analysis of evidence created at trial by a witness who testified that he played no role in Plaintiff's termination and knew nothing about it at the time. (Grebner at 1150-51, 1179.)

[72]     GrubHub spent a significant amount of time at trial attempting to prove Plaintiff's misconduct – purportedly showing up late or leaving early for shifts and toggling unavailable during shifts in order to get the guaranteed minimum hourly rate without performing deliveries. The fact that GrubHub decided he had engaged in misconduct and then terminated him for it is *exactly* the type of response one would expect form an employer.

shift early and warned them not to do so. (Facts at ¶ 64-65.)

The GrubHub dispatcher and driver care employees in Chicago could click on each driver on their computer screens to see the status of any order. (Facts at ¶ 135.)  If a driver did not accept an order, they may log them out of the system. (Facts at ¶ 108.)  If a driver was taking too long with an order, they may reach out to find out why the delivery was taking so long, and they could take the order away and reassign it to another driver. (Facts at ¶¶ 114, 141, 157.) If a customer called in to ask when an order would arrive, GrubHub customer care employees would check on the driver's progress or contact the driver care department. (Facts at ¶ 138.)  If it looked like an order was going to take longer than had been quoted to the customer, GrubHub may offer the customer credit against their next order. (Facts at ¶ 138.)

GrubHub maintained statistics on the drivers, including the time it took them to perform deliveries, the number of orders they performed, and their acceptance rate. (Facts at ¶ 50.)[73] GrubHub kept this information in a file for each driver. (Facts at ¶¶ 150-51.)[74] It also collected complaints from restaurants and customers about drivers and allowed restaurants to rate the drivers, and it kept this information in the drivers' files. (Facts at ¶¶ 151, 161.) These files were viewable to the GrubHub dispatchers and driver care employees in Chicago when they communicated with drivers, and they could be consulted when GrubHub was deciding whether to terminate a driver. (Facts at ¶¶ 152-54.)

The evidence at trial showed that GrubHub monitored Plaintiff and his work, as it did generally for its drivers, as described above. (Facts at ¶¶ 60 n.12, 62, 64, 100 n.31, 133 n.42.) Indeed, Plaintiff was contacted when GrubHub believed he had not logged on for his shift. (Facts

---

[73]     This information would be used to decide if a driver should get priority scheduling, so that they would have a better chance of working the hours they wanted to work for the following week. (Facts at ¶¶ 50-51.)

[74]     The files would also include GrubHub's notes on interactions it had with the drivers and whether the driver has been involved in disputes or disagreements with customers or restaurants or with GrubHub itself. (Facts at ¶¶ 150-54.)

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

at ¶ 60 n.12.) He was also contacted when he logged off several minutes early. (Facts at ¶ 64.) He was even contacted when he logged off briefly to take a bathroom break. (Facts at ¶ 62.)

The evidence of such close monitoring clearly supports a finding of employment status. As this Court noted on summary judgment, "A reasonable fact finder could further conclude that company oversight as to whether a driver is driving as scheduled and the complaint feedback system supports a finding of an employment relationship." Lawson, 2017 WL 2951608, at *5.[75] See also Flores v. Velocity Express, LLC, 250 F. Supp. 3d 468, 482 (N.D. Cal. 2017) (evidence that a defendant "monitor[ed] its drivers work using [a system] which allow[ed] [defendant] to know where its drivers are at all times and to communicate with them" showed employment relationship) (citing Collinge v. IntelliQuick Delivery, Inc., 2015 WL 1299369 (D. Ariz. Mar. 23, 2015)); Garcia v. Seacon Logix, Inc., 238 Cal. App. 4th 1476, 1485 (Cal. Ct. App. 2015) (fact that defendant's employee "maintained regular contact to monitor the progress of deliveries" weighed in favor of employment status); Villalpando v. Exel Direct Inc., 2015 WL 5179486, *46 (N.D. Cal. Sept. 3, 2015) (finding drivers to be employees as a matter of law where defendant "monitor[ed] progress of drivers throughout the day and testif[ied] that reports [were] generated" from the software used to monitor).[76]

---

[75]    The fact that drivers' interactions with the customers were not specifically scripted does not, as GrubHub has argued, mean that they are independent contractors.  Unlike the cases cited by GrubHub (Hennighan, 38 F. Supp. 3d at 1100; Jones, 866 F.3d at 1106-7; and Comparetto v. Allstate Insurance Co., 2014 WL 11514474, *9 (C.D. Cal. July 24, 2014)), where the workers' jobs were in telemarketing or phone sales – positions where the primary job duty is to converse with customers – here, Plaintiff's job was simply delivering food. Moreover, drivers *were* instructed on how to interact with customers and restaurants through GrubHub's training videos. (Facts at ¶¶ 35-37.) They were instructed to be polite and respectful with both. (Facts at ¶¶ 35-37.)

[76]    GrubHub has cited some cases that it claims shows that independent contractors may be monitored to ensure that they are completing their work, but those cases are readily distinguishable.  For example, GrubHub has cited Hennighan, 38 F. Supp. 3d at 1101, but in that case the court found that the defendant *did not* actually monitor the plaintiff's work. Id. GrubHub has also cited Desimone v. Allstate Ins. Co., 2000 WL 1811385, *13 (N.D. Cal. Nov. 7, 2000), but in that case, the court found that monthly reports and annual evaluations did not show an

### 3.      Drivers Were Expected to Accept Every Order Possible and Faced Negative Consequences if They Did Not

Although GrubHub has argued that orders are merely "offered" to drivers, and they are free to accept them or not accept them, the evidence at trial painted a very different picture. GrubHub kept close tabs on drivers' "acceptance rates", which needed to be near perfect in order for drivers to receive the guaranteed hourly rate. (Facts at ¶¶ 74-76.)[77]  Drivers generally strove to receive this hourly rate (Facts at ¶ 75), as did Plaintiff (Facts at ¶ 76) (who never received *more than* the hourly rate, except for one day in which he earned an additional $5.83 beyond the hourly rate). (Facts at ¶ 72 n.16.) Drivers, including Plaintiff, also strove to keep their acceptance rates high in an attempt to receive the weekly bonus that GrubHub reserved for its top drivers (Facts at ¶ 83 n.21) and to obtain priority scheduling (Facts at ¶¶ 50-51).   Further, if drivers did not accept an order, they may be logged off their shift and would risk having the shift removed altogether. (Facts at ¶ 63.)  Low acceptance rates could also, in GrubHub's discretion, lead to a driver's termination. (Facts at ¶ 156.)[78]

---

exercise of control over how insurance agents sold insurance to their customers on a daily basis; here, in contrast, the evidence shows that GrubHub monitors its drivers *constantly*.  GrubHub has also cited <u>Mission Ins. Co. v. Workers' Comp. Appeals Bd.</u>, 123 Cal. App. 3d 211, 223 (1981), but in that case the defendant did not inspect the worker's work unless a customer had made a specific complaint.

[77]     Essentially, by running the risk of slipping below the minimum acceptance rate (75%, which was raised to 85% during Plaintiff's employment), drivers needed to accept pretty much every order possible so as to avoid being docked from their hourly wage. <u>See</u> <u>Knecht v. City of Redwood City</u>, 683 F. Supp. 1307, 1311 (N.D. Cal. 1987) (noting that pay reductions "because of variations in the ... quantity of the work performed" is consistent with the pay structure of a non-exempt employee).

[78]     Moreover, at the time that Plaintiff worked for GrubHub, drivers were not able to pick and choose which orders they wanted to accept, based for example on the size of the order or location of the customer. (Facts at ¶¶ 105-06.)  At the time the cowbell rang on the app, and the driver had a short window of time – as little as 10 to 20 seconds – to press "accept", the only information available to them when they did so was the location of the restaurant. (Facts at ¶¶ 105-07.) <u>See</u> <u>Bowerman</u>, 242 F. Supp. 3d at 920 (finding workers had been misclassified where they had a limited amount of time – 24 hours – to accept job offers).

This evidence clearly supports a finding of employee status. <u>See</u> <u>Lawson</u>, 2017 WL 2951608, *4 ("Grubhub's argument that drivers are 'not obligated to accept any given food order they receive, even if they sign up for a delivery block' is unpersuasive."); <u>Bowerman</u>, 242 F. Supp. 3d at 920 (in granting summary judgment to plaintiff drivers, noting evidence that drivers "'in theory' can decline a work order, but [defendant] will penalize them by, 'among other things, providing less work in the future'").[79]

### 4. Drivers Had Limited Ability to Pick Their Schedule

GrubHub has touted its flexibility in scheduling, both in trying to attract drivers to work for it, as well as in trying to justify their independent contractor status. However, the evidence at trial showed that drivers actually had limited flexibility in choosing their shifts.

In order to work, drivers were expected to sign up for shifts (called "blocks"), which were made available each week by GrubHub, based upon its predictions of how much work would be available during various times of the week. (Facts at ¶ 41.)[80]  Drivers could only get shifts if they were available. (Facts at ¶ 46.)[81]  It was difficult for drivers to get the shifts they

---

[79]     This evidence contrasts with <u>State Comp. Ins. Fund v. Brown</u>, 32 Cal. App. 4th 188, 203 (1995), <u>as</u> <u>modified</u> (Feb. 8, 1995), where a worker was found to be independent contractor where there was "no retribution" for declining work assignments

[80]     Managers chose how many blocks to release each week based on past customer demand, their knowledge of upcoming events that might affect customer demand, and based on their assumption that drivers would accept all, or nearly all, orders sent to them. (Facts at ¶¶ 45, 78.)

[81]     Drivers could not work literally whenever they wanted. Shifts were, naturally, most available around peak mealtimes and based on managers' decisions as to how many drivers were needed and when. (Facts at ¶ 45.)
      GrubHub has tried to argue that drivers could log on to work whenever they wanted, without being signed up on a block. However, the evidence presented at trial refutes this claim. Drivers were warned not to log on when they were not signed up for a shift. (Facts at ¶¶ 54-55, 66 n.14, 67.)  Ms. O'Shae testified that dispatchers monitored whether drivers were trying to log on when they were not signed up and that when they were caught, they would be warned not to do that and would be logged off. (Facts at ¶ 67 n.14.)  She also testified that she was told in training (and her manager repeatedly said) that drivers attempting to work when they were not signed up were "gaming the system." (Facts at ¶ n.14.) Moreover, if a driver was not signed up for a shift but managed to perform a delivery anyway, they would not be paid the hourly rate

wanted because many drivers were competing to sign up for these shifts. (Facts at ¶ 47 n.8.)[82]

Drivers could improve their chances of getting the shifts they wanted by maintaining high

performance metrics (including acceptance rates, speed of deliveries, number of orders taken, etc.

and having a good attitude), which could qualify them for "priority scheduling" (allowing them

to sign up for shifts before other drivers). (Facts at ¶¶ 50-51.)

      This system of scheduling, in which employees can sign up for shifts, is not unusual in

the service industry (particularly in hospitality, such as restaurant or banquet server work).[83]  The

fact that Plaintiff had some say in picking his schedule (though limited) does not make him an

independent contractor.  See Borello, 48 Cal. 3d at 347-48 (finding harvesters to be employees

even though they "decid[ed] when to pick each cucumber at the correct size to maximize the

profit" and that harvesters "may set their own hours"); Air Couriers Int'l, 150 Cal. App. 4th at

926 (affirming trial court finding that drivers were employees as a matter of law despite the fact

---

(which is what drivers were typically attempting to obtain). (Facts at ¶¶ 67 n.14, 75.) Mr.
Grebner testified he was not aware of drivers working when not signed up for a shift. (Facts at ¶
67 n.14.)

[82]    Ms. O'Shae testified that it was discussed during her training how hard it was for drivers
to get shifts. (Facts at ¶ 47.) She also described the process for drivers to get shifts as a "mad
scramble" when blocks were released. (Facts at ¶ 47 n.8.) She also confirmed Plaintiff's sense
that there were many drivers in Los Angeles (she was repeatedly told during her training that
"we need less, not more, drivers in Los Angeles"), which made it particularly difficult for
Plaintiff to get the shifts he wanted. (Facts at ¶ 157.) He would have liked to have worked more
hours than the approximately 20 he typically signed up for, but he was only able to get more
hours (a full time week of 44.75 hours) the one week in which he succeeded in getting priority
scheduling. (Facts at ¶¶ 48-49.)

[83]    Indeed, the "WhenIWork" application for scheduling shifts that GrubHub used for its
drivers was clearly designed to be used by employees, as the language it uses refers to employees.
(Facts at ¶ 44 n.7.) In addition, if a driver needed to change or drop a shift he had signed up for,
he was supposed to give advance notice or call in to GrubHub to let the company know he could
not work. (Facts at ¶¶ 68-69.)  Likewise, if a driver needed to leave a shift early (i.e. for
childcare issues or because they were not feeling well), they were supposed to contact GrubHub.
(Facts at ¶ 65.)  Both of these requirements are also a typical for restaurant, and other service
industry, employees.

---

that "drivers determined their own schedules"); <u>JKH Enterprises, Inc. v. Dep. of Indus. Relations</u>, 142 Cal. App. 4th 1046, 1051 (Cal. Ct. App. 2006) (affirming Department of Industrial Relations and trial court findings that workers were employees as a matter of law despite the fact that they were "not required to work either at all or on any particular schedule").[84]

### 5.    GrubHub Set the Rate of Drivers' Pay

Further evidence of GrubHub's control over its drivers is shown by the fact that GrubHub established the rate of pay and the system of paying drivers. (Facts at ¶¶ 70-88.)[85]  Drivers could not and did not negotiate their rates, either with GrubHub or with customers. (Facts at ¶ 84.)[86] Indeed, the contract that drivers were required to sign in order to work for GrubHub was a contract of adhesion that they had to accept on a take-it-or-leave-it basis, and the contract set forth the rate of pay and reserved to GrubHub the right to make changes to it in its own discretion. (Facts at ¶¶ 19, 71-72.)[87]

The fact that the company unilaterally set the rate of pay is strong evidence in support of an employee relationship.  <u>See</u> <u>Ruiz</u>, 754 F.3d at 1101 (evidence of control includes that a company sets its workers' rates of pay and that such rates are non-negotiable). <u>Espejo</u>, 13 Cal.

---

[84]      Even if a worker does get to choose entirely when to work, that does not make the worker an independent contractor, as "[t]he more relevant inquiry is how much control [a defendant] has over its drivers *while they are on duty*..."  <u>O'Connor</u>, 82 F. Supp. at 1152 (emphasis in original) (citing <u>Air Couriers Int'l</u>, 150 Cal. App. 4th at 926; <u>JKH Enterprises</u>, 142 Cal. App. 4th at 1051).

[85]      When drivers believed that GrubHub had calculated their pay incorrectly, they could ask for a pay adjustment (just like any employee) and GrubHub's driver care specialists or managers would decide whether to grant the adjustment.  (Facts at ¶¶ 87-88.)

[86]      GrubHub tried to argue that drivers could negotiate their pay rates, but it was only able to produce evidence of "a couple of instances" when a manager in Chicago agreed to pay drivers an increased rate during inclement weather. (Facts at ¶ 84 n.22.)

[87]      In December 2015, GrubHub unilaterally changed the pay rate for drivers in Los Angeles from $15 per hour to $11 per hour. (Facts at ¶¶ 71.)  Plaintiff was very disappointed with this change, which led to his disillusionment with the company, and his declining performance after that point apparently led to his termination.  (Facts at ¶ 175.)

App. 5th at 344 (affirming trial court ruling that newspaper deliverers were employees where there was "no negotiation of rates he was to be paid, which were filled in when he was provided the contract"); Truesdale v. Workers' Comp. Appeals Bd., 190 Cal. App. 3d 608 (1987) ("Persons such as Truesdale ... are certainly within the class of persons the legislative scheme was meant to protect; and there are no applicable statutory exclusions. Truesdale had little or no bargaining position; he was simply required to sign the so-called independent contractor agreement prepared by the alleged employer's attorney. There were no negotiations, no options.").

### 6. Drivers Were Expected to Remain in Their Designated Geographical Zones While on Shift

Another example of control that GrubHub exercised over drivers is that drivers were expected to remain during their shifts in designated geographical areas referred to as "zones." (Facts at ¶ 93.) While drivers could express their preference for zone assignments, the ultimate decision as to whether they would get their preference was up to GrubHub. (Facts at ¶ 94.)[88]

GrubHub would monitor whether drivers were in their zone at the start of their shift and if they left their zone during the shift. (Facts at ¶¶ 96-97.) They were warned to stay in their zone and to come back to their zone if they left it without having been sent on an order outside their zone. (Facts at ¶¶ 100-02, n.30.)[89] Indeed, Plaintiff was warned when he left his zone without permission. (Facts at ¶ 100 n.31.)

These geographic restrictions are further evidence of control, supporting a finding of employee status. See Alexander, 765 F.3d at 990 (finding FedEx drivers employees as a matter

---

[88]     If a driver wanted to change his zone, he would have to make a request to GrubHub, which could either grant or deny the request. (Facts at ¶ 95.) These requests were not always granted. (Facts at ¶ 95.)

[89]     Conversely, GrubHub could, however, send drivers outside their zone – even far outside their zone - to perform deliveries. (Facts at ¶ 102.)  Plaintiff at times was given deliveries, which he performed, that took him far outside of his zone, even though he did not want to do them. (Facts at ¶ 103, 119 n.38.)

of law, and noting that FedEx's practice of limiting workers to a "specific service area" was evidence of control). Flores, 250 F. Supp. 3d at 481 (finding drivers to be employees where defendant "assign[ed] each driver a specific service area"); Estrada, 154 Cal. App. 4th at 5 (affirming trial court ruling where evidence was submitted that drivers were required to "provide 'fully competitive' service to a 'primary service area' assigned by FedEx").[90]

### 7. GrubHub Required Drivers to Pass a Background Check

Drivers were also required to submit to a background check before being hired. (Facts at ¶¶ 17-18.)[91] The background check was performed by a third party, and GrubHub managers would review the results and decide whether the driver could be hired. (Facts at ¶¶ 17-18.)[92] See Estrada, 154 Cal. App. 4th at 5 (requiring workers to submit to background checks weighs in

---

[90]   GrubHub has cited Rabanal v. Rideshare Port Mgmt., LLC, 2013 WL 6020340, *7 (Cal. Ct. App. Nov. 14, 2013), and Ruiz, 754 F.3d at 1101, for the proposition that drivers who control their own routes may be independent contractors.  But, here, drivers do not control their routes. They are told exactly where and when to go. (Facts at ¶¶ 131-42.)  The fact that they can decide the specific streets to drive on to get to these destinations does not mean they had the freedom that made them independent contractors.  See Air Couriers Int'l, 150 Cal. App. 4th at 937 (affirming trial court's decision that delivery drivers were employees even where they could determine their own routes).

Indeed, GrubHub's emphasis on minimizing delivery times meant that drivers would attempt to take the shortest route possible to get to the restaurants and the customers. (Facts at ¶ 136.) GrubHub provided a mapping tool in its app (Google Maps), which drivers could use (and Plaintiff did use), although they were not required to, in order to help ensure they would take the shortest route. (Facts at ¶ 124.)  Meanwhile, the dispatchers back in Chicago were watching their progress on their computer monitors and would notice if they appeared to be heading in the wrong direction and may reach out to them when they did.  (Facts at ¶¶ 134-41.)

[91]   Plaintiff was required to pass a background check before being hired, and he was also required to submit to an additional background check two months after he started working. (Facts at ¶ 17-18 n.5.)

[92]   Thus, GrubHub was not simply accepting a pass/fail result provided to it by a third party background check service. (Facts at ¶ 18.) It received information on the applicants' background and then assessed whether the information would prevent the driver from being hired. (Facts at ¶ 18.)

---

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

favor of employment status).[93]

### 8.   GrubHub Encouraged Drivers to Use and Wear Its Branding and Hold Themselves Out as Being GrubHub's Representative

GrubHub provided drivers with its bright red shirts and hats, containing GrubHub's branded logo.  It preferred drivers to wear the shirts and hats when they were on shift so they would be readily recognizable to restaurants[94] (and also to promote its brand).[95]  It also provided insulated food bags with its logo.[96]

Plaintiff generally wore the shirt and hat while he was working for GrubHub, and he used the GrubHub insulated bags.[97] The fact that drivers were given uniforms (even if not strictly required to wear them) supports a finding of employee status. See Air Couriers Int'l, 150 Cal. App. 4th at 930, 938 (although drivers were not strictly required to wear uniforms, the employer encouraged them to, and the fact that some drivers wore uniforms militated in favor of employee status); see also JKH Enterprises, 142 Cal. App. 4th at 1051 (finding delivery drivers to be employees, even though they did not "wear uniforms or badges that evidence their affiliation

---

[93]     GrubHub submitted no evidence that the background check was a regulatory requirement.

[94]     Mr. Smith testified that he also preferred drivers to wear the shirts and hats because it made customers more comfortable. (Facts at ¶ 38 n.6.)

[95]     Plaintiff had no branding of his own business, such as business cards. (Facts at ¶ 184.) Mr. Smith testified that he had never heard of a driver wearing branded clothing promoting their own business.  (Facts at ¶ 184 n.55.)

[96]     Drivers were required to use an insulated bag. (Facts at ¶ 40.) GrubHub charged drivers for the use of its bag, but waived the fee if they agreed to wear the shirt and hat, which was a means of encouraging the drivers to wear the shirt and hat. (Facts at ¶ 40.)

[97]     Plaintiff also testified that he was told by GrubHub to wear close-toed shoes. (Facts at ¶ 36.)

with JKH.").[98]

### 9. Drivers Were Not Free to Operate Their Own Business While Working for GrubHub

In this case, GrubHub has made much of the fact that Plaintiff worked for other "gig economy" companies and even performed deliveries for two of GrubHub's competitors - Postmates and Caviar - while on shift for GrubHub. (Facts at ¶ 169.)  However, these facts do not make Plaintiff an independent contractor.  Instead, it is simply evidence of a worker in a low wage job working other jobs in an attempt to make ends meet.[99]  Even though he worked for different companies, when he did so, he was performing work for those companies—for those companies' customers (not his own)—not as part of his own independent business. (Facts at ¶¶ 181-91.) He had no way to get his own customers to deliver food to; he had no way of even having customers call him back to perform additional deliveries if they were happy with his service. (Facts at ¶¶ 183-91.)[100]

---

[98]     Ms. O'Shae testified that she was instructed during training not to refer to the drivers as independent contractors, but instead to say simply that they represented GrubHub. (Facts at ¶ 143 n.44.)

[99]     See O'Connor, 2015 WL 5138097, at *23 n.24 (Uber drivers who work for multiple companies "closely resemble fast-food workers who may work shifts at both Burger King and McDonald's," rather than an individual with "a distinct business . . . that serves many clients."); Cotter, 60 F. Supp. 3d at 1079-80 (also rejecting argument that because drivers were free to drive for other ride-sharing apps or to hold other jobs, that fact made them independent contractors).

[100]     When Plaintiff worked for GrubHub, he was clearly wearing the "hat" of GrubHub rather than that of his own personal business.  See Coverall North America, Inc. v. Division of Unemployment Assistance, 447 Mass. 852, 858-59 (2006) (finding cleaning worker who had been classified by the company as an independent contractor was an employee since she "wore the hat" of the company, as demonstrated by the fact that she did not have her own clients and could not negotiate her rates with customers; moreover, any customer she served was not her own customer, but a customer of the company's).

GrubHub has also argued that the provision of its contract allowing drivers to hire subcontractors to perform their delivery work makes them independent contractors.  However, none of the witnesses could recall any drivers doing this, other than *after* Plaintiff's employment ended and an occasion in which special arrangements needed to be made in order to allow this to happen. (Facts at ¶ 187 n.57.)  Plaintiff himself did not hire anyone to help him with his deliveries. (Facts at ¶ 187 n.57.) Indeed, the very nature of GrubHub's system made it infeasible

Moreover, the evidence showed that GrubHub closely monitored its drivers' work and their availability to perform deliveries during their shifts. (Facts at ¶¶ 58-63, 99, 123-47.)  It could well in fact be that Plaintiff's increasing overlap of work for Postmates and Caviar in the latter part of his employment with GrubHub (after the hourly rate was dropped from $15 to $11, and he was disillusioned with the job) is what led GrubHub to decide that he was not available enough during his shifts and to therefore terminate him. (Facts at ¶¶ 167-68.)[101]

While GrubHub attempted to emphasize at trial drivers' freedom (allowed by the contract) to work for other companies if they wished, Mr. Smith did admit that he would prefer for drivers to focus on their work for GrubHub and not be working for other companies. (Facts at ¶ 170.)

As this Court noted at the summary judgment hearing, the mere fact that a worker performs work for another company while on the clock for a different company does not mean that the worker is an independent contractor. (Hr. Tr., June 29, 2017, at 2.)  Indeed, if a worker is not supposed to be working for another company while on the clock, the company who is paying him could discipline – or fire – the worker for doing this.  And that, it appears, could be what led to Plaintiff's termination. (Facts at ¶¶ 167-68.)[102]

---

for him to do so, since there was no mechanism for forwarding orders to others. (Facts at ¶ 187 n.57.) Also, even if a driver did attempt to hire someone, GrubHub controlled who could be hired since it required a background check and adherence to GrubHub's contract. (Facts at ¶ 24.) In any event, it is unrealistic to expect that a worker making close to or below minimum wage would be able to subcontract out the work.

[101]    The evidence showed that Plaintiff did not voluntarily share with GrubHub that he was also working for Postmates and Caviar at the same time. (Facts at ¶ 172.) Ms. O'Shae testified that drivers did not generally share with GrubHub that they were working for other companies, but when it was found out that they did, it would be noted in their file. (Facts at ¶ 171.)

[102]    Plaintiff did not voluntarily share with GrubHub that he was also working for these other companies, and the evidence shows that drivers did not necessarily want GrubHub to know they were doing this. (Facts at ¶¶ 171-72.) As Mr. Lawson put it, he thought it "would be risky to accept the orders from other companies." (Facts at ¶ 172.)  Indeed, Mr. Smith admitted that he cared if drivers were driving for other companies while on shift for GrubHub.  (Fact at ¶ 170

60

In both the <u>Uber</u> and <u>Lyft</u> cases, the defendants argued that their drivers could and did perform work for other companies – even at the same time as they were performing work for Uber or Lyft – but both courts denied the companies' motions for summary judgment on employee status. <u>See</u> <u>O'Connor</u>, 82 F. Supp. 3d 1133; <u>Cotter</u>, 60 F. Supp. 3d 1067.[103]  The fact that a number of so-called "gig economy" companies have, in recent years, set up a system by which their workers can perform delivery services for them on a flexible schedule, thus allowing the possibility of some overlap with work performed for other companies, does not mean that the workers are engaged in their own independent business while they are performing these delivery services.  Plaintiff did not establish his own independent delivery service; he did not set up "Raef's Delivery" and seek to acquire his own customers to whom he would deliver meals. (Facts at ¶ 180-91.)  Instead, he signed up to work for several delivery companies, each of which has its own customers, and when he was working for GrubHub, he did so as an employee of GrubHub, not as his own independent business operation. (Facts at ¶ 180-91.)[104]

_____

n.51.)

[103]    Other courts have similarly noted that "such 'freedom' [to work for other companies] alone does not tip this factor in favor of independent contractor status, as '[a]n employee may, of course, work for different employers at different times and still be an employee of each.'" <u>Hurtado v. Raly Dev., Inc.</u>, 2012 WL 3687488, *14 (S.D. Fla. Aug. 27, 2012) (citing <u>Beliz v. W.H. McLeod & Sons Packing Co.</u>, 765 F.2d 1317, 1329 (5th Cir. 1985)).

[104]    GrubHub has compared Plaintiff to the plaintiff in <u>Jones</u>, 866 F.3d at 1106. However, the circumstances in <u>Jones</u> were different from here in that the plaintiffs, who were telemarketers, began their pitch to customers by deciding which company's services would be appropriate to try to sell them.  Here, in contrast, Plaintiff did not take calls directly from customers and then decide whether Postmates or GrubHub would be better suited for the job. (Facts at ¶ 180-91.) GrubHub's system did not allow Plaintiff to do that.  It simply sent him the orders, and he delivered them (wearing the "hat" of GrubHub when he did so). (Facts at ¶ 180-91.)

GrubHub has also cited other cases in support of its contention that Plaintiff was running his own business, but these cases are also distinguishable.  For example, in <u>Robinson v. City of San Bernardino Police Dept.</u>, 992 F. Supp. 1198, 1203 (C.D. Cal. 1998), which was a vicarious liability case, the plaintiff was a certified skilled phlebotomist (a position that required specialized training and for which the plaintiff was able to set up her own practice).  In <u>Arnold v. Mutual of Omaha Ins. Co.</u>, 202 Cal. App. 4th 580, 584 (2011), the plaintiff was "licensed by the Department of Insurance as an independent agent or broker, authorized to offer products clients

Ultimately, GrubHub may not dictate each and every detail of its drivers' work, but it did monitor and dictate many of them, and it also exercised "absolute overall control of all meaningful aspects of this business relationship." <u>Ruiz</u>, 754 F.3d at 1101.  Moreover, "the simplicity of the work" made "detailed supervision, or control, unnecessary." <u>Air Couriers Int'l</u>, 150 Cal. App. 4th at 937; <u>see</u> <u>also</u> <u>JKH Enterprises</u>, 142 Cal. App. 4th at 1064; <u>Borello</u>, 48 Cal. 3d at 356-57 ("It is the simplicity of the work, not the harvesters' superior expertise, which makes detailed supervision and discipline unnecessary . . . Under these circumstances, Borello retains all *necessary* control over the harvest portion of its operations.").

Accordingly, the primary <u>Borello</u> factor – control – weighs heavily in favor of a finding that Plaintiff was GrubHub's employee.

### iii.  Analysis of the Secondary <u>Borello</u> Factors Also Demonstrates That Plaintiff Was GrubHub's Employee

In addition to the primary factor of control, the secondary <u>Borello</u> factors also support Plaintiff's contention that he was GrubHub's employee.

### a.  Plaintiff Was Not Engaged in a Distinct Occupation or Business

While working for GrubHub, Plaintiff was not engaged in a "distinct occupation or business." <u>Alexander</u>, 765 F.3d at 989. Although GrubHub has argued that Plaintiff was in business for himself, the evidence at trial made clear that he was not.  Plaintiff was not running "Raef's Delivery Service" catering to his own customers, negotiating his rates, and deciding which jobs to accept from which customers.  (Facts at ¶ 180-91.)[105] Instead, he was working a

---

from different companies" and indeed had her own business.  In <u>Rabanal</u>, 2013 WL 6020340, at *7, the plaintiff incorporated a business to hire employees and solicited his own customers. <u>Vandiver v. State</u>, 2010 WL 4681252, *6–7 (Cal. Ct. App. Nov. 19, 2010), did not concern misclassification at all.

[105]    GrubHub has argued that Plaintiff's filing taxes as self-employed supports a finding that he was an independent contractor.  However, in pretty much every case in which companies classify their workers as independent contractors, as here, the companies gave the workers 1099s and the workers filed taxes as self-employed.  That has not stopped courts from finding (even as

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

low-paying job, albeit with relatively flexible scheduling to support himself while pursuing his

acting career. (Facts at ¶ 9.)  He tried a number of "gig economy" jobs over a two-year period,

and due to their relative flexibility, at times his work for these companies overlapped somewhat.

But clearly he was not running his own business. (Facts at ¶ 193.)  While working for GrubHub,

he was performing services for GrubHub, delivering food to its customers, following its rules

and procedures, and when he stopped following its rules (not being available to work when he

had signed up for a shift), he was fired. (Facts at ¶¶ 166-76,181, 186.)

Plaintiff was clearly not running his own business, given that GrubHub, not Plaintiff,

would decide how to handle issues with orders (either at the restaurant or with the customer).

The whole service that GrubHub was offering (to restaurants and customers) was to handle the

deliveries, which meant putting in place and overseeing the delivery drivers and taking care of

issues that arose.  (Facts at ¶¶ 3-8.)  If an issue arose with a restaurant during the course of a

delivery, the driver was not supposed to take the issue directly to the restaurant, but instead

contact GrubHub to address the issue. (Facts at ¶¶ 143-44, 148.)  Likewise, if a customer had an

issue with an order, the driver was supposed to have them contact GrubHub, rather than resolve

the issue themselves. (Facts at ¶¶ 143, 145-47.)  For instance, if an item were missing from an

order, the driver was not supposed to go back to the restaurant to retrieve it, but instead have the

customer contact GrubHub, who may offer a credit against the customer's next order. (Facts ¶¶

20
21
22
23
24
25
26

---

a matter of law) that employees have been misclassified.  See, e.g., Alexander, 765 F.3d 981; Air
Couriers Int'l, 150 Cal. App. 4th at 927 (affirming trial court ruling that drivers were employees
even though they were issued 1099s); JKH Enterprises, 142 Cal. App. 4th at 1052 (same). Even
cases that have cited a worker's tax filing as self-employed to support a finding of independent
contractor status have emphasized that this factor was not dispositive, but it was other factors
that led to the court's conclusion. See, e.g., Desimone, 2000 WL 1811385, *16 (noting that a tax
filing as self-employed "is not a strong factor."); Bowerman v. Field Asset Services, Inc., 2013
WL 6057043, *2 (N.D. Cal. Nov. 14, 2013) (noting merely that filing taxes as self-employed is
"relevant" to the misclassification inquiry). And in Hennighan, 38 F. Supp. at 1103, the
plaintiff's tax status as self-employed was but one small factor among many suggesting
independent contractor status.

27
28

at 136-38, 145-46.)  The driver could not offer a credit to the customer.  (Facts at ¶ 146 n. 46.)

As explained above, even though drivers including Plaintiff may have worked for other "gig economy" companies while working for GrubHub, that fact does not make Plaintiff an independent contractor.  While performing that work, he was simply piecing together multiple part time jobs to pay the bills; he was not running his own business.  As the Court noted in its summary judgment decision, "that Plaintiff performed delivery services for other companies while relevant is not dispositive of the lack of an employment relationship." Lawson 2017 WL 2951608, *6 (citing JKH Enterprises, 142 Cal. App. 4th at 1051, 1066; Air Couriers Int'l, 150 Cal. App. 4th at 926, 938-39).

### b.    Plaintiff Performed Work Under GrubHub's Direction

With respect to the next Borello factor, the evidence also supports Plaintiff's argument that he was GrubHub's employee.  As demonstrated at trial, and set forth exhaustively above, Plaintiff "performed [work] under the principal's direction," Alexander, 765 F.3d at 995. The Court recognized on summary judgment that a reasonable finder of fact could conclude that this factor weighed in favor of employee status, and now the evidence has only borne out that conclusion. See Lawson, 2017 WL 2951608, *5. The Court noted that the existence of "company oversight as to whether a driver is driving as scheduled" as well as "the complaint feedback system" could support a finding of an employment relationship. Id.

The evidence presented at trial showed that GrubHub (through its dispatchers and driver care specialists) watched Plaintiff's every move. (Facts at ¶¶ 61-62, 99-101, 111, 131-42.) They knew when he was or was not logged on for a shift, they monitored his location, and they would contact him if he was not where he was supposed to be. (Facts at ¶¶ 61-62, 99-101, 131-42.) GrubHub contacted Plaintiff and took him off his shift because he toggled unavailable for ten minutes to take a bathroom break. (Facts at ¶¶ 61-62.) His performance statistics were noted and used to determine his schedule and pay. (Facts at ¶¶ 50, 73-76.) He could be terminated for not accepting enough orders or not being available to take orders during his shift, and indeed he was

64

terminated for this very reason. (Facts at ¶¶ 156, 166-78.)

This factor weighs strongly in favor of a finding that Plaintiff was GrubHub's employee.

### c.   Plaintiff's Position as a Delivery Driver Did Not Require a High Degree of Skill

Likewise, the third secondary <u>Borello</u> factor, "the skill required in the occupation," also favors Plaintiff.  Many courts have held that the job of a driver does "not require a high degree of skill".  <u>JKH Enterprises</u>, 142 Cal. App. 4th at 1064.[106]  Plaintiff's job as a delivery driver did not require any special skills or educational experience. (Facts at ¶¶ 10, 35-37.)  Plaintiff was not a specialist and instead merely followed instructions that were given to him. (Facts at ¶¶ 35-37, 186.) As this Court noted in its order denying summary judgment, this factor points toward an employment relationship because "GrubHub drivers are not required to possess any special license beyond a normal driver's license, and no skill beyond the ability to driver." <u>Lawson</u>, 2017 WL 2951608, *5.  <u>See also</u> <u>Desoto Cab Co.</u>, 2017 WL 4416856, *9 ("Additionally, it can reasonably be concluded that there is no skill other than driving a car that is required in this case. Plaintiff was not operating a semi-truck or engaging in substantial analytical tasks when driving a cab.").

### d.   GrubHub's Investment in its Delivery Business Significantly Outweighed Plaintiff's Investment

The fourth secondary <u>Borello</u> factor is "whether the principal or worker provides the instrumentalities, tools, and place of work." <u>Estrada</u>, 154 Cal. App. 4th at 9. At summary judgment, the Court found that this factor supported independent contractor status, because Plaintiff provided his own vehicle and a cell phone. <u>Lawson</u>, 2017 WL 2951608, *6.  However,

---

[106]   <u>See also</u> <u>Narayan</u>, 616 F.3d at 903 (drivers needed no "special license beyond a normal driver's license, and no skills beyond the ability to drive"); <u>O'Connor</u>, 82 F. Supp. 3d at 1152 ("[A] jury could conclude that driving a car (as opposed to, *e.g.*, a truck or bus) does not require a special skill, particularly if no special driver's license is required"); <u>Cotter</u>, 60 F. Supp. 3d at 1080 ("And driving for Lyft requires no special skill – something we often expect independent contractors to have"); <u>Estrada</u>, 154 Cal. App. 4th at 12 ("only required skill is the ability to drive").

courts have recognized that when the worker's investment is their use of a vehicle, when compared to a much more significant investment by the company in its infrastructure, this factor does not necessarily support independent contractor status.[107]

Indeed, "numerous California cases find employee status even though the employee provides his own vehicle or tools." Alexander, 765 F.3d at 995 (citing Borello, 256 Cal. Rptr. 543, 769 P.2d at 409; Estrada, 64 Cal. Rptr. 3d at 331; Air Couriers Int'l, 59 Cal. Rptr. 3d at 47; JKH Enterprises, 48 Cal. Rptr. 3d at 569; Toyota Motor Sales U.S.A., v. Sup. Ct., 269 Cal. Rptr. 647, 654 (Cal. App. Ct. 1990).) In Flores, 250 F. Supp. 3d at 488, despite the fact that delivery drivers provided their own vehicles and hundreds of dollars of other equipment, the court noted that "these investments were minimal when compared to the total capital investment necessary to operate [defendant's] business". Like GrubHub, the defendant in Flores had invested more than $20 million in "technology" solutions and spent more than $2 million on "operation costs."[108]

Clearly, the most vital instrumentality necessary to perform GrubHub deliveries is the GrubHub app itself, along with GrubHub's entire delivery infrastructure, which GrubHub has invested many millions of dollars in developing and maintaining. Each year, GrubHub makes massive investments in its delivery business. For example, GrubHub's annual SEC reports reveal that GrubHub's Operation and Support expenses increased by more than $64 million from 2015

---

[107]    See, e.g., Keller v. Miri Microsystems LLC, 781 F.3d 799, 810 (6th Cir. 2015) ("[I]nvestment of a vehicle is no small matter, [but] that investment is somewhat diluted when one considers that the vehicle is also used by most drivers for personal purposes") (quoting Herman v. Express Sixty-Minutes Delivery Serv., Inc., 161 F.3d 299, 304 (5th Cir. 1998)); Sakacsi v. Quicksilver Delivery System, Inc., 2007 WL 4218984 at *7 (M.D. Fla. Nov. 28, 2007) (holding relative investment weighed in favor of employee status where many courier drivers "used their own personal cars to make [] deliveries" and courier service's cost for purchasing and maintaining its software and system far outweighed the costs to drivers); see also Clincy v. Galardi S. Enterprises, Inc., 808 F. Supp. 2d 1326, 1346-47 (N.D. Ga. 2011) (relative investment weighed in favor of employee status where dancer's $50,000 annual investment related to her work did not exceed the nightclub's investment in its business).

[108]    Unlike in this case, the plaintiffs in Flores invested to hire helpers, but that fact still was not enough for the court to find that the investment factor favored independent contractor status. See id. (citing Collinge, 2015 WL 1299369, at *5).

---

66

to 2016. (Facts at ¶ 2 n.2.)  GrubHub states that "this increase was primarily attributable to expenses related to restaurant delivery services." (Facts at ¶ 2 n.2.)  Moreover, GrubHub stated in its 2016 SEC report that "Delivery expenses increased during the year ended December 31, 2015 compared to nominal related expenses in the prior year due to our investment in capacity for the delivery network . . . ." (Facts at ¶ 2 n.2.)

Furthermore, GrubHub has invested tens of millions of dollars since 2015 to acquire other companies in order to grow its delivery business. (Facts at ¶ 4.) GrubHub developed its sophisticated app, provided the resources to support it on an ongoing basis, and employed teams of employees in Chicago to oversee and operate it. (Facts at ¶ 5.)  These investments dwarf Plaintiff's investment in his car.

### e.  The Relationship Between Plaintiff and GrubHub Was Indefinite in Duration

The fifth secondary <u>Borello</u> factor, "the length of time for performance of services," <u>Alexander</u>, 765 F.3d at 996, favors Plaintiff as well.  As the Court noted at summary judgment, "[t]here was no contemplated end to the service relationship at the time Plaintiff began working for GrubHub," and "[t]he indefinite nature of Plaintiff's tenure with GrubHub also indicates an employment relationship." <u>Lawson</u>, 2017 WL 2951608, *5.  Where "a contractor was hired to perform a specific task for a defined period of time," such as a house painter engaged in a short-term agreement to repaint a house, the relationship is more like an independent contractor relationship.  <u>See also</u> <u>Narayan</u>, 616 F.3d at 903; <u>Poizner</u>, 162 Cal. App. 4th at 855 ("[T]he notion that an independent contractor is someone hired to achieve a specific result that is attainable within a finite period of time, such as plumbing work, tax service, or the creation of a work of art for a building's lobby is at odds with carriers who are engaged in prolonged service to [defendant].").

Here, GrubHub's contract automatically renewed every sixty days, and there was no contemplated end to Plaintiff's relationship with GrubHub, unless he quit or was fired. (Facts at

¶ 34.)[109]  The relationship between Mr. Lawson and GrubHub was ongoing with no contemplated end until GrubHub determined to terminate him. (Facts at ¶ 34.)  See also Flores, 250 F. Supp. 3d at 491 ("The agreement suggests permanency in that it does not include a fixed employment period and automatically renews.").[110]

### f.    GrubHub Paid Plaintiff Weekly, Generally on an Hourly Basis

The sixth secondary Borello factor, the "method of payment" utilized by GrubHub, favors Plaintiff as well. Estrada, 154 Cal. App 4th at 8. As a practical matter, GrubHub paid Plaintiff on an hourly basis, with a pay statement emailed to him and a direct deposit into his bank account each week. (Facts at ¶¶ 70-85.)

As discussed above, although GrubHub explained its pay based on a formula consisting of several components (a per-delivery rate, 50 cents per mile for straight-line miles from the restaurant to the customer, and tips), the pay was practically always "trued up" to GrubHub's guaranteed minimum hourly rate. (Facts at ¶ 73 n.18.)[111]  In some weeks, Plaintiff received a bonus when he was a top driver with a very high acceptance rate; that bonus was likewise calculated on an hourly basis ($2.50 per hour). (Facts at ¶ 83.)  Even the few times that Plaintiff did not get the guaranteed minimum hourly rate, GrubHub still paid him by the hour - at the California minimum wage (Facts at ¶ 72 n.16, 17.)[112]

---

[109]    GrubHub has suggested that each separate delivery is a job that Plaintiff was contracted to perform.  This characterization of the evidence and the relationship between the parties is simply not supportable.  Plaintiff signed a contract that automatically renewed every 60 days and thus his relationship with GrubHub was for infinite duration.  He was not hired separately for each individual delivery he performed.

[110]    See also Sales v. Bailey, 2014 WL 3897726, *11 (N.D. Miss. Aug. 8, 2014) (duration of relationship weighed in favor of employee status where some workers worked for shorter periods but had "sought an indefinite employment relationship").

[111]    The threat of the pay not being "trued up" was essentially the equivalent of docking a driver's pay if they did not meet the minimum performance standard, i.e. maintaining a 75%, and later 85%, acceptance rate. (Facts at ¶ 75.)

[112]    There were only two days during Plaintiff's entire employment with GrubHub on which

68

The Court at summary judgment correctly noted that "GrubHub's two-step compensation system with a guarantee of a minimum hourly pay more closely resembles an employment relationship than contractor relationship." Lawson, 2017 WL 2951608, *6.  Indeed, "[a]n hourly rate traditionally indicated an employment relationship." Varisco v. Gateway Sci. & Eng'g, Inc., 166 Cal. App. 4th 1099, 1106 (Cal. App. Ct. 2008).[113]  Plaintiff was paid on a weekly basis by direct deposit into his bank account, just like an employee would be paid. (Facts at ¶ 85.) He was not paid by invoice like, for example, a house painter might be. (Facts at ¶ 85.) Plaintiff was afforded no leeway to negotiate his rate. (Facts at ¶ 84.) Even on the many occasions when Plaintiff had to contact GrubHub to correct its incorrect pay calculations, for instance if he had been required to work past the end of his shift because he was assigned an order at the very end of it, it was GrubHub who decided whether the pay was proper or not. (Facts at ¶ 87-88, n.24.)

### g.  Plaintiff's Work Performing Deliveries for GrubHub was a Part of GrubHub's Core Business as a Food Delivery Service

The seventh secondary Borello factor, "whether the work is part of the principal's regular business, favors plaintiffs," as well, because "drivers [a]re performing an integral and entirely essential aspect of [GrubHub's] core business." Alexander, 765 F.3d at 996.  The evidence showed that, at any given time there were hundreds of GrubHub's delivery drivers on duty. (Facts at ¶ 5.)  Indeed, GrubHub Chief Operating Officer Stanley Chia stated in an interview that "GrubHub was aggressively growing its delivery business in 2015" and that "At the beginning of the year it had a miniscule delivery volume, but by the end of the year it had an annual run rate of about $200 million." (Facts at ¶ 8.) As of June 2016, there were 4,000 active GrubHub

---

Plaintiff was paid more or less than the hourly rate (and bonus). (Facts at ¶ 72.) On one day only, his pay exceeded the hourly rate (by $5.83). (Facts at ¶ 72 n.16.)  On another day (when he had not met the minimum acceptance rate, near the end of his employment), he was paid $17.72 for a 7-hour shift, for a total of $2.53 per hour. (Facts at ¶ 72 n.17.)

[113]   See also Alexander, 765 F.3d at 996 (employers may pay "by time, by the piece, or by successful completion of the service, instead of a fixed salary, and [it will] still constitute employee wages if other factors indicate an employer-employee relationship").

delivery drivers in California alone. (Facts at ¶ 3.)

While GrubHub attempted at trial to portray the delivery aspect of its business as minor, Mr. Chia admitted that, without its delivery business, GrubHub would not remain viable in its most major cities such as San Francisco, New York, Los Angeles, and Boston. (Facts at ¶ 7.)  He also acknowledged how aggressively GrubHub was expanding its food delivery service since 2015 to the present. (Facts at ¶ 8.)  While for many years, GrubHub provided a way for customers to order food online from restaurants without providing a delivery component, since GrubHub established its delivery service in 2014, the evidence showed that GrubHub has grown its delivery service extremely significantly since then. (Facts at ¶¶ 3-8.)[114]

Furthermore, Mr. Chia acknowledged that he has explained in interviews with publications such as Entrepreneur Magazine, Cranes, and Street Fight how powerful it is for GrubHub's market share that it can now offer delivery services on a national scale. (Facts at ¶ 8.) Its SEC filings also acknowledge the significant role that delivery plays in its business. (Facts at ¶ 2 n.2.)  It is simply implausible that GrubHub would set up such an extensive infrastructure to operate such a purportedly insignificant aspect of its business.

GrubHub's argument that it is merely a marketplace connecting customers with drivers smacks of the argument that Uber made in its attempt to obtain summary judgment in O'Connor, 82 F. Supp. 3d at 1137, that it was a technology company rather than a transportation company and that its business was simply to be platform connecting passengers with drivers. Judge Chen emphatically rejected Uber's argument:

> Uber is no more a "technology company" than Yellow Cab is a "technology company" because it uses CB radios to dispatch taxi cabs, John Deere is a "technology company" because it uses computers and robots to manufacture lawn mowers, or Domino Sugar is a "technology company" because it uses modern irrigation techniques to grow its sugar cane.

---

[114]   For example, GrubHub bought DiningIn for $80 million in 2015, GrubHub bought delivered Dish in December 2015, GrubHub bought LA Bites for $65 million in May 2016, GrubHub bought Foodler in 2017, and GrubHub has recently announced its intent to acquire Eat 24. (Facts at ¶ 4.)

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

Id. at 1141. Similarly, in <u>Cotter</u>, Lyft raised a similar argument that it was merely a platform connecting drivers to customers, but Judge Chhabria rejected this argument because the drivers were "'wholly integrated' into Lyft's business – after all, Lyft could not exist without its drivers – and '[t]he riders are [Lyft's] customers, not the drivers' customers." <u>Cotter</u>, 60 F. Supp. 3d at 1079 (citing <u>Estrada</u>, 154 Cal. App. 4th at 64); <u>see also</u> <u>Santa Cruz Transp.</u>, 235 Cal. App. 3d at 1376 ("the work performed by the [drivers] in this case is part of the regular business of [Defendant]" and "[t]he modern tendency is to find employment when the work being done is an integral part of the regular business of the employer . . . ."); <u>Martins v. 3PD, Inc.</u>, 2013 WL 1320454, at *14 (Defendant "is clearly a delivery company, hiring Plaintiffs for a vital and necessary aspect of its business . . . ").

Likewise, GrubHub does not merely connect customers and restaurants. It uses its platform to facilitate orders, going so far as providing the delivery service itself when restaurants do not have their own delivery drivers. (Facts at ¶¶ 3-8.) That is the definition of a food delivery service, and drivers like Plaintiff were at the core of that business. <u>See</u> <u>Lawson</u>, 2017 WL 2951608, at *6 ("GrubHub drivers are also central to the GrubHub business."). Furthermore, GrubHub's Chief Operating Officer Stan Chia testified that GrubHub would not be viable in its most major markets without the delivery services that the drivers provide. (Facts at ¶ 7.)[115]

---

[115]    GrubHub has argued that the fact that it subsisted without its delivery service from 2004 to 2014 means that delivery is not at the core of its business. However, in GrubHub's most major markets, including Los Angeles, not only does it provide delivery services, it acknowledged it would not be viable without the delivery services, indicating that customers in GrubHub's major markets utilize GrubHub for its delivery services. (Facts at ¶ 7.)

Contrary to GrubHub's position, this <u>Borello</u> factor does not require that delivery services be GrubHub's *sole* course of business but instead an "integrated portion" of GrubHub's course of business. <u>Borello</u>, 48 Cal. 3d at 355 (finding that the service provided by harvest workers "though seasonal, was rendered regularly and as an integrated part of the grower's business" and "[t]he harvesters form a regular and integrated *portion* of Borello's business operation.") (emphasis added). Whether GrubHub existed without a delivery service previously is irrelevant, because now it is clear that its delivery services are a regular part of GrubHub's business (regardless of whether it currently comprises a majority of its business) and indeed one upon which GrubHub relies to grow its company. (Facts ¶¶ 3-8.)

1

2

3

4

5

6

7

8

9

10

11

12

13

### h.    Plaintiff Believed that He was an Employee

Finally, the eighth secondary <u>Borello</u> factor is "whether or not the parties believe they are creating the relationship of employer-employee." <u>Alexander</u>, 765 F.3d at 989.  Although GrubHub's agreement, a contract of adhesion, described the relationship between Plaintiff and GrubHub as that of an independent contractor, Plaintiff testified that, once he began working, he came to believe he was GrubHub's employee. (Facts at ¶¶ 192-94.)  <u>See</u> <u>Desoto Cab. Co.</u>, 2017 WL 4416856, *9 ("Rather than assume the relationship from the content of an agreement that was drafted exclusively by defendant, the court was obligated to delve deeper into the parties' actual conduct and the economic realities of their relationship.") Moreover, this factor has been given the least weight by the courts, since companies typically require their workers in these cases to sign agreements stating that they are "independent contractors."[116]  "The belief of the parties as to the legal effect of their relationship is not controlling if as a matter of law a different relationship exists." <u>Grant v. Woods</u>, 71 Cal. App. 3d 647, 654 (Cal. Ct. App. 1977).[117]

---

14

15

16

17

18

19

California courts have recognized that employees' work can be integrated into the defendant's business, and this <u>Borello</u> factor can point toward employee status, even where the services are an important part – but not the sole or even the primary course -- of the defendant's business.  <u>See</u> <u>Angelotti v. Walt Disney Co.</u>, 192 Cal. App. 4th 1394, 1405 (2011) (finding stunt man to be employee of a production company, where court noted that "[f]ilm production, including stunts performed for the films, was part of the regular business of [the] production company."); <u>Stubbs v. Covenant Sec. Servs., Ltd.</u>, 2015 WL 5521984, at *7 (N.D. Cal. Sept. 16, 2015) (noting that security guards could be part of usual course of business, where defendant's business was manufacturing dangerous chemicals).

20

21

22

[116]    To the extent that drivers may believe they are independent contractors, based on representations made in GrubHub's adhesive contracts, "California law is clear that [t]he label placed by the parties on their relationship is not dispositive." <u>Alexander</u>, 765 F.3d at 989 (internal quotation omitted).

23

24

25

26

27

[117]    GrubHub has also argued that drivers such as Plaintiff could maximize their profits based upon their managerial skill.  Notably, however, this is at most only a tertiary factor under <u>Borello</u>.  <u>See</u> <u>Lawson</u>, 2017 WL 2951608, *5.  Moreover, the record shows that Plaintiff, like many employees, simply attempted to make more money with GrubHub by working more shifts (which were limited in availability), working more desirable shifts, or doing his job well (so that he would be rewarded by GrubHub, which at times incentivized drivers (like any good employer) by giving bonuses to top-performing drivers.  <u>See</u> <u>Scantland</u>, 721 F.3d at 1316. ("An individual's ability to earn more by being more technically proficient is unrelated to an individual's ability to earn or lose profit via his managerial skill, and it does not indicate that he

72

28

## B.   PLAINTIFF SUFFERED WAGE VIOLATIONS

As Plaintiff has presented ample evidence demonstrating that he was GrubHub's employee, the Court must also address whether GrubHub committed violations of the California Labor Code. As explained below, Plaintiff established at trial that GrubHub is liable for its failure to reimburse Plaintiff's necessary business expenses (Cal. Lab. Code § 2802), failing to pay Plaintiff overtime for the week of November 30, 2015 (Cal. Lab. Code §§ 1194, 1198, 510, and 554), and failing to pay Plaintiff minimum wage on a number of days (Cal. Lab. Code §§1194 and 1197.)

### i.   Expense Reimbursement

Under Cal. Lab. Code § 2802, a plaintiff proves that he or she is entitled to work-related expenditures if the following elements are met: (1) the employee made expenditures or incurred losses; (2) the expenditures or losses were incurred in direct consequence of the employee's discharge of his or her duties, or obedience to the directions of the employer; and (3) the expenditures or losses were necessary. USS-POSCO Indus. v. Case, 244 Cal. App. 4th 197, 205 (2016).

There can be no question that Plaintiff incurred vehicle expenses as a delivery driver for GrubHub. (Facts at ¶ 195.) Although GrubHub argued before trial that drivers that its drivers are reimbursed for their vehicle expenses, the evidence was clear at trial that they are not. (Facts at ¶¶ 89-92.) The California Supreme Court held in Gattuso v. Harte-Hanks Shoppers, Inc., 42 Cal. 4th 554, 574 (2007), that "an employer that uses salary and/or commission increases to discharge

---

operates his own business."); see also Alexander, 765 F.3d at 994 ("California cases indicate that entrepreneurial opportunities do not undermine a finding of employee status.") (citing Arzate, 192 Cal.App.4th at 121); Narayan, 616 F.3d at 902; and Ruiz, 754 F.3d at 1102). Moreover, the evidence showed that Plaintiff was not able to turn down orders that he thought were not "profitable" because he could not even see the size of the order, or the location of the customer, before he had to accept the order. (Facts at ¶ 106.) If he tried to have orders reassigned after accepting them (once he learned how much the order may pay or how far he would have to drive to reach the customer), GrubHub's dispatchers and driver care specialists had complete discretion whether to grant his requests to have his orders reassigned (and at some point, any such reassignments counted as rejections, so drivers' requests for reassignments greatly diminished). (Facts ¶¶ 109-21.)

its reimbursement obligation must also communicate to its employees the method or basis for apportioning any increases in compensation between compensation for labor performed and business expense reimbursement." Not only does GrubHub's contract itself make clear that the drivers are responsible for their own expenses, the fact that none of GrubHub's managers who testified believed that drivers are reimbursed for their expenses (nor did Plaintiff understand that he was) entirely undercuts GrubHub's argument that it made clear to drivers that their compensation included expense reimbursement. (Facts at ¶¶ 89-91.)

GrubHub has contended in court that it reimbursed Plaintiff for his vehicle expenses because its pay structure included payment of 50 cents per mile for deliveries. However, this "mileage component" of the drivers' pay is not mileage *reimbursement*. (Facts at ¶ 91 n.27.) Indeed, Mr. Chia testified that the "mileage component" was an *incentive* component – not reimbursement for miles driven – to encourage drivers to accept "long-distance" orders. (Facts at ¶ 91 n.27.) Moreover, this component of pay is included in the formula for both delivery drivers *and* bicycle couriers. (Facts at ¶ 92.)[118] Further, the evidence made clear that the mileage component included in GrubHub's pay structure does not reflect the actual miles driven. (Facts at ¶ 91 n.28.) Accordingly, there is no question that Plaintiff satisfies the first element of his §2802 claim.

Nor could there be any dispute that Plaintiff's vehicle expenses were necessarily incurred in order to perform his work for GrubHub. See USS-POSCO Indus., 244 Cal. App. 4th at 205. Plaintiff testified that he incurred vehicle expenses while delivering food for GrubHub – expenses that were "in direct consequence" of Plaintiff's duties as a GrubHub delivery driver. (Facts at ¶¶ 89, 195.)[119]

---

[118]    As this Court asked, "If the purpose of the 50 cents per mile is to cover gasoline costs, then why do bicyclists receive this alleged reimbursement?" Lawson, 2017 WL 2951608, *7.

[119]    GrubHub may (again) argue that it was somehow not aware that Plaintiff had incurred unreimbursed business expenses, *i.e.* by driving a vehicle in order to perform deliveries. This was not a serious argument on summary judgment and is still not a serious argument. See Tan v.

Thus, the only remaining issue regarding this claim is the calculation of Plaintiff's unreimbursed mileage expenses. Based upon GrubHub's records reflecting 252.27 straight-line miles between the restaurants from which Plaintiff picked up orders to the customers that he delivered them to, Plaintiff has estimated that he actually drove twice as many miles (504.54 miles) performing GrubHub deliveries. (Facts at ¶¶ 197-201.)[120]  Using the IRS mileage reimbursement rate ($0.575 for 2015 and $0.54 for 2016)[121] results in a mileage expense of $286.10. (Facts at ¶ 202.)

### ii.    Overtime

During the week of November 30 – December 6, 2015, Plaintiff worked 44.75 hours.

---

GrubHub, Inc., 171 F. Supp. 3d 998, 1005-06 (N.D. Cal. 2016) (noting that it was logical to infer that "an app-based delivery service requires a vehicle and a phone and thus expenses related to each."). Likewise, any suggestion that Plaintiff was required to actually seek reimbursement in order to have a viable claim under § 2802 must also be rejected (again).  See Stuart v. RadioShack Corp., 641 F. Supp. 2d 901, 903 (N.D. Cal. 2009) (a claim under § 2802 "focuses not on whether an employee makes a request for reimbursement but rather on whether the employer either knows or has reason to know that the employee has incurred a reimbursable expense.").

[120]    He reached this estimate based on the fact that actual miles driven will be more than straight-line "as the crow flies" miles.  (Indeed, a comparison of minimum actual miles to straight-line miles, using Google Maps, showed that the actual miles were approximately 50% more. (Facts at ¶ 200.))  In addition, GrubHub's record of miles does not account for the miles driven to get to the restaurant to pick up the order. (Facts at ¶ 198.)  Considering these two factors together, Plaintiff's estimate that his actual miles driven would have been twice as many as GrubHub had recorded for him is eminently reasonable and indeed likely conservative. (Facts at ¶ 201.)

[121]    Courts have allowed plaintiffs to use the IRS mileage reimbursement rate to establish the amount of unreimbursed mileage expenses owed under § 2802, where like here the plaintiffs do not have records of their actual vehicle expenses.  See, e.g., O'Connor v. Uber Technologies, Inc., 311 F.R.D. 547, 567 (N.D. Cal. 2015) (finding "the IRS reimbursement method is not arbitrary but a 'reasonable basis of computation' of vehicle-related expenses" and noting that "the California Supreme Court has specifically upheld the use of the IRS reimbursement method.") (citing Gattuso, 42 Cal.4th at 569) (the IRS rate of reimbursement for mileage expenses is a "reasonable basis of computation of vehicle-related expenses."); Stuart v. RadioShack Corp., 2009 WL 281941, *18 (N.D. Cal. Feb. 5, 2009); Dalton v. Lee Publ'ns, Inc., 270 F.R.D. 555, 564 (S.D. Cal.2010)).

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

(Facts at ¶ 203.) However, he was not compensated at a time-and-a-half overtime premium for the 4.75 hours in excess of 40, as required under California law.  As shown at trial, his regular rate for that week was $11.30 per hour. (Ex. 9.), and so he is owed $26.84 in overtime damages for that week (4.75 hours of overtime times half his regular rate for that week, $5.65).[122] (Overtime Demonstrative, attached hereto as Exhibit B.)[123]

### iii.    Minimum Wage

In addition, an analysis of GrubHub's records shows that Plaintiff did not receive minimum wage for his work on a number of days throughout his employment with GrubHub. (Facts at ¶¶ 208-16.)

As shown in Exhibit 159, an analysis of Mr. Lawson's daily pay shows that he suffered minimum wage damages totaling $273.62. (Facts at ¶ 215.) [124]  This amount was determined by

---

[122]     Cal. Lab. Code § 1194 states that an employee receiving less than legal overtime compensation is entitled to recover the unpaid balance of overtime owed. Cal. Lab. Code § 510 requires work in excess of 40 hours in any one workweek to be compensated at a rate of no less than one and one-half times an employee's regular rate of pay. See also Cal. Code Regs. tit. 8 § 11090, § 3.

[123]     As discussed below, the time Plaintiff was on shift is compensable time for overtime purposes, even if he was not delivering orders every minute of the shift.  But to the extent that GrubHub argues that compensable time cannot include time he was performing deliveries for Postmates or Caviar, the evidence shows that Plaintiff did not perform any deliveries for Postmates or Caviar that week in which he worked more than 40 hours.  (Facts at ¶ 206.)   He was, however, apparently logged in to the Caviar app for approximately three hours during that week. (Exs. 161, 1493.) Although Plaintiff contends that the entire time he was on shift for GrubHub was compensable, even if those three hours were subtracted (even though he did not perform any deliveries for Caviar and was not signed up for a Caviar shift (Lawson at 427-28), he would still have 1.75 hours of overtime that week. Additionally, review of the evidence shows that he was only logged out of the app for about an hour that week. (Ex. 17.)

[124]     Cal. Lab. Code § 1194 states that an employee receiving less than legal minimum wage is entitled to recover the unpaid balance of minimum wage owed.  Under California law, employees must receive minimum wage for all hours worked; it is not enough that an employee's average hourly pay over the course of one week meet or exceed minimum wage. Cal. Lab. Code 1197; Wage Order 9; Cal. Code Regs. tit. 8, § 11090, § 4.  See also Armenta v. Osmose, Inc., 135 Cal. App. 4th 314, 324 (Cal. App. Dec. 29, 2005) ("We conclude, therefore, that the FLSA model of averaging all hours worked "in any work week" to compute an

---

76

calculating the effective hourly rate Plaintiff received for each day that he worked for GrubHub (which was the amount that GrubHub paid Plaintiff each day, minus any tips that Plaintiff received that day[125] and minus the amount of mileage reimbursement Plaintiff was owed[126], divided by the number of hours that Plaintiff worked that day.)  For every day for which the effective hourly rate was less than the California minimum wage ($9 per hour in 2015 and $10 per hour in 2016), the difference was multiplied by the number of hours worked that day; these amounts were then totaled.  (Facts at ¶¶ 210-13.)

Taking into account weekly bonuses that Mr. Lawson received, and spreading that pay over all the hours he worked each week that he earned a bonus, leads to a minimum wage damage calculation of $$247.38.  (Facts at ¶ 215.)  Further, deducting time that Mr. Lawson spent delivering orders for Postmates or Caviar leads to a minimum wage damage calculation of $187.57.  (Facts at ¶ 216.)

Regardless of the precise amount owed, Plaintiff has proved his minimum wage claim.

---

employer's minimum wage obligation under California law is inappropriate").  However, even analyzing his minimum wage damages on a weekly basis shows damages of $211.31.  (Facts at ¶214 n. 61.)

[125]   California does not allow employers to take a "tip credit" against the minimum wage, and therefore the amount of tips that Plaintiff received may not be counted toward GrubHub's minimum wage obligations.  Hennig v. Indus. Welfare Comm., 46 Cal. 3d 1262, 1280 (1988).

[126]   Unreimbursed expenses that drive pay below the minimum wage are recoverable as minimum wage damages. See Arriaga v. Florida Pacific Farms, L.L.C., 305 F.3d 1228, 1241 (11th Cir. 2002) (costs that drive workers' wages below minimum wage are recoverable as minimum wage damages); Brown v. Abercrombie & Fitch Co., 2015 WL 9690357, *8 (C.D. Cal. July 16, 2015) ("[a]n employee who has ostensibly been paid the minimum wage but has been required to make an expenditure which reduces the employee's net income below the minimum wage is, in essence, in the same position as an employee who was paid less than the minimum wage at the outset. Both have been required to satisfy their living expenses with less than the minimum wage.").

### iv.  The Time Plaintiff Spent on Shift Was Compensable Time

For purposes of his overtime and minimum wage claims, Plaintiff expects that GrubHub will dispute that the time he was on shift, but not performing deliveries, was compensable time. As explained below, however, Plaintiff's hours on shift were fully compensable for overtime and minimum wage purposes.

The law is clear that it does not matter whether Plaintiff was performing deliveries every minute of the hours he was on shift in order for those hours to be compensable.  Under California law, hours are compensable when an employee is either "subject to the control of an employer," or when an employee is "suffered or permitted to work, whether or not required to do so." Morillion v. Royal Packing Co., 22 Cal. 4th 575, 582 (2000).[127]  The evidence presented at trial supports Plaintiff's claim that, while on shift, he was subject to GrubHub's control and that his time was therefore compensable.  Indeed, where an employee works on shifts, he or she is, by the very nature of being on a shift, "suffered or permitted to work."[128] See See's Candy Shops, Inc. v. Superior Court, 210 Cal. App. 4th 889, 893 (2012) (noting that "an employee's work shift" is "compensable time"); see also Industrial Welfare Commission, Order No. 9-2001 (Wage Order 9(m)) (defining "shift" as "designated hours of work by an employee, with a designated beginning time and quitting time"); 29 CFR 553.221 ("Compensable hours of work generally include all of the time during which an employee is on duty on the employer's premises or at a prescribed workplace…" (in this case, Plaintiff's vehicle in his designated zone)); Zellagui v.

---

[127]   See also Razak v. Uber Technologies, Inc., 2017 WL 4052417, *16 (E.D. Pa. Sept. 13, 2017) (in a case involving Uber, whose drivers do not work on schedules, the court noted that the hours the drivers spent logged into the app could all be compensable).

[128]   Although, on summary judgment, the Court analyzed "on call" cases for the question of whether Plaintiff's time would be compensable, this case is not actually an "on call" case. Plaintiff was not simply at home or wherever he wanted to be, ready only to respond to emergencies if necessary; during his shift, he was expected to be in his zone and in or near his car, ready to accept orders within 10 to 20 seconds of them being sent to him.  Thus, the factors considering the relative degree of freedom an employee has in determining whether "on call" time is compensable are not strictly relevant here.

1   MCD Pizza, Inc., 59 F. Supp. 3d 712, 718 (E.D. Pa. 2014) (calculating alleged overtime damages

2   "per shift").

3          The fact that an employee might engage in non-work-related activities between

4   productive minutes on a shift does not make the non-productive shift time non-compensable.

5   Mendiola v. CPS Sec. Sols., Inc., 60 Cal. 4th 833, 842 (2015) ("listening to music and drinking

6   coffee while working in an office setting can also be characterized as personal activities, which

7   would not otherwise render the time working noncompensable."). Rather, such an employee

8   might simply be a less than ideal worker, subject to discipline or termination for failing to carry

9   out his or her work duties as expected (which indeed appears to be what happened to

10   Plaintiff).[129]

11          Even if the Court were to consider this an "on call" case (but see note 128 supra), "[i]t is

12   well established that an employee's on-call or standby time may require compensation."

13   Mendiola, 60 Cal. 4th at 840; see also Armour & Co. v. Wantock, 323 U.S. 126 (1944) ("[A]n

14   employer ... may hire a man ... to do nothing but wait for something to happen. ... Readiness to

15   serve may be hired"); Skidmore v. Swift & Co., 323 U.S. 134 (1944) ("facts may show that the

16   employee was engaged to wait, or they may show that he waited to be engaged"). Factors

17   bearing on an employer's control during on-call time include: (1) whether there was an on-

18   premises living requirement; (2) whether there were excessive geographical restrictions on

19   employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a

20

21   ———————————

22   [129]    Furthermore, in arguing that the Court should not count "non-productive" time as compensable time for purposes of determining overtime and minimum wage damages, GrubHub is essentially arguing that it is entitled to effectively retroactively dock Plaintiff's pay for every

23   non-productive minute spent on his shift, even though it had agreed to pay him an hourly rate for the shift (assuming he met the minimum acceptance rate).  If GrubHub believed that he was not

24   being productive during the shift (for example because he was delivering orders for other companies, or simply not in his zone ready to work), it could, as it did, discipline or terminate

25   him.  A post hoc explanation (not even made clear to him at the time, which could have allowed him to refute the accusations) cannot be the basis for retroactively determining that the time is

26   not compensable.

27

28

fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time. Mendiola, 60 Cal. 4th at 840. Courts have also taken into account whether the "[o]n-call waiting time ... is spent primarily for the benefit of the employer and its business." Id.

Here, the evidence shows that when Plaintiff was on shift, he was effectively precluded from doing anything other than simply waiting for a GrubHub order to come through because of the repercussions of not meeting GrubHub's minimum acceptance rate. GrubHub kept track of the rate at which Plaintiff accepted orders and, if the rate was less than 75% (or, later, 85%), Plaintiff would not receive GrubHub's guaranteed hourly rate. (Facts at ¶¶ 73-74.) Other repercussions for an insufficient acceptance rate included failing to qualify for a weekly bonus (which required essentially a 100% acceptance rate), having a shift taken off schedule, failing to qualify for priority scheduling, or risk of outright deactivation. (Facts at ¶¶ 50, 63, 82-83.) Plaintiff had to be ready to accept an order immediately as it was made available, as he had only approximately 10 to 20 seconds to do so.[130] If he failed to accept an order in that short timeframe, he could be automatically logged off.  (Facts at ¶ 107.)[131]

Moreover, the evidence shows that Plaintiff was required to stay in his "zone" during his shifts. (Facts at ¶¶ 93-100, 134.) Thus, once Plaintiff was assigned a zone, he was expected to be in that zone to accept orders unless he was sent an order outside his zone. (Facts at ¶¶ 93-102.) Plaintiff would not even know the location of a restaurant or customer when he had to accept the

---

[130]   See Razak, 2017 WL 4052417, *16 ("Nonetheless, that [Uber] drivers have only 15 seconds to respond to a given trip request may reasonably be considered a requirement that drivers are required by Uber to be tethered to their phones while Online.").

[131]   See Razak, 2017 WL 4052417, *16 ("Similarly, that drivers are automatically switched from Online to offline after ignoring three trip requests could reasonably be considered a severe restriction on their ability to engage in personal activities, particularly if drivers are Online during periods when the trip requests are frequent, such that drivers must constantly engage with the Uber App to keep themselves Online and situated to accept a request.")

order. (Facts at ¶ 106.)[132] Even within the zone, Plaintiff was required to stay close to restaurants or risk termination. (Facts at ¶ 156.)

The evidence also showed that there were negative consequences when Plaintiff attempted to "reassign" an order he did not want to take to another driver; specifically, reassignments were designated as rejected deliveries and would therefore count against Plaintiff's acceptance rate, which, for the reasons discussed above, had significant consequences. (Facts at ¶ 120.) There could also be negative consequences for performing deliveries for other companies (*i.e.* Postmates and Caviar) while Plaintiff was on shift, because Plaintiff needed to be available to accept orders or else suffer adverse consequences for a low acceptance rate. (Facts at ¶¶ 50, 63, 73-74, 82-83.) Indeed, Plaintiff may have been terminated for this conduct. (Facts at ¶¶ 166-178.) While GrubHub's contracts purportedly permit such "multi-apping", there was evidence that GrubHub did not like drivers doing this and that it kept notes on this conduct in drivers' files.  (Facts at ¶¶ 170-71.)[133]

There is no question that the time Plaintiff spent on shift was to benefit GrubHub; after all, GrubHub made money on Plaintiff's deliveries. (Facts at ¶¶ 3-8.) Nor would a cell phone ease such restrictions in these circumstances because, of course, the orders that Plaintiff was effectively required to accept were made via cell phone. (Facts at ¶¶ 76-77.) And while Plaintiff was not required to sleep in his vehicle while on shift, he was, as described above, tethered to his phone and vehicle because of the need to immediately accept the orders he received. (Facts at ¶¶ 76-77.)  See Razak, 2017 WL 4052417, *16. Thus, the weight of the evidence shows that all of Plaintiff's shift hours were compensable, and he is therefore owed damages as described above

---

[132]     See Razak, 2017 WL 4052417, *16 ("[D]rivers are not meaningfully in control of their time if they are not told the rider's destination before accepting a trip.")

[133]     In any event, there is nothing inconsistent with an employment relationship about working for two employers at the same time. While doing so might make a worker a bad employee, it does not make a worker not an employee in the first place.

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128

for GrubHub's failure to compensate him properly for overtime hours worked, as well as GrubHub's failure to pay him minimum wage on every day he worked.

## IV.  CONCLUSION

The totality of the evidence presented during the Phase I trial shows that nearly every (if not every) Borello factor weighs in favor of a finding that Plaintiff was GrubHub's employee. While GrubHub employed the use of novel terminology to attempt to mask its true role as the drivers' employer, the Court should not be fooled.  Plaintiff's work for GrubHub was a classic employer/employee relationship (with the addition of some 21st Century technology and linguistics). Moreover, the evidence has shown that GrubHub failed to reimburse Plaintiff for his car expenses, failed to pay overtime for the week of November 30, 2015, and failed to pay Plaintiff minimum wage on a number of days.[134]

The Court should thus find that Plaintiff was an aggrieved employee for the purposes of PAGA and permit the parties to proceed to the next phase of the case in which Plaintiff will pursue his representative PAGA claims on behalf of the State and other GrubHub drivers throughout California.

---

[134]     Because GrubHub is liable for these wage violations, GrubHub is also liable under the Unfair Competition Law, Cal. Business and Professions Code Sections 17200 et seq. See Cleveland v. Groceryworks.com, LLC, 200 F. Supp. 3d 924, 961 (N.D. Cal. 2016) ("[L]iability under the UCL is generally derivative of liability under another statutory violation); O'Connor v. Uber Technologies, Inc., 2013 2L 6354534, *16 (N.D. Cal. Dec. 5, 2013) (the UCL provides for liability under its "unlawful" prong, where plaintiff can establish a violation by a business of underlying law as a predicate act).

Date: October 23, 2017

Respectfully submitted,

RAEF LAWSON, individually and in his capacity
as Private Attorney General Representative,

By his attorneys,


/s/ Shannon Liss-Riordan
Shannon Liss-Riordan (State Bar No. 310719)
Thomas Fowler, *pro hac vice*
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
Email:  sliss@llrlaw.com, tfowler@llrlaw.com

Matthew D. Carlson (State Bar No. 273242)
mcarlson@llrlaw.com
LICHTEN & LISS-RIORDAN, P.C.
466 Geary St., Suite 201
San Francisco, California 94102
Telephone: (415) 630-2651
Facsimile:  (617) 994-5801


## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of this document was served by electronic filing on October 23, 2017, on all counsel of record.

/s/ Shannon Liss-Riordan
Shannon Liss-Riordan

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 3:15-cv-05128