1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAEF LAWSON,

          Plaintiff,

    v.

GRUBHUB, INC., et al.,

          Defendants.

Case No. 15-cv-05128-JSC

**OPINION**

      Raef Lawson worked as a restaurant delivery driver for Grubhub in Southern California for four months in late 2015 and early 2016.  He complains that Grubhub improperly classified him as an independent contractor rather than an employee under California law and in doing so violated California's minimum wage, overtime and employee expense reimbursement laws.  He brings his claims in his individual capacity and as a representative action pursuant to the California Private Attorney General Act (PAGA).  The critical question is whether under California's common law *Borello* test, Mr. Lawson was an employee or an independent contractor.  After considering all of the *Borello* factors as a whole in light of the trial record, the Court finds that Grubhub has satisfied its burden of showing that Mr. Lawson was properly classified as an independent contractor.  While some factors weigh in favor of an employment relationship, Grubhub's lack of all necessary control over Mr. Lawson's work, including how he performed deliveries and even whether or for how long, along with other factors persuade the Court that the contractor classification was appropriate for Mr. Lawson during his brief tenure with Grubhub.

United States District Court
Northern District of California

**PROCEDURAL HISTORY**

This lawsuit began when San Francisco Grubhub driver Andrew Tan filed a putative wage and hour class action in a California state court.  Grubhub subsequently removed the action to this Court pursuant to the Class Action Fairness Act.  Shortly thereafter, Mr. Tan filed a First Amended Complaint that added Raef Lawson as a plaintiff and the proposed class representative, and as a co-plaintiff on the PAGA claim.  Mr. Tan was only a plaintiff on the PAGA claim and no longer sought to represent a Rule 23 class.  Following a ruling on Grubhub's motion to dismiss, Plaintiffs filed a Second Amended Complaint with the same claims.

Grubhub then moved to deny class action status.  It argued that its delivery services provider contract contained an arbitration agreement with a class action waiver during the proposed class period.  While the arbitration agreement allowed a driver to opt out, Mr. Lawson was one of only two California drivers during the relevant period to have done so; accordingly, the Court granted the motion to deny class action status.  In particular, the Court held that Mr. Lawson was not a typical nor adequate class representative for the delivery workers who had not opted out. (Dkt. No. 65.)[1]

Following that ruling, the parties agreed that this lawsuit would be prosecuted solely by Mr. Lawson on behalf of himself and as a PAGA representative.  (Dkt. Nos. 70 at 4 n.1, 78.)  The parties subsequently stipulated to a bench trial, and to bifurcating the case into two phases: (1) phase one limited to Mr. Lawson's individual claims and whether he is an "aggrieved employee" under PAGA, and (2) assuming the Court finds he is an aggrieved employee, phase two would resolve the PAGA claim following additional discovery.  (Dkt. Nos. 97, 122.)

The Court held a bench trial in September 2017 and following the parties' submission of proposed findings of fact and conclusions of law, heard closing arguments on October 30, 2017.  This Opinion constitutes the Court's findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a).

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

**JURISDICTION**

This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2).  The complaint Grubhub removed to federal court satisfied CAFA's jurisdictional requirements: diversity, numerosity and the amount in controversy.  (Dkt. No. 1.)  The Court's subsequent denial of class action status did not divest it of subject matter jurisdiction.  *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Shell Oil Co.*, 602 F.3d 1087, 1092 (9th Cir. 2010).  Further, the parties have consented to the jurisdiction of a magistrate judge.  (Dkt. Nos. 13, 14, 30, 33.)

**FACTUAL FINDINGS**

**A.    The Parties**

Grubhub is an internet food ordering service that connects diners to local restaurants.  The company was founded in 2004 as an online platform where diners could order food from local restaurants.  Grubhub began offering food delivery in select markets in 2014.  Customers order food through Grubhub's online platform and Grubhub transmits the orders to restaurants. The food is then delivered either by a restaurant delivery person or a Grubhub driver.  Diners may also pick up their own meals ordered through Grubhub.

Grubhub operates in 1,200 markets in the United States.  Of those markets, 250 are in California and of those Grubhub offers its own delivery services in five.  As of June 2016, there were 4,000 Grubhub delivery drivers in California.  Delivery is a growing part of Grubhub's business; indeed, it was aggressively growing its delivery business in 2015.  By providing delivery services, Grubhub increases the number of restaurants it can offer to diners on its online platform. In the five California markets where Grubhub offers delivery services, the majority of Grubhub's diners have their meals delivered by the restaurants.  For the remaining customers, Grubhub delivers meals more than the customers pick up the food themselves.  The percentage of Grubhub-provided deliveries is growing.

Plaintiff Rael Lawson lives in Inglewood, California, a neighborhood in Los Angeles.  At all times relevant to this lawsuit, he was an aspiring actor, writer, producer and director.  In August 2015, Mr. Lawson completed an online application to make food deliveries for Grubhub

and submitted the required documents: a driver's license, vehicle registration, and vehicle insurance. Mr. Lawson performed food deliveries for Grubhub over a four month period: from October 25, 2015 through February 14, 2016. Prior to performing Grubhub food deliveries, Mr. Lawson worked for other so-called "gig economy" companies, including Lyft, Uber, Postmates, and Caviar. He drove for these companies, including Grubhub, because the flexible scheduling allowed him to pursue his acting career. Mr. Lawson continued to deliver food for Postmates and Caviar during the four months he was delivering for Grubhub.

**B.      The Grubhub Delivery Services Provider Contract**

      **1.      The Initial Contract**

      Mr. Lawson executed a "Delivery Service Provider Agreement" with Grubhub on August 28, 2015. The Agreement includes the following terms, among others:

- **Relationship of Parties:** The "Primary Delivery Service Provider" (Mr. Lawson) is engaged in the "independent business of providing delivery services." (Trial Ex. 1 ¶ 2.1.) The parties intend the agreement to create the relationship of principal and independent contractor, not employer and employee. (Trial Ex. 1 ¶ 7.1.) The driver[2] acknowledges that if at any time he believes his relationship with Grubhub is something other than an independent contractor relationship, the driver will immediately notify Grubhub of this view. (Trial Ex. 1 ¶ 7.2.)

- **Performing Services for Others**: The driver is not precluded from doing business with others and Grubhub does not have the right to restrict the driver from being concurrently or subsequently engaged in performing delivery services for other companies, even those that compete with Grubhub. (Trial Ex. 1 ¶ 2.4.)

- **Availability**: There is no specific minimum period of time for which the driver must make himself available. Each day the driver makes himself available is treated as a separate contractual engagement. The driver has complete discretion to select the dates he is available to perform the delivery services and has no obligation to make himself

_____

[2] While a delivery service provider could use a bicycle rather than a vehicle, because Mr. Lawson used a car for deliveries this Opinion will refer to the delivery services provider as the "driver."

United States District Court
Northern District of California

United States District Court
Northern District of California

available on any particular date.  However, once the driver agrees to an engagement, the driver is contractually bound to fully perform the engagement on the specified date. (Trial Ex. 1 ¶ 3.1.)

- **Contractors**:  The driver may use contractors or subcontractors to perform the delivery services.  In such cases the service fee is still paid to the contracted driver who has the sole responsibility of setting the terms of his payments to any contractors or subcontractors.  (Trial Ex. 1 ¶ 3.2.)

- **Service Level Agreement**:  The driver agrees to comply with Appendix A, the "Service Level Agreement," which requires that the driver: (1) download the necessary tools to fulfill orders, (2) sign up for weekly blocks either through the Grubhub driver app or other means, (3) provide a status update to a dispatcher that the driver is "on call" when a delivery block starts, (4) not reject incoming orders or be otherwise unavailable to receive incoming orders during any scheduled delivery block with exceptions for "extenuating circumstances" if the driver timely communicates such circumstances to a dispatcher, (5) provide status updates upon arrival at a restaurant, after receiving the food, and leaving the restaurant for delivery, (6) communicate with the care team or a dispatcher if there are diner issues, and (7) have no more than one moving violation in 24 months and no involvement in any at fault accidents.  Failure to comply with this provision constitutes a material breach.  (Trial Ex. 1 ¶ 3.3; Appendix A Service Level Agreement.)

- **Delivery Service Failure**:  If the driver fails to fully perform a delivery he is contractually bound to perform, fails to follow order instructions, or fails to abide by the Service Level Agreement, the driver forfeits the agreed upon service fee for the job to the extent the driver is responsible for the failure.  (Trial Ex. 1 ¶ 4.1.)

- **Equipment**:  The driver must provide Grubhub a description of his vehicle (or bicycle). (Trial Ex. 1 ¶ 5.1.)  The driver is not required to purchase, lease, or rent any equipment from Grubhub; however, the driver is required to use and maintain a smartphone at his own expense and equipment sufficient to insulate food orders during

delivery.  (Trial Ex. 1 ¶ 5.2.)  The driver may (1) lease insulated delivery bags from Grubhub in exchange for wearing Grubhub t-shirts and hats, (2) lease bags from Grubhub for $5 per month, or (3) purchase two food bags, one pizza bag, and one gelato bag.  (Service Fees and Equipment Appendix.)  The driver is also responsible for all costs and expenses arising from his performance of the delivery services including costs related to equipment.  (Trial Ex. 1 ¶ 5.4.)

- **Service Fees**:  Drivers are paid according to the Service Fees and Equipment Index which states that service fees consists of $4.25 per fulfilled delivery plus $0.50 per mile between the restaurant and the diner.  Drivers are entitled to bonuses if they are available to receive orders for each scheduled block, worked at least 20 hours in one week, and had an acceptance rate of offered deliveries in the "top 15th percentile" of all eligible drivers in that particular market.  Such bonuses are made at $2.50 per hour of completed work that week, up to a maximum of $100.  Drivers are guaranteed a minimum average payment of $15 per hour, including gratuities, if they accept and fulfill 75% of orders received and are available to receive incoming orders during the entirety of each scheduled delivery block (with exceptions for "extenuating circumstances").  Nothing in the agreement prevents the driver from negotiating a different service fee for any given engagement; however, the service fee for subsequent engagements reverts to the amounts set out in the appendix.  (Trial Ex. 1 ¶ 8.1, Service Fees and Equipment Appendix.)

- **Term**: The Agreement remains in effect for 60 days, after which it continues to automatically renew for additional 60-day periods.  (Trial Ex. 1 ¶ 13.1.)  The parties acknowledge the Agreement does not reflect an "uninterrupted service arrangement," as the Agreement guarantees the driver's right to choose when to make himself available and each engagement is treated as a separate service arrangement.  (Trial Ex. 1 ¶ 13.2.)

- **Termination Provision**: The parties have a mutual right to terminate the Agreement. Each could do so immediately upon written notice to the breaching party, with such

6

notice identifying the breach.  Or, each could do so without cause with 14 days prior written notice.  (Trial Ex. 1 ¶¶ 13.1.1, 13.1.2.)

### 2.    The Amendment

The Agreement Mr. Lawson signed in August 2015 was amended by Grubhub on December 5, 2015.  Mr. Lawson agreed to the amendments in writing.  Section 8.1, discussing fees, was deleted in its entirety and replaced with language stating that drivers will be offered a service fee for each proposed engagement and shall accept fee offers by email or through the app. (Trial Ex. 2. at 2-3.)  Drivers have the opportunity to accept or reject the fee offer.  (Trial Ex. 2. at 3.)  If the driver accepts the fee offer, then the driver agrees to perform the delivery services for that particular engagement.  (Trial Ex. 2. at 3.)  Further, the section entitled "Service Fees" in the Service Fees and Equipment Index was deleted in its entirety.  Only the "Equipment" section remained and the title of the document changed to "Equipment Index."  (Trial Ex. 2. at 3.)

The Service Level Agreement was also amended by removing the language that suggested drivers had to sign up for weekly blocks, not reject orders, and receive incoming orders during any scheduled delivery block with exceptions for "extenuating circumstances."  After the amendment, the Agreement required drivers to be located within a reasonable distance of restaurants in the area where the driver is contracted to work.  (Trial Ex. 2 at 3.)

### C.    Mr. Lawson's Work for Grubhub

### 1.    Onboarding

Before Mr. Lawson began working as a Grubhub driver, Grubhub did not require Mr. Lawson to attend any mandatory training or onboarding.  Grubhub did provide Mr. Lawson with certain training videos; however, Grubhub does not monitor whether drivers watch the videos. After Mr. Lawson executed the Agreement, Mr. Lawson watched Grubhub online training videos which provided instruction on how to use the Grubhub driver app, the proper etiquette with restaurants and customers, and how drivers should be prompt with orders so customers receive warm food.

When Mr. Lawson first contracted with Grubhub, Grubhub employed driver coordinators whose primary responsibility was driver recruitment.  As part of the onboarding process, the

driver coordinators phone screened the delivery applicants to, among other things, ensure they had a proper delivery vehicle. Grubhub's phone screening process ended in late 2015. During this period Grubhub also performed a background check on driver applicants, including Mr. Lawson. The background checks were performed by a third party and then reviewed by Grubhub.

During the onboarding process Mr. Lawson learned the Grubhub uniform consisted of a Grubhub shirt and hat; however, Mr. Lawson was not required to wear the uniform. He was also not required to put a Grubhub sign on his car or use the Grubhub insulated food warming bag.

## 2.    Scheduling

Although Mr. Lawson signed the Grubhub Agreement in August 2015, he did not actually begin making deliveries until two months later, in October 2015. This delay was not unusual; approximately 40% of the individuals who sign up to deliver for Grubhub never perform any Grubhub deliveries. During these intervening two months, Grubhub did not contact Mr. Lawson. Nothing happened when Mr. Lawson did not sign up for a single block.

Once a week, Grubhub released a schedule of available shifts called "blocks" through an online program called "When I Work." Drivers selected their schedules by signing up for these blocks on a weekly basis. Blocks were usually released on Sundays and were limited in availability on a first-come-first-serve basis.

Mr. Lawson chose the blocks he wanted to work. If Mr. Lawson did not want to work, he did not schedule himself. No one at Grubhub assigned Mr. Lawson blocks or instructed him to sign up for blocks.

Each block was for a specific amount of time and drivers were required to register for an entire block, not parts of it, if they chose to register for a block at all. A block generally lasted from two to five hours and was oriented around mealtimes. Grubhub used the block system to have some idea of driver supply at a given time so that Grubhub could meet the anticipated demand for its restaurant partners. If a driver did not want to deliver during a block he signed up for, he could drop it or swap it with another worker. Mr. Lawson never made a delivery for Grubhub except during a scheduled block.

Mr. Lawson signed up for Grubhub blocks on 69 different days from October 2015

1   through February 2016, but he performed deliveries on only 59 of those days.  He was

2   compensated for self-scheduled blocks totaling approximately 35 hours in November 2015; 105 in

3   December 2015; 60 in January 2016; and 43 for the first two weeks of February 2015.

4          Drivers Grubhub believed were performing especially well became eligible for "priority

5   scheduling."  Eligible drivers received the schedule of available blocks a day earlier than other

6   drivers, affording them a better chance to register for their first choice blocks.  Priority drivers

7   could swap shifts only with other priority drivers.  Grubhub bestowed Mr. Lawson with priority

8   scheduling on one occasion: for the pay period of November 30, 2015 to December 6, 2015.  That

9   week, Mr. Lawson worked a total of 44.75 hours, the highest number of blocks and hours Mr.

10  Lawson worked during the four months he performed delivery services for Grubhub.

11         **3.     Payment**

12         During the period Mr. Lawson delivered for Grubhub, the Agreement provided that drivers

13  would receive a per-order-delivered payment plus tips and a nominal amount for mileage to the

14  customer's home (or other specified delivery location) from the restaurant.  Until December 2015,

15  if Mr. Lawson accepted 75% of the orders offered to him for delivery during his self-scheduled

16  block, Grubhub guaranteed him $15 per hour for that block.  This was known as "true up" pay.

17  After December 2015, Grubhub reduced the true up to $11 per hour for completing 85% of the

18  deliveries offered during the block.  Drivers had to be signed up for and working during a block to

19  qualify for true up pay; drivers that toggled into the app without being scheduled for a block did

20  not qualify for the guaranteed rate.  Mr. Lawson's pay statement showed how much he earned

21  based on the per-delivery-fee (including tips and mileage); if the amount he received per delivery

22  was less than the guaranteed hourly minimum true up rate (assuming he satisfied the 75%

23  acceptance rate), then his compensation was "trued up" to the minimum hourly guarantee.

24         Grubhub paid Mr. Lawson on a weekly basis by direct deposit.  It nearly always paid Mr.

25  Lawson the hourly true up guarantee.  On one occasion Mr. Lawson was paid per delivery rather

26  than the true up amount because the cumulative per delivery pay was greater than the true up

27  amount.  On five days when he did not qualify for the true up, and the "per delivery fee" would

28  pay him below minimum wage, Mr. Lawson received the minimum wage of $9 an hour in Los

9

Angeles.  Mr. Lawson was not reimbursed for expenses, although he incurred costs for gas and his cell phone.

Sometimes a delivery would extend Mr. Lawson beyond the end of his block, or at least Mr. Lawson would indicate through the app that he had completed the delivery outside his scheduled block.  To receive compensation beyond his scheduled block, Mr. Lawson would contact Grubhub and report that his pay should be adjusted.  On each occasion, Grubhub adjusted his pay without any investigation or inquiry as to why or whether Mr. Lawson in fact made the delivery after the end of his scheduled block.

Grubhub paid Mr. Lawson the guaranteed true up rate for the blocks he scheduled provided he toggled himself available at some point during the block.  It paid him the full amount even when he toggled available after his block had started.  For example, Mr. Lawson toggled available at least five minutes late for over half of the approximately 87 blocks he was scheduled to deliver for Grubhub.  Of those, he toggled available more than 15 minutes late 27 times, more than 30 minutes late 19 times, and more than two and half hours late 11 times.  He toggled available more than three hours late for eight of his 87 blocks.  Even though Mr. Lawson was not available to receive offers for the entire period of his self-scheduled block, for each of these blocks Grubhub paid him the true up fee for the entire block.

### 4.   Deliveries

#### i.   Geographic zones

Grubhub released blocks for specific delivery zones.  Drivers were allowed to choose which zone they wanted to deliver in when they first contracted with Grubhub.  When Mr. Lawson began driving for Grubhub there were three delivery zones in the Los Angeles area.  Mr. Lawson chose the "Los Angeles-Metro" zone which was near his home.  Grubhub later added a "South Bay" zone and Mr. Lawson signed up for that zone at some point.  At his request, however, Grubhub reassigned him to the Los Angeles zone near his home.

Grubhub asked drivers to start each scheduled block in their zones and to stay near their zones during their block.  At times Grubhub monitored whether drivers, such as Mr. Lawson, were in their zone at the beginning of their block.  If the drivers were not in their zone, and, in response

to a Grubhub inquiry did not indicate that they intended to be in their zone to make deliveries, Grubhub would remove the driver from that scheduled block; that is, the Grubhub app would not send them any further delivery offers during that scheduled block.

### ii.    Delivery offers

Mr. Lawson moved the toggle button on the Grubhub driver app to "available" when he began a block.  Grubhub used a computer algorithm to offer deliveries to available drivers, which could be overridden by operations specialists (previously called "driver dispatchers").  After the Grubhub driver app offered Mr. Lawson a delivery, he could either accept or reject it by hitting the appropriate "button" on the app.  If a driver rejected an offered delivery, Grubhub did not toggle the driver off the app or remove the driver from his scheduled block or otherwise kick the driver off the system; instead, the algorithm offered the delivery to a different available driver.  If a driver was having difficulty completing an accepted delivery; for example the driver got a flat tire, an operations specialist could override the algorithm and manually make an offer to another driver.  If there was more customer demand than available drivers, Grubhub could send a market-wide message asking for more drivers.

Generally, once Mr. Lawson accepted an order he drove to the restaurant to pick it up. Grubhub did not require that he take a particular route to the restaurant; nor did it dictate how much time he had to get to the restaurant.  It also did not control what he could do on his way to the restaurant; that is, what stops, if any, he would make along the way.

Upon Mr. Lawson's arrival at the restaurant, he was required to use the Grubhub driver app to indicate that he had arrived.  Sometimes the food order took longer than expected, in which case Mr. Lawson would notify Grubhub, who instructed Mr. Lawson on what to do.  Restaurants had the ability to rate drivers, but in practice only did so infrequently.  Once Mr. Lawson picked up the correct order, he used the app to so indicate.

Mr. Lawson would then deliver the food order to the Grubhub customer's residence or other specified place of delivery.  Mr. Lawson could use any route he chose, and Grubhub did not specify the amount of time in which he had to complete the delivery.  According to Grubhub's records, on several occasions Mr. Lawson did not complete the delivery, or at least did not

United States District Court
Northern District of California

11

indicate on the app that he had completed the delivery, until nearly an hour after he had indicated through the app that he had picked up the food order from the restaurant.  Grubhub did not contact Mr. Lawson on these occasions to discover what was taking so long.  When customers had issues with their food order, such as a missing item or cold food, Mr. Lawson instructed the customer to call Grubhub's customer care.

Grubhub did not require Mr. Lawson to carry any customer supplies with him, such as condiments or napkins.  Grubhub did, however, determine the delivery fee charged to the customers ordering food though its platform; Mr. Lawson could not and did not negotiate with customers about how much they paid for any delivery.

### iii.    Mr. Lawson's Delivery Attire

When making deliveries Mr. Lawson usually wore the Grubhub hat and shirt, but not always.  Grubhub did not monitor Mr. Lawson to ensure that he wore the uniform which he had agreed to do in exchange for use of Grubhub's insulated bags.

### iv.    Mr. Lawson's Deliveries for Grubhub's Competitors

Mr. Lawson also worked as a delivery driver for Postmates and Caviar, two of Grubhub's food delivery competitors, during the same period he worked for Grubhub.  He often accessed the Postmates and Caviar apps during his Grubhub blocks and sometimes made deliveries for Postmates and Caviar while working a scheduled Grubhub block.  For example, on January 29, 2016, Mr. Lawson scheduled himself for a 5:00 p.m. to 8:00 p.m. Grubhub block.  During that time period he performed a delivery for Postmates and was logged in to the Caviar app during the entire Grubhub block.  Mr. Lawson performed a delivery for Caviar or Postmates, and sometimes more than one delivery, during 17 of the 87 Grubhub blocks that Mr. Lawson signed up for and did not drop.

### v.    Mr. Lawson Performed his own Deliveries

Mr. Lawson never hired anyone to make his deliveries for him or help with his deliveries.

### 5.    Mr. Lawson's Gaming of the Grubhub Driver App

When Mr. Lawson first began delivering for Grubhub, he would sometimes accept an offer he did not intend to deliver to maintain his acceptance rate and eligibility for the true up minimum

United States District Court
Northern District of California

United States District Court
Northern District of California

1  guarantee.  He would then contact the Grubhub driver hotline and ask that the delivery be

2  reassigned; reassignment following acceptance did not affect his acceptance rate for purposes of

3  the true up.  According to Mr. Lawson, "everybody did this."  But after Grubhub began counting

4  driver requested reassignments against the acceptance rate for purposes of the true up, Mr. Lawson

5  ceased this practice.

6      Mr. Lawson then gamed the app by scheduling himself for a block and ensuring that he

7  received few, if any, delivery offers so that he would receive the true up minimum guarantee for

8  performing none or maybe one delivery during an entire block.  He did so by (1) turning his

9  cellphone on airplane mode or otherwise making his cellphone "out of network," (2) toggling

10  "available" for his self-scheduled block well after the block began, and (3) reporting through the

11  app that he had completed a delivery after the end of his scheduled block.  A few examples are set

12  forth below.

13  - **November 26**:  Mr. Lawson made no deliveries during a four hour block, 6 p.m. to 10 p.m.

14    He was "out of network" for much of the block.  He did receive one delivery offer which

15    he accepted, but Grubhub's records do not show that he picked up the order or delivered it;

16    he may have asked that it be reassigned.  Because his acceptance rate was 100% he

17    received the full true up amount of $60.

18  - **December 31**:  Mr. Lawson's four hour block began at 5:00 p.m., but he did not toggle

19    available until 8:15 p.m.  He received and accepted an order shortly thereafter, at around

20    8:21 p.m.  He picked up the order at 8:42 p.m., but did not record that he delivered the

21    order until 9:14 p.m.  Even though he did not toggle available until three hours after his

22    block began, he was paid the full true up amount for a block of four hours and twenty

23    minutes and received $47.63.[3]

24  - **January 8**:  Mr. Lawson scheduled himself for a four hour block, from 5 p.m. to 9 p.m.

25    Mr. Lawson did not toggle available until 8:20 p.m., and his block ended 40 minutes later.

26    Despite his unavailability for most of his block, Grubhub paid him the full $44 true up

27

28  ---
   [3] By this date Grubhub had reduced the "true up" rate to $11 per hour.

amount for a four hour block.

- **January 11**: Mr. Lawson's four hour block started at 5 p.m., but Mr. Lawson did not toggle available until 7:57 p.m.  He was offered two deliveries during the one hour of his block he was available.  The second delivery was offered to him at 8:54 p.m.  He accepted the offer and reported completing the delivery at 9:29 p.m.  (He apparently never reported picking up the delivery from the restaurant).  Mr. Lawson then asked Grubhub to extend his block an additional 30 minutes due to the delivery made after the end of his block; in doing so, he did not mention that he had started his block nearly three hours late.  Grubhub paid him the true up guarantee for a 4.5 hour block.

- **January 12**: Mr. Lawson's two hour block started at 3:00 p.m.  He toggled available at 5:00 p.m. and toggled unavailable at 5:01 p.m. and paid the full true up amount of $22.

- **January 15**: Mr. Lawson's four hour block started at 5 p.m. but he did not toggle available until 7:13 p.m.  Grubhub paid him the full true up amount for the four hour block.

- **January 18**: Mr. Lawson scheduled himself for a four hour block, from 5 p.m. to 9 p.m.  He did not toggle himself available until 8:05 p.m. and shortly thereafter was offered and accepted a delivery.  His cell phone then went "out of network," and he is not recorded as having picked up or completed the delivery.  Grubhub paid him the true up amount for the full four hour block.

- **January 29**: Mr. Lawson's four hour block started at 5 p.m. but he did not toggle available until 8:17 p.m.  He was immediately offered a delivery which he accepted and delivered at the end of his block.  Grubhub paid him the true up amount for the full four hour block.

- **January 30**: Mr. Lawson's four hour block started at 5 p.m., but he did not toggle available until 8:26 p.m.  He performed zero deliveries.  Grubhub paid him the full true up amount for a four hour block.

- **February 7**: Mr. Lawson scheduled himself for a three hour block from 11:00 a.m. to 2:00 p.m.  He did not toggle himself available until one minute before the end of the block

United States District Court
Northern District of California

1    at 1:59 p.m.  Grubhub paid him the true up amount for the full three hour block.

2    At trial, Mr. Lawson did not deny that he manipulated the driver app so that Grubhub

3    would pay him as if he had worked full blocks despite not being available to make deliveries

4    throughout those blocks; to the contrary, when asked whether he had learned how to game the

5    Grubhub driver app, Mr. Lawson testified that he did not remember or he did not know.

6    Q:    Fourteen times you performed no or one delivery and you got paid; correct?

7    A:    I don't know the exact number, but it's around that.

8    Q:    And you learned how to do that by trial and error playing around with the app; isn't

9    that right?

10    A:    I don't remember.

11    Q:    You don't remember?

12    A:    Again it looks like a lot of these are after the hourly rate cut.  At that point I

13    didn't really care.

14    Q:    So you figured out how to game the system and you didn't care?

15    A:    Like I said, I don't really recall.

16    (Dkt. No. 206 at 152:4-15.)

17    When asked under oath if he had intentionally reported that he had completed a delivery

18    long after the delivery had been completed and after the end of his block so that he could be paid

19    more money for not working Mr. Lawson again did not deny the conduct.

20    Q:    Isn't it true, Mr. Lawson, that you were holding deliveries and you would click the

21    button long after the block had ended, even though you had completed the delivery,

22    in order to get more money out of Grubhub?

23    A:    I don't remember that.

24    Q:    But you can't say it didn't happen?

25    A:    I don't know.

26    Q:    So you're not denying it?

27    A:    I can't do anything.  I really don't know.

28    (Dkt. No.  208 at 70:4-12.)

United States District Court
Northern District of California

United States District Court
Northern District of California

### 6.    The Termination of Mr. Lawson's Grubhub Contract

On February 15, 2016, Grubhub terminated its Agreement with Mr. Lawson based on Mr. Lawson's material breach of its terms.  It did so by sending Mr. Lawson an email stating "you have not been available to receive orders and have not performed delivery services during a high proportion of the delivery blocks that you have signed up for.  As a result of this material breach of Section 3.3 of your Delivery Service Provider Agreement (your "Agreement"), you are being notified that Grubhub is terminating your Agreement, effective immediately, in accordance with Section 13.1.1 of your Agreement."  (Trial Ex. 75.)

Less than one month after Grubhub terminated its Agreement with Mr. Lawson, Postmates terminated its delivery contract with Mr. Lawson.  Postmates advised Mr. Lawson:  "It has come to our attention that you have been engaging in fraudulent activity on your Postmates account.  Specifically, on more than one occasion, you have accepted delivery requests for merchants that are closed or about to close, waited 30 minutes or more without moving, then informed job support the merchant was closed, and received a payout despite no effort on your part to complete the delivery.  As a result, Postmates is deactivating your account.  From the date of this letter forward we have terminated your participation in our service."  (Tr. Ex. 1430.)

### D.    Mr. Lawson's Credibility

Mr. Lawson's claimed ignorance of his dishonest conduct is not credible.  Mr. Lawson would remember if after he filed this lawsuit against Grubhub he cheated Grubhub.  If he had not moved his smart phone to airplane mode, intentionally toggled available late, or deliberately engaged in other conduct to get paid for doing nothing he would have denied doing so at trial.  But he did not.

Other dishonest conduct during this lawsuit further supports the Court's finding that Mr. Lawson intentionally manipulated the app to get paid for not working. [4]  During discovery he

---

[4] For this reason, to the extent any of the Court's findings contradict Mr. Lawson's trial testimony, the Court did not find Mr. Lawson's testimony credible.  The same is true for T.J. O' Shae's testimony.  While Ms. O'Shae was sincere in her testimony, the Court finds much of it not credible due to her limited first hand exposure to relevant facts.  Ms. O'Shae worked only 16 shifts in the driver care unit before resigning from Grubhub on February 14, 2016.  And she tendered her resignation after only four shifts.  Further, much of what she testified to as "fact" was based on

1    produced a resume that falsely represents that he attended a Loyola Marymount University Master

2    of Fine Arts program from August 2012 to May 2015, and even lists a specific grade point

3    average; however, Mr. Lawson was only enrolled in the program for one year and did not

4    graduate.  When confronted at trial with this misrepresentation, Mr. Lawson testified that he listed

5    all three years because he was "still involved in various activities" and he felt "still part of [the

6    Loyola Marymount] community."  (Dkt. No. 208 at 48:13-16.)  This explanation is not credible.

7    He also tried to explain the misrepresentation by claiming that he had not updated the resume

8    since he had started the Master of Fine Arts program, apparently suggesting that he had written

9    those dates on the resume because at the time he had anticipated completing the program.

10   However, other dates on the resume expose that this explanation, also given under oath, is false.

11   The resume states that Mr. Lawson's most recent employment at "QED International" began in

12   June 2015; thus, Mr. Lawson must have updated the resume after he started the program in 2012

13   and his testimony that he had not was false.

14       Further, in April 2017, Mr. Lawson—using an alias (Ray Lawson) and a different email

15   address—applied to deliver for Grubhub.  In his application he falsely represented that he had

16   never before driven for Grubhub.  At trial he admitted that he had lied on the application.

17                                   **LEGAL ANALYSIS**[5]

18       To find in favor of Mr. Lawson on his individual California Labor Code claims and his

19   PAGA claim, the Court must find that Mr. Lawson was a Grubhub employee rather than an

20   independent contractor.  *See Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal.4th 522, 530

21   (2014); *Iskanian v. CLS Transportation Los Angeles,* 59 Cal.4th 348, 380 (2014).  Mr. Lawson's

22   employment status is governed by the multi-factor test set forth in *S.G. Borello & Sons, Inc. v.*

23   *Department of Industrial Relations*, 48 Cal.3d 341 (1989).  *See Alexander v. FedEx Ground*

24

25   assumptions she made after eavesdropping on one side of a conversation or just misremembered
     and was in fact demonstrably false.  For example, although she never delivered for Grubhub, she

26   testified that drivers had only 20 seconds to accept or reject a delivery offer on the driver app.
     Grubhub's records, however, show the offers stayed available for two to three minutes before

27   being withdrawn or "reaped."
     [5] The Court's legal analysis may contain findings of fact not included in the factual findings

28   section.  The Court intends all statements of fact to constitute a finding of fact regardless of what
     section of this Opinion they appear.

United States District Court
Northern District of California

1  *Package System, Inc.*, 765 F.3d 981, 988 (9th Cir. 2014); *see also Linton v. DeSoto Cab Co.*, 15

2  Cal.App.5th 1208, 1219 (2017) (holding that the *Borello* test applies to wage and expense-related

3  employee issues, not just workers compensation).  As Mr. Lawson performed delivery services for

4  Grubhub, Grubhub bears the burden of proving that Mr. Lawson was an independent contractor

5  rather than an employee.  *See Ruiz v. Affinity Logistics, Corp.*, 754 F.3d 1093, 1100 (9th Cir.

6  2014); *Linton*, 15 Cal.App.5th at 1221.

7          "'The principle test of an employment relationship is whether the person to whom service

8  is rendered has the right to control the manner and means of accomplishing the result desired.'"

9  *Alexander*, 765 F.3d at 988 (quoting *Borello*, 48 Cal.3d at 350); *see also Ayala,* 59 Cal.4th at 532

10  ("the hirer's right to control the work is the foremost consideration in assessing whether a

11  common law employer-employee relationship exists").  Courts also consider the following

12  secondary factors:

> (a) whether the one performing services is engaged in a distinct
> occupation or business; (b) the kind of occupation, with reference to
> whether, in the locality, the work is usually done under the direction
> of the principal or by a specialist without supervision; (c) the skill
> required in the particular occupation; (d) whether the principal or the
> worker supplies the instrumentalities, tools, and the place of work
> for the person doing the work; (e) the length of time for which the
> services are to be performed; (f) the method of payment, whether by
> the time or by the job; (g) whether or not the work is a part of the
> regular business of the principal; and (h) whether or not the parties
> believe they are creating the relationship of employer-employee.

*Alexander*, 765 F.3d at 989 (quoting *Borello,* 48 Cal.3d at 351); *see also Linton*, 15 Cal.App.5th at

1219 (holding that the *Borello* secondary factors derived from the Restatement of Agency apply).

**A.      Right-to-Control**

**1.      The Manner and Means**

        Grubhub's "right to control work details is the *most important or most significant*

consideration." *Ruiz*, 754 F.3d at 1100 (quoting *Borello,* 48 Cal.3d at 350) (emphasis in *Ruiz*).

That is, its "right to control the manner and means of accomplishing the result desired."

*Alexander*, 765 F.3d at 988 (quoting *Borello*, at 48 Cal.3d at 350).

        Grubhub exercised little control over the details of Mr. Lawson's work during the four

18

months he performed delivery services for Grubhub.  Grubhub did not control how he made the deliveries—whether by car, motorcycle, scooter or bicycle.  Nor did it control the condition of the mode of transportation Mr. Lawson chose.  Grubhub never inspected or even saw a photograph of Mr. Lawson's vehicle.  Grubhub did ensure that Mr. Lawson's chosen vehicle was registered and insured, and that he had a valid driver's license.  But given that he could not legally drive the car without these conditions being satisfied, Grubhub's oversight in this respect does not weigh in favor of employee status.  *See Linton*, 15 Cal.App.5th at 1223 ("A putative employer does not exercise any degree of control merely by imposing requirements mandated by government regulation").

Grubhub also did not control Mr. Lawson's appearance while he was making Grubhub deliveries.  While Mr. Lawson could wear a Grubhub shirt and hat, he was not required to do so and did not always do so.  Mr. Lawson was not required to have any Grubhub signage on his car and in fact did not have any such signage.  Further, although he agreed to wear the shirt and hat in exchange for Grubhub providing him with insulated bags to carry the food orders, Grubhub did not supervise whether he or other drivers did in fact wear the hat and shirt; indeed, there is nothing in the record that suggests that Grubhub even knew whether drivers that took the insulated bags in exchange for wearing the shirt and hat in fact did so.  *Compare with Ruiz,* 754 F.3d at 1101 (defendant exercised control of detail of drivers' work by requiring them to wear uniforms and prohibiting them from wearing earrings, displaying tattoos, or having certain facial hair); *Alexander,* 765 F.3d at 989 (employer controlled "drivers' clothing from their hats down to their shoes and socks" and required drivers to be "'clean shaven, hair neat and trimmed, [and] free of body odor'").

Grubhub did not require Mr. Lawson to undergo any particular training or orientation.  He was not provided with a script for how to interact with restaurants or customers.  He was not told what supplies, if any, he had to have with him, whether condiments, straws or extra napkins.  No Grubhub employee ever performed a ride along with Mr. Lawson; indeed, no Grubhub employee ever met Mr. Lawson in person before this lawsuit.

Grubhub did not control who could be with Mr. Lawson in his vehicle, or even accompany

19

United States District Court
Northern District of California

1   him into a restaurant to pick up an order or to a customer's door to make a delivery.  While

2   Grubhub did reserve the right to perform a background check on any worker to whom Mr. Lawson

3   subcontracted his deliveries, Mr. Lawson's right to subcontract his deliveries was theoretical

4   rather than actual.  Given the nature of the work, the pay, and how the app works, subcontracting

5   was not a realistic option.  However, the fact remains that Grubhub had no control over whom, if

6   anyone, Mr. Lawson wanted to accompany him on his deliveries.

7          Mr. Lawson, rather than Grubhub, controlled whether and when Mr. Lawson worked, and

8   for how long.  He contracted to drive for Grubhub in August 2015, but he did not schedule himself

9   for a block until October 2015.  During that intervening period Grubhub did not terminate his

10  contract or even contact Mr. Lawson to inquire why he was not taking deliveries.  Grubhub did not

11  require Mr. Lawson to work a minimum number of blocks nor was there a maximum number of

12  blocks; Mr. Lawson was not required to sign up for any particular number of blocks, or any blocks

13  at all.  If Mr. Lawson did not want to perform any deliveries for a particular week or month

14  because he was busy with his acting career or simply preferred to do something else, Grubhub did

15  not require him to sign up for any blocks.  In sum, Grubhub had no control over what blocks, if

16  any, Mr. Lawson chose to work.  *See Hennighan v. Insphere Ins. Sols., Inc*., 38 F. Supp. 3d 1083,

17  1100 (N.D. Cal. 2014) ("An individual who determines his own hours and break times 'on most

18  days' exercises 'meaningful discretion.'") (citation omitted), aff'd, 650 F. App'x 500 (9th Cir.

19  2016).

20         Mr. Lawson could decide not to work a block he signed up for right up to the time the

21  block started.  Mr. Lawson even had the right to reject any order offered during his scheduled

22  block; in other words, he had no obligation to perform any delivery offered to him by Grubhub

23  even though he had signed up to work a particular block.  Indeed, the Grubhub driver app had a

24  reject button the entire time Mr. Lawson performed deliveries for Grubhub.

25         Before the December 5, 2015 amendment to the Agreement, if Mr. Lawson signed up for a

26  block, the Agreement stated that he *should* perform all deliveries offered to him during his block

27  unless he had "extenuating circumstances."  The Agreement nonetheless contemplated that he

28  would not accept all deliveries offered to him given that he would receive the true up guarantee by

accepting and delivering 75% of the delivery offers (excluding extenuating circumstances). And he was never forced to accept a particular delivery offer during his scheduled blocks.

Thus, at bottom, Mr. Lawson had complete control of his work schedule: Grubhub could not make him work and could not count on him to work. Even when he signed up for a block he could cancel his engagement right up to the block start. Grubhub's right to terminate Mr. Lawson's Agreement for a material breach, for example, scheduling himself for blocks and then not making himself available for deliveries without cancelling his commitment, is not inconsistent with an independent contractor relationship. Even an independent contractor must perform the work he contracted to perform. The right to terminate the Agreement in these circumstances is not controlling the means and manner of how Mr. Lawson performed deliveries; it is merely the right to terminate the agreement if one party does not do what he contracted to do. If the landscaper Grubhub hired to maintain its headquarters never shows up when she says she will, Grubhub's right to cancel its contract with the landscaper does not transform the relationship into one of employer/employee. Such a right is control over the result rather than control over the manner and means of the work. *See Millsap v. Fed. Express Corp.*, 227 Cal. App. 3d 425, 431 (1991) ("If control may be exercised only as to the result of the work and not the means by which it is accomplished, an independent contractor relationship is established") (internal quotation marks and citation omitted); *see also Alexander*, 765 F.3d at 990 (control over results in the delivery context means the "timely and professional delivery of packages").

Grubhub also did not control how and when Mr. Lawson delivered the restaurant orders he chose to accept. The Agreement did not specify an amount of time in which a driver had to reach a restaurant to pick up an order; nor did it specify how quickly the driver had to complete the delivery. Mr. Lawson picked his own route; indeed, he could make as many stops as he desired and even make a delivery for another company while delivering for Grubhub, and on many occasions he made deliveries for Grubhub's restaurant delivery competitors while working a Grubhub scheduled block. While Grubhub might contact a driver to ask how long before a delivery would be made in response to a customer inquiry, the Agreement did not require deliveries be made within any set amount of time, and Grubhub never told Mr. Lawson a delivery

United States District Court
Northern District of California

had to be made in a particular amount of time.  While there is evidence that Grubhub terminated its delivery contract with a couple of drivers for routinely taking well more than an hour to make deliveries, such control is control over the result: "timely and professional delivery" of restaurant meals.  *See Alexander*, 765 F.3d at 990.

Further, if Mr. Lawson reported that he completed a delivery after the end of his scheduled block, he requested that his pay be adjusted to reflect the longer hours.  Grubhub modified his pay accordingly without any investigation or supervision into whether Mr. Lawson made the delivery when recorded or whether he could have completed the delivery in less time.  This lack of oversight further evidences Grubhub's lack of control of the manner and means of Mr. Lawson's work.

Grubhub also did not prepare performance evaluations of Mr. Lawson.  While for a time drivers whom Grubhub in its sole discretion determined were its top performers were offered priority scheduling, failing to qualify as a top performer did not jeopardize Mr. Lawson's contract with Grubhub.  No one at Grubhub was Mr. Lawson's boss or supervisor.

Mr. Lawson's gaming of the Grubhub driver app further illustrates how little control Grubhub had over the details of Mr. Lawson's work.  For weeks, if not months, Mr. Lawson was able to perform little to no deliveries and yet get compensated as if he had been available for entire blocks—and sometimes even past his scheduled blocks—because Grubhub was not supervising his performance.  Mr. Lawson's dishonesty eventually led to Grubhub's termination of his Agreement for cause, but this does not mean that Grubhub had the right to control the details of his work.  As explained above, a hirer must have the right to terminate an agreement with an independent contractor if the contractor is not performing the work he contracted to do and is in fact cheating the hirer.

Grubhub did control some aspects of Mr. Lawson's work.  Grubhub determined the rates Mr. Lawson would be paid and the fee customers would pay for delivery services.  While the Agreement states that a driver may negotiate his own rate, this right is hypothetical rather than real.  The Court finds that Mr. Lawson could not negotiate his pay in any meaningful way and therefore this fact weighs in favor of an employment relationship.

Grubhub also determined which blocks to make available for driver selection and the length of each block.  By providing a schedule of available blocks, however, Grubhub did not control the manner or means of Mr. Lawson's work.  Grubhub did not make Mr. Lawson work a certain schedule or control Mr. Lawson's hours – there was no minimum or maximum number of blocks a driver could or must sign up for.

Grubhub determined the geographic boundaries of the delivery zones and required Mr. Lawson and other drivers to stay in or around their delivery zone during their scheduled blocks. But this control was also not over the manner and means of Mr. Lawson's work; it was instead to control the result of the work, that is, to ensure that diners received their meals in a timely fashion. *See Alexander,* 765 F.3d at 990.  And, in any event, Mr. Lawson decided in what delivery zone he wanted to work and whether on any given day for any available block he wanted to work for Grubhub at all.

### 2.      Termination at Will

The fact that arguably most suggests Grubhub had a right to control Mr. Lawson's work is its right to terminate the Agreement at will, albeit with 14 days' notice.  *See Ayala*, 59 Cal. 4th at 531 ("Perhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because '[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities."); *Borello*, 48 Cal. 3d at 350 ("Strong evidence in support of an employment relationship is the right to discharge, at will, without cause."); *Alexander*, 765 F.3d at 988 ("The right to terminate at will, without cause, is strong support of an employment relationship."); *Narayan v. EGL, Inc.*, 616 F.3d 895, 900 (9th Cir. 2010) (stating that under California law the right to discharge at will is the most important factor).

Grubhub contends that this factor does not weigh in favor of an employment relationship because the at-will termination right was mutual: Grubhub could terminate the Agreement with 14 days' notice and Mr. Lawson could do so the same.  In fact, since Mr. Lawson was not required to sign up for any blocks at all, he could in effect terminate the Agreement at any time without notice by simply not signing up for any blocks.  As support for its position, Grubhub cites *Jones v. Royal Admin. Servs., Inc.,* 866 F.3d 1100 (9th Cir. 2017).  There, in a case involving vicarious liability

under a federal statute, the Ninth Circuit held that a mutual termination provision with 30 days' notice and a one-year term was consistent with an independent contractor relationship because "[t]he designated impermanency of the relationship supports a finding of independent contractor status." *Id.* at 1107. *Jones*, however, was not addressing the right-to-control under California's *Borello* test and is thus inapposite.

The Court is also not persuaded that *Beaumont-Jacques v. Farmers Group, Inc.*, 217 Cal. App. 4th 1138 (2013) dictates that a mutual at-will termination provision weighs against an employer/employee relationship. The *Beaumont-Jacques* court appeared influenced by the fact that the cases suggesting otherwise were in the workers compensation area, a distinction that is no longer viable. *See Linton*, 15 Cal. App. 5th at 1219. In any event, in the end, the court decided that even if the at-will termination provision was consistent with an employment relationship, weighing all the factors established that the plaintiff was an independent contractor. *Id.* at 1147; *see also Hennighan v. Insphere Ins. Sols., Inc.*, 38 F. Supp. 3d 1083, 1105 (N.D. Cal. 2014) (citing *Beaumont-Jacques* for the proposition that a mutual termination clause evidences an independent-contractor relationship) aff'd, 650 F. App'x 500 (9th Cir. 2016). Further, *Beaumont-Jacques* was decided before the California Supreme Court's decision in *Ayala*.

The question, then, is how much Grubhub's right to terminate at will on 14 days' notice gave it control over the manner and means of Mr. Lawson's work. In some circumstances, that termination right will be powerful. In *Estrada v. FedEx Ground Package System, Inc.*, 154 Cal. App. 4th 1 (2007), for example, the drivers had to make the considerable investment of buying FedEx approved trucks and scanners. The drivers worked full time. FedEx supervised the drivers and could control their routes and schedules and thus their income. And the drivers worked exclusively for FedEx. *Id.* at 12. Under these circumstances, FedEx exercised tremendous control through its right to terminate at will (or, in that case, not renew) given that the driver would have made this large financial and time commitment. The driver would need to protect his investment and livelihood and thus would accede to whatever FedEx wanted to avoid termination.

For Mr. Lawson, not so much. He waited two months after he contracted with Grubhub to even start delivering meals. He delivered for other companies during the four months he delivered

24

for Grubhub, sometimes at the same time he was on block for Grubhub.  He worked only when he wanted so that he could pursue his acting career, and generally less than 20 hours a week.  He did not have to purchase any special equipment or tools to perform the work; all he needed was a cell phone and a mode of transportation which he already had.  He did not even have to invest in a uniform or insulated bags.  In these circumstances, Grubhub's right to terminate at will is neutral in the right to control analysis.

***

The Court thus concludes that the right to control factor weighs strongly in favor of finding that Mr. Lawson was an independent contractor.  The cases in which courts have found that delivery drivers were employees based on the right to control the driver's work all evidenced significantly more hirer control.  In *Alexander*, for example, FedEx controlled the drivers' appearance, route, schedule, and even what truck they could drive.  Grubhub controls none of those details.  *Ruiz* was similar to *Alexander*.  Affinity, the putative employer, controlled the drivers' schedules, routes, equipment, including delivery vehicles, and even "every exquisite detail" of the drivers' appearance. 754 F.3d at 1101-02.  Similarly, in *Flores v. Velocity Express, LLC*, 250 F.Supp.3d 468 (N.D. Cal. 2017), Velocity, the putative employer, designed particular delivery routes, determined what the routes would pay, and then hired drivers for particular routes. *Id.* at 472.  It required the drivers to wear a Velocity uniform and badge, and to display certain signage.  The drivers had to report to Velocity's warehouse each day, and Velocity dictated what packages the drivers delivered and by what time.  And the drivers were required to follow Velocity's standard operating procedures.  *Id.* at 472-73.  Grubhub controlled none of those details as to Mr. Lawson's work.

In *Villapando v. Excel Direct Inc.*, 2015 WL 5179486 (N.D. Cal. Sep. 3, 2015), the putative employer determined what deliveries the driver had to make and in what time window, required drivers to attend a daily morning meeting, to work five to six days a week for between 10 and 12 hours per day, and the drivers had to speak to a manager before taking a day off.  The employer also controlled the drivers' appearance as well as that of their vehicles. *Id.* at *46; *see also Garcia v. Season Logix, Inc.*, 238 Cal. App. 4th 1476, 1485 (2015) (the putative employer

25

United States District Court
Northern District of California

1  required the plaintiffs to report to a warehouse for a meeting every morning, receive permission to

2  take time off, determined what deliveries the driver would make; drivers could only use their truck

3  for work for the putative employer, and they were not allowed to make deliveries for others).

4  Again, Grubhub controlled none of those manner or means of Mr. Lawson's work.

**B.      The Borello Secondary Factors**

6          That the right to control the manner and means of Mr. Lawson's work weighs in favor of

7  finding that Grubhub properly classified Mr. Lawson as an independent contractor is not the end

8  of the Court's inquiry; the Court must also consider the *Borello* secondary factors.

### 1.      Distinct Occupation or Business

10         This factor weighs in favor of an employment rather than independent contractor

11 relationship.  Mr. Lawson was not engaged in a distinct occupation or business.  He did not run a

12 delivery business of which Grubhub was simply one client.  *See Jones*, 866 F.3d at 1107 (when a

13 worker "ha[s] many different clients and offer[s] [the same] services to others during the same

14 period," those facts are consistent with an independent contractor relationship) (internal quotation

15 marks and citation omitted).  He did not get to decide how much Grubhub paid him or how much

16 Grubhub's customers paid for his delivery services.  Instead, Mr. Lawson worked multiple low-

17 wage jobs in addition to his nascent acting career.

18         Mr. Lawson's identification of himself on his tax return as "self-employed" does not

19 persuade the Court otherwise.  Given that Grubhub and the other "gig economy" companies for

20 whom he performed services classified him as an independent contractor that is what he had to put

21 on his return.

### 2.      Whether the Work is Performed Under the Principal's Direction or Supervision

24         This factor is similar to the right-to-control work details analysis, thus it favors an

25 independent contractor finding.  *See Alexander*, 765 F.3d at 995 (this factor slightly favored the

26 drivers because FedEx closely supervised their work through various methods); *Ruiz*, 754 F.3d at

27 1104 (same).  Mr. Lawson did not have a supervisor.  He did not report to anyone at Grubhub;

28 indeed, he never met in person with anyone at Grubhub.  Grubhub did not supervise Mr. Lawson's

work in nearly any respect other than eventually terminating him after he did not perform

deliveries when he said he would but was nonetheless paid as if he had.

### 3.    The Skill Required in the Occupation

This factor favors an employment relationship as anyone with a means of delivery can

contract to deliver for Grubhub—no special skills are needed.  *See Alexander*, 765 F.3d at 995

(holding that this factor favored an employment finding as the "FedEx drivers need no experience

to get the job in the first place and [the] only required skill is the ability to drive.") (internal

quotation marks and citation omitted).

### 4.    The Provision of Tools and Equipment

This factor favors an independent contractor finding as Mr. Lawson provided his own

mode of transportation, his own smart phone, and could even provide his own insulated food bags.

Indeed, Grubhub does not provide, finance nor require any specific equipment or tools.  *Compare*

*with Alexander*, 765 F.3d at 995 (finding that this factor slightly favored FedEx even though

FedEx was involved in the truck purchasing process, providing funds and recommending

vendors); *Linton*, 15 Cal. App. 5th at 1229 (this factor favored the plaintiff taxi driver where the

defendant provided the cab and tools to collect the fares).

### 5.    Length of Time for Performance of Services

This factor favors an independent contractor finding.  Mr. Lawson made deliveries for

Grubhub for four months and only on approximately half the days during those months, most days

for blocks of four hours or less.  The Agreement had a 60-day term, and while it automatically

renewed, Mr. Lawson was free to stop making deliveries at any time.  Further, the Agreement

itself classified each block as a separate contractual engagement and explicitly stated that it was

not an uninterrupted service arrangement. While such classification was designed to strengthen

Grubhub's independent contractor argument and thus is not overly persuasive, it is evidence that

Grubhub did not count on its relationship with its drivers being permanent.  This lack of

permanence is reflected in the arrangement's design; Mr. Lawson could sign up for blocks when

he wanted and not sign up when he did not want to deliver, without any penalty of any kind.

Grubhub had no expectation that Mr. Lawson would register for any particular block on any given

day.  And there is nothing in the record that suggests Mr. Lawson's short-lived engagement, although involuntarily terminated, was unique in its minimal length.

### 6.      The Method of Payment

This factor weighs slightly in favor of an employment relationship.  Grubhub insists that this factor favors an independent contractor relationship because it paid Mr. Lawson per delivery. But while in theory it did so, in practice it paid him by the hour.  Specifically, provided he accepted and delivered at least 75% (and later 85%) of the deliveries offered to him during a scheduled block, Grubhub paid him a minimum hourly rate.  Only one time during the four months Mr. Lawson delivered for Grubhub was Mr. Lawson paid per delivery. This may have occurred, in part, because due to his fraud Mr. Lawson was offered (and therefore made) few deliveries and thus the per delivery compensation for him was never greater than the true up.

As Grubhub emphasizes, however, its implementation of the true up guaranteed minimum actually illustrates its lack of control over drivers such as Mr. Lawson.  Grubhub provided the guaranteed minimum to incentivize Mr. Lawson and other contracted drivers to deliver because it did not have the right to require Mr. Lawson to make any particular delivery or any deliveries at any given time or ever.  An employer, on the other hand, could require an employee to perform all deliveries during an assigned shift.

Nonetheless, this factor still weighs slightly in favor of an employment relationship because on all but one occasion when Mr. Lawson did not satisfy the delivery percentage for the true up, Grubhub paid him minimum wage rather than what he would have been entitled to on a fee-per-delivery basis. While Grubhub no doubt paid Mr. Lawson (and presumably) other drivers the minimum wage as a hedge against a possible subsequent court ruling that the drivers are employees, that excuse does not mean this factor favors Grubhub.  Grubhub, in practice, paid Mr. Lawson as an hourly employee.

### 7.      Whether the Work is Part of Grubhub's Regular Business

This factor favors an employment relationship.  Grubhub is an internet restaurant ordering platform that connects diners with participating restaurants.  Diners can pick up their orders, have them delivered by those restaurants that offer delivery, or, in some Grubhub markets, have

Grubhub deliver the food.  While Grubhub did not offer any food delivery for 10 years, at the time Mr. Lawson drove for Grubhub food delivery was part of Grubhub's regular business in Los Angeles; indeed, more diners had Grubhub deliver their food than picked it up themselves.  While food delivery is not Grubhub's only or primary business (as was package delivery in the FedEx or courier cases, *see*, *e.g.*, *Alexander*, 765 F.3d at 996), it is a regular part of its business in Los Angeles.  Indeed, offering delivery services is key to Grubhub's continued growth in urban markets such as Los Angeles.

The cases Grubhub cites illustrate why this factor favors an employee finding.  In *Futrell v. Payday Cal., Inc.*, 190 Cal. App. 4th 1419 (2010), the plaintiff was hired to provide traffic and crowd control by a company that produces commercials. The plaintiff argued that the company hired by the commercial producer to provide payroll services was his employer.  The court held that traffic and crowd control was not part of the payroll company's regular business; the payroll company had no control over what the workers for whom it was providing payroll services do and no expertise in the area.  Here, in contrast, Grubhub deliberately entered the food delivery business in certain urban markets.  It developed an entire mobile app and algorithm and created entire company departments to facilitate Grubhub's delivery services.  The payroll company, in contrast, did not provide traffic and crowd control services.  Similarly, in *Lara v. Workers Comp. Appeals Bd.*, 182 Cal. App. 4th 393 (2010), the restaurant that hired the gardener to trim the bushes was not in the gardening business.  Grubhub, in contrast, is in the business of online restaurant ordering and, in the Los Angeles market, of also providing food delivery for certain restaurants.  Just because it is not the majority of its business does not mean it is not a regular part of its business in those markets where Grubhub offers delivery service.

### 8.    The Parties' Intent

The parties' intent is neutral in the Court's analysis.  Grubhub identifies the Agreement as strong evidence of the parties' intent to create an independent contractor relationship.  The Agreement expressly states that Mr. Lawson is an independent contractor, he acknowledges that he is, and he promises that he will advise Grubhub if he changes his mind.  But the label placed by the parties on their relationship is not dispositive.  *See Alexander*, 765 F.3d at 997.  In the

United States District Court
Northern District of California

circumstances here—where the hirer unilaterally determines the contract's terms for a low wage, low-skilled job—the parties' label warrants little weight.  *See Linton*, 15 Cal. App. 5th at 1222. Mr. Lawson had to check the box stating that he understood he was an independent contractor if he wanted to drive for Grubhub; Grubhub offers no evidence that it would have hired him regardless.

Grubhub also makes much of the evidence that Mr. Lawson contacted Plaintiff's counsel regarding a lawsuit before he ever joined Grubhub.  But even if he signed up with Grubhub believing that he was improperly classified (as he alleged in a complaint shortly thereafter), that just means he did not intend to create an independent contractor relationship.

## C.     The Upshot

The *Borello* factors "cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations."  *Alexander*, 765 F.3d at 989 (internal quotation marks and citation omitted).  Here, some secondary factors favor an employee/employer relationship: namely, Mr. Lawson's delivery work was part of Grubhub's regular business in Los Angeles; the work was low-skilled; Mr. Lawson was not engaged in a distinct delivery business of which Grubhub was just one client; and, slightly less, Grubhub's method of payment.  The other factors, however, favor a finding that Mr. Lawson was an independent contractor.  *See Varisco,* 166 Cal.App.4th at 1106 (explaining that because some factors suggest an employment relationship does not means that such a relationship necessarily exists).  Of primary significance, Grubhub did not control the manner or means of Mr. Lawson's work, including whether he worked at all or for how long or how often, or even whether he performed deliveries for Grubhub's competitors at the same time he had agreed to deliver for Grubhub.  Grubhub also did not provide Mr. Lawson with any of the tools for his work (other than a downloadable mobile app) and neither Grubhub nor Mr. Lawson contemplated the work to be long term or regular, but rather episodic at Mr. Lawson's sole convenience.  And while Grubhub had the right to terminate the Agreement at will upon 14 days' notice, under the specific circumstances of this case, this right did not allow Grubhub to exert control over Mr. Lawson's work.  After considering all the facts, and the caselaw regarding the status of delivery drivers, the Court finds that all the factors

United States District Court
Northern District of California

weighed and considered as a whole establish that Mr. Lawson was an independent contractor and not an employee.

*JKH Enterprises*, 142 Cal. App. 4th 1046, which has facts similar to those the Court has found here, does not persuade the Court otherwise.  There the putative employer provided courier services to Bay Area businesses such as law firms and title companies. The couriers picked up delivery items from regular customers and delivered them to the locations requested by the customers.  The couriers regularly serviced the same route and were paid a negotiated hourly rate based on the particular route.  Special drivers performed "special deliveries" requested by customers on a particular day.  Each day the special driver called JKH to advise whether the driver wished to perform deliveries that day; if so, JKH provided the pickup and delivery information for the special deliveries.  The special drivers, however, could decline to perform any particular delivery and were not required to work at all or on any particular schedule and they were paid based on deliveries performed.  Couriers and special drivers used their own vehicles to make deliveries, did not wear uniforms or other JKH markings, and could perform delivery services for other companies.  If not enough drivers were available to work any particular day, JKH's owner or his family members performed the needed deliveries.  *Id.* at 1050-52.

Upon a petition from some of the couriers, the California Department of Industrial Relations found that the couriers who provide the actual delivery services on JKH's behalf were its employees rather than independent contractors and thus JKH failed to procure workers compensation insurance on their behalf.  *Id.* at 1049.  JKH petitioned for administrative mandamus.  The appellate court concluded "[b]ased on the administrative record and the deferential standard of review" that JKH had not demonstrated that the Department had abused its discretion.  *Id.*

*JKH* is distinguishable.  First, although the drivers to some extent set their own schedule, most of them worked regular routes and thus regular schedules. And, they worked regularly enough that if a driver decided not to work on a particular day, JKH's owner could fulfill its delivery needs by delivering himself or having one of his family members deliver the packages.  Thus, substantial evidence supported the Department's decision that JKH had all "necessary"

31

United States District Court
Northern District of California

1   control.  Here, in contrast, Grubhub has to create delivery blocks with bonuses and other

2   incentives to encourage drivers to make deliveries because it does not have all necessary control of

3   the drivers' work; in particular, it does not have control of when and whether they work.  Mr.

4   Lawson did not have a regular route, regular schedule or regular customers. Grubhub's model is

5   different: there are no regular delivery drivers.

6       Second, JKH had previously classified the drivers as employees when using the identical

7   work structure.  JKH only changed the drivers' classification to independent contractors after JKH

8   was penalized for failing to provide workers compensation insurance; in other words, the

9   Department found that JKH's classification was an intentional subterfuge.  Grubhub never

10  classified the California drivers as employees.

11      Third, many of JKH's drivers not only drove regularly for JKH, but had done so for at least

12  two years.  The facts create an impression of a small group of delivery drivers that JKH could

13  regularly count on for deliveries.  Not so here.

14      Finally, the factor of over-riding importance to the Department was that providing

15  deliveries was JKH's only business—the drivers were not only critical to the business they were

16  the business.  It appears from the appellate court's decision that in the Department's view this

17  factor overrode JKH's lack of control of the manner and means of the drivers' work.  Here, in

18  contrast, while delivery services are a regular part of  Grubhub's Los Angeles business, it is not

19  Grubhub's only or even primary service.  Grubhub could exist without offering delivery services;

20  indeed, for nearly a decade it did so, and even when Mr. Lawson delivered for Grubhub delivery

21  was only offered in a few markets.

22      The drivers in *Air Couriers Intern. v. Employment Development Dept.*, 150 Cal. App. 4th

23  923 (2007), as Mr. Lawson, were also not required to accept every job, were not penalized for

24  rejecting a delivery, and were able to make deliveries for other companies.  Further, drivers were

25  paid by the job, used their own vehicles and were not required to wear a uniform.  The trial court,

26  and then the appellate court, found substantial evidence supported the Employment Development

27  Department's decision that the drivers were employees.  The Air Couriers drivers, however,

28  worked a regular schedule and thus the trial court found that the putative employer controlled the

hours the drivers worked.  *Id.* at 937.  Not so here.  Further, many of the drivers delivered for the putative employer for years.  *Id.* at 938.  Again, not so here.  And, as with JKH, the delivery service was the putative employer's only business; without the drivers there was no business. Again, not so here.

### CONCLUSION

Under California law whether an individual performing services for another is an employee or an independent contractor is an all-or-nothing proposition.  If Mr. Lawson is an employee, he has rights to minimum wage, overtime, expense reimbursement and workers compensation benefits.  If he is not, he gets none.  With the advent of the gig economy, and the creation of a low wage workforce performing low skill but highly flexible episodic jobs, the legislature may want to address this stark dichotomy.  In the meantime the Court must answer the question one way or the other.  Based on what the Court observed at trial and the facts found, and after applying the *Borello* test, the Court finds that during the four months Mr. Lawson performed delivery services for Grubhub he was an independent contractor.  Since he was not an employee, he cannot prevail on his individual Labor Code or PAGA claims.  Accordingly, judgment must be entered in favor of Grubhub and against Mr. Lawson.

**IT IS SO ORDERED.**

Dated: February 8, 2018

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California

33