1  GIBSON, DUNN & CRUTCHER LLP
   THEANE EVANGELIS, SBN 243570
2    tevangelis@gibsondunn.com
   DHANANJAY S. MANTHRIPRAGADA, SBN 254433
3    dmanthripragada@gibsondunn.com
   BRANDON J. STOKER, SBN 277325
4    bstoker@gibsondunn.com
   333 South Grand Avenue
5  Los Angeles, CA  90071-3197
   Telephone: 213.229.7000
6  Facsimile:  213.229.7520

7  MICHELE L. MARYOTT, SBN 191993
     mmaryott@gibsondunn.com
8  GIBSON, DUNN & CRUTCHER LLP
   3161 Michelson Drive
9  Irvine, CA  92612-4412
   Telephone: 949.451.3800
10 Facsimile:  949.451.4220

11 Attorneys for Defendants
   GRUBHUB HOLDINGS INC. and GRUBHUB INC.
12

13                  UNITED STATES DISTRICT COURT

14                 NORTHERN DISTRICT OF CALIFORNIA

15                    SAN FRANCISCO DIVISION

16
   RAEF LAWSON, in his capacity as Private          CASE NO. 3:15-cv-05128-JSC
17 Attorney General Representative,
                                                    **DEFENDANTS GRUBHUB HOLDINGS INC.**
18                  Plaintiff,                       **AND GRUBHUB INC.'S REPLY IN**
                                                    **SUPPORT OF THEIR MOTION FOR**
19        v.                                         **JUDGMENT ON PARTIAL FINDINGS**

20 GRUBHUB HOLDINGS INC. and                        **Hearing:**
   GRUBHUB INC.,                                    Date:       February 9, 2023
21                                                  Time:       10:00 a.m.
                   Defendants.                      Place:      Courtroom 8
22
                                                    Judge:        Hon. Jacqueline Scott Corley
23                                                  Action Filed: September 23, 2015
                                                    Trial Date:   Not set
24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ........................................................................................................... 1

II.    ARGUMENT .................................................................................................................. 2

    A.     Lawson Failed to Prove He Suffered Any Minimum Wage or Overtime
        Violations. ........................................................................................................... 2

    B.     The ABC Test Does Not Apply to the Parties' Business-to-Business
        Relationship. ....................................................................................................... 5

    C.     Grubhub Satisfies Prong B in All Events.......................................................... 8

        2.     Grubhub Is—and Has Always Represented Itself to Be—a Marketing
              Company That Operates a Multi-Sided Platform. ............................................ 9

        3.     Delivery Partners Provide Services That Are Incidental to Grubhub's
              Business. .................................................................................................. 12

        4.     Delivery Partners Do Not Continuously Perform Work for Grubhub. ........... 15

III.   CONCLUSION .............................................................................................................. 15

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Alexander v. FedEx Ground Package Sys., Inc.*,
  765 F.3d 981 (9th Cir. 2014)...............................................................................12

*Athol Daily News v. Bd. of Rev. of Div. of Emp. & Training*,
  439 Mass. 171 (2003)...........................................................................................9

*Awuah v. Coverall N. Am., Inc.*,
  707 F. Supp. 2d 80 (D. Mass. 2010) ...................................................................12

*Beare Co. v. State*,
  814 S.W.2d 715 (Tenn. 1991)..............................................................................10

*Cal. Trucking Ass'n v. Bonta*,
  996 F.3d 644 (9th Cir. 2021)................................................................................8

*Carey v. GateHouse Media Mass. I, Inc.*,
  94 N.E.3d 420 (Mass. Ct. App. 2018).............................................................11, 12

*Chaves v. King Arthur's Lounge*,
  2009 WL 3188948 (Mass. Super. Ct. July 30, 2009)...........................................12

*D'Italia v. Lowe's Home Ctrs., Inc.*,
  2013 WL 8149730 (Mass. Super. Ct. Nov. 5, 2013) .............................................9

*Est. of Duffin v. United Olympic Life Ins. Co.*,
  1995 WL 124343 (9th Cir. Mar. 23, 1995) ...........................................................6

*Facebook, Inc. v. Power Ventures, Inc.*,
  252 F. Supp. 3d 765 (N.D. Cal. 2017) ..................................................................4

*In re Fedex Ground Package Sys., Inc. Emp't Pracs. Litig.*,
  2010 WL 1838400 (N.D. Ind. May 4, 2010) .......................................................10

*Guynn-Neupane v. Magna Legal Servs., LLC*,
  2021 WL 4481661 (N.D. Cal. Sept. 30, 2021) ....................................................13

*Haitayan v. 7-Eleven, Inc.*,
  2021 WL 4078727 (C.D. Cal. Sept. 8, 2021)..................................................10, 13

*Hennighan v. Insphere Ins. Sols., Inc.*,
  38 F. Supp. 3d 1083 (N.D. Cal. 2014) ...............................................................6, 7

*Hernandez v. Pac. Bell Tel. Co.*,
  29 Cal. App. 5th 131 (2018)...........................................................................2, 4, 5

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Hogan v. InStore Grp., LLC*,
    512 F. Supp. 3d 157 (D. Mass. 2021) ............................................................15

*Hoyt v. Career Sys. Dev. Corp.*,
    2010 WL 11508867 (S.D. Cal. May 3, 2010)...................................................10

*Interstate Fire & Cas. Co. v. Underwriters at Lloyd's, London*,
    139 F.3d 1234 (9th Cir. 1998) .........................................................................5

*James v. Uber Techs. Inc.*,
    338 F.R.D. 123 (N.D. Cal. 2021) .....................................................................3

*Johnson v. VCG-IS, LLC*,
    2018 WL 7636473 (Cal. Super. Ct. Aug. 31, 2018) ........................................12

*Kim v. Reins Int'l Cal., Inc.*,
    9 Cal. 5th 73 (2020) .........................................................................................1

*Lawson v. Grubhub, Inc.*,
    13 F.4th 908 (9th Cir. 2021)..............................................................................8

*Mendiola v. CPS Sec. Sols., Inc.*,
    60 Cal. 4th 833, 840 (2015) .............................................................................3

*Morrow v. Flowers Foods, Inc.*,
    2009 WL 10729946 (M.D. Ala. Apr. 27, 2009) .............................................10

*Nicolas v. Uber Techs. Inc.*,
    2021 WL 2016161 (N.D. Cal. May 20, 2021) ............................................3, 5

*People v. Uber Techs., Inc.*,
    56 Cal. App. 5th 266 (2020).........................................................................5, 14

*Q.D.-A., Inc. v. Ind. Dep't of Workforce Dev.*,
    114 N.E.3d 840 (Ind. 2019) ...........................................................................11

*Ridgeway v. Walmart, Inc.*,
    946 F.3d 1066 (9th Cir. 2020)........................................................................3, 4

*Roman v. Jan-Pro Franchising Int'l, Inc.*,
    342 F.R.D. 274 (N.D. Cal. 2022) .................................................................7, 12

*Ruggiero v. Am. United Life Ins. Co.*,
    137 F. Supp. 3d 104 (D. Mass. 2015) ...................................................9, 14, 15

*Sagar v. Fiorenza*,
    2014 WL 794966 (Mass. Super. Ct. Jan. 18, 2014)..................................8, 12, 13

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Schwann v. FedEx Ground Package Sys., Inc.*,
  2013 WL 3353776 (D. Mass. July 3, 2013) ................................................................. 12

*Sebago v. Boston Cab Dispatch, Inc.*,
  471 Mass. 321 (2015) .......................................................................... 8, 11, 12, 13

*Sims v. QG Printing II, LLC*,
  2022 WL 1592599 (C.D. Cal. Mar. 4, 2022) ................................................................ 4

*Taylor v. Cox Commc'ns Cal., LLC*,
  283 F. Supp. 3d 881 (C.D. Cal. 2017) ......................................................................... 4

*Vazquez v. Jan-Pro Franchising Int'l, Inc.*,
  986 F.3d 1106 (9th Cir. 2021) ............................................................................. 8, 15

**STATUTES**

Cal. Code Regs. tit. 8, § 11090 ....................................................................... 2, 4

Cal. Lab. Code § 2699 ......................................................................................... 1

Cal. Lab. Code § 2776 ................................................................................. 2, 6, 7

Cal. Lab. Code § 2785 ......................................................................................... 6

# I.    INTRODUCTION

The California Supreme Court recognizes not one, but two prerequisites for being an aggrieved employee with PAGA standing:  A plaintiff must show that he was "employed by the alleged violator" and suffered "one or more of the alleged violations."  *Kim v. Reins Int'l Cal., Inc.*, 9 Cal. 5th 73, 83 (2020) (quoting Cal. Lab. Code § 2699(c)).  Lawson all but overlooks the latter requirement, arguing instead that "whether [he was misclassified" fully determines his status as "an 'aggrieved employee' under PAGA."  Dkt. 301 at 5.  It does not.  And because Lawson cannot satisfy either requirement for PAGA standing, his years-long pursuit of penalties for time during which he "g[o]t paid for doing nothing" must finally come to an end.  Dkt. 221 at 16.

Lawson devotes barely a page to the dispositive issue in this case: his failure to prove that he suffered any minimum wage or overtime violation, irrespective of his classification.  As he concedes, these claims hinge on a finding that "all time spent on blocks was compensable."  Dkt. 301 at 29.  But the record proves the opposite.  This Court has already found that Grubhub exercised so "little control … over the details of Mr. Lawson's work" that "[f]or weeks, if not months, [he] was able to perform little to no deliveries and yet get compensated as if he had been available for entire blocks."  Dkt. 221 at 22.  And all the *Mendiola* factors point to a finding that his on-call time was not compensable.  Indeed, Lawson was not subject to an on-premises living requirement, nor was he required to respond to offers within a fixed time (or at all).  Rather, he could use his cell phone not only to schedule and trade blocks at whim, but also to receive and reject delivery requests anywhere throughout the sprawling Los Angeles-Metro zone, including his own home.  Nor was the frequency of delivery requests restrictive—Lawson frequently engaged in personal activities and "made deliveries for Grubhub's restaurant delivery competitors" while on block.  *Id.* at 21.  As this Court has observed, Grubhub already "paid [Lawson] minimum wage" (*id.* at 9–10, 28), and his overtime claim fares no better.  The failure to prove any Labor Code violations is the end of the road for Lawson and clearly results in a lack of standing to pursue his PAGA claim—regardless of his classification.

Should the Court nonetheless wish to reach the classification issue, it should reaffirm that he was properly classified as an independent contractor under *Borello*, which continues to apply because Grubhub qualifies for the business-to-business exemption.  In arguing otherwise, Lawson asks the

Court to ignore the relevant experiences of Delivery Partners who routinely hired subcontractors, advertised their independent delivery businesses, and negotiated their own compensation—simply because he elected not to take these opportunities available to him. But the business-to-business exemption is not so limited. Because the statute focuses on a "contracting business" as a whole (Cal. Lab. Code § 2776(a)), and because Lawson purports to represent "similarly situated" Delivery Partners (Dkt. 41 ¶ 2), the Court should consider their use of the Grubhub platform as well.

Even if the ABC test were relevant, Grubhub satisfies each prong of the test. With respect to Prong B, the wealth of new evidence Grubhub has adduced—including an uncontroverted expert report, four company declarations, and extensive data regarding its revenue sources and business operations—confirms that it is a marketing company that administers an online platform to connect restaurants to customers and facilitate online food ordering. Grubhub has consistently held itself out as such, and its actual business operations reflect this reality. For the first 10 years of its existence, Grubhub operated without facilitating *any* delivery services, and at the time Lawson used the app, they were confined to only five geographic markets nationwide and accounted for less than 3% of orders. Grubhub generated nearly all of its revenue from restaurant commissions and advertising services, which it earned regardless whether or how the food was delivered. During the relevant time period, Grubhub *lost* tens of millions of dollars on orders fulfilled by Delivery Partners who—like Lawson— used its platform sporadically and while simultaneously performing work via the platforms of its direct competitors. No court has found that a worker is necessary to a company's business under these circumstances. This Court should therefore enter a take-nothing judgment for Grubhub.

## II.   ARGUMENT

### A.   Lawson Failed to Prove He Suffered Any Minimum Wage or Overtime Violations.

Lawson concedes that his minimum wage and overtime claims depend on a finding that "all time spent on blocks was compensable." Dkt. 301 at 29. But time is compensable only where the alleged employee (1) was "subject to the control of an employer," or (2) was "suffered or permitted to work, whether or not required to do so." *Hernandez v. Pac. Bell Tel. Co.*, 29 Cal. App. 5th 131, 137 (2018) (citation omitted); Cal. Code Regs. tit. 8, § 11090(2)(G). Lawson cannot show that the entire time spent on block was compensable under either test, so the Court should enter judgment for

Grubhub.  Indeed, the Court has already noted that "Grubhub paid [Lawson] minimum wage" (Dkt. 221 at 9–10, 28), and his rampant "fraud" and "intentional[] manipulat[ion]" of the app "to get paid for not working" belies any claim to overtime pay (*id.* at 16, 28).

**Control test.**  The record establishes that Grubhub did not exert such control as to prevent Lawson "from using the time effectively for his … own purposes."  *Mendiola v. CPS Sec. Sols., Inc.*, 60 Cal. 4th 833, 840 (2015) (citation omitted).[1]  Lawson could drop or trade blocks, reject delivery offers, travel anywhere in his self-selected Los Angeles-Metro zone, engage in personal activities, and complete deliveries for other companies. Dkt. 302 at 14–20. And he often did so.  *Id.*

Lawson's assertion that he could not "do[] anything while he was on shift other than simply waiting for a GrubHub order to come through" defies reality and the evidence already considered by this Court. Dkt. 301 at 30.  At all times, he was free to decide whether to sign up for a block at all and whether to accept or reject a delivery.  *See* Trial Tr. 294:8–295:14, 291:11–292:14, 638:14–639:1; Trial Ex. 15; Dkt. 276, Ex. A § 3.1; *id.*, Ex. B § 3.1.  Far from being captive on his phone, he utilized strategies to make himself inaccessible even during blocks he voluntarily selected, including toggling available hours after his blocks started and making his mobile phone appear "out of network."  *See* Trial Tr. at 273:3–5, 1057:14–1076:5, 1083:7–1109:22; Trial Ex. 17.  On at least 15 occasions, Lawson completed zero or one delivery during his voluntary multi-hour blocks, but was paid for the entire blocks.  Trial Ex. 17.  Lawson's belief that he is entitled to additional compensation is totally illogical when—as this Court has found—he already "g[o]t paid for not working."  Dkt. 221 at 16.

Lawson cites just two cases in response, but neither supports his position.  In fact, the Ninth Circuit's holding in *Ridgeway v. Walmart, Inc.* only underscores the deficiencies in his claims.  946 F.3d 1066 (9th Cir. 2020).  There, the court determined that Walmart controlled truck drivers on their mandatory layover breaks because they were expected to *remain in their trucks* for the break, needed *permission* to spend breaks elsewhere (including in their own homes), and could not host guests or pets

---

[1] Although Lawson has suggested that the *Mendiola* factors "are not strictly relevant here" (Dkt. 217 at 78 n.128), he cites no authority for that proposition and there is none.  Courts routinely apply these factors when considering minimum wage and overtime claims in other cases involving app-based platforms (*see, e.g.*, *James v. Uber Techs. Inc.*, 338 F.R.D. 123, 141 (N.D. Cal. 2021); *Nicolas v. Uber Techs. Inc.*, 2021 WL 2016161, at *7 (N.D. Cal. May 20, 2021))—just as this Court has already done on summary judgment (Dkt. 142 at 12).

during their layover.  *Id.* at 1080, 1083.  Here, by contrast, Lawson was not confined to a stationary vehicle but was free to travel anywhere within the sprawling Los Angeles-Metro zone, including his own home.  *See* Trial Tr. at 195:7–13, 441:20–25; Trial Ex. 1493.  And he frequently used downtime on his blocks to perform any number of personal activities or other work via the platforms of Grubhub's direct competitors.  *See* Trial Tr. at 194:10–13, 194:21–25, 268:2–8; Trial Ex. 1493.

As for *Sims v. QG Printing II, LLC*, that case did not involve a minimum wage or overtime claim at all; the court instead granted class certification on a claim for *reporting* time.  2022 WL 1592599 at *9 (C.D. Cal. Mar. 4, 2022).  Lawson has never alleged such a claim, however, and it is too late to do so now.  *See Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 775 (N.D. Cal. 2017) (issue "waived at the trial level … cannot be revived on remand"), *aff'd*, 749 F. App'x 557 (9th Cir. 2019).  What's more, he cannot establish even the first prerequisite of a reporting time claim—a "require[ment] to report for work" (Cal. Code Regs. tit. 8, § 11090(5))—as Grubhub imposed no such requirement (Dkt. 221 at 20–21).  And even if he could prevail on a claim for reporting time, it would only entitle him to compensation for "*half* the usual or scheduled day's work" (Cal. Code Regs. tit. 8, § 11090(5) (emphasis added))—not "*all* time spent on blocks" (Dkt. 301 at 29 (emphasis added)).

**Suffer or permit to work test.**  Lawson also cannot prove that Grubhub "suffered or permitted [him] to work" for any unpaid time.  *See Hernandez*, 29 Cal. App. 5th at 137.  "[A]n employee is 'suffered or permitted to work' when the employee is *working*, but not subject to the employer's control, such as unauthorized overtime when an employee voluntarily continues to work at the end of a shift with the employer's knowledge."  *Id.* at 142 (emphasis added); *Taylor v. Cox Commc'ns Cal., LLC*, 283 F. Supp. 3d 881, 890 (C.D. Cal. 2017) ("the 'suffered or permitted to work' standard requires that a [worker] be engaged in work-related tasks or exertion"), *aff'd*, 776 F. App'x 544 (9th Cir. 2019).

Lawson has never claimed that Grubhub failed to pay him for time he spent *actually working*— i.e., performing deliveries—after the end of his scheduled blocks.  Nor can he:  The record shows that he received compensation for the deliveries he performed (and even those he did not (Trial Ex. 11; Trial Tr. at 309:20–314:22)), regardless when he did so (Trial Tr. at 197:21–198:6; Trial Ex. 42; Dkt. 221 at 10, 22; Dkt. 276, Ex. A at GH000322).  Instead, the only question is whether Grubhub must pay for time when he was *not* working during his scheduled blocks.  The suffer or permit to work test does

Gibson, Dunn &
Crutcher LLP

not answer that question and thus has no application here.  *See Hernandez*, 29 Cal. App. 5th at 142.

Even if the test were relevant, Lawson cannot satisfy it.  "[T]he standard of 'suffered or permitted to work' is met when an employee is engaged in certain tasks or exertion that a manager would recognize as work."  *Id.* (citation omitted).  But Lawson cannot "explain how waiting for a [delivery] request qualifies as a task that a manager would recognize as work."  *Nicolas*, 2021 WL 2016161, at *7 (dismissing driver's claim that waiting time spent between rides while logged onto the app is compensable).  No reasonable factfinder would recognize Lawson's engagement in personal activities, his gaming of the app to avoid receiving delivery offers, and his performance of deliveries using competitors' apps as "work" for Grubhub.

**B.     The ABC Test Does Not Apply to the Parties' Business-to-Business Relationship.**

Although there is no need to reach the classification question, this Court has already answered it correctly:  Lawson is an independent contractor under *Borello*.  That remains true even after *Dynamex* as Grubhub satisfies the factors of AB5's business-to-business exemption now under consideration.

***Factor 2:   Direct services.***  At Lawson's behest (Dkt. 217 at 41–42 & n. 63), and over Grubhub's objection (Dkt. 176 at 1), this Court found for purposes of the *Borello* analysis that Lawson "performed delivery services for Grubhub," not its customers (Dkt. 221 at 9, 18–19, 33; Dkt. 142 at 5).  Having argued that Grubhub is not "merely an intermediary between customers and drivers" and that Delivery Partners "perform[] services for GrubHub" (Dkt. 217 at 41 & n. 63), Lawson may not change his tune now (*see Interstate Fire & Cas. Co. v. Underwriters at Lloyd's, London*, 139 F.3d 1234, 1239 (9th Cir. 1998) ("Judicial estoppel precludes a party from taking inconsistent positions ….")).

Sensing the dissonance in his position, Lawson falls back on *People v. Uber Technologies, Inc.*, 56 Cal. App. 5th 266 (2020), in urging that "drivers' services may be rendered both to [Grubhub] *and* to the third party, benefiting each one."  Dkt. 301 at 24–25.  Yet that case is inapposite as the court there did not purport to address the business-to-business exemption at all.  *See Uber Techs.*, 56 Cal. App. 5th at 289 ("Defendants do not rely on a statutory exemption here.").  Moreover, Lawson's interpretation would render the exemption a dead letter as virtually any service performed for a contracting business can ultimately be said to benefit its customers, too.  Under Lawson's conception, a law office that pays an electrician to install lighting would not satisfy the business-to-business

exemption because the lighting would invariably benefit the office's clients as well.

In any event, the second factor of the exemption "does not apply" because Delivery Partners provided services via the Grubhub platform under their own "name[s]" and "regularly contract[ed] with other businesses."  Cal. Lab. Code § 2776(a)(2); *see* Dkt. 302 at 17–18.  Lawson does not—and cannot—contest any of this.  Instead, he contends that his personal choice not to hire any subcontractors precludes Grubhub from invoking the exemption.  Dkt. 301 at 26–27.  But nothing in the statute requires that a business service provider hire *other* workers.  To the contrary, the exemption specifically extends to an "individual acting as a sole proprietor" (Cal. Lab. Code § 2776(a)), and it is well established that "a sole proprietor" may "be deemed an 'employee' of … himself" (*Est. of Duffin v. United Olympic Life Ins. Co.*, 1995 WL 124343, at *3 (9th Cir. Mar. 23, 1995)).  Because it is undisputed that Lawson performed delivery services under his own name using the platforms of Grubhub and its competitors, Grubhub readily satisfies this factor.  *See* Cal. Lab. Code § 2776(a)(2).

In any event, Delivery Partners could and did hire subcontractors, who likewise performed services under the "name[s]" of the Delivery Partners for whom they worked.  *See* Trial Tr. at 1112:7–22, 1196:24–1197:2; Dkt. 276 ¶¶ 24–26, Exs. H–N.  Lawson insists "this evidence is completely irrelevant" because only "Plaintiff's relationship with Grubhub" matters—"not Grubhub's relationship with other drivers."  Dkt. 301 at 27.  But that argument misses the mark.  The statute expressly refers to a "contracting business" as a whole (Cal. Lab. Code § 2776(a); *see also id.* § 2785(d)), and thus extends to *all* "similarly situated" Delivery Partners who used the Grubhub platform and whom Lawson purports to represent (Dkt. 41 ¶ 2).  Were it otherwise, the same business could be subject to different classification tests—and different legal obligations—based solely on the idiosyncratic decisions of each worker, rather than on generally applicable company policies.  That approach makes no sense.

***Factor 8:   Advertisement.***  Delivery Partners—including Lawson—"advertise[d] and h[e]ld [themselves] out to the public as available to provide" delivery services because they *actually* performed such services separate and apart from the Grubhub platform.  Cal. Lab. Code § 2776(a)(8); *accord Hennighan v. Insphere Ins. Sols., Inc.*, 38 F. Supp. 3d 1083, 1103 (N.D. Cal. 2014) (worker "held himself out as a separate business" where he "sold insurance products outside of" the defendant's), *aff'd*, 650 F. App'x 500 (9th Cir. 2016).  For example, Lawson performed driving or

delivery services through 10 different companies' platforms without any restriction or reprisal from Grubhub. *See* Trial Tr. at 120:10–13, 121:5–11, 230:16–25, 319:5–14; Dkt. 276 ¶ 28, Ex. A § 2.4. In fact, "on many occasions," he even "made deliveries for Grubhub's restaurant delivery competitors while working a Grubhub scheduled block" for which he received full compensation. Dkt. 221 at 21. And he "held himself out as a separate business" by identifying "as self-employed on his tax returns and deduct[ing] business expenses." *Hennighan*, 38 F. Supp. 3d at 1103–04; Dkt. 302 at 19.

Lawson does not dispute that Delivery Partners also created business cards, signs, and other marketing materials to develop repeat customers and expand their client base. Dkt. 276 ¶¶ 7–9. Nor does he deny that these efforts were successful; indeed, corporate clients requested Delivery Partners by name when placing orders. *Id.* ¶ 8. Lawson tries to brush these inconvenient facts aside by highlighting that he personally "did not have business cards." Dkt. 301 at 27. But the reality is that Delivery Partners could—and often did—advertise through these and other means.

**Factor 10: Rate Negotiation.** Finally, Grubhub is exempt from the ABC test because Delivery Partners "*c[ould]* negotiate [their] own rates." Cal. Lab. Code § 2776(a)(10) (emphasis added). In a now-familiar refrain, Lawson maintains that the business-to-business exemption is inapplicable because *he* "did not negotiate … his pay." Dkt. 301 at 28. But the exemption does not require proof that Delivery Partners *actually* negotiated compensation—only that they "*c[ould]*" do so. Cal. Lab. Code § 2776(a)(10) (emphasis added). And the undisputed record shows that Delivery Partners were free to negotiate their own rates (Dkt. 276, Ex. A § 8.1; *id.*, Ex. B § 8) and frequently did so (*see id.* 276, Exs. C (negotiating "6 additional tip-outs totaling $22.00" as "[n]o drivers would accept the order" otherwise); *id.*, Exs. D–E (similar)).[2] That Lawson may not have engaged in any direct negotiations himself is both unsurprising (given that he "g[o]t paid for doing nothing" (Dkt. 221 at 16)) and irrelevant (given that he *could* have done so, as many Delivery Partners plainly did). Delivery Partners like Lawson also indirectly negotiated their compensation by waiting for Grubhub to extend market-wide bonuses before accepting any delivery requests via the platform. Dkt. 276 ¶ 13; *see also* Dkt. 221 at 32 ("Grubhub has to create delivery blocks with bonuses and other incentives to encourage drivers

---

[2] Lawson's reliance on *Roman v. Jan-Pro Franchising International, Inc.* is misplaced as the defendant there conceded that it "determine[d] the pricing of cleaning contracts" at its "discretion." 342 F.R.D. 274, 308–09 (N.D. Cal. 2022).

Gibson, Dunn &
Crutcher LLP

to make deliveries because it does not have all necessary control of the drivers' work").

## C.    Grubhub Satisfies Prong B in All Events.

Even if the ABC test applies, the record demonstrates that Lawson and other Delivery Partners performed work outside the usual course of Grubhub's business, which was a marketing and food-ordering platform.   Lawson cannot deny this, so he resorts to arguing that the Court's ruling under *Borello* that his work was "part of Grubhub's regular business" resolved the Prong B inquiry because the ABC test "overlap[s] with three of the *Borello* factors," which are "just applied [in] a different way." Dkt. 301 at 9.   He is wrong in every respect.

### 1.    Prong B Is Legally Distinct from *Borello* and Requires a Rigorous Analysis of a Company's Entire Operations.

The ABC test marks a "significant change[]" in the law governing worker classification. *Lawson v. Grubhub, Inc.*, 13 F.4th 908, 910 (9th Cir. 2021).   Aside from their radically different weights in the classification analysis—the Prong B inquiry is dispositive, while each of *Borello*'s twelve factors is part of a flexible balancing test—Prong B and the next closest *Borello* factor ask very different questions.   This Court addressed only whether Lawson's work was "*part of*" Grubhub's regular business in Los Angeles under *Borello* (Dkt. 221 at 28–29 (emphasis added)), but Prong B asks whether his work was "*necessary to*" Grubhub's business as a whole (*Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106, 1125–26 (9th Cir. 2021) (emphasis added); *see also Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 650 (9th Cir. 2021) ("ABC test [is] … significantly different from the *Borello* test").   These are fundamentally different inquiries, and the former can be true while the latter certainly is not.  *See, e.g.*, *Sebago v. Boston Cab Dispatch, Inc.*, 471 Mass. 321, 326, 334–36 (2015) (taxi drivers did not perform work "within the usual course" of taxi leasing and dispatch companies' businesses even though the drivers "incidentally contribute[d]" to the companies' revenue); *Sagar v. Fiorenza*, 2014 WL 794966, at *6–7 & n.11 (Mass. Super. Ct. Jan. 18, 2014) (same).

Specifically, Prong B requires a detailed evaluation of (1) "whether the work of the employee is necessary to or merely incidental to that of the hiring entity"; (2) "whether the work of the employee is continuously performed for the hiring entity"; and (3) "what business the hiring entity proclaims to be in."  *Vazquez*, 986 F.3d at 1125.   Although "[a]ll of these formulations should be considered in determining whether" a worker is an employee (*id.*), this Court did not previously do so:  It devoted

Gibson, Dunn &
Crutcher LLP

only two paragraphs of its 33-page opinion to the next closest *Borello* factor (Dkt. 221 at 28–29).  And the Court did so without the benefit of the extensive evidence and expert testimony Grubhub has since presented concerning its revenue sources, marketing materials, and business operations.  Dkts. 275–79.  That is unsurprising, given that the *Borello* factor Lawson points to was relatively trivial (which is why the Court found for Grubhub in spite of its conclusion as to this factor).  *See* Oct. 11, 2018 Hearing Tr. at 19:13 (recognizing that *Dynamex* represented a "sea change" in California's classification law).  And that is precisely why, over Lawson's repeated objections, the Court accepted Grubhub's offer of proof and permitted Grubhub to adduce new evidence on Prong B.  *See* Dkt. 269.

Lawson's argument has another problem:  He focuses only on the activities *he* chose to perform in Los Angeles during his short time using Grubhub.  But the Prong B inquiry extends to Grubhub's entire business operations nationwide, not just the activities of certain drivers in particular markets like Los Angeles.  For example, in *Ruggiero v. American United Life Insurance Co.*, the court evaluated the defendants' business operations as a whole—including their nationwide revenue streams—rather than limiting its analysis to the defendants' operations in Boston (where the plaintiff worked).  *See* 137 F. Supp. 3d 104, 108, 118–23 (D. Mass. 2015) (discussing reach of company's operations to "every state but New York, and [D.C.]," and that defendant "made $2.4 billion in 2013"); *D'Italia v. Lowe's Home Ctrs., Inc.*, 2013 WL 8149730, at *1 (Mass. Super. Ct. Nov. 5, 2013) (considering nationwide "revenues" not limited to cities where plaintiffs worked).  The Court should do the same here and hold that Lawson performed delivery services outside the usual course of Grubhub's marketing business.

### 2.   Grubhub Is—and Has Always Represented Itself to Be—a Marketing Company That Operates a Multi-Sided Platform.

From its inception, Grubhub has consistently held itself out as a marketing company that operates a multi-sided platform that connects restaurants to diners and facilitates online food ordering.  *See* Dkt. 275 ¶ 3; Dkt. 279 ¶¶ 5–6, Exs. D–E; Dkt. 302 at 22–23; Trial Tr. at 599:6–8, 598:14–23, 602:1–605:6; Trial Exs. 164, 165.   Economists likewise concur that Grubhub's business of "*connect[ing]* restaurants, diners, and in some instances, Delivery Partners" is distinct from the actual *provision* of delivery services.  Dkt. 277 ¶¶ 14, 18, 34–35, 39 (emphasis added).[3]

---

[3] *Athol Daily News v. Board of Review of Division of Employment & Training* is thus inapposite as the defendant "itself define[d] its business as 'publishing and distributing' a daily newspaper." 439 Mass.

1    Rather than rebut this expert testimony, Lawson seeks to bar its admission.  He insists the Court

2    should disregard Grubhub's expert report as presenting a legal conclusion (Dkt. 301 at 2–3, 14–16),

3    but that argument is contrary to precedent, not to mention this Court's own reasoning in this case.

4    In *Haitayan v. 7-Eleven, Inc.*, the Ninth Circuit recently affirmed the district court's reliance on expert

5    testimony in holding that 7-Eleven was in the business of "franchising, not operating convenience

6    stores."  2021 WL 4078727, at *17 (C.D. Cal. Sept. 8, 2021), *aff'd*, 2022 WL 17547805 (9th Cir. Dec.

7    9, 2022).  As the district court explained, "[c]ompany-owned stores typically account for only between

8    1 and 2.5% of 7-Eleven locations" and 1% of its royalties, and "economists define a company's regular

9    course of business by the predominant manner in which the company generates profits."  *Id*.; *see also*

10   *Beare Co. v. State*, 814 S.W.2d 715, 719 (Tenn. 1991) (considering expert testimony on Prong B).

11   In much the same way, Grubhub's expert testimony is admissible because it does not purport

12   to draw any legal conclusions, but merely describes the *nature* of multi-sided platforms and compares

13   Grubhub to other familiar platform companies.  *See* Dkt. 277.[4]  And because the parties have agreed to

14   a bench trial, there is no concern that this testimony will confuse a jury or usurp its fact-finding role—

15   the traditional ground for excluding an expert report.  *See*, *e.g.*, *Hoyt*, 2010 WL 11508867, at *3 (jury

16   trial); *In re Fedex*, 2010 WL 1838400, at *5 (potential for jury confusion).  In any event, the Court

17   already ruled that Grubhub may "put … in" expert evidence (Apr. 21, 2022 Hearing Tr. at 10:11–14)

18   and that any objection Lawson may have would go only to the *weight* of that testimony, not its

19   admissibility (Sept. 15, 2022 Hearing Tr. at 2:15–21).

20   Lawson next resorts to distorting the record.  He claims—with zero evidentiary support—that

21   Grubhub is a delivery company because 61% of its employees facilitate delivery services.  Dkt. 301 at

22   3, 20–21.  But the record establishes that Grubhub's employees primarily worked to develop software,

23   administer the platform, and market restaurants to diners (Dkt. 277 ¶¶ 39–42; Dkt. 275 ¶¶ 5–8, 10–13),

---

24   171, 179 (2003).  Here, however, Grubhub has presented a wealth of expert and other evidence refuting
Lawson's caricature of its usual course of business.  Dkt. 302 at 22–29.

25

26   [4] For this reason, Lawson's cited cases are readily distinguishable because the expert testimony there
contained blatant legal conclusions and statements of law.  *See In re Fedex Ground Package Sys., Inc.
Emp't Pracs. Litig.*, 2010 WL 1838400, at *2 (N.D. Ind. May 4, 2010) (expert report stated "plainly,
unequivocally, and without qualification, the P & D drivers do not (and cannot) constitute *bona fide*

27   independent contractors"); *Morrow v. Flowers Foods, Inc.*, 2009 WL 10729946, at *4 (M.D. Ala. Apr.
27, 2009) (similar); *Hoyt v. Career Sys. Dev. Corp.*, 2010 WL 11508867, at *3 (S.D. Cal. May 3, 2010)

28   (expert offered to "opin[e] as to whether Plaintiff was an independent contractor or an employee").

Gibson, Dunn &
Crutcher LLP

and only 5% spent *any* time supporting delivery orders fulfilled by Delivery Partners (Dkt. 275, Ex. B; Dkt. 278 ¶ 10). That certain of Grubhub's employees worked in departments tasked with developing technology that restaurants, diners, and Delivery Partners all invariably used does not mean that *all* the employees in those departments were dedicated to facilitating delivery services. Dkt. 275 ¶¶ 6–13.

It is also beside the point that Grubhub may have employed certain drivers in Massachusetts *after* Lawson stopped using the Grubhub platform in 2016. Dkt. 279 ¶ 13. Not only is this outside the record (which Lawson chose not to supplement), but it only shows that it is *possible* to hire drivers as employees—not that Lawson was himself one. Grubhub has always classified Delivery Partners outside of Massachusetts as independent contractors, and the Court should not rely on the classification of a vanishingly small fraction of drivers in another state when nearly all drivers—and certainly all drivers in California—used the platform as independent contractors.

Lawson invokes a handful of out-of-context marketing materials, which merely allude to Grubhub *facilitating* deliveries. But not one of those statements represents that Grubhub will *provide* the deliveries. Dkt. 301 at 22–24. In any event, "marketing plays little, if any, direct role in analyzing the *activities* [a business] performs on a regular or continual basis." *Q.D.-A., Inc. v. Ind. Dep't of Workforce Dev.*, 114 N.E.3d 840, 847 (Ind. 2019). The court "cannot uncritically rely on … advertising to fully reflect the activities a company regularly or continually performs" (*id.* at 848), but instead must evaluate "the *realities* … of [an entity's] actual business operations" (*Sebago*, 471 Mass. at 335 (emphasis added)). Where, as here, a company's main purpose is to "match[] drivers with customers," those drivers do not "perform[] a service within [the company's] usual course of business." *Q.D.-A.*, 114 N.E.3d at 842, 848; *Sebago*, 471 Mass. at 335 (defendants "advertis[ing] themselves as providing taxicab services … d[id] not override the realit[y]" that their businesses were "not directly dependent on the drivers' services").

*Carey v. GateHouse Media Massachussetts I, Inc.*, 94 N.E.3d 420 (Mass. Ct. App. 2018) lends Lawson no support. There, the court recognized that a company "cannot alter the substance of its usual course of business merely by … self-labeling" and held that delivery drivers were "necessary to" a newspaper business because, among other things, they: (1) solicited new subscribers to the newspaper; (2) were assigned to specific delivery territories; and (3) were "require[d] … to service" new

Gibson, Dunn &
Crutcher LLP

subscribers within their assigned territory.  *Id.* at 425–28, n.9.  Thus, the drivers were effectively the company's marketing, sales, delivery, and collection agents, and the company was "*very much* 'concerned with the results of the drivers' operations.'"  *Id.* at 428 (emphasis added).  Lawson ignores that *none* of those conditions exist here:  Delivery Partners did not solicit new customers for Grubhub, were not assigned to territories, were not required to accept delivery requests, and did not sell Grubhub's products or services.[5]  Unlike in *Carey*, "the realities … of [Grubhub's] actual business operations" (*Sebago*, 471 Mass. at 335) therefore confirm what its self-description makes plain: Grubhub operates a multi-sided platform to connect restaurants with diners to facilitate food ordering.

### 3.     Delivery Partners Provide Services That Are Incidental to Grubhub's Business.

Delivery Partners are not (and never were) necessary to Grubhub's business because the delivery services they provided constituted a negligible fraction of Grubhub's activities and generated substantial losses throughout the relevant timeframe.  As this Court has already found, Grubhub thus "could exist without offering delivery services" (Dkt. 221 at 32)—as it, in fact, did for the first 10 years of its operation (Trial Tr. 598:24–599:1; Dkt. 277 ¶¶ 19–20).

Lawson does not deny this.  Instead, he contends that "an employer can have more than one usual course of business" and that a worker need not perform services within the company's "sole, principal, or core business" to be deemed an employee.  Dkt. 301 at 8 n.2, 12 (citation omitted).  But he can point to no cases finding employment status where, as here, the services at issue comprised a *de minimis* portion of the company's activities and revenues and were not necessary to its survival.[6] Indeed, all the caselaw is to the contrary.  *See*, *e.g.*, *Sagar*, 2014 WL 794966, at *6–7 n.11 (taxicab drivers outside usual course of dispatch company's business because it would not "cease to operate" without them); *Sebago*, 471 Mass. at 335 (similar); *Guynn-Neupane v. Magna Legal Servs., LLC*, 2021

---

[5] The defendant in *Awuah v. Coverall North America, Inc.* similarly exercised elements of control not present here.  707 F. Supp. 2d 80, 82, 84 (D. Mass. 2010) (janitors were required to "complete mandatory training programs and wear approved uniforms and identification badges").

[6] *See Schwann v. FedEx Ground Package Sys., Inc.*, 2013 WL 3353776, at *5–6 (D. Mass. July 3, 2013) (FedEx would "cease to operate" without drivers because "there would be no one to pick up or deliver packages"); *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 996 (9th Cir. 2014) (similar); *Johnson v. VCG-IS, LLC*, 2018 WL 7636473, at *2 (Cal. Super. Ct. Aug. 31, 2018) (strip club "simply would not survive without" exotic dancers); *Roman*, 342 F.R.D. at 305 ("Without a consistent supply of unit franchisees, defendant's business would have cratered."); *Chaves v. King Arthur's Lounge*, 2009 WL 3188948 at *1 (Mass. Super. Ct. July 30, 2009) (defendant derived 70% of its total revenue from workers' services).

Gibson, Dunn &
Crutcher LLP

WL 4481661, at *29 (N.D. Cal. Sept. 30, 2021) (mock juror outside usual course of consulting firm's business where "[j]ury focus groups comprise[d] only a portion" of its activities); *Haitayan*, 2021 WL 4078727, at *17 ("operating convenience stores" outside usual course of 7-Eleven's franchise business where its company stores "account[ed] for a relatively small amount of profits").

Lawson's attempts to distance this case from *Sebago* and *Sagar* are unpersuasive. The core holding of *Sebago* is that a court must examine "the realities of the [defendant's] actual business operations" to determine whether its business is "directly dependent on the [plaintiff's] services." 471 Mass. at 335. The court did not limit its holding to the taxicab or other "heavily regulated" industries. *Contra* Dkt. 301 at 20 n.15. And the court's reasoning applies squarely to the facts presented here. It explained that because drivers only "incidentally contribute[d] to" the defendants' revenues, and the defendants' "*raison d'etre* … [wa]s to provide dispatch services to medallion owners," their "business [wa]s not directly dependent on the drivers' services." *Sebago*, 471 Mass. at 334–35. Even though the defendants profited by "creat[ing] a base of customers" for drivers, the court found that benefit to be "incidental to the ordinary course of" the business of selling dispatch services. *Id.* at 336. *Sagar* likewise instructs that "it is only where a putative employer *would not have any services to offer* to its customers without its workers … that it should be treated as their employer for the purposes" of Prong B. 2014 WL 794966, at *6 n.11 (emphasis added). Again, the court did not limit its holding to the taxicab industry or rely on any unique aspects of the regulatory framework in its reasoning.

Here, Grubhub's "raison d'etre" is operating a multi-sided platform to connect restaurants to diners and facilitate online food ordering. Delivery Partners—like both restaurants and diners—are *customers* who use the Grubhub platform to connect with restaurants and diners looking for delivery. Dkt. 277 ¶ 35. As Grubhub's CEO acknowledged (Dkt. 278, Ex. C), Grubhub obviously encouraged drivers to use its platform—just as it did restaurants and diners (Dkt. 279 ¶¶ 5–7). But that does not mean Delivery Partners were *essential* to the company's continued existence. To the contrary, Grubhub could (and successfully did) operate its platform without Delivery Partners. Trial Tr. 598:24–599:1; Dkt. 279 ¶¶ 6, 13. In fact, Grubhub earned money from commissions *regardless* whether or how the food was delivered. Dkt. 278 ¶¶ 5–6; Dkt. 279 ¶ 11. And just because Grubhub had the potential to earn money on each delivery performed by Delivery Partners does not mean their services were

*necessary* to its economic success. *See Ruggiero*, 137 F. Supp. 3d at 120, 122 ("[A]n agent will not be considered an employee of  company simply because" the company "benefits financially with each of the [agent's] sales" and "invests in the [agent's] success"). That is especially so because, in reality, Delivery Partners did not even incidentally contribute to Grubhub's bottom line during the relevant time period—Grubhub *lost* money on deliveries it facilitated. Dkt. 278 ¶ 11. Grubhub benefited much more so from restaurants and diners (*id.* ¶¶ 7–8), but no one suggests that makes them its employees.

Ignoring the economic realities of Grubhub's business, Lawson argues that *People v. Uber Technologies* controls here because the court in that case rejected Uber and Lyft's arguments that drivers' services were incidental to their platform-based businesses. *See* Dkt. 301 at 10–11, 16, 19. But that court merely affirmed the trial court's grant of a preliminary injunction under a deferential abuse of discretion standard without a full evidentiary record. 56 Cal. App. 5th at 292. The court of appeal "emphasize[d] that [its] conclusion … [wa]s not a final resolution of the merits" of Prong B, which was "ultimately to be determined after a *full trial*." *Id.* at 301 (emphasis added). And while the court suggested on a preliminary basis that "Defendants' businesses depend on riders paying for rides" (*id.* at 295), the same cannot be said here, given that Delivery Partners performed deliveries on only 2–3% of all orders[7] and generated substantial losses on those orders for Grubhub (Dkt. 278 ¶ 11, Ex. B).

Finally, although Lawson surmises that multi-apping "has nothing to do with Prong B," Delivery Partners' simultaneous use of other app-based platforms while using the Grubhub platform is undoubtedly relevant to the Prong B inquiry, since a company is not "dependent on the success of [a worker] who … primarily sells" for its competitors. *Ruggiero*, 137 F. Supp. 3d at 121. In *Ruggiero*, for example, the court held that because the plaintiff sold "only a small percentage of" the defendant's products as compared to its competitors, "it surely cannot be said that his services were critical to [the defendant's] business." *Id.* So too here. Grubhub makes its platform available to Delivery Partners to find opportunities for delivery services. And Lawson and other Delivery Partners regularly performed services using competitors' platforms while using the Grubhub platform (*see* Dkt. 277 ¶¶ 30–31; Dkt.

---

[7] Lawson argues that Delivery Partners were necessary to Grubhub's operations in Los Angeles because "more diners had Grubhub deliver their food than picked it up themselves." Dkt. 301 at 10. Not only is he wrong to focus solely on Los Angeles (*see supra* at 8–9), but even in the few California markets where Grubhub-facilitated delivery existed, only 11% of all orders were delivered by Delivery Partners, compared to the 83.5% that were delivered by restaurants (Trial Ex. 1483).

276 ¶ 10; Dkt. 221 at 4, 12), such that their services were not "critical" to Grubhub's business.

Plaintiff's reliance on *Hogan v. InStore Grp., LLC*, 512 F. Supp. 3d 157 (D. Mass. 2021) is misplaced. *See* Dkt. 301 at 19. Although the plaintiff there worked for one of the defendant's competitors, there was no indication that his work for the two companies overlapped or was performed simultaneously. *Hogan*, 512 F. Supp. 3d at 166. And, in concluding that the plaintiff performed services in the usual course of the company's business, the court focused solely on the fact that the company held itself out as providing the same services as the plaintiff. *Id.* at 185–86. But here, Grubhub did not hold itself out as a food delivery company, and Delivery Partners often used competitors' platforms simultaneously, rendering *Hogan* inapplicable.

### 4.      Delivery Partners Do Not Continuously Perform Work for Grubhub.

There can be no dispute that Delivery Partners do not "continuously perform[]" work using the Grubhub platform—an aspect of the Prong B inquiry that Lawson wholly overlooks. *See Vazquez*, 986 F.3d at 1125. As this Court already determined, the Delivery Service Provider Agreement did not create "an uninterrupted service arrangement" as each such agreement "had a 60-day term," provided that Delivery Partners were "free to stop making deliveries at any time," and "classified each block as a separate contractual engagement." Dkt. 221 at 27. As such, this Court found that "Grubhub did not count on its relationship with drivers being permanent." *Id.* It further concluded that Grubhub had "no regular delivery drivers" (*id.* at 32), and "neither Grubhub nor Mr. Lawson contemplated the work to be long term or regular, but rather episodic at Mr. Lawson's sole convenience" (*id.* at 30). That Delivery Partners enjoyed complete autonomy to decide when and whether to work at all (*see* Dkt. 277 ¶¶ 23–27; Dkt. 276 ¶ 7) underscores that they did not perform services for Grubhub "on a regular or continuous basis" (*Vazquez*, 986 F.3d at 1127; *see also Ruggiero*, 137 F. Supp. 3d at 121 (agent's services outside usual course of insurance company's business because he "brought in minimal business" for defendant and sold competitors' products simultaneously)). Grubhub thus satisfies Prong B, and Lawson was properly classified as an independent contractor.

### III.      CONCLUSION

Lawson did not suffer any minimum wage or overtime violations, and he is not an employee under either *Borello* or the ABC test. This Court should therefore enter judgment for Grubhub.

Gibson, Dunn & Crutcher LLP

1

Dated:  January 19, 2023                              GIBSON, DUNN & CRUTCHER LLP

2

3                                                                   By:   */s/ Theane Evangelis*
                                                                              Theane Evangelis
4

5                                                                   Attorneys for Defendants
                                                                    GRUBHUB HOLDINGS INC. and GRUBHUB INC.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28