1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

RAEF LAWSON,

Case No.  15-cv-05128-JSC

Plaintiff,

8

**ORDER RE: RULE 52 BRIEFS**

9

v.

Re: Dkt. Nos. 301, 302, 311

10

GRUBHUB, INC., et al.,

Defendants.

11

12

13

Raef Lawson alleges Grubhub improperly classified him as an independent contractor

14

rather than an employee under California law and in doing so violated California's minimum

15

wage, overtime, and employee expense reimbursement laws.  (Dkt. No. 41.)[1]  After a bench trial in

16

2017, the Court concluded Grubhub properly classified Mr. Lawson as an independent contractor

17

under the *Borello* standard and entered judgment in Defendants' favor.  *Lawson v. Grubhub, Inc.*

18

("*Lawson I*"), 302 F. Supp. 3d 1071 (N.D. Cal. 2018), *vacated and remanded*, 13 F.4th 908 (9th

19

Cir. 2021); *see S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 769 P.2d 399 (Cal. 1989).

20

Following various developments in the law, the ABC test, not *Borello*, governs Mr.

21

Lawson's minimum wage and overtime claims (unless an exemption applies).[2]  *See Lawson v.*

22

*Grubhub, Inc.* ("*Lawson II*"), 13 F.4th 908, 912–13, 916 (9th Cir. 2021); *Vazquez v. Jan-Pro*

23

24

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
ECF-generated page numbers at the top of the documents.

25

[2] The operative complaint has five claims.  (Dkt. No. 41.)  Count one (expense reimbursement)

26

remains governed by *Borello*.  (Dkt. No. 292); *see Lawson v. Grubhub, Inc.*, 13 F.4th 908, 917
(9th Cir. 2021) (remanding that issue).  Counts two (minimum wage) and three (overtime) are

27

governed by the ABC test unless an exemption applies.  *See Lawson II*, 13 F.4th at 916.  Counts
four (Unfair Competition Law) and five (Private Attorneys General Act penalties) are derivative

28

of the others.

1    *Franchising Int'l, Inc.*, 478 P.3d 1207, 1215–16 (Cal. 2021); *Dynamex Operations W. v. Superior*

2    *Court*, 416 P.3d 1, 40 (Cal. 2018); *see also* Cal. Lab. Code § 2775(b) (codifying ABC test).  The

3    Ninth Circuit remanded for this Court to determine whether an exemption applies and to apply the

4    ABC test in the first instance.  *Lawson II*, 13 F.4th at 915–16.  The Court gave Grubhub the

5    opportunity to supplement the evidence in the trial record.  (Dkt. No. 269; Dkt. No. 271 at 6–14.)

6         Before the Court are the parties' briefs pursuant to Federal Rule of Civil Procedure 52.

7    (Dkt. Nos. 301, 302.)[3]  Having carefully considered the briefing, and with the benefit of oral

8    argument on February 9, 2023, the Court makes the following findings of fact and conclusions of

9    law in Mr. Lawson's favor on his minimum wage claim, but not on his overtime claim.  All

10   findings of fact about Grubhub relate to the period before February 2016, when Mr. Lawson last

11   worked there.[4]

12                                **DISCUSSION**

13        "If a party has been fully heard on an issue during a nonjury trial and the court finds

14   against the party on that issue, the court may enter judgment against the party on a claim or

15   defense that, under the controlling law, can be maintained or defeated only with a favorable

16   finding on that issue."  Fed. R. Civ. P. 52(c).  "Rule 52(c) expressly authorizes the district judge to

17   resolve disputed issues of fact."  *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006).

18   "[T]he district court is not required to draw any inferences in favor of the non-moving party;

19   rather, the district court may make findings in accordance with its own view of the evidence."  *Id.*

20        Grubhub invokes the business-to-business exemption to the ABC test.  *See* Cal. Lab. Code

21   § 2776(a).  It has the burden to establish the exemption applies.  *See id.*; *Lawson II*, 13 F.4th at

22   917.  If so, then *Borello* governs Mr. Lawson's minimum wage and overtime claims, *see* Cal. Lab.

23   Code § 2776(a), and the Court's bench trial opinion found Mr. Lawson is properly classified as an

24   independent contractor under *Borello*.  If the exemption does not apply, Grubhub has the burden to

25

26   ───────────────

[3] Mr. Lawson's administrative motion to submit demonstratives is GRANTED.  (Dkt. No. 311.)

27   [4] The Court's legal analysis may contain findings of fact not included in the factual findings
     sections.  The Court intends all statements of fact to constitute a finding of fact regardless of
     where they appear in this Order; findings of fact from one section may be relevant to later sections

28   as well.

United States District Court
Northern District of California

1   show all three prongs of the ABC test are met in order to classify Mr. Lawson as an independent

2   contractor for his minimum wage and overtime claims.  *See id.* § 2775(b)(1); *Lawson II*, 13 F.4th

3   at 911–12.

4        The Court informed the parties it will consider the evidence in phases, starting with criteria

5   (2), (8), and (10) of the business-to-business exemption and Prong B.  (Dkt. No. 269 at 2.)  If

6   Grubhub meets its burden to establish three exemption criteria, further proceedings will consider

7   the other criteria; if it meets its burden to establish prong B, further proceedings will consider

8   Prongs A and C.  *See* Cal. Lab. Code §§ 2775(b)(1), 2776(a); *see also People v. Uber Techs., Inc.*,

9   270 Cal. Rptr. 3d 290, 308 (Cal. Ct. App. 2020), *as modified on denial of reh'g* (Nov. 20, 2020)

10  ("[T]here are three steps to the ABC test, these steps may be considered in any order, and the

11  analysis is at an end if the putative employer fails at any step.").

12  **I.      BUSINESS-TO-BUSINESS EXEMPTION**

13       Criteria (2), (8), and (10) of the business-to-business exemption require Grubhub to

14  establish the "individual acting as a sole proprietor, or a business entity formed as a partnership,

15  limited liability company, limited liability partnership, or corporation ('business service

16  provider')" who "contracts to provide services to another such business . . . ('contracting

17  business')":

18       (2) . . . is providing services directly to the contracting business rather
     than to customers of the contracting business. This subparagraph does
19   not apply if the business service provider's employees are solely
     performing the services under the contract under the name of the
20   business service provider and the business service provider regularly
     contracts with other businesses.
21
     (8) . . . advertises and holds itself out to the public as available to
22   provide the same or similar services.

23       (10) . . . can negotiate its own rates.

24  Cal. Lab. Code § 2776(a).

25       At the outset, Grubhub's assertion that in deciding whether the exemption applies the

26  Court must consider Grubhub's business (the contracting business) as a whole rather than in

27  relation to Mr. Lawson is incorrect as a matter of law.  The Labor Code requires the contracting

28  business to show "*[t]he* business service provider" meets each criterion.  *Id.* (emphasis added).

United States District Court
Northern District of California

1   Thus, the exemption focuses on Mr. Lawson's particular relationship with Grubhub.

2   As discussed below, Grubhub has not met its burden on criteria (8) and (10).  As such, the

3   Court need not analyze criterion (2).  *See* Cal. Lab. Code § 2776(a) (requiring contracting business

4   to "demonstrate[] that *all* of the following criteria are satisfied" (emphasis added)).

5   **A.      Criterion (8): Advertises & Holds Itself Out to the Public**

6   **1.      Findings of Fact**

7   Mr. Lawson was an aspiring actor, writer, producer, and director living in Los Angeles.

8   Before working for Grubhub, he drove for Lyft, Uber, Postmates, and Caviar.  He applied to

9   Grubhub in August 2015 and performed deliveries between October 2015 and February 2016.

10  Once a week, Grubhub released a schedule of available shifts called "blocks" through an

11  online program called "When I Work."  Grubhub determined which blocks to make available for

12  driver selection and the length of each block.  Grubhub released blocks for specific delivery zones.

13  Drivers were allowed to choose which zone they wanted to deliver in when they first contracted

14  with Grubhub.  When Mr. Lawson began driving for Grubhub there were three delivery zones in

15  the Los Angeles area.  Mr. Lawson chose the "Los Angeles–Metro" zone which was near his

16  home.  Grubhub later added a "South Bay" zone and Mr. Lawson signed up for that zone at some

17  point.  At his request, however, Grubhub reassigned him to the Los Angeles zone near his home.

18  Grubhub asked drivers to start each scheduled block in their zones and to stay near their

19  zones during their block.  At times Grubhub monitored whether drivers, such as Mr. Lawson, were

20  in their zone at the beginning of their block.  If the drivers were not in their zone, and, in response

21  to a Grubhub inquiry did not indicate that they intended to be in their zone to make deliveries,

22  Grubhub would remove the driver from that scheduled block; that is, the Grubhub app would not

23  send them any further delivery offers during that scheduled block.

24  Drivers selected their schedules by signing up for blocks on a weekly basis.  Blocks were

25  usually released on Sundays and were limited in availability on a first-come, first-served basis.

26  Each block was for a specific amount of time and drivers were required to register for an entire

27  block, not parts of it, if they chose to register for a block at all.  A block generally lasted from two

28  to five hours and was oriented around mealtimes.  Grubhub used the block system to have some

United States District Court
Northern District of California

4

1    idea of driver supply at a given time so that Grubhub could meet the anticipated demand for its

2    restaurant partners.  If a driver did not want to deliver during a block he signed up for, he could

3    drop it or swap it with another worker.

4           Mr. Lawson chose the blocks he wanted to work.  If Mr. Lawson did not want to work, he

5    did not schedule himself.  No one at Grubhub assigned Mr. Lawson blocks or instructed him to

6    sign up for blocks.  Mr. Lawson never made a delivery for Grubhub except during a scheduled

7    block.

8           Mr. Lawson's agreement with Grubhub did not preclude him from doing business with

9    other companies, even those that compete with Grubhub.  Mr. Lawson often accessed the

10   Postmates and Caviar apps during his Grubhub blocks and sometimes made deliveries for

11   Postmates and Caviar while working a scheduled Grubhub block.  For example, on January 29,

12   2016, Mr. Lawson scheduled himself for a 5:00 p.m. to 8:00 p.m. Grubhub block.  During that

13   time period he performed a delivery for Postmates and was logged in to the Caviar app during the

14   entire Grubhub block.  Mr. Lawson performed a delivery for Caviar or Postmates, and sometimes

15   more than one delivery, during 17 of the 87 Grubhub blocks that Mr. Lawson signed up for and

16   did not drop.  Although he worked for other apps, Mr. Lawson did not run his own delivery

17   business of which Grubhub was simply one client.  He did not have business cards and did not

18   contact diners himself without going through the Grubhub app.  Diners could not request that Mr.

19   Lawson, in particular, deliver food to them again.

20           **2.      Conclusions of Law**

21           Grubhub has not established Mr. Lawson advertised and held himself out to the public as

22   available to provide delivery services.  He did not run his own business, communicate with

23   customers through independent channels, or advertise in any way.

24           Grubhub's argument that Mr. Lawson advertised and held himself out simply by working

25   for competitors is unpersuasive.  That conduct does not show he advertised and held himself out

26   "to the public," a specific requirement of this criterion.  Cal. Lab. Code § 2776(a)(8).  The cases

27   Grubhub cites are not persuasive as they involved the "distinct occupation or business" factor of

28   the *Borello* test as well as very different facts.  *See Hennighan v. Insphere Ins. Sols., Inc.*, 38 F.

United States District Court
Northern District of California

5

Supp. 3d 1083, 1103 (N.D. Cal. 2014) (stating the plaintiff, a licensed insurance salesperson, "held himself out as a separate business" by selling elsewhere), *aff'd*, 650 F. App'x 500 (9th Cir. 2016); *Anderson v. Kids Included Together*, No. D074368, 2020 WL 4931373, at *9 (Cal. Ct. App. Aug. 24, 2020) (unpublished) (noting the plaintiff provided accounting services to other businesses as one piece of substantial evidence supporting lower court's conclusion under *Borello*).  The Court concludes that in Mr. Lawson's circumstances, working other jobs does not constitute "advertis[ing] and hold[ing] [one]self out to the public."  Cal. Lab. Code § 2776(a)(8).  Therefore, Grubhub has not met its burden on criterion (8).

### B.       Criterion (10): Can Negotiate Its Own Rates

#### 1.       Findings of Fact

Grubhub determined the delivery fee charged to diners ordering food though its platform. Mr. Lawson could not and did not negotiate with customers about how much they paid Grubhub for any delivery.

During the period Mr. Lawson delivered for Grubhub, the parties' written agreement provided drivers would receive a per-order-delivered payment plus tips and a nominal amount for mileage to the customer's home (or other specified delivery location) from the restaurant.  Until December 2015, if Mr. Lawson accepted 75% of the orders offered to him for delivery during his self-scheduled block, Grubhub guaranteed him $15 per hour for that block.  This was known as "true up" pay.  After December 2015, Grubhub reduced the true up to $11 per hour for completing 85% of the deliveries offered during the block.  Drivers had to be signed up for and working during a block to qualify for true up pay; drivers that toggled into the app without being scheduled for a block did not qualify for the guaranteed rate.  Mr. Lawson's pay statement showed how much he earned based on the per-delivery fee (including tips and mileage); if the amount he received per delivery was less than the guaranteed hourly minimum true up rate (assuming he satisfied the 75% acceptance rate), then his compensation was "trued up" to the minimum hourly guarantee.

Sometimes a delivery would extend Mr. Lawson beyond the end of his block, or at least Mr. Lawson would indicate through the app that he had completed the delivery outside his

scheduled block.  To receive compensation beyond his scheduled block, Mr. Lawson would contact Grubhub and report that his pay should be adjusted.  On each occasion, Grubhub adjusted his pay without any investigation or inquiry as to why or whether Mr. Lawson in fact made the delivery after the end of his scheduled block.

Grubhub paid Mr. Lawson the guaranteed true up rate for the blocks he scheduled provided he toggled himself "available" at some point during the block.  It paid him the full amount even when he toggled available after his block had started.  For example, Mr. Lawson toggled available at least five minutes late for over half of the approximately 87 blocks he was scheduled to deliver for Grubhub.  Of those, he toggled available more than 15 minutes late 27 times, more than 30 minutes late 19 times, and more than two and half hours late 11 times.  He toggled available more than three hours late for eight of his 87 blocks.  Even though Mr. Lawson was not available to receive offers for the entire period of his self-scheduled block, for each of these blocks Grubhub paid him the true up fee for the entire block.

While in theory Grubhub paid Mr. Lawson per delivery, in practice it paid him by the hour. Specifically, provided he accepted and delivered at least 75% (and later 85%) of the deliveries offered to him during a scheduled block, Grubhub paid him a minimum hourly rate.  Only one time during the four months Mr. Lawson delivered for Grubhub was Mr. Lawson paid per delivery.

Finally, while the parties' agreement stated that a driver could negotiate his own rate, that right was hypothetical rather than real.  Mr. Lawson could not negotiate how much Grubhub paid him for his delivery services.

### 2.    Conclusions of Law

Grubhub has not established either that Mr. Lawson actually negotiated his own rates or that he could do so.  *See Roman v. Jan-Pro Franchising Int'l, Inc.*, 342 F.R.D. 274, 308–09 (N.D. Cal. 2022) (concluding evidence showed workers could not negotiate their own rates).  Disputed evidence that some drivers "developed relationships with certain corporate clients who would specifically request them," (Dkt. No. 276 at 4), even if resolved in Grubhub's favor, cannot meet Grubhub's burden because it does not speak to Mr. Lawson in particular.  *See* Cal. Lab. Code §

2776(a). Grubhub has not established that Mr. Lawson had access to corporate clients who could request him in a way that, the evidence shows, regular customers could not.

Grubhub's argument that it sometimes offered drivers a higher rate if a delivery offer had not been accepted is unpersuasive. That Grubhub revoked an offer prior to acceptance does not establish Mr. Lawson could negotiate (i.e., by rejecting or counteroffering). Under principles of contract law, the offeror's ability to revoke and make a new offer is distinct from the offeree's ability to reject or counteroffer. *See* 1 Witkin, Summary of California Law, Contracts § 156 (11th ed., May 2022 update) ("An offer gives the offeree a continuing power to create a contract by acceptance of the offer before the power has been terminated. The power may be terminated by [*inter alia*] . . . revocation by the offeror; [or] rejection or counteroffer by the offeree . . . ."); *T. M. Cobb Co. v. Superior Court*, 682 P.2d 338, 340 (Cal. 1984) ("It is a well-established principle of contract law that an offer may be revoked by the offeror any time prior to acceptance."); *see also* Restatement (Second) of Contracts § 39, comment (a) (Am. Law Inst. 1981, Oct. 2022 update) ("It is often said that a counter-offer is a rejection, and it does have the same effect in terminating the offeree's power of acceptance. But . . . [a] counter-offer must be capable of being accepted; it carries negotiations on rather than breaking them off."). As such, evidence that Grubhub revoked and made better offers is not probative of Mr. Lawson's ability to negotiate and does not meet Grubhub's burden on criterion (10).

\* \* \*

Grubhub has not established criteria (8) and (10) of the business-to-business exemption. *See Ritchie*, 451 F.3d at 1023. Because it does not satisfy two required criteria, no further proceedings are necessary to conclude it does not qualify for the exemption. *See* Cal. Lab. Code § 2776(a). Therefore, the ABC test governs Mr. Lawson's minimum wage and overtime claims. *See id.* §§ 2776(a), 2775(b)(1).

## II.  PRONG B

Prong B requires Grubhub to establish the "person providing labor or services for remuneration . . . performs work that is outside the usual course of the hiring entity's business." Cal. Lab. Code § 2775(b)(1)(B). Like the other prongs, Prong B is a "prominent factor[] already

listed in *Borello*."  *Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106, 1124 (9th Cir.

2021).  It corresponds to "whether or not the work is a part of the regular business of the

principal," one of several factors secondary to the main *Borello* inquiry: "whether the person to

whom service is rendered has the right to control the manner and means of accomplishing the

result desired."  *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 989 (9th Cir. 2014)

(quoting *Borello*, 769 P.2d at 404); *see Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 650 (9th Cir.

2021) ("[W]hile *Borello* considered whether or not the work is a part of the regular business of the

principal as only one factor in the classification analysis, the ABC test presumed a worker was an

employee unless the worker met that condition." (cleaned up)).

Prong B "reflects the distinction between workers who are truly independent contractors

and those whose work involves the hiring entity's usual course of business."  *Vazquez*, 986 F.3d at

1125.

> Analytically, courts have framed the Prong B inquiry in several ways.
> They have considered whether the work of the employee is necessary
> to or merely incidental to that of the hiring entity, whether the work
> of the employee is continuously performed for the hiring entity, and
> what business the hiring entity proclaims to be in.  All of these
> formulations should be considered . . . .

*Id.* (cleaned up).

> Thus, on the one hand, when a retail store hires an outside plumber to
> repair a leak in a bathroom on its premises or hires an outside
> electrician to install a new electrical line, the services of the plumber
> or electrician are not part of the store's usual course of business . . . .
> On the other hand, when a clothing manufacturing company hires
> work-at-home seamstresses to make dresses from cloth and patterns
> supplied by the company that will thereafter be sold by the company,
> or when a bakery hires cake decorators to work on a regular basis on
> its custom-designed cakes, the workers are part of the hiring entity's
> usual business operation . . . .

*Dynamex*, 416 P.3d at 37 (cleaned up); *see People v. Superior Court*, 271 Cal. Rptr. 3d 570, 574

(Ct. App. 2020) (noting Labor Code's Prong B codifies the test announced in *Dynamex*).

The first analytical framework is "whether the putative employees were 'necessary' or

'incidental' to the hiring entity's business."  *Vazquez*, 986 F.3d at 1125.  "In some cases, this

inquiry can be conducted through a common-sense observation of the nature of the businesses."

*Id.*  So, for example, floor measurers were found necessary to the business of a carpet retailer,

United States District Court
Northern District of California

9

while "highly specialized restoration" workers were not necessary to a "general contracting firm doing a mix of residential and commercial work." *Id.* at 1126 (cleaned up). "In other cases, courts view the 'necessary' versus 'incidental' distinction in more economic terms," and find that putative employees are necessary where the business "earns a percentage" and "is not indifferent to how much work [putative employees] do or how well they perform that work." *Id.*

The second framework is "whether the services of the putative employee are continuously used by the hiring entity." *Id.* "This approach also helps capture the distinction between independent contractor arrangements designed to evade requirements placed on employers and traditional contractors like electricians and plumbers, who perform incidental services for otherwise unrelated businesses." *Id.* "[A] hiring entity cannot meet its burden under Prong B when it performs the putative employee's activity on a regular or continuous basis, without regard to the substantiality of the activity in relation to the enterprise's other business activities." *Id.* at 1126–27 (cleaned up; directing district court to consider "whether [the hiring entity's] business model relies on [putative employees] continuously performing cleaning services").

The third framework is "how the business describes itself." *Id.* at 1127. A business that "publicly advertise[s] the provision of dental services" is in the usual course of business of dentistry. *Id.* (cleaned up; directing district court to consider significance of hiring entity describing itself as "provid[ing] cleaning services").

### A.     Findings of Fact

Grubhub is an internet food ordering service that connects diners to local restaurants. The company was founded in 2004 as an online platform where diners could order food from local restaurants. Grubhub began offering food delivery in select markets in 2014. By providing delivery services, Grubhub increased the number of restaurants it could offer to diners on its online platform. Customers order food through Grubhub's online platform; Grubhub transmits the orders to restaurants; and the food is either delivered by a restaurant delivery person, delivered by a Grubhub driver, or picked up by the diner.

As of 2016, Grubhub operated in 1,200 markets in the United States. Of those markets, 250 were in California and of those Grubhub offered its own delivery services in five, including

Los Angeles.  There were 4,000 Grubhub delivery drivers in California.  In the five California markets where Grubhub offered delivery services, the majority of Grubhub's diners had their meals delivered by the restaurants.  For the remaining customers, Grubhub delivered meals more than the customers picked up the food themselves.  Grubhub drivers delivered 2-3% of orders nationwide and 11-12% of orders within the five California markets where Grubhub offered delivery services.

Grubhub was aggressively growing its delivery business in 2015 and, in particular, offering delivery services was key to Grubhub's continued growth in urban markets such as Los Angeles.  To facilitate its delivery services, Grubhub developed an entire mobile app and algorithm and created entire company departments of people it classified as employees.  When Mr. Lawson first contracted with Grubhub, Grubhub employed driver coordinators whose primary responsibility was driver recruitment.  As part of the onboarding process, the driver coordinators phone-screened the delivery applicants to, among other things, ensure they had a proper delivery vehicle.  Approximately 60% of Grubhub's acknowledged employees worked in departments that supported driver deliveries in some way.[5]  In part, the Data & Software Engineering and Product & Design departments created web and mobile app interfaces used by diners, restaurants, and delivery drivers; the Logistics & Operations department had a Driver Network team to support deliveries; and the Customer Care and Delivery Support departments communicated with diners, restaurants, and delivery drivers about delivery orders.

Grubhub earned revenue on deliveries from both restaurants and diners.  Restaurants paid a fee set by Grubhub, sometimes consisting of a fee per delivery order and other times a percentage of each delivery order amount.  Diners sometimes paid Grubhub a fee per delivery order and a tip; the latter was meant to be passed on to the delivery driver.

---

[5] During the relevant time period, 557–611 employees worked in the Data & Software Engineering, Product & Design, Logistics & Operations, Customer Care, and Delivery Support departments, combined.  Grubhub had 821–1,007 acknowledged employees.  Thus, 60-67% of employees worked in departments that supported driver deliveries in some way.  However, even if the Court resolved this disputed issue of fact in Grubhub's favor and accepted that only 4-5% of employees focused on supporting delivery orders, the Court would still conclude delivering food was within the usual course of Grubhub's business.

United States District Court
Northern District of California

Delivery services were not profitable in late 2015 and early 2016, but Grubhub invested in them to expand the number of restaurants it could offer to diners, encourage diners to use Grubhub rather than its competitors, and prompt them to order more frequently.

### B.      Conclusions of Law

Grubhub has not met its burden to establish Mr. Lawson performed work "outside the usual course" of its business.  Cal. Lab. Code § 2775(b)(1)(B).  Under any of the frameworks set out in *Vazquez*, 986 F.3d at 1125–28, Mr. Lawson's work delivering food was within the usual course of Grubhub's business of connecting restaurants with diners to facilitate food ordering.

First, the simple economics show delivery services were "necessary" to the business because Grubhub made more money if drivers made more deliveries.  *Id.* at 1125.  Grubhub structured its business to earn either a fee per delivery order or a percentage of the order from restaurants and/or diners.  Therefore, it was "not indifferent to how much work" drivers did "or how well they perform[ed] that work."  *Id.* at 1126; *see Roman*, 342 F.R.D. at 305–06 (noting hiring entity's revenue "depended on the amount of work that unit franchisees performed"); *cf. Sebago v. Boston Cab Dispatch, Inc.*, 471 Mass. 321, 325, 333–34 (2015) (noting taxicab drivers pay a flat-rate leasing fee to lease a taxi medallion from medallion owners and concluding "medallion owners are not concerned with the results of the plaintiffs' operations, as drivers are not required to remit a percentage of their revenues").  Supposing a delivery driver arrived late and the customer decided never to order through Grubhub again, Grubhub would earn less money; if the driver did a good job and the customer started ordering through Grubhub several times a week, Grubhub would earn more.  That economic relationship shows the drivers' work was necessary to and not incidental to Grubhub's business.  *See Uber*, 56 Cal. App. 5th at 295 (noting "defendants' revenues are directly connected to the fees that riders pay for each ride" and concluding drivers "perform services . . . in the usual course of defendants' businesses"); *McPherson Timberlands, Inc. v. Unemployment Ins. Comm'n*, 714 A.2d 818, 822 (Me. 1998) (noting hiring entity's "business encompassed locating, obtaining, and selling timber at a profit" and it derived a profit from selling timber that the putative employee had harvested); *see also Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459, 477–78 (9th Cir. 2023) (citing *Uber*); *Vazquez*, 986 F.3d at 1126 (citing

12

*Sebago* and *McPherson*).  That Grubhub did not offer delivery services from its inception and could have stayed in business without delivery services does not change that, under its business model, it earned more if drivers worked more.

As to the second *Vazquez* framework, 986 F.3d at 1126, Grubhub performed delivery services on a continuous basis in the Los Angeles market.  Once it deliberately entered the delivery services market in that area, it provided them continuously for at least the period when Mr. Lawson worked there.  *See Bigfoot's, Inc. v. Bd. of Rev. of Indus. Comm'n of Utah*, 710 P.2d 180, 181 (Utah 1985) (noting that over 15 months, bar "engaged numerous bands and entertainers . . . to attract customers and increase business"); *see also Vazquez*, 986 F.3d at 1127 (citing *Bigfoot's*); *cf. Sagar v. Fiorenza*, No. MI-CV-2012-04081-F, 2014 WL 794966, at *6–7 (Mass. Super. Jan. 18, 2014) (finding dispute of material fact as to whether hiring entity provided taxi services in its "usual" course of business: "There is nothing in the summary judgment record to demonstrate that Ambassador provided taxi services during most of its business operations, or even that it did so regularly.  There is no evidence of how frequently Ambassador provided taxi services to its corporate customers, or what proportion of its business activities was comprised of providing such services.").  Grubhub's argument that Mr. Lawson and other drivers *each* worked sporadically does not match the legal standard, which asks whether the "*hiring entity* . . . performs the putative employee's activity on a regular or continuous basis, without regard to the substantiality of the activity in relation to the enterprise's other business activities." *Vazquez*, 986 F.3d at 1126–27 (cleaned up; emphasis added); *see id.* at 1125 ("whether *the work of* the employee is continuously performed for the hiring entity" (emphasis added)), 1127 (directing district court to consider "whether [the hiring entity's] business model relies on unit franchisees continuously performing cleaning services").  Grubhub did so.

Third, Grubhub publicly advertised delivery services to diners.  Diners using Grubhub's website or app could order from restaurants and, among other options, have their orders delivered by Grubhub drivers.  Thus, Grubhub held itself out as offering the service that Mr. Lawson performed.  *See Gerber Dental Ctr. Corp. v. Me. Unemployment Ins. Comm'n*, 531 A.2d 1262, 1262, 1264 (Me. 1987) (noting hiring entity "advertises in the telephone book yellow pages under

'dentists'" and therefore "publicly advertises its provision of dental services"); *see also Vazquez*, 986 F.3d at 1127 (citing *Gerber*).  That Grubhub has styled itself "a multi-sided platform that enables restaurants to market themselves and connect with customers to facilitate online food ordering," (Dkt. No. 301 at 7), does not change that it publicly advertised that it provided delivery services.  *Cf. Roman*, 342 F.R.D. at 306 ("[D]efendant did not hold itself out *to the public* as supporting master franchisees.  It held itself out as a cleaning business.").

Moreover, courts have rejected attempts by hiring entities to categorize their business as merely enabling, facilitating, or coordinating services rather than providing those services.  *See Bowerman*, 60 F.4th at 477 (rejecting hiring entity's argument that "it does not itself perform preservation services, but coordinates the completion of preservation services, an activity distinctly different from the business of property preservation," and noting "[s]tating the proposition is alone enough to show its fatal shortcomings" (cleaned up)); *Uber*, 56 Cal. App. 5th at 292–94 (reviewing cases "dismiss[ing] out of hand" the argument that "ride-sharing companies such as Lyft and Uber are in the business solely of creating technological platforms, not of transporting passengers"); *see also Bowerman*, 60 F.4th at 477–78 (citing *Uber*).

Apart from the three *Vazquez* frameworks, Grubhub's delivery drivers simply do not match the paradigmatic lawful independent contracting arrangements that satisfy Prong B.  "[W]hen a retail store hires an outside plumber to repair a leak in a bathroom on its premises or hires an outside electrician to install a new electrical line, the services of the plumber or electrician are not part of the store's usual course of business."  *Dynamex*, 416 P.3d at 37; *see Vazquez*, 986 F.3d at 1125 (citing this portion of *Dynamex* for the proposition that Prong B "reflects the distinction between workers who are truly independent contractors and those whose work involves the hiring entity's usual course of business").  The rest of Grubhub's business was restaurant marketing, transmitting orders between diners and restaurants, and facilitating delivery by the restaurants or pickup by the diners.  "[C]ommon-sense observation," *Vazquez*, 986 F.3d at 1125, shows the relationship between those aspects of its business and the delivery services aspect of its business is much closer than the relationship between a retail store and plumbing or electrician services.  *Cf. Great N. Constr., Inc. v. Dep't of Lab.*, 161 A.3d 1207, 1217 (Vt. 2016) (noting putative

1    employee's "highly specialized tools, equipment and expertise" in restoration work enabled hiring

2    entity to "perform work in a specialized segment of the construction market," but was outside its

3    usual course of business in "general remodeling and construction"); *Vazquez*, 986 F.3d at 1126

4    (citing *Great N.*).

5    At oral argument, Grubhub emphasized that Grubhub drivers fulfilled only 2-3% of orders

6    nationwide.  From there, it compared this case to *Haitayan v. 7-Eleven, Inc.*, in which the court

7    noted 7-Eleven owned and operated 1-2.5% of its stores in California and franchised the rest.  No.

8    CV-17-7454-DSF (ASX), 2021 WL 4078727, at *17 (C.D. Cal. Sept. 8, 2021), *aff'd*, No. 21-

9    56144, 2022 WL 17547805 (9th Cir. Dec. 9, 2022).  It is more probative that drivers delivered 11-

10   12% of orders within the five California markets where Grubhub offered delivery services and

11   60% of Grubhub's classified employees worked in departments that supported driver deliveries in

12   some way.  And Prong B does not require the putative employee's aspect of the business to be the

13   majority or a substantial percentage of the hiring entity's business.  It is a qualitative, not merely

14   quantitative, inquiry into the usual course of the hiring entity's business.  *See Vazquez*, 986 F.3d at

15   1127 ("without regard to the substantiality of the activity in relation to the enterprise's other

16   business activities" (cleaned up)).

17   Even so, the *Haitayan* comparison is apples to oranges.  The district court did not find the

18   franchisees were not employees because they constituted a small percentage of the overall

19   business (they were not); instead, the court rejected the plaintiff's argument that because 7-Eleven

20   owned a small percentage of stores run by its acknowledged employees that meant the franchisees

21   who ran the large percentage of stores were therefore also employees.  *See Haitayan*, 2021 WL

22   4078727, at *17.  No such argument is being or can be made here.  Thus, *Haitayan* does not

23   support Grubhub's argument that a small percentage of the overall business means those putative

24   employees are not necessary to the hiring entity's business.  Moreover, *Haitayan*'s reasoning on

25   the hiring entity's core business is inapposite because it focuses on franchising "as a distinct form

26   of business."  *Id.*

27            7-Eleven primarily locates and develops store sites, markets and sells
             franchises, licenses the right to use its intellectual property, develops
28            an operations manual that sets forth its recommended practices, leases

United States District Court
Northern District of California

15

> property and equipment, conducts advertising, develops new products, and provides back office support and business advisory assistance to franchisees. Plaintiffs do none of these things. Instead, they order and price products, maintain equipment, hire and oversee employees, and operate the stores.

*Id.* (cleaned up). The court found the business of franchising different in kind from the business of operating stores. Here, the business of restaurant food delivery is not comparably different in kind from the business of restaurant food ordering.

*Guynn-Neupane v. Magna Legal Services, LLC* is a better case for Grubhub, but still distinguishable. No. 19-CV-02652-VKD, 2021 WL 4481661, at *29 (N.D. Cal. Sept. 30, 2021). There, the putative employee served as a mock juror for one day for a litigation consulting company, and the court concluded such services were outside the company's usual course of business. The court noted "[j]ury focus groups comprise only a portion of Magna's consulting, deposition, and record retrieval services," and "it is not always necessary to conduct a jury focus group for any particular client engagement." *Id.* That reasoning supports Grubhub's argument about delivery drivers' percentage of Grubhub orders. But the court also explained that mock jurors' role was to "provide data": "There are no 'right' or 'wrong' responses, and Magna values active and disengaged mock jurors alike." *Id.* "Similarly, in economic terms, Magna pays focus group participants a flat fee. There is no indication that Magna's revenues are affected by the responses mock jurors provide or how actively they participate in the process." *Id.* (cleaned up). That reasoning does not hold here. Grubhub has an economic interest in how well drivers do their jobs.

Grubhub's percentage argument is also faulty because it would lead to inconsistent application between large and small hiring entities. For a huge company, any one aspect of its business might represent a small percentage of its transactions, revenues, and putative employees. Thus, it could more easily classify workers in any one aspect of the business as independent contractors than could a small company—even if that aspect of the business is the company's bread and butter. That inconsistency goes against two core rationales for the ABC test under California law. First, the ABC test seeks to protect workers by "enabl[ing] them to provide at least minimally for themselves and their families and to accord them a modicum of dignity and

16

self-respect." *Dynamex*, 416 P.3d at 32.  Second, the ABC test seeks to benefit "those law-abiding businesses that comply" with the law, "ensuring that such responsible companies are not hurt by unfair competition from competitor businesses that utilize substandard employment practices." *Id.* Interpreting Prong B to rest on the percentage of the hiring entity's business would impede both rationales because it would lead to inconsistent application between large and small entities.

Finally, Grubhub's argument that delivery services are incidental because it lost money from them is unpersuasive.  Profitability is relevant to Prong B, but not dispositive.  That Grubhub invested in delivery not withstanding it was not immediately profitable actually underscores that delivery services were necessary and squarely within the usual course of Grubhub's business.  It demonstrates there was an interplay between delivery services and other aspects of Grubhub's business: Grubhub pursued the former in order to grow the latter.  So too with Grubhub's argument that drivers are its customers, not employees.  Grubhub pays drivers for their work.  That it must compete for drivers' labor—just as it must compete for executives and software developers—and that drivers must use the app to perform their work in no way makes them Grubhub's customers.

\* \* \*

Grubhub has not met its burden to establish Mr. Lawson "performs work that is outside the usual course of [its] business."  Cal. Lab. Code § 2775(b)(1)(B); *see Ritchie*, 451 F.3d at 1023. The usual course of its business is connecting restaurants with diners to facilitate food ordering. Food delivery is not outside the usual course of that business.  Because Grubhub has not established Prong B, it does not meet the ABC test and Mr. Lawson is properly classified as an employee for purposes of his minimum wage and overtime claims.  *See* Cal. Lab. Code § 2775(b)(1); *Vazquez*, 986 F.3d at 1125 ("[T]he ABC test is conjunctive, so a finding of any prong against the hiring entity directs a finding of an employer-employee relationship.").

## III.    MERITS OF MINIMUM WAGE & OVERTIME CLAIMS

Because Mr. Lawson is properly classified as an employee, he is entitled to the protections of minimum wage and overtime.  *See* Cal. Lab. Code §§ 1194, 1197.

"[W]age and hour claims are today governed by two complementary and occasionally

United States District Court
Northern District of California

overlapping sources of authority: the provisions of the Labor Code, enacted by the Legislature, and a series of 18 wage orders, adopted by the [Industrial Welfare Commission]." *Mendiola v. CPS Sec. Sols., Inc.*, 60 Cal. 4th 833, 838 (2015) (cleaned up). "The IWC, a state agency, was empowered to issue wage orders, which are legislative regulations specifying minimum requirements with respect to wages, hours, and working conditions." *Id.* "[W]age orders are the type of remedial legislation that must be liberally construed in a manner that serves its remedial purposes of protecting and benefitting employees." *Frlekin v. Apple Inc.*, 8 Cal. 5th 1038, 1045 (2020) (cleaned up).

For Mr. Lawson, the relevant minimum wage and overtime thresholds are found in Wage Order 9, which regulates "the transportation industry." Cal. Code Regs., tit. 8, § 11090. Wage Order 9 requires employers to pay their employees a minimum wage for all "hours worked," *id.* § 11090(4)(A), which is defined as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so," *id.* § 11090(2)(G). The California minimum wage was $9.00 in 2015 and $10.00 in 2016.[6] As for overtime, Wage Order 9 provides:

> [E]mployees shall not be employed more than eight (8) hours in any workday or more than 40 hours in any workweek unless the employee receives one and one-half (1½) times such employee's regular rate of pay for all hours worked over 40 hours in the workweek. Eight (8) hours of labor constitutes a day's work. Employment beyond eight (8) hours in any workday or more than six (6) days in any workweek is permissible provided the employee is compensated for such overtime at not less than:
>
> (a) One and one-half (1½) times the employee's regular rate of pay for all hours worked in excess of eight (8) hours up to and including 12 hours in any workday, and for the first eight (8) hours worked on the seventh (7th) consecutive day of work in a workweek; and
>
> (b) Double the employee's regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of eight (8) hours on the seventh (7th) consecutive day of work in a workweek.

*Id.* § 11090(3)(A)(1).

---

[6] *See History of California Minimum Wage*, STATE OF CAL. DEPT. OF INDUS. RELATIONS, https://www.dir.ca.gov/iwc/minimumwagehistory.htm (last visited Mar. 20, 2023).

United States District Court
Northern District of California

**A.      Work Time**

Wage Order 9's "two phrases of the 'hours worked' definition"—control and suffer or permit—"establish independent factors, each of which defines whether certain time spent is compensable." *Frlekin*, 8 Cal. 5th at 1046 (cleaned up).  "Thus, an employee who is *subject to the control* of an employer does not have to be working during that time to be compensated under the applicable wage order." *Id.* (cleaned up); *see Ridgeway v. Walmart Inc.*, 946 F.3d 1066, 1078 (9th Cir. 2020).  "Likewise, an employee who is *suffered or permitted to work* does not have to be under the employer's control to be compensated, provided the employer has or should have knowledge of the employee's work." *Frlekin*, 8 Cal. 5th at 1046 (cleaned up); *see Morillion v. Royal Packing Co.*, 995 P.2d 139, 145 (Cal. 2000), *as modified* (May 10, 2000).

To determine whether Mr. Lawson was properly paid minimum wage and overtime, the Court must determine his compensable work time.

**1.      Findings of Fact**

Mr. Lawson executed a "Delivery Service Provider Agreement" with Grubhub on August 28, 2015.  The Agreement includes the following terms, among others:

- **Availability:** There is no specific minimum period of time for which the driver must make himself available.  Each day the driver makes himself available is treated as a separate contractual engagement.  The driver has complete discretion to select the dates he is available to perform the delivery services and has no obligation to make himself available on any particular date.  However, once the driver agrees to an engagement, the driver is contractually bound to fully perform the engagement on the specified date.

- **Service Level Agreement:** The driver agrees to comply with Appendix A, the "Service Level Agreement," which requires that the driver: (1) download the necessary tools to fulfill orders, (2) sign up for weekly blocks either through the Grubhub driver app or other means, (3) provide a status update to a dispatcher that the driver is "on call" when a delivery block starts, (4) not reject incoming orders or be otherwise unavailable to receive incoming orders during any scheduled delivery block with exceptions for "extenuating circumstances" if the driver timely communicates such circumstances to a dispatcher, (5)

United States District Court
Northern District of California

provide status updates upon arrival at a restaurant, after receiving the food, and leaving the restaurant for delivery, (6) communicate with the care team or a dispatcher if there are diner issues, and (7) have no more than one moving violation in 24 months and no involvement in any at fault accidents.  Failure to comply with this provision constitutes a material breach.

- **Delivery Service Failure:** If the driver fails to fully perform a delivery he is contractually bound to perform, fails to follow order instructions, or fails to abide by the Service Level Agreement, the driver forfeits the agreed upon service fee for the job to the extent the driver is responsible for the failure.

The Agreement was amended by Grubhub on December 5, 2015.  Mr. Lawson agreed to the amendments in writing.  Among other changes, the Service Level Agreement was amended by removing the language that suggested drivers had to sign up for weekly blocks, not reject orders, and receive incoming orders during any scheduled delivery block with exceptions for "extenuating circumstances."  After the amendment, the Agreement required drivers to be located within a reasonable distance of restaurants in the area where the driver is contracted to work.

Mr. Lawson signed up for blocks (between two and five hours) during which he made deliveries.  He was expected to toggle himself available in the Grubhub app during his self-scheduled blocks and would then receive delivery offers which he could accept or reject.  When he accepted a delivery offer, he was expected to pick up food from the restaurant and deliver it to the customer.  Grubhub used the block system to have some idea of driver supply at a given time so that Grubhub could meet the anticipated demand for its restaurant partners.

Mr. Lawson sometimes gamed the app by scheduling himself for a block and ensuring that he received few, if any, delivery offers so that he would receive the true up minimum guarantee for performing none or maybe one delivery during an entire block.  He did so by (1) turning his cellphone on airplane mode or otherwise making his cellphone "out of network," (2) toggling "available" for his self-scheduled block well after the block began, and (3) reporting through the app that he had completed a delivery after the end of his scheduled block.  Two examples are set forth below.

- **December 31:** Mr. Lawson's four-hour block began at 5:00 p.m., but he did not toggle available until 8:15 p.m. He received and accepted an order shortly thereafter, at around 8:21 p.m. He picked up the order at 8:42 p.m., but did not record that he delivered the order until 9:14 p.m. Even though he did not toggle available until three hours after his block began, he was paid the full true up amount for a block of 4.33 hours and received $47.63.

- **January 11:** Mr. Lawson's four-hour block started at 5:00 p.m., but he did not toggle available until 7:57 p.m. He was offered two deliveries during the one hour of his block he was available. The second delivery was offered to him at 8:54 p.m. He accepted the offer and reported completing the delivery at 9:29 p.m. (He apparently never reported picking up the delivery from the restaurant.) Mr. Lawson then asked Grubhub to extend his block an additional 30 minutes due to the delivery made after the end of his block; in doing so, he did not mention that he had started his block nearly three hours late. Grubhub paid him the true up guarantee for a 4.5 hour block.

Mr. Lawson's claimed ignorance of his dishonest conduct at trial was not credible. He did not deny putting his phone on airplane mode, intentionally toggling available late, or deliberately engaging in other conduct to get paid for not working. Additionally, during discovery he produced a resume falsely representing he attended a Loyola Marymount University Master of Fine Arts program from August 2012 to May 2015, and even lists a specific grade point average; however, Mr. Lawson was only enrolled in the program for one year and did not graduate. When confronted at trial, Mr. Lawson testified he listed all three years because he was "still involved in various activities" and he felt "still part of [the Loyola Marymount] community." (Dkt. No. 208 at 48:13–16.) This explanation is not credible, and further supports the Court's finding that Mr. Lawson intentionally manipulated the app.

On February 15, 2016, Grubhub terminated its Agreement with Mr. Lawson based on Mr. Lawson's material breach of its terms. It did so by sending Mr. Lawson an email stating "you have not been available to receive orders and have not performed delivery services during a high proportion of the delivery blocks that you have signed up for. As a result of this material breach

21

of Section 3.3 of your Delivery Service Provider Agreement . . . , you are being notified that GrubHub is terminating your Agreement, effective immediately, in accordance with Section 13.1.1 of your Agreement."  (Trial Ex. 75.)

### 2.    Conclusions of Law

Mr. Lawson had four categories of potentially compensable work time: (1) time when he was performing deliveries (whether on-block or shortly after a block had ended); (2) time when he was on-block, toggled available, and in-network, but not performing deliveries; (3) time when he was on-block and toggled available, but intentionally out-of-network; and (4) time when he was on-block but had not toggled available.

### a.    Performing Deliveries

The first category is clearly compensable.  When Mr. Lawson had accepted a delivery offer and was performing a delivery, Grubhub "suffered or permitted" him to work.  *Morillion*, 995 P.2d at 145 ("'suffer' and 'permit' . . . mean with the knowledge of the employer" (cleaned up)); *see Hernandez v. Pac. Bell Tel. Co.*, 239 Cal. Rptr. 3d 852, 860 (Ct. App. 2018) ("[T]he standard of 'suffered or permitted to work' is met when an employee is engaged in certain tasks or exertion that a manager would recognize as work." (cleaned up)).  Mr. Lawson was also "subject to [Grubhub's] control" during that time, *Morillion*, 995 P.2d at 144 (cleaned up), because Grubhub required him to drive to the restaurant, pick up the order, deliver it to the diner, and communicate with Grubhub throughout.  Thus, under either definition of hours worked, Mr. Lawson was working during this time.  *See Hernandez*, 239 Cal. Rptr. 3d at 856.

### b.    On-Block, Toggled Available, and In-Network, but not Performing Deliveries

The second category is also compensable.  The California Supreme Court recently "reaffirm[ed]" that:

> the level of the employer's control over its employees, rather than the mere fact that the employer requires the employees' activity, is determinative concerning whether an activity is compensable under the "hours worked" control clause.  We also emphasize that whether an activity is required remains probative in determining whether an employee is subject to the employer's control.  But, at least with regard to cases involving *onsite* employer-controlled activities, the mandatory nature of an activity is not the only factor to consider.  We

> conclude that courts may and should consider additional relevant factors—including, but not limited to, the location of the activity, the degree of the employer's control, whether the activity primarily benefits the employee or employer, and whether the activity is enforced through disciplinary measures—when evaluating such employer-controlled conduct.

*Frlekin*, 8 Cal. 5th at 1056 (cleaned up).  By self-scheduling a block and then toggling himself available, Mr. Lawson presented himself as available to accept delivery offers from Grubhub.  Throughout his on-block time, he could accept delivery offers that were made to him.  But even when he had not yet accepted a delivery offer, Mr. Lawson was subject to Grubhub's control under *Frlekin*.  *See id.*; *Morillion*, 995 P.2d at 144.

Grubhub "required" Mr. Lawson to spend some amount of time on-block, toggled available, and in-network, but not performing deliveries, because it structured this part of its business around on-demand deliveries.  *Frlekin*, 8 Cal. 5th at 1056; *cf. Mendiola*, 60 Cal. 4th at 841–42 ("[T]he guards' on-call time was spent primarily for the benefit of [the employer] . . . [whose] business model is based on the idea that construction sites should have an active security presence during the morning and evening hours when construction workers arrive and depart the site, but that theft and vandalism during the night and weekend hours can be deterred effectively by the mere presence of a security guard in a residential trailer." (cleaned up)).  Drivers did not have the option to receive a list of preplanned orders at the beginning of their block; they had to wait for delivery offers to come in.  As a result, Mr. Lawson could not have spent all his on-block time performing deliveries.  This second category of time was therefore required.

Grubhub did not require Mr. Lawson to be at a particular location or workplace when he was on-block, toggled available, and in-network, but not performing deliveries.  *Cf. Frlekin*, 8 Cal. 5th at 1051 ("Apple controls its employees *at the workplace*, where the employer's interest—here, deterring theft—is inherently greater."), 1047 (noting one way employer exercises control is by "confin[ing] its employees to the premises as they wait for and undergo an exit search").  It did, however, require him to be within a reasonable distance of the area of his self-scheduled block.

Grubhub exerted a moderate degree of control over Mr. Lawson during this time.  *See id.* at 1053.  Most fundamentally, Grubhub instructed Mr. Lawson not to reject incoming orders or be otherwise unavailable to receive incoming orders.  *See Morillion*, 995 P.2d at 147 ("By directing

United States District Court
Northern District of California

and commanding plaintiffs . . . Royal controlled them within the meaning of 'hours worked' . . . ." (cleaned up)); *cf. Nicolas v. Uber Techs., Inc.*  No. 19-CV-08228-PJH, 2021 WL 2016161, at *6 (N.D. Cal. May 20, 2021) ("Plaintiffs fail to allege sufficient facts showing that they are subject to the control of defendant when logged onto the Uber App and waiting for requests between rides. First, plaintiffs do not allege that defendant requires them to wait for requests between rides."). Prior to December 2015, Mr. Lawson's written agreement contained this instruction.  After December 2015, the written agreement omitted this instruction and added an instruction that Mr. Lawson be located within a reasonable distance of restaurants in the area where he had scheduled the block.  When Grubhub terminated Mr. Lawson in February 2016, it stated Mr. Lawson had materially breached the agreement because "you have not been available to receive orders and have not performed delivery services during a high proportion of the delivery blocks that you have signed up for."  (Trial Ex. 75.)  Thus, the Court finds notwithstanding the amended agreement removed the instruction that Mr. Lawson not reject incoming orders or be otherwise unavailable, that instruction remained a practical feature of his employment.  *See Frlekin*, 8 Cal. 5th at 1054 ("[C]ourts have considered whether an activity is required in determining whether it is compensable.  But this includes both an activity that is, strictly speaking, required, and also an activity that is required as a practical matter." (cleaned up)).  The Court further rejects Grubhub's argument that drivers could accept or reject offers without reprisal because Grubhub did not kick them off the app at that time; Grubhub expressly terminated Mr. Lawson because he was not available and did not accept delivery offers during his self-scheduled blocks.

Spending time on on-block, toggled available, and in-network, but not performing deliveries primarily benefitted Grubhub, not Mr. Lawson.  *See id.* at 1056.  As noted above, Grubhub structured this part of its business around on-demand deliveries.  It used the block system to monitor driver supply and meet the anticipated demand for its restaurant partners.  *See id.* at 1052 (concluding exit searches primarily benefitted employer "by serving to detect and deter theft"); *cf. Nicolas*, 2021 WL 2016161, at *5–7 (noting plaintiffs sought compensation for time merely logged into the Uber app, without a scheduled block).  And, by instructing drivers to accept incoming delivery offers, Grubhub "required employees to return to duty if necessary" and

1    prevented them from "using the time effectively for [their] own purposes." *Frlekin*, 8 Cal. 5th at

2    1056, 1047 (cleaned up); *see also Ridgeway*, 946 F.3d at 1079 ("[T]he question of control boils

3    down to whether the employee may use break or non-work time however he or she would like.").

4    While Mr. Lawson spent some of this category of time at home or doing other activities, including

5    delivering for competitors, that does not mean the time primarily benefitted him. *See Frlekin*, 8

6    Cal. 5th at 1051–52 (describing "optional services" and "optional benefit[s]," such as free

7    transportation, "that primarily benefit the *employee*" and therefore do not represent compensable

8    time); *see also Ridgeway*, 946 F.3d at 1079 ("[C]ontrol may exist even when employees are

9    permitted to perform personal activities if the employer imposes meaningful restrictions on the

10   employee.").

11          As to the last *Frlekin* factor, 8 Cal. 5th at 1056, Grubhub used disciplinary measures to

12   enforce its expectations about how employees should use this time.  Grubhub terminated Mr.

13   Lawson because he was not available to receive orders and did not accept orders while on-block.

14   *See id.* at 1053 ("Apple's exit searches are enforceable by disciplinary action. . . .  Apple's written

15   policy explicitly provides that failure to comply with its bag-search policy may lead to disciplinary

16   action, up to and including termination. . . .  This factor also strongly suggests that plaintiffs are

17   under Apple's control while waiting for, and undergoing, the exit searches."); *cf. Nicolas*, 2021

18   WL 2016161, at *6 ("[P]laintiffs do not allege that defendant imposes any disciplinary measure on

19   them in the event they either turn off their Uber App or deny a request.").

20                                               * * *

21          In sum, the factors laid out in *Frlekin*, 8 Cal. 5th at 1056, establish this second category of

22   time is compensable.  Grubhub required Mr. Lawson to spend some time on-block, toggled

23   available, and in-network, but not performing deliveries; be in a reasonable distance of the block

24   zone during that time; and accept incoming delivery offers.  This time primarily benefitted

25   Grubhub because it helped Grubhub fulfill on-demand deliveries and meet restaurant demand

26   around mealtimes.  The time did not primarily benefit Mr. Lawson because it was not an optional

27   service instituted to benefit him or other drivers.  And Grubhub enforced its expectations for this

28   time with disciplinary measures, including by terminating Mr. Lawson.

That Mr. Lawson sometimes made deliveries for Grubhub's competitors while he was on-block and was not a particularly good delivery driver does not change that Grubhub exercised control over him during this time.  *See Mendiola*, 60 Cal. 4th at 842 ("CPS notes that on-call guards engaged in personal activities, including sleeping, showering, eating, reading, watching television, and browsing the Internet.  Although relevant, this fact does not compel a different conclusion. . . .  [T]hat guards could engage in limited personal activities does not lessen the extent of CPS's control.").  A helpful analogy is a corporate receptionist who works from home, that is, anywhere she has her cell phone and network service.  The company uses software that allows the receptionist to remotely answer phone calls to the office's main line and then transfer calls to other employees.  Although the receptionist does not work in a brick-and-mortar office, the company requires her to observe 9:00 a.m. to 5:00 p.m. business hours because it expects phone calls will come in during that block of time.  Because the company has hired her to be available to answer calls, the time when she presents herself as available to answer calls is work time even if no one calls the company that day.  The company exercises control over her by requiring her to be at the ready to answer incoming calls.

Similarly, suppose the receptionist is working on her novel and ignoring incoming calls, and callers cannot get through to the company's other employees.  Perhaps the company could fire the receptionist for poor performance or for working another job.  But Grubhub has not cited any case suggesting an employer can lawfully refuse to pay minimum wage just because an employee is unproductive.  *See Kim v. Sheraton Operating Corp.*, No. CV 17-9247 FMO (EX), 2020 WL 3124306, at *6 (C.D. Cal. Apr. 2, 2020) ("Plaintiff's productive/non-productive dichotomy appears to be irrelevant to the issues in this case . . . .  So long as plaintiff was under the 'control' of defendant, defendant was obligated to pay plaintiff the minimum rate for every hour worked, irrespective of what plaintiff was doing at any particular time." (cleaned up)); *cf. Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 314, 317, 324 (2005) (noting "[t]he minimum wage standard applies to each hour worked by respondents for which they were not paid," including time spent driving or processing paperwork that employer categorized as "nonproductive"); *Nisei Farmers League v. Lab. & Workforce Dev. Agency*, 30 Cal. App. 5th 997, 1005 (2019) ("*Armenta*'s rule

26

1  [is] that averaging an employee's wages for all hours spent on the job during the pay period

2  (where the employee's work time included both paid/productive hours and unpaid/nonproductive

3  hours) would not suffice to show compliance with the minimum wage law for each hour

4  worked.").

5                    c.      **On-Block and Toggled Available, but Intentionally Out-of-Network**

6
        The third category of time is not compensable as to Mr. Lawson in particular.  Using Trial

7  Exhibit 17, which provides timestamps of Mr. Lawson's activity during his on-block time, the

8  Court finds Mr. Lawson sometimes went out-of-network intentionally to game the app.  When Mr.

9  Lawson was on-block and toggled available, but intentionally out-of-network, he could not receive

10 delivery offers.  The time is analogous to an employee intentionally leaving her brick-and-mortar

11 place of employment on an unauthorized break.  Grubhub did not suffer or permit Mr. Lawson to

12 work when he intentionally went out-of-network, nor did it exercise control over him during that

13 time.

14       Accordingly, the Court excludes (as non-compensable) windows of time when there were

15 enough out-of-network timestamps, with long intervals in between, to indicate Mr. Lawson had

16 gone out-of-network intentionally and was not, for example, driving to pick up or deliver an order.

17 For example, the Court finds Mr. Lawson was intentionally out-of-network between 5:13 p.m. and

18 6:22 p.m. on December 25, 2015, when he had eight out-of-network timestamps in a row.

19                    d.      **On-Block but not Toggled Available**

20       Finally, the fourth category of time is not compensable.  Time when Mr. Lawson was on-

21 block but had not toggled himself available is analogous to when an employee is scheduled for a

22 shift but shows up late to work at her brick-and-mortar place of employment.  Grubhub did not

23 suffer or permit Mr. Lawson to work when he was on-block yet failed to toggle on and present

24 himself as available to accept deliveries.  Nor did it exercise control over him, because he had not

25 shown up.

26                                              * * *

27       Accordingly, to determine whether Grubhub properly paid Mr. Lawson minimum wage

28

27

1    and overtime, Mr. Lawson's compensable time includes (1) time when he was performing

2    deliveries (whether on-block or shortly after a block had ended) and (2) time when he was on-

3    block, toggled available, and in-network, but not performing deliveries.  Compensable time does

4    not include (3) time when he was on-block and toggled available, but intentionally out-of-network

5    or (4) time when he was on-block but had not toggled available.

6        **B.    Minimum Wage Claims**

7        For his minimum wage claims under Sections 1194 and 1197, (*see* Dkt. No. 41 at 8), Mr.

8    Lawson claims $273.62 in damages for being paid below minimum wage on 26 days.  His

9    effective hourly rate calculation starts with the amount Grubhub paid him each day, subtracts his

10   tips and mileage expenses, and then divides the result by the number of hours worked that day.

11   (*See* Dkt. No. 217 at 48–49 ¶¶ 208–16.)  The Court previously held the *Borello* standard governs

12   Mr. Lawson's Section 2802 claim (count one of the complaint) and, consistent with *Lawson I*, the

13   Court concludes he is not an employee under that standard.  (Dkt. No. 292); *see Lawson I*, 302 F.

14   Supp. 3d at 1093.[7]  Grubhub therefore argues Mr. Lawson's effective hourly-rate calculation

15   should not subtract his mileage expenses.

16       The Court is not persuaded.  The Labor Code's minimum wage provisions are separate and

17   independent from Section 2802.  *See* Cal. Lab. Code §§ 1194(a), 1197.  They use different

18   standards to classify a worker as an employee or an independent contractor.  *See Bowerman*, 60

19   F.4th at 472 (explaining ABC test governs claims based on or rooted in a California wage order,

20   such as minimum wage claims); (Dkt. No. 292 (concluding *Borello* governs Mr. Lawson's Section

21   2802 claims)).  The separate and independent provisions mean that for employees whose take-

22   home pay is above minimum wage notwithstanding that they have made expenditures, Section

23   2802 entitles them to reimbursement if they are employees under the *Borello* standard and the

24   expenditures were "necessary."  Cal. Lab. Code § 2802(a).  For employees whose take-home pay

25   is below minimum wage in part because they have made expenditures, Sections 1194 and 1197

26   entitle them to minimum wage even if Section 2802 does not entitle them to reimbursement

27   _____

28   [7] Mr. Lawson does not ask the Court to reconsider the conclusion that he is not an employee under *Borello*.

because they are not employees under the *Borello* standard.  *See id.* §§ 1194(a), 1197; *Sanchez v. Aerogroup Retail Holdings, Inc.*, No. 12-CV-05445-LHK, 2013 WL 1942166, at *11 (N.D. Cal. May 8, 2013) ("An employer who causes an employee to bear expenses which reduce the employee's net pay below the minimum wage has committed two wrongs.  First, the employer has not reimbursed the employee for expenses as required by Section 2802.  Second, the employer has caused the employee to have to satisfy the employee's living expenses with less than the minimum wage.  Notably, different penalties apply where an employer is alleged have committed the latter wrong."); *see generally Ridgeway*, 946 F.3d at 1078 ("California courts construe worker-protection laws liberally with an eye to promoting such protection.").

Mr. Lawson falls into the latter category: he was paid below minimum wage in part because Grubhub required him to make expenditures on mileage.  *See Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1077–78 (9th Cir. 2020) (explaining that employer requires expenditures when they are necessary to the job and employer does not provide them directly).  Therefore, Sections 1194 and 1197 entitle Mr. Lawson to minimum wage even though he does not have a Section 2802 claim for those expenses because he is not an employee under *Borello*.  *See Sanchez*, 2013 WL 1942166, at *9–11 (concluding that, separately from Section 2802, Sections 1194, 1194.2, 1197, and 1197.1 "permit[] a cause of action where an employee has been required to bear expenses which effectively cause the employee's wages to fall below the minimum wage").  The Court acknowledges but is not persuaded by *Hassell v. Uber Technologies, Inc.*, which reached the opposite conclusion without much analysis.  No. 20-CV-04062-PJH, 2020 WL 7173218, at *4 (N.D. Cal. Dec. 7, 2020) ("Absent a right to reimbursement for the mileage expenses deducted, the court does not see any basis to permit plaintiff to count such expenses toward his effective wage rate.").

Thus, Mr. Lawson's effective hourly rate calculation may properly subtract his mileage expenses.  Further, the Court credits Mr. Lawson's calculations of his mileage expenses, which start with twice the mileage recorded by Grubhub each day and use the IRS mileage rate.  Grubhub recorded "as-the-crow-flies" miles between the restaurants where Mr. Lawson picked up food and the customers to whom he delivered.  Grubhub did not record Mr. Lawson's actual

mileage on city streets and did not account for Mr. Lawson's drive to the restaurant after accepting a delivery offer.  Accordingly, the Court finds Mr. Lawson drove twice Grubhub's recorded mileage each day, for a total of 504.54 miles across all his work days.

* * *

In the chart below, the Court finds Mr. Lawson's compensable windows of time on the 26 identified days and his effective hourly rate on those days.  *See Armenta*, 135 Cal. App. 4th at 323 (explaining Section 1194 "expresses the intent to ensure that employees be compensated at the minimum wage for each hour worked," and rejecting calculation that averages an employee's pay over the course of a work week); *cf. Kaanaana v. Barrett Bus. Servs., Inc.*, 29 Cal. App. 5th 778, 805 (2018) ("Plaintiffs were subjected to defendant's control for an average of four minutes, and were otherwise free to come and go as they please [during meal periods].  Under minimum wage provisions, this entitled them to four minutes of compensation—not 30 minutes." (cleaned up)), *aff'd*, 11 Cal. 5th 158 (2021).  Mr. Lawson was paid below minimum wage on 9 days, with damages of $65.11.

| Date | Comp. Time[8] Categories (1) and (2) | | Comp. Hours (Window) | Comp. Hours (Day) | Paid[9] | Effective Hourly Rate | Min. Wage | Damages (Per Hour) | Damages (Day) |
|---|---|---|---|---|---|---|---|---|---|
| | Start | End | | | | | | | |
| 12-Nov-15 | 18:20 | 22:00 | 3.67 | 3.67 | $49.20 | $13.42 | $9.00 | ($4.42) | |
| 13-Nov-15 | 18:00 | 22:00 | 4.00 | 4.00 | $37.44 | $9.36 | $9.00 | ($0.36) | |
| 18-Nov-15 | 17:01 | 19:03 | 2.03 | 2.77 | $30.41 | $10.99 | $9.00 | ($1.99) | |
| | 19:41 | 19:54 | 0.22 | | | | | | |
| | 20:35 | 21:06 | 0.52 | | | | | | |
| 20-Nov-15 | 17:23 | 21:06 | 3.72 | 3.72 | $29.73 | $8.00 | $9.00 | $1.00 | $3.72 |
| 25-Nov-15 | 18:00 | 19:59 | 1.98 | 2.97 | $39.62 | $13.36 | $9.00 | ($4.36) | |
| | 21:46 | 22:45 | 0.98 | | | | | | |
| 29-Nov-15 | 17:05 | 21:07 | 4.03 | 4.03 | $32.41 | $8.04 | $9.00 | $0.96 | $3.89 |
| | 21:52 | 21:52 | 0.00 | | | | | | |
| 6-Dec-15 | 17:08 | 18:10 | 1.03 | 4.05 | $42.37 | $10.46 | $9.00 | ($1.46) | |
| | 18:47 | 19:14 | 0.45 | | | | | | |
| | 20:04 | 22:38 | 2.57 | | | | | | |

---

[8] (*See* Trial Ex. 17.)
[9] This refers to net pay, meaning total pay less tips and Mr. Lawson's mileage expenses calculated according to the IRS rate.  (Trial Ex. 159, column J.)

United States District Court
Northern District of California

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **8-Dec-15** | 18:04 | 18:47 | 0.72 | 3.10 | $35.26 | $11.37 | $9.00 | ($2.37) | |
| | 19:00 | 20:34 | 1.57 | | | | | | |
| | 21:11 | 22:00 | 0.82 | | | | | | |
| **19-Dec-15** | 17:09 | 21:00 | 3.85 | 3.85 | $29.47 | $7.65 | $9.00 | $1.35 | **$5.18** |
| **25-Dec-15** | 17:06 | 17:13 | 0.12 | 1.97 | $33.32 | $16.94 | $9.00 | ($7.94) | |
| | 18:23 | 18:24 | 0.02 | | | | | | |
| | 19:10 | 21:00 | 1.83 | | | | | | |
| **31-Dec-15** | 20:15 | 21:14 | 0.98 | 0.98 | $36.92 | $37.55 | $9.00 | ($28.55) | |
| **7-Jan-16** | 18:07 | 20:51 | 2.73 | 4.15 | $29.38 | $7.08 | $10.00 | $2.92 | **$12.12** |
| | 20:57 | 22:22 | 1.42 | | | | | | |
| **9-Jan-16** | 17:14 | 21:00 | 3.77 | 3.77 | $24.86 | $6.60 | $10.00 | $3.40 | **$12.81** |
| **10-Jan-16** | 17:10 | 19:09 | 1.98 | 3.80 | $25.73 | $6.77 | $10.00 | $3.23 | **$12.27** |
| | 20:08 | 21:03 | 0.92 | | | | | | |
| | 21:08 | 22:02 | 0.90 | | | | | | |
| **11-Jan-16** | 19:57 | 21:30 | 1.55 | 1.55 | $38.28 | $24.70 | $10.00 | ($14.70) | |
| **13-Jan-16** | 13:17 | 13:38 | 0.35 | 1.30 | $17.95 | $13.81 | $10.00 | ($3.81) | |
| | 13:40 | 14:37 | 0.95 | | | | | | |
| **14-Jan-16** | 19:20 | 21:30 | 2.17 | 2.17 | $29.61 | $13.67 | $10.00 | ($3.67) | |
| **15-Jan-16** | 19:13 | 19:49 | 0.60 | 1.38 | $27.70 | $20.02 | $10.00 | ($10.02) | |
| | 20:21 | 21:08 | 0.78 | | | | | | |
| **17-Jan-16** | 18:08 | 19:15 | 1.12 | 1.92 | $17.40 | $9.08 | $10.00 | $0.92 | **$1.77** |
| | 19:30 | 20:16 | 0.77 | | | | | | |
| | 20:58 | 21:00 | 0.03 | | | | | | |
| **21-Jan-16** | 19:07 | 21:15 | 2.13 | 2.13 | $16.64 | $7.80 | $10.00 | $2.20 | **$4.69** |
| **29-Jan-16** | 20:17 | 21:00 | 0.72 | 0.72 | $38.59 | $53.85 | $10.00 | ($43.85) | |
| **2-Feb-16** | 19:32 | 20:48 | 1.27 | 1.45 | $26.19 | $18.06 | $10.00 | ($8.06) | |
| | 21:07 | 21:17 | 0.17 | | | | | | |
| | 21:29 | 21:30 | 0.02 | | | | | | |
| **4-Feb-16** | 16:45 | 17:42 | 0.95 | 2.50 | $33.43 | $13.37 | $10.00 | ($3.37) | |
| | 19:27 | 21:00 | 1.55 | | | | | | |
| **5-Feb-16** | 16:19 | 17:00 | 0.68 | 2.78 | $54.93 | $19.74 | $10.00 | ($9.74) | |
| | 19:40 | 21:46 | 2.10 | | | | | | |
| **6-Feb-16** | 19:28 | 21:30 | 2.03 | 2.03 | $39.66 | $19.50 | $10.00 | ($9.50) | |
| **13-Feb-16** | 16:30 | 17:00 | 0.50 | 1.52 | $6.50 | $4.29 | $10.00 | $5.71 | **$8.67** |
| | 20:18 | 21:16 | 0.97 | | | | | | |
| | 21:30 | 21:33 | 0.05 | | | | | | |
| | | | | | | | | **TOTAL** | **$65.11** |

- **November 20:** Mr. Lawson's block started at 5:00 p.m., but he did not clock in until 5:23 p.m. (category 4). He then either performed deliveries or was on-block, toggled available, and in-network (categories 1 and 2) until 9:06 p.m. In particular, he had two out-of-

31

network timestamps in a row between 7:30 and 7:51 p.m. and between 9:00 and 9:04 p.m., but he picked up an order shortly before and delivered it shortly after each of those windows.  Thus, he was driving and working during those windows, not intentionally out-of-network.

- **November 29:** Mr. Lawson clocked in at 5:05 p.m. for his 5:00 p.m. block (category 4). He then either performed deliveries or was on-block, toggled available, and in-network (categories 1 and 2) until 9:07 p.m., when he went intentionally out-of-network.  He was then out-of-network (category 3) until 9:52 p.m., when he delivered his last order for the day.

- **December 19:** Mr. Lawson clocked in at 5:09 p.m. for his 5:00 p.m. block.  He then worked until the end of the block at 9:00 p.m.  He had a few instances of one or two out-of-network timestamps in a row, but either the windows were brief or he had just accepted a delivery offer or picked up an order, indicating he was driving and working during those windows.

- **January 7:** Mr. Lawson clocked in at 6:07 p.m. for his 6:00 p.m. block.  He then worked until clocking out 8:51 p.m., clocked in again at 8:57 p.m., and worked until the block ended at 10:22 p.m.  There were a few instances of clocking out and in within one minute, but the Court does not exclude that time from compensable work time.

- **January 9:** Mr. Lawson clocked in at 5:14 p.m. for his 5:00 p.m. block.  He then worked until the block ended at 9:00 p.m.  He had three out-of-network timestamps between 7:46 and 7:53 p.m., but that window was brief and Mr. Lawson was driving between picking up and delivering an order during that time.

- **January 10:** Mr. Lawson clocked in at 5:10 p.m. for his 5:00 p.m. block.  He then worked until 7:09 p.m., when he had 13 out-of-network timestamps in a row (category 3).  He started working again at 8:08 p.m. and worked until he clocked out at 9:03 p.m.  He clocked in again at 9:08 p.m. and worked until accepting an offer at 10:00 p.m. and clocking out at 10:02 p.m.

- **January 17:** Mr. Lawson clocked in at 6:08 p.m. for his 5:00 p.m. block.  He then worked

until 7:15 p.m., when he had five out-of-network timestamps in a row (category 3).  He

started working again at 7:30 p.m. and worked until 8:16 p.m.  At that time, he had three

out-of-network timestamps in a row; the Court finds he was intentionally out-of-network

during that window because he did not deliver an order picked up at 7:59 p.m. until 8:58

p.m.  He then worked from 8:58 p.m. until the block ended at 9:00 p.m.

- **January 21:** Mr. Lawson clocked in at 7:07 p.m. for a 5:00 p.m. block.  He then worked
  until 9:15 p.m., when he delivered an order shortly after the block had ended.

- **February 13:** Mr. Lawson clocked in at 4:30 p.m. for a 2:00 p.m. block.  He then worked
  until the block ended at 5:00 p.m.  He clocked in to a second block at 8:18 p.m. and
  worked until 9:16 p.m., when he had four out-of-network timestamps in a row (category
  3).  He started working again at 9:30 p.m. and worked until 9:33 p.m., when he delivered
  an order and clocked out.

### C.    Overtime Claims

For his overtime claims under Sections 1194, 1198, 510, and 554, (*see* Dkt. No. 41 at 5 ¶

23; *id.* at 8), Mr. Lawson claims $26.84 in damages for 4.75 hours worked above 40 hours during

the week of November 30 to December 6, 2015, (*see* Dkt. No. 217 at 48 ¶¶ 203–05).

In the chart below, the Court finds Mr. Lawson's compensable windows of time during the

week of November 30, 2015.  Mr. Lawson had less than 40 hours of compensable time that week,

so he has not met his burden to show he is entitled to overtime damages based on that threshold.

*See* Cal. Code Regs., tit. 8, § 11090(3)(A)(1); *Hernandez v. Mendoza*, 199 Cal. App. 3d 721, 727

(1988).

| Date | Comp. Time[10] Categories (1) and (2) | | Comp. Hours (Window) | Comp. Hours (Day) |
|---|---|---|---|---|
| | **Start** | **End** | | |
| **30-Nov-15** | 17:09 | 18:38 | 1.48 | 5.08 |
| | 19:01 | 19:19 | 0.30 | |
| | 19:50 | 22:31 | 2.68 | |
| | 22:52 | 23:29 | 0.62 | |
| **1-Dec-15** | 17:02 | 23:12 | 6.17 | 6.17 |

---

[10] (*See* Trial Ex. 17.)

33

| | | | | TOTAL | 32.75 |
|---|---|---|---|---|---|
| **2-Dec-15** | 17:00 | 19:26 | 2.43 | | 4.93 |
| | 21:00 | 23:30 | 2.50 | | |
| **3-Dec-15** | 17:08 | 23:30 | 6.37 | | 6.37 |
| **4-Dec-15** | 17:10 | 17:53 | 0.72 | | 3.58 |
| | 18:13 | 21:05 | 2.87 | | |
| **5-Dec-15** | 17:11 | 23:05 | 5.90 | | 6.62 |
| | 23:14 | 23:57 | 0.72 | | |
| **6-Dec-15** | 17:08 | 18:10 | 1.03 | | 4.05 |
| | 18:47 | 19:14 | 0.45 | | |
| | 20:04 | 22:38 | 2.57 | | |

**CONCLUSION**

Mr. Lawson is properly classified as an employee, not an independent contractor, for purposes of his minimum wage and overtime claims.  He is entitled to judgment on his minimum wage claim (count two of the complaint) with damages in the amount of $65.11.  However, Grubhub is entitled to judgment on Mr. Lawson's overtime claim (count three).  *See Ritchie*, 451 F.3d at 1023.

The Court will hold a further case management conference on **April 27, 2023**, at 1:30 p.m. by Zoom video.  A joint case management conference statement is due one week in advance.

This Order disposes of Docket No. 311.

**IT IS SO ORDERED.**

Dated: March 30, 2023

JACQUELINE SCOTT CORLEY
United States District Judge